EXHIBIT A

# Civil Part Case Summary

**Case Number:** HNT L-000010-25

**Case Caption:**  Weiss Eric  Vs Tiger John  *Rab Conflict

| | | |
|---|---|---|
| **Court:**  Civil Part | **Venue:**  Hunterdon | **Case Initiation Date:**  01/03/2025 |
| **Case Type:** Civil Rights | **Case Status:**  Active | **Jury Demand:**  6 Jurors |
| **Case Track:**  3 | **Judge:**  William G Mennen | **Team:**  1 |
| **Original DED:**  07/03/2026 | **Current DED:** 07/03/2026 | **# of DED Extensions:**  0 |
| **Original Arb Date:** | **Current Arb Date:** | **# of Arb Adjournments:**  0 |
| **Original Trial Date:** | **Current Trial Date:** | **# of Trial Adjournments:** 0 |
| **Disposition Date:** | **Case Disposition:**  Open | **Statewide Lien:** |

**Plaintiffs**

**Eric S Weiss**

| | | |
|---|---|---|
| **Party Description:** Individual | **Phone:** (908) 913-0832 | |
| **Address Line 1:** 210 Walnut Street | | |
| **Address Line 2:** | | |
| **City:** Garwood | **State:** NJ | **Zip:** 07027 |
| **Attorney Name:** | | **Attorney Bar ID:** |
| **Attorney Email:** | | |

**Defendants**

**John/Jane Does 1-10**

| | | |
|---|---|---|
| **Party Description:** Fictitious | **Phone:** | |
| **Address Line 1:** | | |
| **Address Line 2:** | | |
| **City:** | **State:** NJ | **Zip:** 00000 |
| **Attorney Name:** | | **Attorney Bar ID:** |
| **Attorney Email:** | | |

**John  Tiger**

| | | |
|---|---|---|
| **Party Description:** Individual | **Phone:** | |
| **Address Line 1:** | | |
| **Address Line 2:** | | |
| **City:** | **State:** NJ | **Zip:** 00000 |
| **Attorney Name:** | | **Attorney Bar ID:** |
| **Attorney Email:** | | |

**Peter  Schleisier**

| | | |
|---|---|---|
| **Party Description:** Individual | **Phone:** | |
| **Address Line 1:** | | |
| **Address Line 2:** | | |
| **City:** | **State:** NJ | **Zip:** 00000 |
| **Attorney Name:** | | **Attorney Bar ID:** |
| **Attorney Email:** | | |

**Michael  Balsamo**

| | | |
|---|---|---|
| **Party Description:** Individual | **Phone:** | |
| **Address Line 1:** | | |
| **Address Line 2:** | | |
| **City:** | **State:** NJ | **Zip:** 00000 |
| **Attorney Name:** | | **Attorney Bar ID:** |

**Attorney Email:**

| Thomas A Derosa |
|---|

| **Party Description:** Individual | **Phone:** | |
|---|---|---|

**Address Line 1:**

**Address Line 2:**

| **City:** | **State:** NJ | **Zip:** 00000 |
|---|---|---|

| **Attorney Name:** | **Attorney Bar ID:** |
|---|---|

**Attorney Email:**

| Sean Ross |
|---|

| **Party Description:** Individual | **Phone:** | |
|---|---|---|

**Address Line 1:**

**Address Line 2:**

| **City:** | **State:** NJ | **Zip:** 00000 |
|---|---|---|

| **Attorney Name:** | **Attorney Bar ID:** |
|---|---|

**Attorney Email:**

| Jeffery Glennon |
|---|

| **Party Description:** Individual | **Phone:** | |
|---|---|---|

**Address Line 1:**

**Address Line 2:**

| **City:** | **State:** NJ | **Zip:** 00000 |
|---|---|---|

| **Attorney Name:** | **Attorney Bar ID:** |
|---|---|

**Attorney Email:**

| Township Of Clintonpolice Dep |
|---|

| **Party Description:** Business | **Phone:** | |
|---|---|---|

**Address Line 1:**

**Address Line 2:**

| **City:** | **State:** NJ | **Zip:** 00000 |
|---|---|---|

| **Attorney Name:** | **Attorney Bar ID:** |
|---|---|

**Attorney Email:**

| Hunterdon County |
|---|

| **Party Description:** Business | **Phone:** | |
|---|---|---|

**Address Line 1:**

**Address Line 2:**

| **City:** | **State:** NJ | **Zip:** 00000 |
|---|---|---|

| **Attorney Name:** Catriona Coffey | **Attorney Bar ID:** 381682021 |
|---|---|

**Attorney Email:** CATRIONA.COFFEY@LAW.NJOAG.GOV

| Kelsey Marsh |
|---|

| **Party Description:** Individual | **Phone:** | |
|---|---|---|

**Address Line 1:**

**Address Line 2:**

| **City:** | **State:** NJ | **Zip:** 00000 |
|---|---|---|

| **Attorney Name:** Catriona Coffey | **Attorney Bar ID:** 381682021 |
|---|---|

**Attorney Email:** CATRIONA.COFFEY@LAW.NJOAG.GOV

| Case Proceeding | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Proceeding Date** | **Actual Time** | **Court Room** | **Judge Name** | **Proceeding Description** | **Motion Type** | **Proceeding Status** | **Motion Status** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 05/23/2025 | 09:00 | PAPER | ROBERT A BALLARD | MOTION HEARING | MOTION DISMISSING COMPLAINT | RSCHED | |
| 05/23/2025 | 09:00 | PAPER | JOHN E BRUDER | MOTION HEARING | MOTION DISMISSING COMPLAINT | RSCHED | |
| 06/06/2025 | 09:00 | PAPER | JOHN E BRUDER | MOTION HEARING | MOTION DISMISSING COMPLAINT | RSCHED | |
| 07/03/2025 | 09:00 | PAPER | JOHN E BRUDER | MOTION HEARING | MOTION DISMISSING COMPLAINT | PENDING | PG |

## Case Actions

| Filed Date | Docket Text | Transaction ID | Entry Date |
|---|---|---|---|
| 01/03/2025 | Complaint with Jury Demand for HNT-L-000010-25 submitted by ERIC WEISS, on behalf of ERIC S WEISS against JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS ET AL. | LCV202548092 | 01/08/2025 |
| 01/09/2025 | TRACK ASSIGNMENT Notice submitted by Case Management | LCV202557034 | 01/09/2025 |
| 01/13/2025 | Proof Of Service uploaded by Case Management Staff submitted by ERIC S WEISS | LCV202591642 | 01/13/2025 |
| 01/14/2025 | NOTICE: Self represented litigant WEISS, ERIC, S has certified and agreed to receive electronic service | LCV2025102026 | 01/22/2025 |
| 04/14/2025 | NOTICE OF APPEARANCE (NOT THE FIRST PAPER) submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY MARSH against ERIC S WEISS | LCV20251092510 | 04/14/2025 |
| 04/14/2025 | MOTION DISMISSING COMPLAINT submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY MARSH against ERIC S WEISS *LINKED FILING* | LCV20251092587 | 04/14/2025 |
| 04/15/2025 | The motion filed on 04/14/2025 will be decided on 05/23/2025. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT [LCV20251092587] | LCV20251097097 | 04/15/2025 |
| 05/13/2025 | Reply brief submitted by Eric Weiss. JEDS EF-3362162 | LCV20251376446 | 05/13/2025 |
| 05/13/2025 | Opposition To Motion uploaded by Case Management Staff submitted by ERIC S WEISS *LINKED FILING* | LCV20251378274 | 05/13/2025 |
| 05/05/2025 | NOTICE: Self represented litigant WEISS, ERIC, S has certified and agreed to receive electronic service | LCV20251311761 | 05/13/2025 |
| 05/15/2025 | The motion filed on 04/14/2025 was rescheduled to 05/23/2025. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT [LCV20251092587] | LCV20251411194 | 05/15/2025 |
| 05/19/2025 | CLERK NOTICE: re: MOTION DISMISSING COMPLAINT [LCV20251092587] -This motion has been reassigned to the Hon. John E. Bruder, J.S.C. Per R. 4:6-2(e), matters outside the pleading have been presented. Thus, the motion is adjourned 1 cycle and will be treated as one for summary judgment. | LCV20251430121 | 05/19/2025 |
| 05/19/2025 | The motion filed on 04/14/2025 was rescheduled to 06/06/2025. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT [LCV20251092587] | LCV20251430135 | 05/19/2025 |
| 05/19/2025 | GENERAL CORRESPONDENCE submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY MARSH against ERIC S WEISS | LCV20251435376 | 05/19/2025 |
| 05/28/2025 | Adjournment request submitted by Eric Weiss. JEDS EF-3395738 | LCV20251610697 | 05/28/2025 |
| 05/28/2025 | Letter/Correspondence submitted by Eric Weiss. JEDS EF-3395742 | LCV20251610699 | 05/28/2025 |
| 06/02/2025 | CLERK NOTICE: re: MOTION DISMISSING COMPLAINT [LCV20251092587] -Plaintiff's adjournment request is denied. The matter will be scheduled for an in-person oral argument on 06/06/25. A separate notice will go out later this week containing more specific information for oral argument. | LCV20251640236 | 06/02/2025 |

| 06/02/2025 | GENERAL CORRESPONDENCE submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY  MARSH against ERIC S WEISS | LCV20251644020 | 06/02/2025 |
|---|---|---|---|
| 06/02/2025 | REPLY BRIEF submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY  MARSH against ERIC S WEISS *LINKED FILING* | LCV20251649292 | 06/02/2025 |
| 06/03/2025 | CLERK NOTICE:  re: MOTION DISMISSING COMPLAINT [LCV20251092587] -Ignore the last notice. The motion to dismiss/summary judgment is adjourned 2 cycles. New return date is 07/03/25. | LCV20251659789 | 06/03/2025 |
| 06/03/2025 | The motion filed on 04/14/2025 was rescheduled to 07/03/2025. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT [LCV20251092587] | LCV20251660854 | 06/03/2025 |

EXHIBIT B

1/3/25
b600
ct 239967806
250

**Eric S. Weiss**
210 Walnut Street
Garwood, NJ 07027
(908) 913 0832
ericsweiss@gmail.com

| | |
|---|---|
| Eric Weiss | SUPERIOR COURT OF NEW JERSEY |
| | CIVIL DIVISION; SOMERSET COUNTY |
| **Plaintiff,** | DOCKET No. |
| vs. | |
| John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh, John/Jane Does 1-10 | **COMPLAINT** |
| **Defendants.** | |

PLT by way of complaint against the DEFs, verified to the facts asserted, pleads as follows:

## <u>THE PARTIES</u>

1. PLT lives in Garwood NJ

2. DEFs John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon are employed by the Township of Clinton/Police Department

3. Township of Clinton/Police Department is located at 1371 Route 31 Clinton TWSP NJ 08801  is the employer of the DEF

4. DEF Hunterdon County is the employer of Marsh, Robeson, Crisologo, and Frinzi.  Hunterdon County Prosecutor's office 71 Main Street, PO Box 2900  Flemington, New Jersey 08822

5. DEF Kelsey Marsh is also named in her individual capacity

## <u>FACTS COMMON TO ALL COUNTS</u>

6. This complaint has been filed because the DEF's believe they are above the law and do not have to abide by the laws, civil rights of individuals and police rules that they swore to uphold.

7. On Jan 10, 2023 PLT, a commercial realtor, was working by reviewing/accessing the Beaver Brook Concourse building site located on 1465 NJ-31, Annandale / Clinton Township NJ

8. Around 1:00 PM PLT ran into Sam (his son) who he had not seen in 5 years due to him being alienated from PLT by his former wife (Posner).

9. PLT told Sam that he still loved him, missed him, asked him to go out to lunch and wanted Sam to get therapy for his alienation in accordance with all the Court appointed experts recommended.

10. Unbeknown to PLT and Sam, Sam's phone "Pocket dialed" Posner. Posner had her friend record PLT's and Sam's conversation to give to the police so she could have PLT prosecuted.

11. Posner also, despite knowing such was a lie, called the Clinton Police department and reported to them that Sam was "being beaten" by PLT, PLT was "Hitting her son" and that PLT "was waiting for the son [sam] when he came out."

12. DEF Tiger, Schleisier, Balsamo from the Clinton police responded to the call and immediately could see Posner's report was a lie. They also immediately had Sam confirm that PLT had never touched him.

13. PLT told DEFs that he was a commercial realtor and was checking out the site and ran into his son who he had not seen 5 years due to him being alienated from PLT.

14. DEF confirmed to PLT that he knew what parental alienation was.

15. DEFs knew that PLT had a custody order with Posner for Sam and his sister and was ordered to still pay child support.

16. DEFs also falsely claimed and argued with PLT that Sam was emancipated from PLT.

17. Acting in retaliation to PLT disputing DEFs claim of emancipation, DEFs decided to push Sam to pursue domestic violence charges against PLT despite knowing there was no such basis.

18. Despite DEFs knowing the call was a false report, (and an example of the alienation that PLT had told them occurred), there were no "outstanding warrants" or "restraining orders" DEFs then asked PLT for his driver's license. PLT complied.

19. About 5 minutes later, DEFs asked PLT where his car was. PLT complied and pointed to his car that was about a 100 feet away from where they were standing.

20. DEFs then ordered PLT to get into his car and ordered another DEF to take his police car and block PLT in so he could not leave.  DEFs did not give PLT back his driver's license.

21. PLT offered to provide but the DEF's refused to review copies of the expert reports showing that PLT son was alienated from him, that Sam and Posner have a long history of making false allegations of abuse against PLT, that about a dozen experts determined with a medical degree of certainty that all the allegations made were in fact false and that several concluded that it was Posner that was forcing Sam to make the false allegations.

22. PLT also offered to provide but DEF's refused to review Sam's latest evaluation to confirm that Sam had learning and processing disabilities.

23. DEFs refused to do their job and investigate and accept anything that would get in the way of their retaliation against PLT who without any basis, despite witnessing first-hand how he was truthful via Posners false claim wanted to further destroy PLT chance of reconnecting with his son.

24. DEFs, while detaining PLT, ran his car plates and driver's license searching for infractions and issued him a citation for an expired registration.

25. At no time did DEF's read PLT his rights, tell him he could remain silent or leave, or that they had decided to and were investigating him.

26. While DEFs were refusing information from PLT, they were holding PLT waiting for Posner to send them information as Posner lied saying Sam had a "Restraining Order" against PLT.

27. Despite knowing there was no such restraining order, that Posner had lied about the assault and that PLT was just talking to his son, DEFs held PLT against his will for about an hour as Posner told him that she was going to have Sam file a TRO for domestic violence against PLT.

28. About 40 minutes after the initial contact, DEFs allowed Sam to leave the area.  DEFs still held PLT for an additional 20 Minutes before moving their police car and giving PLT back his license so he may leave.

29. Around 3 PM that day, DEF's called Sam to see if he was able to make it to the Court to file a restraining order.

30. DEFs were all aware that every single expert, about a dozen, concluded that DEFs had made false claims of abuse by PLT.  That Sam was forced and brainwashed by DEFs to make false allegations.

31. DEF's knew that multiple Judges had ruled that DEF's had actually lied and fabricated claims of domestic violence and harassment.

32. In a violation of PLT rights (and the statute) that FRO hearings must start to be adjudicated within 10 days, the Court adjourned the matter for 3 months when Sam was to return to school.

33. So for 3 months PLT lived in constant fear of being arrested as Posner had repeatedly done in the past by making up fictitious violations of TRO's and Court orders.

34. On March 16, 2023 after a full day trial, the Court denied the FRO.  The Court found:

   a. Posner had put Sam into this conflict, and it was not fair to him
   b. That Sam needed to have a relationship with PLT and therapy
   c. That Posner filed a false police report to Clinton
   d. Sam & Posner lied about PLT going to the house and trying to install a GPS
   e. DEFs lied about PLT assaulting Sam.

35. Most importantly the Court also ruled that even if the Court was to accept everything that Sam/Posner alleged was "True," that it still was no way near a claim of domestic violence.

36. DEFs knew that PLT did not commit any actions that could be considered domestic violence.  DEF's used the false claim to try to help Posner remove any chance that PLT and his son could ever have a relationship and further harm the chance of PLT having a relationship with his daughter, who they knew was also alienated from PLT.

37. DEF's then refused to provide PLT with copies of the police report so he can defend himself against the FRO.  To cover up this as being further abuse and retaliation against PLT, despite knowing the FRO hearing had to be done within 10 days, they made PLT file an OPRA request to get the information knowing that they could take 7 business days to produce the information.

38. By contrast, DEFs instantly provided Posner with the police report and other stuff they wanted so they could prosecute the FRO against DEF.

39. Thereafter when DEF heard the FRO hearing was delayed, they refused to provide any of the information to PLT stating that he did not have any "interest" in the matter.  DEF knowing that there is no reciprocal discovery in an FRO, did not even give PLT what they gave Posner to prosecute.

40. On April 10, 2023 PLT filed a notice of tort claim with Clinton Township/Police Department.  So PLT's suit and claims against DEFs are both in their official and personal capacity.

41. DEFs, continuing with their retaliation, refused to file charges against Posner for making the knowingly false police report despite knowing that she did so and put peoples safety at risk

42. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner for the filing false police report against him despite knowing the crime occurred.

43. DEFs, continuing with their retaliation, refused to charge Posner and her friend for wiretapping despite knowing such occurred.

44. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner and her friend for wiretapping despite knowing such crime occurred.

45. DEF continuing with their retaliation did not inform PLT that he had the right to file the charges after they refused.

46. DEFs were well aware of the contracts between PLT and his former wife.

47. DEFs conduct as outline above tortuously interfered with PLT's rights in those contracts.

48. DEF were well aware how their actions and conduct would negatively affect the long term relationship that PLT had with his children and the harmful affect it would have upon PLT.

### THE COVER UP IS OFTEN AS BAD OR WORSE THAN THE CRIME AS IT SHOWS INTENT TO BREAK THE LAW

49. On April 10, 2023 PLT filed a notice of tort claim

50. told Captain Derosa he wanted to file a complaint against Tiger, Schleisier, Balsamo and other officers who might have acted illegally or improperly.  Neither him nor anyone at the department ever responded.

51. PLT then reached out again to file a complaint against the officers.  No one responded

52. Despite being required to respond immediately to internal affair complaints, 3-4 months later in August 2023, Ross finally reached out to PLT saying that he was going to investigate.

53. PLT never heard back from Ross.  So in November/December PLT again reached out to Derosa and Glennon again telling them that no one has ever taken his complaint.  They never respond.

54. In January 2024 Ross finally call PLT to take his complaint.  PLT told him that he wanted to add himself, Derosa and Glennon to the complaint for not taking the complaint, as they were required.

55. Ross then called PLT a few days later saying he did not and could not take the complaint falsely alleging it was due to a lawsuit that PLT never filed.

56. PLT then asked Ross to transfer the matter to the prosecutors officers because it was clear that DEF were still retaliating against PLT and refusing to do their job.  (PLT has since learned that Ross, Derosa and Glennon were required to transfer the matters against themselves to the prosecutors office as they were "superiors" to him and that he could not investigate himself.

57. PLT then reached out to the Hunterdon county prosecutor to take over the internal affairs complaint.

58. The prosecutor agreed and ordered DEF Kelsey Marsh and Frizzi to take PLTs complaint.

59. DEFs Clinton Township/Police Department again denied PLTs OPRA request to obtain information that was now needed to file an accurate and full complaint against its officers.

60. PLT traveled out to Hunterdon to meet with March and Frizzi

61. March was the officer who took the lead in taking PLT complaint.

62. It quickly became apparent to PLT that March was refusing to do her job, breached the duties that she owed to PLT and her true intent was to stop PLT from filing the complaint.

63. PLT told Marsh it was over a year since the incident occurred and asked her to obtain the police report, body cams, and other information so PLT could refresh his memory and see if there was anything else that occurred.  March continued to refuse to do so without explanation.

64. At the hearing DEF said "that they were not going to provide me any discovery to help me file my complaint against these officers"

65. DEF Marshs line of questioning was clearly not to obtain the facts and the basis for PLT's complaint but to cover up the officers illegal and unconstitutional conduct.

66. When PLT did not give in to DEF's Marsh's plan, Marsh became abusive towards PLT and falsely stated that he committed domestic violence against Posner and was not going to do it to her.  That she was refusing to take the complaint against the officers because PLT was trying to control her and ordered PLT to leave, would not allow PLT to have a copy of the tape so he could file a complaint

against her and Frizzi who was sitting in the room while this was occurring and allowed officer March to ignore the orders that they were given to take the complaint.

67. After the meeting, I informed Robeson of the improper conduct of her employee.  Refusing to take the report as she was ordered to do and the conduct that she showed during the interview.

> "Even if I was "louder" then she hoped or was "condensing" in my tone, both officers were still required to take my full statement and complaint which they refused to do.  They did not want to hear how they refused to take my internal affairs complaint.  How it took almost a year for Detective Ross to respond or the cleary false reasons as to why he said he did not do what the law required them to do.  Even if your officers thought I was a "total lunatic" they should have grave concerns over DeRosa, Ross and Glennon conduct in refusing to take internal affairs complaint and not acting as the law requires especially since my complaint of improper conduct are against the same officers that others have made complaints against for improper conduct.  I sure you are aware that there have been 3 such complaints against Chief Derosa."

68. Robeson did not respond so PLT was forced to send a second email.

69. Robeson finally responded and agree to transfer the entire matter to the NJ Attorney General's Office of Professional Integrity and Accountability as PLT now that I had a complaint to file against her officers as well.

70. DEF's Huntington County refused PLT OPRA request to obtain the video so he may properly prepare for the interview in filing his complaint.

71. Despite claiming they transferred the case, they refused to give me the information of whom they transferred the case too.

72. After a ½ dozen follow ups with the OPIA, as no one would respond to PLT, several months later the OPIA ignored the request to take the case and instead said that an officer in Hunterdon should investigate all the complaints, including those against people in his office.

73. Robeson did not push back and ordered her officer to take the complaint.

74. In July 2024, PLT met with DEF Crisgolo who took his complaint.

75. In Aug 2024, PLT followed up with Crisgolo and gave him more information to support his statement.

76. As of the filing of this complaint, PLT's complaints have still not been investigated or a report or findings issued, despite the rules requiring such to be done within 45 days.

WHEREFORE, PLT repeats and incorporates each and every allegation as set forth above as if fully set forth at length herein, demands against all of the DEFs, jointly and severally, as well as their successors and assigns, for the following relief:

## COUNT 1
Malicious Prosecution, Malicious use of process and Malicious abuse of process

## COUNT 2
Deprivation of Rights

## COUNT 3
Intentional Infliction of Emotional Distress (IIED)

## COUNT 4
Negligent Infliction of Emotional Distress (NIED)

## COUNT 5
False Imprisonment

## COUNT 6
Civil Conspiracy

## COUNT 7
Negligence or Gross Negligence

## COUNT 8
Invasion of Privacy

## COUNT 9
Common Law Fraud

## COUNT 10
Conspiracy to Commit Fraud

## COUNT 11
Tortious interference with contractual relationship

## COUNT 12
Aiding the commission of a tort

## COUNT 13
Breach of Duty

## COUNT 14
Deprivation and interference with protected parental rights

## PRAYER FOR RELIEF

As a direct and proximate result of the foregoing, PLT has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, and substantial medical and other expenses for treatment and care, past, present, and future. Damages for loss of service, society, and companionship. Said losses, injuries, and expenses are either permanent or continuing in nature and PLT will continue to suffer same in the future.

WHEREFORE, PLT demands judgment against DEFs for compensatory damages, consequential damages, punitive damages, actual damages, costs, interest, awarding reasonable attorneys fees and costs and expense of litigation. and other such relief as this Court deems just and proper.

## VERIFICATION OF ASSERTED FACTS

I PLT, do hereby certify that the foregoing factual assertions made in this Complaint are made by me and are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

## DESIGNATION OF TRIAL COUNSEL

PLT is designated as trial counsel in this matter.

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

## DEMANDS FOR A JURY TRIAL

The PLT demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey. Court Rules 1:8-2(b) and 4:35-1(a)

## CERTIFICATION PURSUANT TO R. 1:38-7

I certify that all confidential personal identifiers have been removed or redacted from this Complaint and that the same information will be removed or redacted from all documents submitted to the Court in connection with this matter in the future consistent with Rule 1:38-7(b).

DATED: Jan 3, 2024                           Eric S. Weiss, Plaintiff

**Eric S. Weiss**
210 Walnut Street
Garwood, NJ 07027
(908) 913 0832
ericsweiss@gmail.com

| | |
|---|---|
| Eric Weiss<br><br>          Plaintiff,<br><br>          vs.<br><br>John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh,<br>John/Jane Does 1-10<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CIVIL DIVISION; SOMERSET COUNTY<br>DOCKET NO.<br><br><br><br>**COMPLAINT** |

PLT by way of complaint against the DEFs, verified to the facts asserted, pleads as follows:

### THE PARTIES

1. PLT lives in Garwood NJ

2. DEFs John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon are employed by the Township of Clinton/Police Department

3. Township of Clinton/Police Department is located at 1371 Route 31 Clinton TWSP NJ 08801  is the employer of the DEF

4. DEF Hunterdon County is the employer of Marsh, Robeson, Crisologo, and Frinzi.  Hunterdon County Prosecutor's office 71 Main Street, PO Box 2900  Flemington, New Jersey 08822

5. DEF Kelsey Marsh is also named in her individual capacity

### FACTS COMMON TO ALL COUNTS

6. This complaint has been filed because the DEF's believe they are above the law and do not have to abide by the laws, civil rights of individuals and police rules that they swore to uphold.

1

7. On Jan 10, 2023 PLT, a commercial realtor, was working by reviewing/accessing the Beaver Brook Concourse building site located on 1465 NJ-31, Annandale / Clinton Township NJ

8. Around 1:00 PM PLT ran into Sam (his son) who he had not seen in 5 years due to him being alienated from PLT by his former wife (Posner).

9. PLT told Sam that he still loved him, missed him, asked him to go out to lunch and wanted Sam to get therapy for his alienation in accordance with all the Court appointed experts recommended.

10. Unbeknown to PLT and Sam, Sam's phone "Pocket dialed" Posner.  Posner had her friend record PLT's and Sam's conversation to give to the police so she could have PLT prosecuted.

11. Posner also, despite knowing such was a lie, called the Clinton Police department and reported to them that Sam was "being beaten" by PLT, PLT was "Hitting her son" and that PLT "was waiting for the son [sam] when he came out."

12. DEF Tiger, Schleisier, Balsamo from the Clinton police responded to the call and immediately could see Posner's report was a lie. They also immediately had Sam confirm that PLT had never touched him.

13. PLT told DEFs that he was a commercial realtor and was checking out the site and ran into his son who he had not seen in 5 years due to him being alienated from PLT.

14. DEF confirmed to PLT that he knew what parental alienation was.

15. DEFs knew that PLT had a custody order with Posner for Sam and his sister and was ordered to still pay child support.

16. DEFs also falsely claimed and argued with PLT that Sam was emancipated from PLT.

17. Acting in retaliation to PLT disputing DEFs claim of emancipation, DEFs decided to push Sam to pursue domestic violence charges against PLT despite knowing there was no such basis.

18. Despite DEFs knowing the call was a false report, (and an example of the alienation that PLT had told them occurred), there were no "outstanding warrants" or "restraining orders" DEFs then asked PLT for his driver's license.  PLT complied.

19. About 5 minutes later, DEFs asked PLT where his car was.  PLT complied and pointed to his car that was about a 100 feet away from where they were standing.

20. DEFs then ordered PLT to get into his car and ordered another DEF to take his police car and block PLT in so he could not leave.  DEFs did not give PLT back his driver's license.

21. PLT offered to provide but the DEF's refused to review copies of the expert reports showing that PLT son was alienated from him, that Sam and Posner have a long history of making false allegations of abuse against PLT, that about a dozen experts determined with a medical degree of certainty that all the allegations made were in fact false and that several concluded that it was Posner that was forcing Sam to make the false allegations.

22. PLT also offered to provide but DEF's refused to review Sam's latest evaluation to confirm that Sam had learning and processing disabilities.

23. DEFs refused to do their job and investigate and accept anything that would get in the way of their retaliation against PLT who without any basis, despite witnessing first-hand how he was truthful via Posners false claim wanted to further destroy PLT chance of reconnecting with his son.

24. DEFs, while detaining PLT, ran his car plates and driver's license searching for infractions and issued him a citation for an expired registration.

25. At no time did DEF's read PLT his rights, tell him he could remain silent or leave, or that they had decided to and were investigating him.

26. While DEFs were refusing information from PLT, they were holding PLT waiting for Posner to send them information as Posner lied saying Sam had a "Restraining Order" against PLT.

27. Despite knowing there was no such restraining order, that Posner had lied about the assault and that PLT was just talking to his son, DEFs held PLT against his will for about an hour as Posner told him that she was going to have Sam file a TRO for domestic violence against PLT.

28. About 40 minutes after the initial contact, DEFs allowed Sam to leave the area.  DEFs still held PLT for an additional 20 Minutes before moving their police car and giving PLT back his license so he may leave.

29. Around 3 PM that day, DEF's called Sam to see if he was able to make it to the Court to file a restraining order.

3

30. DEFs were all aware that every single expert, about a dozen, concluded that DEFs had made false claims of abuse by PLT.  That Sam was forced and brainwashed by DEFs to make false allegations.

31. DEF's knew that multiple Judges had ruled that DEF's had actually lied and fabricated claims of domestic violence and harassment.

32. In a violation of PLT rights (and the statute) that FRO hearings must start to be adjudicated within 10 days, the Court adjourned the matter for 3 months when Sam was to return to school.

33. So for 3 months PLT lived in constant fear of being arrested as Posner had repeatedly done in the past by making up fictitious violations of TRO's and Court orders.

34. On March 16, 2023 after a full day trial, the Court denied the FRO.  The Court found:

   a. Posner had put Sam into this conflict, and it was not fair to him
   b. That Sam needed to have a relationship with PLT and therapy
   c. That Posner filed a false police report to Clinton
   d. Sam & Posner lied about PLT going to the house and trying to install a GPS
   e. DEFs lied about PLT assaulting Sam.

35. Most importantly the Court also ruled that even if the Court was to accept everything that Sam/Posner alleged was "True," that it still was no way near a claim of domestic violence.

36. DEFs knew that PLT did not commit any actions that could be considered domestic violence.  DEF's used the false claim to try to help Posner remove any chance that PLT and his son could ever have a relationship and further harm the chance of PLT having a relationship with his daughter, who they knew was also alienated from PLT.

37. DEF's then refused to provide PLT with copies of the police report so he can defend himself against the FRO.  To cover up this as being further abuse and retaliation against PLT, despite knowing the FRO hearing had to be done within 10 days, they made PLT file an OPRA request to get the information knowing that they could take 7 business days to produce the information.

38. By contrast, DEFs instantly provided Posner with the police report and other stuff they wanted so they could prosecute the FRO against DEF.

39. Thereafter when DEF heard the FRO hearing was delayed, they refused to provide any of the information to PLT stating that he did not have any "interest" in the matter.  DEF knowing that there is no reciprocal discovery in an FRO, did not even give PLT what they gave Posner to prosecute.

40. On April 10, 2023 PLT filed a notice of tort claim with Clinton Township/Police Department.  So PLT's suit and claims against DEFs are both in their official and personal capacity.

41. DEFs, continuing with their retaliation, refused to file charges against Posner for making the knowingly false police report despite knowing that she did so and put peoples safety at risk

42. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner for the filing false police report against him despite knowing the crime occurred.

43. DEFs, continuing with their retaliation, refused to charge Posner and her friend for wiretapping despite knowing such occurred.

44. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner and her friend for wiretapping despite knowing such crime occurred.

45. DEF continuing with their retaliation did not inform PLT that he had the right to file the charges after they refused.

46. DEFs were well aware of the contracts between PLT and his former wife.

47. DEFs conduct as outline above tortuously interfered with PLT's rights in those contracts.

48. DEF were well aware how their actions and conduct would negatively affect the long term relationship that PLT had with his children and the harmful affect it would have upon PLT.

### THE COVER UP IS OFTEN AS BAD OR WORSE THAN THE CRIME AS IT SHOWS INTENT TO BREAK THE LAW

49. On April 10, 2023 PLT filed a notice of tort claim

50. told Captain Derosa he wanted to file a complaint against Tiger, Schleisier, Balsamo and other officers who might have acted illegally or improperly.  Neither him nor anyone at the department ever responded.

51. PLT then reached out again to file a complaint against the officers.  No one responded

52. Despite being required to respond immediately to internal affair complaints, 3-4 months later in August 2023, Ross finally reached out to PLT saying that he was going to investigate.

53. PLT never heard back from Ross.  So in November/December PLT again reached out to Derosa and Glennon again telling them that no one has ever taken his complaint.  They never respond.

54. In January 2024 Ross finally call PLT to take his complaint.  PLT told him that he wanted to add himself, Derosa and Glennon to the complaint for not taking the complaint, as they were required.

55. Ross then called PLT a few days later saying he did not and could not take the complaint falsely alleging it was due to a lawsuit that PLT never filed.

56. PLT then asked Ross to transfer the matter to the prosecutors officers because it was clear that DEF were still retaliating against PLT and refusing to do their job.  (PLT has since learned that Ross, Derosa and Glennon were required to transfer the matters against themselves to the prosecutors office as they were "superiors" to him and that he could not investigate himself.

57. PLT then reached out to the Hunterdon county prosecutor to take over the internal affairs complaint.

58. The prosecutor agreed and ordered DEF Kelsey Marsh and Frizzi to take PLTs complaint.

59. DEFs Clinton Township/Police Department again denied PLTs OPRA request to obtain information that was now needed to file an accurate and full complaint against its officers.

60. PLT traveled out to Hunterdon to meet with March and Frizzi

61. March was the officer who took the lead in taking PLT complaint.

62. It quickly became apparent to PLT that March was refusing to do her job, breached the duties that she owed to PLT and her true intent was to stop PLT from filing the complaint.

63. PLT told Marsh it was over a year since the incident occurred and asked her to obtain the police report, body cams, and other information so PLT could refresh his memory and see if there was anything else that occurred.  March continued to refuse to do so without explanation.

64. At the hearing DEF said "that they were not going to provide me any discovery to help me file my complaint against these officers"

65. DEF Marshs line of questioning was clearly not to obtain the facts and the basis for PLT's complaint but to cover up the officers illegal and unconstitutional conduct.

66. When PLT did not give in to DEF's Marsh's plan, Marsh became abusive towards PLT and falsely stated that he committed domestic violence against Posner and was not going to do it to her.  That she was refusing to take the complaint against the officers because PLT was trying to control her and ordered PLT to leave, would not allow PLT to have a copy of the tape so he could file a complaint

against her and Frizzi who was sitting in the room while this was occurring and allowed officer March to ignore the orders that they were given to take the complaint.

67. After the meeting, I informed Robeson of the improper conduct of her employee. Refusing to take the report as she was ordered to do and the conduct that she showed during the interview.

> "Even if I was "louder" then she hoped or was "condensing" in my tone, both officers were still required to take my full statement and complaint which they refused to do. They did not want to hear how they refused to take my internal affairs complaint. How it took almost a year for Detective Ross to respond or the cleary false reasons as to why he said he did not do what the law required them to do. Even if your officers thought I was a "total lunatic" they should have grave concerns over DeRosa, Ross and Glennon conduct in refusing to take internal affairs complaint and not acting as the law requires especially since my complaint of improper conduct are against the same officers that others have made complaints against for improper conduct. I sure you are aware that there have been 3 such complaints against Chief Derosa."

68. Robeson did not respond so PLT was forced to send a second email.

69. Robeson finally responded and agree to transfer the entire matter to the NJ Attorney General's Office of Professional Integrity and Accountability as PLT now that I had a complaint to file against her officers as well.

70. DEF's Huntington County refused PLT OPRA request to obtain the video so he may properly prepare for the interview in filing his complaint.

71. Despite claiming they transferred the case, they refused to give me the information of whom they transferred the case too.

72. After a ½ dozen follow ups with the OPIA, as no one would respond to PLT, several months later the OPIA ignored the request to take the case and instead said that an officer in Hunterdon should investigate all the complaints, including those against people in his office.

73. Robeson did not push back and ordered her officer to take the complaint.

74. In July 2024, PLT met with DEF Crisgolo who took his complaint.

75. In Aug 2024, PLT followed up with Crisgolo and gave him more information to support his statement.

76. As of the filing of this complaint, PLT's complaints have still not been investigated or a report or findings issued, despite the rules requiring such to be done within 45 days.

WHEREFORE, PLT repeats and incorporates each and every allegation as set forth above as if fully set forth at length herein, demands against all of the DEFs, jointly and severally, as well as their successors and assigns, for the following relief:

## COUNT 1
Malicious Prosecution, Malicious use of process and Malicious abuse of process

## COUNT 2
Deprivation of Rights

## COUNT 3
Intentional Infliction of Emotional Distress (IIED)

## COUNT 4
Negligent Infliction of Emotional Distress (NIED)

## COUNT 5
False Imprisonment

## COUNT 6
Civil Conspiracy

## COUNT 7
Negligence or Gross Negligence

## COUNT 8
Invasion of Privacy

## COUNT 9
Common Law Fraud

## COUNT 10
Conspiracy to Commit Fraud

## COUNT 11
Tortious interference with contractual relationship

## COUNT 12
Aiding the commission of a tort

## COUNT 13
Breach of Duty

## COUNT 14
Deprivation and interference with protected parental rights

## PRAYER FOR RELIEF

As a direct and proximate result of the foregoing, PLT has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, and substantial medical and other expenses for treatment and care, past, present, and future. Damages for loss of service, society, and companionship. Said losses, injuries, and expenses are either permanent or continuing in nature and PLT will continue to suffer same in the future.

WHEREFORE, PLT demands judgment against DEFs for compensatory damages, consequential damages, punitive damages, actual damages, costs, interest, awarding reasonable attorneys fees and costs and expense of litigation. and other such relief as this Court deems just and proper.

## VERIFICATION OF ASSERTED FACTS

I PLT, do hereby certify that the foregoing factual assertions made in this Complaint are made by me and are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

## DESIGNATION OF TRIAL COUNSEL

PLT is designated as trial counsel in this matter.

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

## DEMANDS FOR A JURY TRIAL

The PLT demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey. Court Rules 1:8-2(b) and 4:35-1(a)

## CERTIFICATION PURSUANT TO R. 1:38-7

I certify that all confidential personal identifiers have been removed or redacted from this Complaint and that the same information will be removed or redacted from all documents submitted to the Court in connection with this matter in the future consistent with Rule 1:38-7(b).

DATED: Jan 3, 2024                                    Eric S. Weiss, Plaintiff

**Eric S. Weiss**
210 Walnut Street
Garwood, NJ 07027
(908) 913 0832
ericsweiss@gmail.com

| | |
|---|---|
| Eric Weiss<br><br>          Plaintiff,<br><br>          vs.<br><br>John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh,<br>John/Jane Does 1-10<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CIVIL DIVISION; SOMERSET COUNTY<br>DOCKET NO.<br><br><br><br>          **COMPLAINT** |

PLT by way of complaint against the DEFs, verified to the facts asserted, pleads as follows:

## <u>THE PARTIES</u>

1. PLT lives in Garwood NJ

2. DEFs John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon are employed by the Township of Clinton/Police Department

3. Township of Clinton/Police Department is located at 1371 Route 31 Clinton TWSP NJ 08801  is the employer of the DEF

4. DEF Hunterdon County is the employer of Marsh, Robeson, Crisologo, and Frinzi.  Hunterdon County Prosecutor's office 71 Main Street, PO Box 2900  Flemington, New Jersey 08822

5. DEF Kelsey Marsh is also named in her individual capacity

## <u>FACTS COMMON TO ALL COUNTS</u>

6. This complaint has been filed because the DEF's believe they are above the law and do not have to abide by the laws, civil rights of individuals and police rules that they swore to uphold.

7.  On Jan 10, 2023 PLT, a commercial realtor, was working by reviewing/accessing the Beaver Brook Concourse building site located on 1465 NJ-31, Annandale / Clinton Township NJ

8.  Around 1:00 PM PLT ran into Sam (his son) who he had not seen in 5 years due to him being alienated from PLT by his former wife (Posner).

9.  PLT told Sam that he still loved him, missed him, asked him to go out to lunch and wanted Sam to get therapy for his alienation in accordance with all the Court appointed experts recommended.

10. Unbeknown to PLT and Sam, Sam's phone "Pocket dialed" Posner.  Posner had her friend record PLT's and Sam's conversation to give to the police so she could have PLT prosecuted.

11. Posner also, despite knowing such was a lie, called the Clinton Police department and reported to them that Sam was "being beaten" by PLT, PLT was "Hitting her son" and that PLT "was waiting for the son [sam] when he came out."

12. DEF Tiger, Schleisier, Balsamo from the Clinton police responded to the call and immediately could see Posner's report was a lie. They also immediately had Sam confirm that PLT had never touched him.

13. PLT told DEFs that he was a commercial realtor and was checking out the site and ran into his son who he had not seen in 5 years due to him being alienated from PLT.

14. DEF confirmed to PLT that he knew what parental alienation was.

15. DEFs knew that PLT had a custody order with Posner for Sam and his sister and was ordered to still pay child support.

16. DEFs also falsely claimed and argued with PLT that Sam was emancipated from PLT.

17. Acting in retaliation to PLT disputing DEFs claim of emancipation, DEFs decided to push Sam to pursue domestic violence charges against PLT despite knowing there was no such basis.

18. Despite DEFs knowing the call was a false report, (and an example of the alienation that PLT had told them occurred), there were no "outstanding warrants" or "restraining orders" DEFs then asked PLT for his driver's license.  PLT complied.

19. About 5 minutes later, DEFs asked PLT where his car was.  PLT complied and pointed to his car that was about a 100 feet away from where they were standing.

20. DEFs then ordered PLT to get into his car and ordered another DEF to take his police car and block PLT in so he could not leave.  DEFs did not give PLT back his driver's license.

21. PLT offered to provide but the DEF's refused to review copies of the expert reports showing that PLT son was alienated from him, that Sam and Posner have a long history of making false allegations of abuse against PLT, that about a dozen experts determined with a medical degree of certainty that all the allegations made were in fact false and that several concluded that it was Posner that was forcing Sam to make the false allegations.

22. PLT also offered to provide but DEF's refused to review Sam's latest evaluation to confirm that Sam had learning and processing disabilities.

23. DEFs refused to do their job and investigate and accept anything that would get in the way of their retaliation against PLT who without any basis, despite witnessing first-hand how he was truthful via Posners false claim wanted to further destroy PLT chance of reconnecting with his son.

24. DEFs, while detaining PLT, ran his car plates and driver's license searching for infractions and issued him a citation for an expired registration.

25. At no time did DEF's read PLT his rights, tell him he could remain silent or leave, or that they had decided to and were investigating him.

26. While DEFs were refusing information from PLT, they were holding PLT waiting for Posner to send them information as Posner lied saying Sam had a "Restraining Order" against PLT.

27. Despite knowing there was no such restraining order, that Posner had lied about the assault and that PLT was just talking to his son, DEFs held PLT against his will for about an hour as Posner told him that she was going to have Sam file a TRO for domestic violence against PLT.

28. About 40 minutes after the initial contact, DEFs allowed Sam to leave the area.  DEFs still held PLT for an additional 20 Minutes before moving their police car and giving PLT back his license so he may leave.

29. Around 3 PM that day, DEF's called Sam to see if he was able to make it to the Court to file a restraining order.

30. DEFs were all aware that every single expert, about a dozen, concluded that DEFs had made false claims of abuse by PLT. That Sam was forced and brainwashed by DEFs to make false allegations.

31. DEF's knew that multiple Judges had ruled that DEF's had actually lied and fabricated claims of domestic violence and harassment.

32. In a violation of PLT rights (and the statute) that FRO hearings must start to be adjudicated within 10 days, the Court adjourned the matter for 3 months when Sam was to return to school.

33. So for 3 months PLT lived in constant fear of being arrested as Posner had repeatedly done in the past by making up fictitious violations of TRO's and Court orders.

34. On March 16, 2023 after a full day trial, the Court denied the FRO. The Court found:

   a. Posner had put Sam into this conflict, and it was not fair to him
   b. That Sam needed to have a relationship with PLT and therapy
   c. That Posner filed a false police report to Clinton
   d. Sam & Posner lied about PLT going to the house and trying to install a GPS
   e. DEFs lied about PLT assaulting Sam.

35. Most importantly the Court also ruled that even if the Court was to accept everything that Sam/Posner alleged was "True," that it still was no way near a claim of domestic violence.

36. DEFs knew that PLT did not commit any actions that could be considered domestic violence. DEF's used the false claim to try to help Posner remove any chance that PLT and his son could ever have a relationship and further harm the chance of PLT having a relationship with his daughter, who they knew was also alienated from PLT.

37. DEF's then refused to provide PLT with copies of the police report so he can defend himself against the FRO. To cover up this as being further abuse and retaliation against PLT, despite knowing the FRO hearing had to be done within 10 days, they made PLT file an OPRA request to get the information knowing that they could take 7 business days to produce the information.

38. By contrast, DEFs instantly provided Posner with the police report and other stuff they wanted so they could prosecute the FRO against DEF.

39. Thereafter when DEF heard the FRO hearing was delayed, they refused to provide any of the information to PLT stating that he did not have any "interest" in the matter. DEF knowing that there is no reciprocal discovery in an FRO, did not even give PLT what they gave Posner to prosecute.

4

40. On April 10, 2023 PLT filed a notice of tort claim with Clinton Township/Police Department.  So PLT's suit and claims against DEFs are both in their official and personal capacity.

41. DEFs, continuing with their retaliation, refused to file charges against Posner for making the knowingly false police report despite knowing that she did so and put peoples safety at risk

42. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner for the filing false police report against him despite knowing the crime occurred.

43. DEFs, continuing with their retaliation, refused to charge Posner and her friend for wiretapping despite knowing such occurred.

44. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner and her friend for wiretapping despite knowing such crime occurred.

45. DEF continuing with their retaliation did not inform PLT that he had the right to file the charges after they refused.

46. DEFs were well aware of the contracts between PLT and his former wife.

47. DEFs conduct as outline above tortuously interfered with PLT's rights in those contracts.

48. DEF were well aware how their actions and conduct would negatively affect the long term relationship that PLT had with his children and the harmful affect it would have upon PLT.

### THE COVER UP IS OFTEN AS BAD OR WORSE THAN THE CRIME AS IT SHOWS INTENT TO BREAK THE LAW

49. On April 10, 2023 PLT filed a notice of tort claim

50. told Captain Derosa he wanted to file a complaint against Tiger, Schleisier, Balsamo and other officers who might have acted illegally or improperly.  Neither him nor anyone at the department ever responded.

51. PLT then reached out again to file a complaint against the officers.  No one responded

52. Despite being required to respond immediately to internal affair complaints, 3-4 months later in August 2023, Ross finally reached out to PLT saying that he was going to investigate.

53. PLT never heard back from Ross.  So in November/December PLT again reached out to Derosa and Glennon again telling them that no one has ever taken his complaint.  They never respond.

54. In January 2024 Ross finally call PLT to take his complaint.  PLT told him that he wanted to add himself, Derosa and Glennon to the complaint for not taking the complaint, as they were required.

55. Ross then called PLT a few days later saying he did not and could not take the complaint falsely alleging it was due to a lawsuit that PLT never filed.

56. PLT then asked Ross to transfer the matter to the prosecutors officers because it was clear that DEF were still retaliating against PLT and refusing to do their job.  (PLT has since learned that Ross, Derosa and Glennon were required to transfer the matters against themselves to the prosecutors office as they were "superiors" to him and that he could not investigate himself.

57. PLT then reached out to the Hunterdon county prosecutor to take over the internal affairs complaint.

58. The prosecutor agreed and ordered DEF Kelsey Marsh and Frizzi to take PLTs complaint.

59. DEFs Clinton Township/Police Department again denied PLTs OPRA request to obtain information that was now needed to file an accurate and full complaint against its officers.

60. PLT traveled out to Hunterdon to meet with March and Frizzi

61. March was the officer who took the lead in taking PLT complaint.

62. It quickly became apparent to PLT that March was refusing to do her job, breached the duties that she owed to PLT and her true intent was to stop PLT from filing the complaint.

63. PLT told Marsh it was over a year since the incident occurred and asked her to obtain the police report, body cams, and other information so PLT could refresh his memory and see if there was anything else that occurred.  March continued to refuse to do so without explanation.

64. At the hearing DEF said "that they were not going to provide me any discovery to help me file my complaint against these officers"

65. DEF Marshs line of questioning was clearly not to obtain the facts and the basis for PLT's complaint but to cover up the officers illegal and unconstitutional conduct.

66. When PLT did not give in to DEF's Marsh's plan, Marsh became abusive towards PLT and falsely stated that he committed domestic violence against Posner and was not going to do it to her.  That she was refusing to take the complaint against the officers because PLT was trying to control her and ordered PLT to leave, would not allow PLT to have a copy of the tape so he could file a complaint

against her and Frizzi who was sitting in the room while this was occurring and allowed officer March to ignore the orders that they were given to take the complaint.

67. After the meeting, I informed Robeson of the improper conduct of her employee.  Refusing to take the report as she was ordered to do and the conduct that she showed during the interview.

> "Even if I was "louder" then she hoped or was "condensing" in my tone, both officers were still required to take my full statement and complaint which they refused to do.  They did not want to hear how they refused to take my internal affairs complaint.  How it took almost a year for Detective Ross to respond or the cleary false reasons as to why he said he did not do what the law required them to do.  Even if your officers thought I was a "total lunatic" they should have grave concerns over DeRosa, Ross and Glennon conduct in refusing to take internal affairs complaint and not acting as the law requires especially since my complaint of improper conduct are against the same officers that others have made complaints against for improper conduct.  I sure you are aware that there have been 3 such complaints against Chief Derosa."

68. Robeson did not respond so PLT was forced to send a second email.

69. Robeson finally responded and agree to transfer the entire matter to the NJ Attorney General's Office of Professional Integrity and Accountability as PLT now that I had a complaint to file against her officers as well.

70. DEF's Huntington County refused PLT OPRA request to obtain the video so he may properly prepare for the interview in filing his complaint.

71. Despite claiming they transferred the case, they refused to give me the information of whom they transferred the case too.

72. After a ½ dozen follow ups with the OPIA, as no one would respond to PLT, several months later the OPIA ignored the request to take the case and instead said that an officer in Hunterdon should investigate all the complaints, including those against people in his office.

73. Robeson did not push back and ordered her officer to take the complaint.

74. In July 2024, PLT met with DEF Crisgolo who took his complaint.

75. In Aug 2024, PLT followed up with Crisgolo and gave him more information to support his statement.

76. As of the filing of this complaint, PLT's complaints have still not been investigated or a report or findings issued, despite the rules requiring such to be done within 45 days.

WHEREFORE, PLT repeats and incorporates each and every allegation as set forth above as if fully set forth at length herein, demands against all of the DEFs, jointly and severally, as well as their successors and assigns, for the following relief:

### COUNT 1
Malicious Prosecution, Malicious use of process and Malicious abuse of process

### COUNT 2
Deprivation of Rights

### COUNT 3
Intentional Infliction of Emotional Distress (IIED)

### COUNT 4
Negligent Infliction of Emotional Distress (NIED)

### COUNT 5
False Imprisonment

### COUNT 6
Civil Conspiracy

### COUNT 7
Negligence or Gross Negligence

### COUNT 8
Invasion of Privacy

### COUNT 9
Common Law Fraud

### COUNT 10
Conspiracy to Commit Fraud

### COUNT 11
Tortious interference with contractual relationship

### COUNT 12
Aiding the commission of a tort

### COUNT 13
Breach of Duty

### COUNT 14
Deprivation and interference with protected parental rights

### PRAYER FOR RELIEF

8

As a direct and proximate result of the foregoing, PLT has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, and substantial medical and other expenses for treatment and care, past, present, and future. Damages for loss of service, society, and companionship. Said losses, injuries, and expenses are either permanent or continuing in nature and PLT will continue to suffer same in the future.

WHEREFORE, PLT demands judgment against DEFs for compensatory damages, consequential damages, punitive damages, actual damages, costs, interest, awarding reasonable attorneys fees and costs and expense of litigation. and other such relief as this Court deems just and proper.

## VERIFICATION OF ASSERTED FACTS

I PLT, do hereby certify that the foregoing factual assertions made in this Complaint are made by me and are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

## DESIGNATION OF TRIAL COUNSEL

PLT is designated as trial counsel in this matter.

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

## DEMANDS FOR A JURY TRIAL

The PLT demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey. Court Rules 1:8-2(b) and 4:35-1(a)

## CERTIFICATION PURSUANT TO R. 1:38-7

I certify that all confidential personal identifiers have been removed or redacted from this Complaint and that the same information will be removed or redacted from all documents submitted to the Court in connection with this matter in the future consistent with Rule 1:38-7(b).

DATED: Jan 3, 2024                    Eric S. Weiss, Plaintiff

9

**Eric S. Weiss**
210 Walnut Street
Garwood, NJ 07027
(908) 913 0832
ericsweiss@gmail.com

| | |
|---|---|
| Eric Weiss<br><br>          Plaintiff,<br><br>          vs.<br><br>John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh,<br>John/Jane Does 1-10<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CIVIL DIVISION; SOMERSET COUNTY<br>DOCKET NO.<br><br><br><br>          **COMPLAINT** |

PLT by way of complaint against the DEFs, verified to the facts asserted, pleads as follows:

### THE PARTIES

1. PLT lives in Garwood NJ

2. DEFs John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon are employed by the Township of Clinton/Police Department

3. Township of Clinton/Police Department is located at 1371 Route 31 Clinton TWSP NJ 08801  is the employer of the DEF

4. DEF Hunterdon County is the employer of Marsh, Robeson, Crisologo, and Frinzi.  Hunterdon County Prosecutor's office 71 Main Street, PO Box 2900  Flemington, New Jersey 08822

5. DEF Kelsey Marsh is also named in her individual capacity

### FACTS COMMON TO ALL COUNTS

6. This complaint has been filed because the DEF's believe they are above the law and do not have to abide by the laws, civil rights of individuals and police rules that they swore to uphold.

1

7. On Jan 10, 2023 PLT, a commercial realtor, was working by reviewing/accessing the Beaver Brook Concourse building site located on 1465 NJ-31, Annandale / Clinton Township NJ

8. Around 1:00 PM PLT ran into Sam (his son) who he had not seen in 5 years due to him being alienated from PLT by his former wife (Posner).

9. PLT told Sam that he still loved him, missed him, asked him to go out to lunch and wanted Sam to get therapy for his alienation in accordance with all the Court appointed experts recommended.

10. Unbeknown to PLT and Sam, Sam's phone "Pocket dialed" Posner. Posner had her friend record PLT's and Sam's conversation to give to the police so she could have PLT prosecuted.

11. Posner also, despite knowing such was a lie, called the Clinton Police department and reported to them that Sam was "being beaten" by PLT, PLT was "Hitting her son" and that PLT "was waiting for the son [sam] when he came out."

12. DEF Tiger, Schleisier, Balsamo from the Clinton police responded to the call and immediately could see Posner's report was a lie. They also immediately had Sam confirm that PLT had never touched him.

13. PLT told DEFs that he was a commercial realtor and was checking out the site and ran into his son who he had not seen in 5 years due to him being alienated from PLT.

14. DEF confirmed to PLT that he knew what parental alienation was.

15. DEFs knew that PLT had a custody order with Posner for Sam and his sister and was ordered to still pay child support.

16. DEFs also falsely claimed and argued with PLT that Sam was emancipated from PLT.

17. Acting in retaliation to PLT disputing DEFs claim of emancipation, DEFs decided to push Sam to pursue domestic violence charges against PLT despite knowing there was no such basis.

18. Despite DEFs knowing the call was a false report, (and an example of the alienation that PLT had told them occurred), there were no "outstanding warrants" or "restraining orders" DEFs then asked PLT for his driver's license. PLT complied.

19. About 5 minutes later, DEFs asked PLT where his car was. PLT complied and pointed to his car that was about a 100 feet away from where they were standing.

20. DEFs then ordered PLT to get into his car and ordered another DEF to take his police car and block PLT in so he could not leave.  DEFs did not give PLT back his driver's license.

21. PLT offered to provide but the DEF's refused to review copies of the expert reports showing that PLT son was alienated from him, that Sam and Posner have a long history of making false allegations of abuse against PLT, that about a dozen experts determined with a medical degree of certainty that all the allegations made were in fact false and that several concluded that it was Posner that was forcing Sam to make the false allegations.

22. PLT also offered to provide but DEF's refused to review Sam's latest evaluation to confirm that Sam had learning and processing disabilities.

23. DEFs refused to do their job and investigate and accept anything that would get in the way of their retaliation against PLT who without any basis, despite witnessing first-hand how he was truthful via Posners false claim wanted to further destroy PLT chance of reconnecting with his son.

24. DEFs, while detaining PLT, ran his car plates and driver's license searching for infractions and issued him a citation for an expired registration.

25. At no time did DEF's read PLT his rights, tell him he could remain silent or leave, or that they had decided to and were investigating him.

26. While DEFs were refusing information from PLT, they were holding PLT waiting for Posner to send them information as Posner lied saying Sam had a "Restraining Order" against PLT.

27. Despite knowing there was no such restraining order, that Posner had lied about the assault and that PLT was just talking to his son, DEFs held PLT against his will for about an hour as Posner told him that she was going to have Sam file a TRO for domestic violence against PLT.

28. About 40 minutes after the initial contact, DEFs allowed Sam to leave the area.  DEFs still held PLT for an additional 20 Minutes before moving their police car and giving PLT back his license so he may leave.

29. Around 3 PM that day, DEF's called Sam to see if he was able to make it to the Court to file a restraining order.

3

30. DEFs were all aware that every single expert, about a dozen, concluded that DEFs had made false claims of abuse by PLT.  That Sam was forced and brainwashed by DEFs to make false allegations.

31. DEF's knew that multiple Judges had ruled that DEF's had actually lied and fabricated claims of domestic violence and harassment.

32. In a violation of PLT rights (and the statute) that FRO hearings must start to be adjudicated within 10 days, the Court adjourned the matter for 3 months when Sam was to return to school.

33. So for 3 months PLT lived in constant fear of being arrested as Posner had repeatedly done in the past by making up fictitious violations of TRO's and Court orders.

34. On March 16, 2023 after a full day trial, the Court denied the FRO.  The Court found:

   a. Posner had put Sam into this conflict, and it was not fair to him
   b. That Sam needed to have a relationship with PLT and therapy
   c. That Posner filed a false police report to Clinton
   d. Sam & Posner lied about PLT going to the house and trying to install a GPS
   e. DEFs lied about PLT assaulting Sam.

35. Most importantly the Court also ruled that even if the Court was to accept everything that Sam/Posner alleged was "True," that it still was no way near a claim of domestic violence.

36. DEFs knew that PLT did not commit any actions that could be considered domestic violence.  DEF's used the false claim to try to help Posner remove any chance that PLT and his son could ever have a relationship and further harm the chance of PLT having a relationship with his daughter, who they knew was also alienated from PLT.

37. DEF's then refused to provide PLT with copies of the police report so he can defend himself against the FRO.  To cover up this as being further abuse and retaliation against PLT, despite knowing the FRO hearing had to be done within 10 days, they made PLT file an OPRA request to get the information knowing that they could take 7 business days to produce the information.

38. By contrast, DEFs instantly provided Posner with the police report and other stuff they wanted so they could prosecute the FRO against DEF.

39. Thereafter when DEF heard the FRO hearing was delayed, they refused to provide any of the information to PLT stating that he did not have any "interest" in the matter.  DEF knowing that there is no reciprocal discovery in an FRO, did not even give PLT what they gave Posner to prosecute.

40. On April 10, 2023 PLT filed a notice of tort claim with Clinton Township/Police Department.  So PLT's suit and claims against DEFs are both in their official and personal capacity.

41. DEFs, continuing with their retaliation, refused to file charges against Posner for making the knowingly false police report despite knowing that she did so and put peoples safety at risk

42. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner for the filing false police report against him despite knowing the crime occurred.

43. DEFs, continuing with their retaliation, refused to charge Posner and her friend for wiretapping despite knowing such occurred.

44. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner and her friend for wiretapping despite knowing such crime occurred.

45. DEF continuing with their retaliation did not inform PLT that he had the right to file the charges after they refused.

46. DEFs were well aware of the contracts between PLT and his former wife.

47. DEFs conduct as outline above tortuously interfered with PLT's rights in those contracts.

48. DEF were well aware how their actions and conduct would negatively affect the long term relationship that PLT had with his children and the harmful affect it would have upon PLT.

### THE COVER UP IS OFTEN AS BAD OR WORSE THAN THE CRIME AS IT SHOWS INTENT TO BREAK THE LAW

49. On April 10, 2023 PLT filed a notice of tort claim

50. told Captain Derosa he wanted to file a complaint against Tiger, Schleisier, Balsamo and other officers who might have acted illegally or improperly.  Neither him nor anyone at the department ever responded.

51. PLT then reached out again to file a complaint against the officers.  No one responded

52. Despite being required to respond immediately to internal affair complaints, 3-4 months later in August 2023, Ross finally reached out to PLT saying that he was going to investigate.

53. PLT never heard back from Ross.  So in November/December PLT again reached out to Derosa and Glennon again telling them that no one has ever taken his complaint.  They never respond.

54. In January 2024 Ross finally call PLT to take his complaint.  PLT told him that he wanted to add himself, Derosa and Glennon to the complaint for not taking the complaint, as they were required.

55. Ross then called PLT a few days later saying he did not and could not take the complaint falsely alleging it was due to a lawsuit that PLT never filed.

56. PLT then asked Ross to transfer the matter to the prosecutors officers because it was clear that DEF were still retaliating against PLT and refusing to do their job.  (PLT has since learned that Ross, Derosa and Glennon were required to transfer the matters against themselves to the prosecutors office as they were "superiors" to him and that he could not investigate himself.

57. PLT then reached out to the Hunterdon county prosecutor to take over the internal affairs complaint.

58. The prosecutor agreed and ordered DEF Kelsey Marsh and Frizzi to take PLTs complaint.

59. DEFs Clinton Township/Police Department again denied PLTs OPRA request to obtain information that was now needed to file an accurate and full complaint against its officers.

60. PLT traveled out to Hunterdon to meet with March and Frizzi

61. March was the officer who took the lead in taking PLT complaint.

62. It quickly became apparent to PLT that March was refusing to do her job, breached the duties that she owed to PLT and her true intent was to stop PLT from filing the complaint.

63. PLT told Marsh it was over a year since the incident occurred and asked her to obtain the police report, body cams, and other information so PLT could refresh his memory and see if there was anything else that occurred.  March continued to refuse to do so without explanation.

64. At the hearing DEF said "that they were not going to provide me any discovery to help me file my complaint against these officers"

65. DEF Marshs line of questioning was clearly not to obtain the facts and the basis for PLT's complaint but to cover up the officers illegal and unconstitutional conduct.

66. When PLT did not give in to DEF's Marsh's plan, Marsh became abusive towards PLT and falsely stated that he committed domestic violence against Posner and was not going to do it to her.  That she was refusing to take the complaint against the officers because PLT was trying to control her and ordered PLT to leave, would not allow PLT to have a copy of the tape so he could file a complaint

against her and Frizzi who was sitting in the room while this was occurring and allowed officer March to ignore the orders that they were given to take the complaint.

67. After the meeting, I informed Robeson of the improper conduct of her employee. Refusing to take the report as she was ordered to do and the conduct that she showed during the interview.

> "Even if I was "louder" then she hoped or was "condensing" in my tone, both officers were still required to take my full statement and complaint which they refused to do. They did not want to hear how they refused to take my internal affairs complaint. How it took almost a year for Detective Ross to respond or the cleary false reasons as to why he said he did not do what the law required them to do. Even if your officers thought I was a "total lunatic" they should have grave concerns over DeRosa, Ross and Glennon conduct in refusing to take internal affairs complaint and not acting as the law requires especially since my complaint of improper conduct are against the same officers that others have made complaints against for improper conduct. I sure you are aware that there have been 3 such complaints against Chief Derosa."

68. Robeson did not respond so PLT was forced to send a second email.

69. Robeson finally responded and agree to transfer the entire matter to the NJ Attorney General's Office of Professional Integrity and Accountability as PLT now that I had a complaint to file against her officers as well.

70. DEF's Huntington County refused PLT OPRA request to obtain the video so he may properly prepare for the interview in filing his complaint.

71. Despite claiming they transferred the case, they refused to give me the information of whom they transferred the case too.

72. After a ½ dozen follow ups with the OPIA, as no one would respond to PLT, several months later the OPIA ignored the request to take the case and instead said that an officer in Hunterdon should investigate all the complaints, including those against people in his office.

73. Robeson did not push back and ordered her officer to take the complaint.

74. In July 2024, PLT met with DEF Crisgolo who took his complaint.

75. In Aug 2024, PLT followed up with Crisgolo and gave him more information to support his statement.

76. As of the filing of this complaint, PLT's complaints have still not been investigated or a report or findings issued, despite the rules requiring such to be done within 45 days.

WHEREFORE, PLT repeats and incorporates each and every allegation as set forth above as if fully set forth at length herein, demands against all of the DEFs, jointly and severally, as well as their successors and assigns, for the following relief:

### COUNT 1
Malicious Prosecution, Malicious use of process and Malicious abuse of process

### COUNT 2
Deprivation of Rights

### COUNT 3
Intentional Infliction of Emotional Distress (IIED)

### COUNT 4
Negligent Infliction of Emotional Distress (NIED)

### COUNT 5
False Imprisonment

### COUNT 6
Civil Conspiracy

### COUNT 7
Negligence or Gross Negligence

### COUNT 8
Invasion of Privacy

### COUNT 9
Common Law Fraud

### COUNT 10
Conspiracy to Commit Fraud

### COUNT 11
Tortious interference with contractual relationship

### COUNT 12
Aiding the commission of a tort

### COUNT 13
Breach of Duty

### COUNT 14
Deprivation and interference with protected parental rights

### PRAYER FOR RELIEF

As a direct and proximate result of the foregoing, PLT has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, and substantial medical and other expenses for treatment and care, past, present, and future. Damages for loss of service, society, and companionship. Said losses, injuries, and expenses are either permanent or continuing in nature and PLT will continue to suffer same in the future.

WHEREFORE, PLT demands judgment against DEFs for compensatory damages, consequential damages, punitive damages, actual damages, costs, interest, awarding reasonable attorneys fees and costs and expense of litigation. and other such relief as this Court deems just and proper.

## VERIFICATION OF ASSERTED FACTS

I PLT, do hereby certify that the foregoing factual assertions made in this Complaint are made by me and are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

## DESIGNATION OF TRIAL COUNSEL

PLT is designated as trial counsel in this matter.

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

## DEMANDS FOR A JURY TRIAL

The PLT demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey. Court Rules 1:8-2(b) and 4:35-1(a)

## CERTIFICATION PURSUANT TO R. 1:38-7

I certify that all confidential personal identifiers have been removed or redacted from this Complaint and that the same information will be removed or redacted from all documents submitted to the Court in connection with this matter in the future consistent with Rule 1:38-7(b).

DATED: Jan 3, 2024                          Eric S. Weiss, Plaintiff

**Eric S. Weiss**
210 Walnut Street
Garwood, NJ 07027
(908) 913 0832
ericsweiss@gmail.com

| | |
|---|---|
| Eric Weiss<br><br>           Plaintiff,<br><br>           vs.<br><br>John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh,<br>John/Jane Does 1-10<br><br>           Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CIVIL DIVISION; SOMERSET COUNTY<br>DOCKET NO.<br><br><br><br><br>           **COMPLAINT** |

PLT by way of complaint against the DEFs, verified to the facts asserted, pleads as follows:

<u>**THE PARTIES**</u>

1. PLT lives in Garwood NJ

2. DEFs John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon are employed by the Township of Clinton/Police Department

3. Township of Clinton/Police Department is located at 1371 Route 31 Clinton TWSP NJ 08801  is the employer of the DEF

4. DEF Hunterdon County is the employer of Marsh, Robeson, Crisologo, and Frinzi.  Hunterdon County Prosecutor's office 71 Main Street, PO Box 2900  Flemington, New Jersey 08822

5. DEF Kelsey Marsh is also named in her individual capacity

<u>**FACTS COMMON TO ALL COUNTS**</u>

6. This complaint has been filed because the DEF's believe they are above the law and do not have to abide by the laws, civil rights of individuals and police rules that they swore to uphold.

1

7. On Jan 10, 2023 PLT, a commercial realtor, was working by reviewing/accessing the Beaver Brook Concourse building site located on 1465 NJ-31, Annandale / Clinton Township NJ

8. Around 1:00 PM PLT ran into Sam (his son) who he had not seen in 5 years due to him being alienated from PLT by his former wife (Posner).

9. PLT told Sam that he still loved him, missed him, asked him to go out to lunch and wanted Sam to get therapy for his alienation in accordance with all the Court appointed experts recommended.

10. Unbeknown to PLT and Sam, Sam's phone "Pocket dialed" Posner. Posner had her friend record PLT's and Sam's conversation to give to the police so she could have PLT prosecuted.

11. Posner also, despite knowing such was a lie, called the Clinton Police department and reported to them that Sam was "being beaten" by PLT, PLT was "Hitting her son" and that PLT "was waiting for the son [sam] when he came out."

12. DEF Tiger, Schleisier, Balsamo from the Clinton police responded to the call and immediately could see Posner's report was a lie. They also immediately had Sam confirm that PLT had never touched him.

13. PLT told DEFs that he was a commercial realtor and was checking out the site and ran into his son who he had not seen in 5 years due to him being alienated from PLT.

14. DEF confirmed to PLT that he knew what parental alienation was.

15. DEFs knew that PLT had a custody order with Posner for Sam and his sister and was ordered to still pay child support.

16. DEFs also falsely claimed and argued with PLT that Sam was emancipated from PLT.

17. Acting in retaliation to PLT disputing DEFs claim of emancipation, DEFs decided to push Sam to pursue domestic violence charges against PLT despite knowing there was no such basis.

18. Despite DEFs knowing the call was a false report, (and an example of the alienation that PLT had told them occurred), there were no "outstanding warrants" or "restraining orders" DEFs then asked PLT for his driver's license. PLT complied.

19. About 5 minutes later, DEFs asked PLT where his car was. PLT complied and pointed to his car that was about a 100 feet away from where they were standing.

20. DEFs then ordered PLT to get into his car and ordered another DEF to take his police car and block PLT in so he could not leave.  DEFs did not give PLT back his driver's license.

21. PLT offered to provide but the DEF's refused to review copies of the expert reports showing that PLT son was alienated from him, that Sam and Posner have a long history of making false allegations of abuse against PLT, that about a dozen experts determined with a medical degree of certainty that all the allegations made were in fact false and that several concluded that it was Posner that was forcing Sam to make the false allegations.

22. PLT also offered to provide but DEF's refused to review Sam's latest evaluation to confirm that Sam had learning and processing disabilities.

23. DEFs refused to do their job and investigate and accept anything that would get in the way of their retaliation against PLT who without any basis, despite witnessing first-hand how he was truthful via Posners false claim wanted to further destroy PLT chance of reconnecting with his son.

24. DEFs, while detaining PLT, ran his car plates and driver's license searching for infractions and issued him a citation for an expired registration.

25. At no time did DEF's read PLT his rights, tell him he could remain silent or leave, or that they had decided to and were investigating him.

26. While DEFs were refusing information from PLT, they were holding PLT waiting for Posner to send them information as Posner lied saying Sam had a "Restraining Order" against PLT.

27. Despite knowing there was no such restraining order, that Posner had lied about the assault and that PLT was just talking to his son, DEFs held PLT against his will for about an hour as Posner told him that she was going to have Sam file a TRO for domestic violence against PLT.

28. About 40 minutes after the initial contact, DEFs allowed Sam to leave the area.  DEFs still held PLT for an additional 20 Minutes before moving their police car and giving PLT back his license so he may leave.

29. Around 3 PM that day, DEF's called Sam to see if he was able to make it to the Court to file a restraining order.

30. DEFs were all aware that every single expert, about a dozen, concluded that DEFs had made false claims of abuse by PLT.  That Sam was forced and brainwashed by DEFs to make false allegations.

31. DEF's knew that multiple Judges had ruled that DEF's had actually lied and fabricated claims of domestic violence and harassment.

32. In a violation of PLT rights (and the statute) that FRO hearings must start to be adjudicated within 10 days, the Court adjourned the matter for 3 months when Sam was to return to school.

33. So for 3 months PLT lived in constant fear of being arrested as Posner had repeatedly done in the past by making up fictitious violations of TRO's and Court orders.

34. On March 16, 2023 after a full day trial, the Court denied the FRO.  The Court found:
   a. Posner had put Sam into this conflict, and it was not fair to him
   b. That Sam needed to have a relationship with PLT and therapy
   c. That Posner filed a false police report to Clinton
   d. Sam & Posner lied about PLT going to the house and trying to install a GPS
   e. DEFs lied about PLT assaulting Sam.

35. Most importantly the Court also ruled that even if the Court was to accept everything that Sam/Posner alleged was "True," that it still was no way near a claim of domestic violence.

36. DEFs knew that PLT did not commit any actions that could be considered domestic violence.  DEF's used the false claim to try to help Posner remove any chance that PLT and his son could ever have a relationship and further harm the chance of PLT having a relationship with his daughter, who they knew was also alienated from PLT.

37. DEF's then refused to provide PLT with copies of the police report so he can defend himself against the FRO.  To cover up this as being further abuse and retaliation against PLT, despite knowing the FRO hearing had to be done within 10 days, they made PLT file an OPRA request to get the information knowing that they could take 7 business days to produce the information.

38. By contrast, DEFs instantly provided Posner with the police report and other stuff they wanted so they could prosecute the FRO against DEF.

39. Thereafter when DEF heard the FRO hearing was delayed, they refused to provide any of the information to PLT stating that he did not have any "interest" in the matter.  DEF knowing that there is no reciprocal discovery in an FRO, did not even give PLT what they gave Posner to prosecute.

4

40. On April 10, 2023 PLT filed a notice of tort claim with Clinton Township/Police Department.  So PLT's suit and claims against DEFs are both in their official and personal capacity.

41. DEFs, continuing with their retaliation, refused to file charges against Posner for making the knowingly false police report despite knowing that she did so and put peoples safety at risk

42. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner for the filing false police report against him despite knowing the crime occurred.

43. DEFs, continuing with their retaliation, refused to charge Posner and her friend for wiretapping despite knowing such occurred.

44. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner and her friend for wiretapping despite knowing such crime occurred.

45. DEF continuing with their retaliation did not inform PLT that he had the right to file the charges after they refused.

46. DEFs were well aware of the contracts between PLT and his former wife.

47. DEFs conduct as outline above tortuously interfered with PLT's rights in those contracts.

48. DEF were well aware how their actions and conduct would negatively affect the long term relationship that PLT had with his children and the harmful affect it would have upon PLT.

## THE COVER UP IS OFTEN AS BAD OR WORSE THAN THE CRIME
## AS IT SHOWS INTENT TO BREAK THE LAW

49. On April 10, 2023 PLT filed a notice of tort claim

50. told Captain Derosa he wanted to file a complaint against Tiger, Schleisier, Balsamo and other officers who might have acted illegally or improperly.  Neither him nor anyone at the department ever responded.

51. PLT then reached out again to file a complaint against the officers.  No one responded

52. Despite being required to respond immediately to internal affair complaints, 3-4 months later in August 2023, Ross finally reached out to PLT saying that he was going to investigate.

53. PLT never heard back from Ross.  So in November/December PLT again reached out to Derosa and Glennon again telling them that no one has ever taken his complaint.  They never respond.

54. In January 2024 Ross finally call PLT to take his complaint. PLT told him that he wanted to add himself, Derosa and Glennon to the complaint for not taking the complaint, as they were required.

55. Ross then called PLT a few days later saying he did not and could not take the complaint falsely alleging it was due to a lawsuit that PLT never filed.

56. PLT then asked Ross to transfer the matter to the prosecutors officers because it was clear that DEF were still retaliating against PLT and refusing to do their job. (PLT has since learned that Ross, Derosa and Glennon were required to transfer the matters against themselves to the prosecutors office as they were "superiors" to him and that he could not investigate himself.

57. PLT then reached out to the Hunterdon county prosecutor to take over the internal affairs complaint.

58. The prosecutor agreed and ordered DEF Kelsey Marsh and Frizzi to take PLTs complaint.

59. DEFs Clinton Township/Police Department again denied PLTs OPRA request to obtain information that was now needed to file an accurate and full complaint against its officers.

60. PLT traveled out to Hunterdon to meet with March and Frizzi

61. March was the officer who took the lead in taking PLT complaint.

62. It quickly became apparent to PLT that March was refusing to do her job, breached the duties that she owed to PLT and her true intent was to stop PLT from filing the complaint.

63. PLT told Marsh it was over a year since the incident occurred and asked her to obtain the police report, body cams, and other information so PLT could refresh his memory and see if there was anything else that occurred. March continued to refuse to do so without explanation.

64. At the hearing DEF said "that they were not going to provide me any discovery to help me file my complaint against these officers"

65. DEF Marshs line of questioning was clearly not to obtain the facts and the basis for PLT's complaint but to cover up the officers illegal and unconstitutional conduct.

66. When PLT did not give in to DEF's Marsh's plan, Marsh became abusive towards PLT and falsely stated that he committed domestic violence against Posner and was not going to do it to her. That she was refusing to take the complaint against the officers because PLT was trying to control her and ordered PLT to leave, would not allow PLT to have a copy of the tape so he could file a complaint

6

against her and Frizzi who was sitting in the room while this was occurring and allowed officer March to ignore the orders that they were given to take the complaint.

67. After the meeting, I informed Robeson of the improper conduct of her employee.  Refusing to take the report as she was ordered to do and the conduct that she showed during the interview.

> "Even if I was "louder" then she hoped or was "condensing" in my tone, both officers were still required to take my full statement and complaint which they refused to do.  They did not want to hear how they refused to take my internal affairs complaint.  How it took almost a year for Detective Ross to respond or the cleary false reasons as to why he said he did not do what the law required them to do.  Even if your officers thought I was a "total lunatic" they should have grave concerns over DeRosa, Ross and Glennon conduct in refusing to take internal affairs complaint and not acting as the law requires especially since my complaint of improper conduct are against the same officers that others have made complaints against for improper conduct.  I sure you are aware that there have been 3 such complaints against Chief Derosa."

68. Robeson did not respond so PLT was forced to send a second email.

69. Robeson finally responded and agree to transfer the entire matter to the NJ Attorney General's Office of Professional Integrity and Accountability as PLT now that I had a complaint to file against her officers as well.

70. DEF's Huntington County refused PLT OPRA request to obtain the video so he may properly prepare for the interview in filing his complaint.

71. Despite claiming they transferred the case, they refused to give me the information of whom they transferred the case too.

72. After a ½ dozen follow ups with the OPIA, as no one would respond to PLT, several months later the OPIA ignored the request to take the case and instead said that an officer in Hunterdon should investigate all the complaints, including those against people in his office.

73. Robeson did not push back and ordered her officer to take the complaint.

74. In July 2024, PLT met with DEF Crisgolo who took his complaint.

75. In Aug 2024, PLT followed up with Crisgolo and gave him more information to support his statement.

76. As of the filing of this complaint, PLT's complaints have still not been investigated or a report or findings issued, despite the rules requiring such to be done within 45 days.

WHEREFORE, PLT repeats and incorporates each and every allegation as set forth above as if fully set forth at length herein, demands against all of the DEFs, jointly and severally, as well as their successors and assigns, for the following relief:

### COUNT 1
Malicious Prosecution, Malicious use of process and Malicious abuse of process

### COUNT 2
Deprivation of Rights

### COUNT 3
Intentional Infliction of Emotional Distress (IIED)

### COUNT 4
Negligent Infliction of Emotional Distress (NIED)

### COUNT 5
False Imprisonment

### COUNT 6
Civil Conspiracy

### COUNT 7
Negligence or Gross Negligence

### COUNT 8
Invasion of Privacy

### COUNT 9
Common Law Fraud

### COUNT 10
Conspiracy to Commit Fraud

### COUNT 11
Tortious interference with contractual relationship

### COUNT 12
Aiding the commission of a tort

### COUNT 13
Breach of Duty

### COUNT 14
Deprivation and interference with protected parental rights

### PRAYER FOR RELIEF

As a direct and proximate result of the foregoing, PLT has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, and substantial medical and other expenses for treatment and care, past, present, and future. Damages for loss of service, society, and companionship. Said losses, injuries, and expenses are either permanent or continuing in nature and PLT will continue to suffer same in the future.

WHEREFORE, PLT demands judgment against DEFs for compensatory damages, consequential damages, punitive damages, actual damages, costs, interest, awarding reasonable attorneys fees and costs and expense of litigation. and other such relief as this Court deems just and proper.

### VERIFICATION OF ASSERTED FACTS
I PLT, do hereby certify that the foregoing factual assertions made in this Complaint are made by me and are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

### DESIGNATION OF TRIAL COUNSEL
PLT is designated as trial counsel in this matter.

### CERTIFICATION PURSUANT TO R. 4:5-1
I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

### DEMANDS FOR A JURY TRIAL
The PLT demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey. Court Rules 1:8-2(b) and 4:35-1(a)

### CERTIFICATION PURSUANT TO R. 1:38-7
I certify that all confidential personal identifiers have been removed or redacted from this Complaint and that the same information will be removed or redacted from all documents submitted to the Court in connection with this matter in the future consistent with Rule 1:38-7(b).

DATED: Jan 3, 2024                          Eric S. Weiss, Plaintiff

**Eric S. Weiss**
210 Walnut Street
Garwood, NJ 07027
(908) 913 0832
ericsweiss@gmail.com

|  |  |
|---|---|
| Eric Weiss<br><br>          Plaintiff,<br><br>          vs.<br><br>John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh,<br>John/Jane Does 1-10<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CIVIL DIVISION; SOMERSET COUNTY<br>DOCKET NO.<br><br><br>**COMPLAINT** |

PLT by way of complaint against the DEFs, verified to the facts asserted, pleads as follows:

## THE PARTIES

1. PLT lives in Garwood NJ

2. DEFs John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon are employed by the Township of Clinton/Police Department

3. Township of Clinton/Police Department is located at 1371 Route 31 Clinton TWSP NJ 08801  is the employer of the DEF

4. DEF Hunterdon County is the employer of Marsh, Robeson, Crisologo, and Frinzi.  Hunterdon County Prosecutor's office 71 Main Street, PO Box 2900  Flemington, New Jersey 08822

5. DEF Kelsey Marsh is also named in her individual capacity

## FACTS COMMON TO ALL COUNTS

6. This complaint has been filed because the DEF's believe they are above the law and do not have to abide by the laws, civil rights of individuals and police rules that they swore to uphold.

1

7. On Jan 10, 2023 PLT, a commercial realtor, was working by reviewing/accessing the Beaver Brook Concourse building site located on 1465 NJ-31, Annandale / Clinton Township NJ

8. Around 1:00 PM PLT ran into Sam (his son) who he had not seen in 5 years due to him being alienated from PLT by his former wife (Posner).

9. PLT told Sam that he still loved him, missed him, asked him to go out to lunch and wanted Sam to get therapy for his alienation in accordance with all the Court appointed experts recommended.

10. Unbeknown to PLT and Sam, Sam's phone "Pocket dialed" Posner. Posner had her friend record PLT's and Sam's conversation to give to the police so she could have PLT prosecuted.

11. Posner also, despite knowing such was a lie, called the Clinton Police department and reported to them that Sam was "being beaten" by PLT, PLT was "Hitting her son" and that PLT "was waiting for the son [sam] when he came out."

12. DEF Tiger, Schleisier, Balsamo from the Clinton police responded to the call and immediately could see Posner's report was a lie. They also immediately had Sam confirm that PLT had never touched him.

13. PLT told DEFs that he was a commercial realtor and was checking out the site and ran into his son who he had not seen in 5 years due to him being alienated from PLT.

14. DEF confirmed to PLT that he knew what parental alienation was.

15. DEFs knew that PLT had a custody order with Posner for Sam and his sister and was ordered to still pay child support.

16. DEFs also falsely claimed and argued with PLT that Sam was emancipated from PLT.

17. Acting in retaliation to PLT disputing DEFs claim of emancipation, DEFs decided to push Sam to pursue domestic violence charges against PLT despite knowing there was no such basis.

18. Despite DEFs knowing the call was a false report, (and an example of the alienation that PLT had told them occurred), there were no "outstanding warrants" or "restraining orders" DEFs then asked PLT for his driver's license. PLT complied.

19. About 5 minutes later, DEFs asked PLT where his car was. PLT complied and pointed to his car that was about a 100 feet away from where they were standing.

20. DEFs then ordered PLT to get into his car and ordered another DEF to take his police car and block PLT in so he could not leave.  DEFs did not give PLT back his driver's license.

21. PLT offered to provide but the DEF's refused to review copies of the expert reports showing that PLT son was alienated from him, that Sam and Posner have a long history of making false allegations of abuse against PLT, that about a dozen experts determined with a medical degree of certainty that all the allegations made were in fact false and that several concluded that it was Posner that was forcing Sam to make the false allegations.

22. PLT also offered to provide but DEF's refused to review Sam's latest evaluation to confirm that Sam had learning and processing disabilities.

23. DEFs refused to do their job and investigate and accept anything that would get in the way of their retaliation against PLT who without any basis, despite witnessing first-hand how he was truthful via Posners false claim wanted to further destroy PLT chance of reconnecting with his son.

24. DEFs, while detaining PLT, ran his car plates and driver's license searching for infractions and issued him a citation for an expired registration.

25. At no time did DEF's read PLT his rights, tell him he could remain silent or leave, or that they had decided to and were investigating him.

26. While DEFs were refusing information from PLT, they were holding PLT waiting for Posner to send them information as Posner lied saying Sam had a "Restraining Order" against PLT.

27. Despite knowing there was no such restraining order, that Posner had lied about the assault and that PLT was just talking to his son, DEFs held PLT against his will for about an hour as Posner told him that she was going to have Sam file a TRO for domestic violence against PLT.

28. About 40 minutes after the initial contact, DEFs allowed Sam to leave the area.  DEFs still held PLT for an additional 20 Minutes before moving their police car and giving PLT back his license so he may leave.

29. Around 3 PM that day, DEF's called Sam to see if he was able to make it to the Court to file a restraining order.

3

30. DEFs were all aware that every single expert, about a dozen, concluded that DEFs had made false claims of abuse by PLT.  That Sam was forced and brainwashed by DEFs to make false allegations.

31. DEF's knew that multiple Judges had ruled that DEF's had actually lied and fabricated claims of domestic violence and harassment.

32. In a violation of PLT rights (and the statute) that FRO hearings must start to be adjudicated within 10 days, the Court adjourned the matter for 3 months when Sam was to return to school.

33. So for 3 months PLT lived in constant fear of being arrested as Posner had repeatedly done in the past by making up fictitious violations of TRO's and Court orders.

34. On March 16, 2023 after a full day trial, the Court denied the FRO.  The Court found:

    a.  Posner had put Sam into this conflict, and it was not fair to him
    b.  That Sam needed to have a relationship with PLT and therapy
    c.  That Posner filed a false police report to Clinton
    d.  Sam & Posner lied about PLT going to the house and trying to install a GPS
    e.  DEFs lied about PLT assaulting Sam.

35. Most importantly the Court also ruled that even if the Court was to accept everything that Sam/Posner alleged was "True," that it still was no way near a claim of domestic violence.

36. DEFs knew that PLT did not commit any actions that could be considered domestic violence.  DEF's used the false claim to try to help Posner remove any chance that PLT and his son could ever have a relationship and further harm the chance of PLT having a relationship with his daughter, who they knew was also alienated from PLT.

37. DEF's then refused to provide PLT with copies of the police report so he can defend himself against the FRO.  To cover up this as being further abuse and retaliation against PLT, despite knowing the FRO hearing had to be done within 10 days, they made PLT file an OPRA request to get the information knowing that they could take 7 business days to produce the information.

38. By contrast, DEFs instantly provided Posner with the police report and other stuff they wanted so they could prosecute the FRO against DEF.

39. Thereafter when DEF heard the FRO hearing was delayed, they refused to provide any of the information to PLT stating that he did not have any "interest" in the matter.  DEF knowing that there is no reciprocal discovery in an FRO, did not even give PLT what they gave Posner to prosecute.

4

40. On April 10, 2023 PLT filed a notice of tort claim with Clinton Township/Police Department.  So PLT's suit and claims against DEFs are both in their official and personal capacity.

41. DEFs, continuing with their retaliation, refused to file charges against Posner for making the knowingly false police report despite knowing that she did so and put peoples safety at risk

42. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner for the filing false police report against him despite knowing the crime occurred.

43. DEFs, continuing with their retaliation, refused to charge Posner and her friend for wiretapping despite knowing such occurred.

44. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner and her friend for wiretapping despite knowing such crime occurred.

45. DEF continuing with their retaliation did not inform PLT that he had the right to file the charges after they refused.

46. DEFs were well aware of the contracts between PLT and his former wife.

47. DEFs conduct as outline above tortuously interfered with PLT's rights in those contracts.

48. DEF were well aware how their actions and conduct would negatively affect the long term relationship that PLT had with his children and the harmful affect it would have upon PLT.

### THE COVER UP IS OFTEN AS BAD OR WORSE THAN THE CRIME AS IT SHOWS INTENT TO BREAK THE LAW

49. On April 10, 2023 PLT filed a notice of tort claim

50. told Captain Derosa he wanted to file a complaint against Tiger, Schleisier, Balsamo and other officers who might have acted illegally or improperly.  Neither him nor anyone at the department ever responded.

51. PLT then reached out again to file a complaint against the officers.  No one responded

52. Despite being required to respond immediately to internal affair complaints, 3-4 months later in August 2023, Ross finally reached out to PLT saying that he was going to investigate.

53. PLT never heard back from Ross.  So in November/December PLT again reached out to Derosa and Glennon again telling them that no one has ever taken his complaint.  They never respond.

54. In January 2024 Ross finally call PLT to take his complaint. PLT told him that he wanted to add himself, Derosa and Glennon to the complaint for not taking the complaint, as they were required.

55. Ross then called PLT a few days later saying he did not and could not take the complaint falsely alleging it was due to a lawsuit that PLT never filed.

56. PLT then asked Ross to transfer the matter to the prosecutors officers because it was clear that DEF were still retaliating against PLT and refusing to do their job. (PLT has since learned that Ross, Derosa and Glennon were required to transfer the matters against themselves to the prosecutors office as they were "superiors" to him and that he could not investigate himself.

57. PLT then reached out to the Hunterdon county prosecutor to take over the internal affairs complaint.

58. The prosecutor agreed and ordered DEF Kelsey Marsh and Frizzi to take PLTs complaint.

59. DEFs Clinton Township/Police Department again denied PLTs OPRA request to obtain information that was now needed to file an accurate and full complaint against its officers.

60. PLT traveled out to Hunterdon to meet with March and Frizzi

61. March was the officer who took the lead in taking PLT complaint.

62. It quickly became apparent to PLT that March was refusing to do her job, breached the duties that she owed to PLT and her true intent was to stop PLT from filing the complaint.

63. PLT told Marsh it was over a year since the incident occurred and asked her to obtain the police report, body cams, and other information so PLT could refresh his memory and see if there was anything else that occurred. March continued to refuse to do so without explanation.

64. At the hearing DEF said "that they were not going to provide me any discovery to help me file my complaint against these officers"

65. DEF Marshs line of questioning was clearly not to obtain the facts and the basis for PLT's complaint but to cover up the officers illegal and unconstitutional conduct.

66. When PLT did not give in to DEF's Marsh's plan, Marsh became abusive towards PLT and falsely stated that he committed domestic violence against Posner and was not going to do it to her. That she was refusing to take the complaint against the officers because PLT was trying to control her and ordered PLT to leave, would not allow PLT to have a copy of the tape so he could file a complaint

against her and Frizzi who was sitting in the room while this was occurring and allowed officer March to ignore the orders that they were given to take the complaint.

67. After the meeting, I informed Robeson of the improper conduct of her employee. Refusing to take the report as she was ordered to do and the conduct that she showed during the interview.

> "Even if I was "louder" then she hoped or was "condensing" in my tone, both officers were still required to take my full statement and complaint which they refused to do. They did not want to hear how they refused to take my internal affairs complaint. How it took almost a year for Detective Ross to respond or the cleary false reasons as to why he said he did not do what the law required them to do. Even if your officers thought I was a "total lunatic" they should have grave concerns over DeRosa, Ross and Glennon conduct in refusing to take internal affairs complaint and not acting as the law requires especially since my complaint of improper conduct are against the same officers that others have made complaints against for improper conduct. I sure you are aware that there have been 3 such complaints against Chief Derosa."

68. Robeson did not respond so PLT was forced to send a second email.

69. Robeson finally responded and agree to transfer the entire matter to the NJ Attorney General's Office of Professional Integrity and Accountability as PLT now that I had a complaint to file against her officers as well.

70. DEF's Huntington County refused PLT OPRA request to obtain the video so he may properly prepare for the interview in filing his complaint.

71. Despite claiming they transferred the case, they refused to give me the information of whom they transferred the case too.

72. After a ½ dozen follow ups with the OPIA, as no one would respond to PLT, several months later the OPIA ignored the request to take the case and instead said that an officer in Hunterdon should investigate all the complaints, including those against people in his office.

73. Robeson did not push back and ordered her officer to take the complaint.

74. In July 2024, PLT met with DEF Crisgolo who took his complaint.

75. In Aug 2024, PLT followed up with Crisgolo and gave him more information to support his statement.

76. As of the filing of this complaint, PLT's complaints have still not been investigated or a report or findings issued, despite the rules requiring such to be done within 45 days.

7

WHEREFORE, PLT repeats and incorporates each and every allegation as set forth above as if fully set forth at length herein, demands against all of the DEFs, jointly and severally, as well as their successors and assigns, for the following relief:

### COUNT 1
Malicious Prosecution, Malicious use of process and Malicious abuse of process

### COUNT 2
Deprivation of Rights

### COUNT 3
Intentional Infliction of Emotional Distress (IIED)

### COUNT 4
Negligent Infliction of Emotional Distress (NIED)

### COUNT 5
False Imprisonment

### COUNT 6
Civil Conspiracy

### COUNT 7
Negligence or Gross Negligence

### COUNT 8
Invasion of Privacy

### COUNT 9
Common Law Fraud

### COUNT 10
Conspiracy to Commit Fraud

### COUNT 11
Tortious interference with contractual relationship

### COUNT 12
Aiding the commission of a tort

### COUNT 13
Breach of Duty

### COUNT 14
Deprivation and interference with protected parental rights

### PRAYER FOR RELIEF

As a direct and proximate result of the foregoing, PLT has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, and substantial medical and other expenses for treatment and care, past, present, and future. Damages for loss of service, society, and companionship. Said losses, injuries, and expenses are either permanent or continuing in nature and PLT will continue to suffer same in the future.

WHEREFORE, PLT demands judgment against DEFs for compensatory damages, consequential damages, punitive damages, actual damages, costs, interest, awarding reasonable attorneys fees and costs and expense of litigation. and other such relief as this Court deems just and proper.

## VERIFICATION OF ASSERTED FACTS

I PLT, do hereby certify that the foregoing factual assertions made in this Complaint are made by me and are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

## DESIGNATION OF TRIAL COUNSEL

PLT is designated as trial counsel in this matter.

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

## DEMANDS FOR A JURY TRIAL

The PLT demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey. Court Rules 1:8-2(b) and 4:35-1(a)

## CERTIFICATION PURSUANT TO R. 1:38-7

I certify that all confidential personal identifiers have been removed or redacted from this Complaint and that the same information will be removed or redacted from all documents submitted to the Court in connection with this matter in the future consistent with Rule 1:38-7(b).

DATED: Jan 3, 2024                                    Eric S. Weiss, Plaintiff

**Eric S. Weiss**
210 Walnut Street
Garwood, NJ 07027
(908) 913 0832
ericsweiss@gmail.com

| | |
|---|---|
| Eric Weiss<br><br>                 Plaintiff,<br><br>              vs.<br><br>John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh,<br>John/Jane Does 1-10<br><br>             Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CIVIL DIVISION; SOMERSET COUNTY<br>DOCKET NO.<br><br><br>**COMPLAINT** |

PLT by way of complaint against the DEFs, verified to the facts asserted, pleads as follows:

<u>**THE PARTIES**</u>

1.  PLT lives in Garwood NJ

2.  DEFs John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon are employed by the Township of Clinton/Police Department

3.  Township of Clinton/Police Department is located at 1371 Route 31 Clinton TWSP NJ 08801  is the employer of the DEF

4.  DEF Hunterdon County is the employer of Marsh, Robeson, Crisologo, and Frinzi.  Hunterdon County Prosecutor's office 71 Main Street, PO Box 2900  Flemington, New Jersey 08822

5.  DEF Kelsey Marsh is also named in her individual capacity

<u>**FACTS COMMON TO ALL COUNTS**</u>

6.  This complaint has been filed because the DEF's believe they are above the law and do not have to abide by the laws, civil rights of individuals and police rules that they swore to uphold.

1

7. On Jan 10, 2023 PLT, a commercial realtor, was working by reviewing/accessing the Beaver Brook Concourse building site located on 1465 NJ-31, Annandale / Clinton Township NJ

8. Around 1:00 PM PLT ran into Sam (his son) who he had not seen in 5 years due to him being alienated from PLT by his former wife (Posner).

9. PLT told Sam that he still loved him, missed him, asked him to go out to lunch and wanted Sam to get therapy for his alienation in accordance with all the Court appointed experts recommended.

10. Unbeknown to PLT and Sam, Sam's phone "Pocket dialed" Posner. Posner had her friend record PLT's and Sam's conversation to give to the police so she could have PLT prosecuted.

11. Posner also, despite knowing such was a lie, called the Clinton Police department and reported to them that Sam was "being beaten" by PLT, PLT was "Hitting her son" and that PLT "was waiting for the son [sam] when he came out."

12. DEF Tiger, Schleisier, Balsamo from the Clinton police responded to the call and immediately could see Posner's report was a lie. They also immediately had Sam confirm that PLT had never touched him.

13. PLT told DEFs that he was a commercial realtor and was checking out the site and ran into his son who he had not seen in 5 years due to him being alienated from PLT.

14. DEF confirmed to PLT that he knew what parental alienation was.

15. DEFs knew that PLT had a custody order with Posner for Sam and his sister and was ordered to still pay child support.

16. DEFs also falsely claimed and argued with PLT that Sam was emancipated from PLT.

17. Acting in retaliation to PLT disputing DEFs claim of emancipation, DEFs decided to push Sam to pursue domestic violence charges against PLT despite knowing there was no such basis.

18. Despite DEFs knowing the call was a false report, (and an example of the alienation that PLT had told them occurred), there were no "outstanding warrants" or "restraining orders" DEFs then asked PLT for his driver's license. PLT complied.

19. About 5 minutes later, DEFs asked PLT where his car was. PLT complied and pointed to his car that was about a 100 feet away from where they were standing.

20. DEFs then ordered PLT to get into his car and ordered another DEF to take his police car and block PLT in so he could not leave. DEFs did not give PLT back his driver's license.

21. PLT offered to provide but the DEF's refused to review copies of the expert reports showing that PLT son was alienated from him, that Sam and Posner have a long history of making false allegations of abuse against PLT, that about a dozen experts determined with a medical degree of certainty that all the allegations made were in fact false and that several concluded that it was Posner that was forcing Sam to make the false allegations.

22. PLT also offered to provide but DEF's refused to review Sam's latest evaluation to confirm that Sam had learning and processing disabilities.

23. DEFs refused to do their job and investigate and accept anything that would get in the way of their retaliation against PLT who without any basis, despite witnessing first-hand how he was truthful via Posners false claim wanted to further destroy PLT chance of reconnecting with his son.

24. DEFs, while detaining PLT, ran his car plates and driver's license searching for infractions and issued him a citation for an expired registration.

25. At no time did DEF's read PLT his rights, tell him he could remain silent or leave, or that they had decided to and were investigating him.

26. While DEFs were refusing information from PLT, they were holding PLT waiting for Posner to send them information as Posner lied saying Sam had a "Restraining Order" against PLT.

27. Despite knowing there was no such restraining order, that Posner had lied about the assault and that PLT was just talking to his son, DEFs held PLT against his will for about an hour as Posner told him that she was going to have Sam file a TRO for domestic violence against PLT.

28. About 40 minutes after the initial contact, DEFs allowed Sam to leave the area. DEFs still held PLT for an additional 20 Minutes before moving their police car and giving PLT back his license so he may leave.

29. Around 3 PM that day, DEF's called Sam to see if he was able to make it to the Court to file a restraining order.

3

30. DEFs were all aware that every single expert, about a dozen, concluded that DEFs had made false claims of abuse by PLT.  That Sam was forced and brainwashed by DEFs to make false allegations.

31. DEF's knew that multiple Judges had ruled that DEF's had actually lied and fabricated claims of domestic violence and harassment.

32. In a violation of PLT rights (and the statute) that FRO hearings must start to be adjudicated within 10 days, the Court adjourned the matter for 3 months when Sam was to return to school.

33. So for 3 months PLT lived in constant fear of being arrested as Posner had repeatedly done in the past by making up fictitious violations of TRO's and Court orders.

34. On March 16, 2023 after a full day trial, the Court denied the FRO.  The Court found:

   a. Posner had put Sam into this conflict, and it was not fair to him
   b. That Sam needed to have a relationship with PLT and therapy
   c. That Posner filed a false police report to Clinton
   d. Sam & Posner lied about PLT going to the house and trying to install a GPS
   e. DEFs lied about PLT assaulting Sam.

35. Most importantly the Court also ruled that even if the Court was to accept everything that Sam/Posner alleged was "True," that it still was no way near a claim of domestic violence.

36. DEFs knew that PLT did not commit any actions that could be considered domestic violence.  DEF's used the false claim to try to help Posner remove any chance that PLT and his son could ever have a relationship and further harm the chance of PLT having a relationship with his daughter, who they knew was also alienated from PLT.

37. DEF's then refused to provide PLT with copies of the police report so he can defend himself against the FRO.  To cover up this as being further abuse and retaliation against PLT, despite knowing the FRO hearing had to be done within 10 days, they made PLT file an OPRA request to get the information knowing that they could take 7 business days to produce the information.

38. By contrast, DEFs instantly provided Posner with the police report and other stuff they wanted so they could prosecute the FRO against DEF.

39. Thereafter when DEF heard the FRO hearing was delayed, they refused to provide any of the information to PLT stating that he did not have any "interest" in the matter.  DEF knowing that there is no reciprocal discovery in an FRO, did not even give PLT what they gave Posner to prosecute.

40. On April 10, 2023 PLT filed a notice of tort claim with Clinton Township/Police Department.  So PLT's suit and claims against DEFs are both in their official and personal capacity.

41. DEFs, continuing with their retaliation, refused to file charges against Posner for making the knowingly false police report despite knowing that she did so and put peoples safety at risk

42. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner for the filing false police report against him despite knowing the crime occurred.

43. DEFs, continuing with their retaliation, refused to charge Posner and her friend for wiretapping despite knowing such occurred.

44. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner and her friend for wiretapping despite knowing such crime occurred.

45. DEF continuing with their retaliation did not inform PLT that he had the right to file the charges after they refused.

46. DEFs were well aware of the contracts between PLT and his former wife.

47. DEFs conduct as outline above tortuously interfered with PLT's rights in those contracts.

48. DEF were well aware how their actions and conduct would negatively affect the long term relationship that PLT had with his children and the harmful affect it would have upon PLT.

### THE COVER UP IS OFTEN AS BAD OR WORSE THAN THE CRIME
### AS IT SHOWS INTENT TO BREAK THE LAW

49. On April 10, 2023 PLT filed a notice of tort claim

50. told Captain Derosa he wanted to file a complaint against Tiger, Schleisier, Balsamo and other officers who might have acted illegally or improperly.  Neither him nor anyone at the department ever responded.

51. PLT then reached out again to file a complaint against the officers.  No one responded

52. Despite being required to respond immediately to internal affair complaints, 3-4 months later in August 2023, Ross finally reached out to PLT saying that he was going to investigate.

53. PLT never heard back from Ross.  So in November/December PLT again reached out to Derosa and Glennon again telling them that no one has ever taken his complaint.  They never respond.

54. In January 2024 Ross finally call PLT to take his complaint.  PLT told him that he wanted to add himself, Derosa and Glennon to the complaint for not taking the complaint, as they were required.

55. Ross then called PLT a few days later saying he did not and could not take the complaint falsely alleging it was due to a lawsuit that PLT never filed.

56. PLT then asked Ross to transfer the matter to the prosecutors officers because it was clear that DEF were still retaliating against PLT and refusing to do their job.  (PLT has since learned that Ross, Derosa and Glennon were required to transfer the matters against themselves to the prosecutors office as they were "superiors" to him and that he could not investigate himself.

57. PLT then reached out to the Hunterdon county prosecutor to take over the internal affairs complaint.

58. The prosecutor agreed and ordered DEF Kelsey Marsh and Frizzi to take PLTs complaint.

59. DEFs Clinton Township/Police Department again denied PLTs OPRA request to obtain information that was now needed to file an accurate and full complaint against its officers.

60. PLT traveled out to Hunterdon to meet with March and Frizzi

61. March was the officer who took the lead in taking PLT complaint.

62. It quickly became apparent to PLT that March was refusing to do her job, breached the duties that she owed to PLT and her true intent was to stop PLT from filing the complaint.

63. PLT told Marsh it was over a year since the incident occurred and asked her to obtain the police report, body cams, and other information so PLT could refresh his memory and see if there was anything else that occurred.  March continued to refuse to do so without explanation.

64. At the hearing DEF said "that they were not going to provide me any discovery to help me file my complaint against these officers"

65. DEF Marshs line of questioning was clearly not to obtain the facts and the basis for PLT's complaint but to cover up the officers illegal and unconstitutional conduct.

66. When PLT did not give in to DEF's Marsh's plan, Marsh became abusive towards PLT and falsely stated that he committed domestic violence against Posner and was not going to do it to her.  That she was refusing to take the complaint against the officers because PLT was trying to control her and ordered PLT to leave, would not allow PLT to have a copy of the tape so he could file a complaint

against her and Frizzi who was sitting in the room while this was occurring and allowed officer March to ignore the orders that they were given to take the complaint.

67. After the meeting, I informed Robeson of the improper conduct of her employee. Refusing to take the report as she was ordered to do and the conduct that she showed during the interview.

> "Even if I was "louder" then she hoped or was "condensing" in my tone, both officers were still required to take my full statement and complaint which they refused to do. They did not want to hear how they refused to take my internal affairs complaint. How it took almost a year for Detective Ross to respond or the cleary false reasons as to why he said he did not do what the law required them to do. Even if your officers thought I was a "total lunatic" they should have grave concerns over DeRosa, Ross and Glennon conduct in refusing to take internal affairs complaint and not acting as the law requires especially since my complaint of improper conduct are against the same officers that others have made complaints against for improper conduct. I sure you are aware that there have been 3 such complaints against Chief Derosa."

68. Robeson did not respond so PLT was forced to send a second email.

69. Robeson finally responded and agree to transfer the entire matter to the NJ Attorney General's Office of Professional Integrity and Accountability as PLT now that I had a complaint to file against her officers as well.

70. DEF's Huntington County refused PLT OPRA request to obtain the video so he may properly prepare for the interview in filing his complaint.

71. Despite claiming they transferred the case, they refused to give me the information of whom they transferred the case too.

72. After a ½ dozen follow ups with the OPIA, as no one would respond to PLT, several months later the OPIA ignored the request to take the case and instead said that an officer in Hunterdon should investigate all the complaints, including those against people in his office.

73. Robeson did not push back and ordered her officer to take the complaint.

74. In July 2024, PLT met with DEF Crisgolo who took his complaint.

75. In Aug 2024, PLT followed up with Crisgolo and gave him more information to support his statement.

76. As of the filing of this complaint, PLT's complaints have still not been investigated or a report or findings issued, despite the rules requiring such to be done within 45 days.

WHEREFORE, PLT repeats and incorporates each and every allegation as set forth above as if fully set forth at length herein, demands against all of the DEFs, jointly and severally, as well as their successors and assigns, for the following relief:

### COUNT 1
Malicious Prosecution, Malicious use of process and Malicious abuse of process

### COUNT 2
Deprivation of Rights

### COUNT 3
Intentional Infliction of Emotional Distress (IIED)

### COUNT 4
Negligent Infliction of Emotional Distress (NIED)

### COUNT 5
False Imprisonment

### COUNT 6
Civil Conspiracy

### COUNT 7
Negligence or Gross Negligence

### COUNT 8
Invasion of Privacy

### COUNT 9
Common Law Fraud

### COUNT 10
Conspiracy to Commit Fraud

### COUNT 11
Tortious interference with contractual relationship

### COUNT 12
Aiding the commission of a tort

### COUNT 13
Breach of Duty

### COUNT 14
Deprivation and interference with protected parental rights

### PRAYER FOR RELIEF

As a direct and proximate result of the foregoing, PLT has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, and substantial medical and other expenses for treatment and care, past, present, and future. Damages for loss of service, society, and companionship. Said losses, injuries, and expenses are either permanent or continuing in nature and PLT will continue to suffer same in the future.

WHEREFORE, PLT demands judgment against DEFs for compensatory damages, consequential damages, punitive damages, actual damages, costs, interest, awarding reasonable attorneys fees and costs and expense of litigation. and other such relief as this Court deems just and proper.

## VERIFICATION OF ASSERTED FACTS

I PLT, do hereby certify that the foregoing factual assertions made in this Complaint are made by me and are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

## DESIGNATION OF TRIAL COUNSEL

PLT is designated as trial counsel in this matter.

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

## DEMANDS FOR A JURY TRIAL

The PLT demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey. Court Rules 1:8-2(b) and 4:35-1(a)

## CERTIFICATION PURSUANT TO R. 1:38-7

I certify that all confidential personal identifiers have been removed or redacted from this Complaint and that the same information will be removed or redacted from all documents submitted to the Court in connection with this matter in the future consistent with Rule 1:38-7(b).

DATED: Jan 3, 2024                              Eric S. Weiss, Plaintiff

9

**Eric S. Weiss**
210 Walnut Street
Garwood, NJ 07027
(908) 913 0832
ericsweiss@gmail.com

<table>
<tr><td>

Eric Weiss

          Plaintiff,

          vs.

John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh,
John/Jane Does 1-10

          Defendants.

</td><td>

SUPERIOR COURT OF NEW JERSEY
CIVIL DIVISION; SOMERSET COUNTY
DOCKET NO.


**COMPLAINT**

</td></tr>
</table>

PLT by way of complaint against the DEFs, verified to the facts asserted, pleads as follows:

### THE PARTIES

1. PLT lives in Garwood NJ

2. DEFs John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon are employed by the Township of Clinton/Police Department

3. Township of Clinton/Police Department is located at 1371 Route 31 Clinton TWSP NJ 08801 is the employer of the DEF

4. DEF Hunterdon County is the employer of Marsh, Robeson, Crisologo, and Frinzi.  Hunterdon County Prosecutor's office 71 Main Street, PO Box 2900  Flemington, New Jersey 08822

5. DEF Kelsey Marsh is also named in her individual capacity

### FACTS COMMON TO ALL COUNTS

6. This complaint has been filed because the DEF's believe they are above the law and do not have to abide by the laws, civil rights of individuals and police rules that they swore to uphold.

7. On Jan 10, 2023 PLT, a commercial realtor, was working by reviewing/accessing the Beaver Brook Concourse building site located on 1465 NJ-31, Annandale / Clinton Township NJ

8. Around 1:00 PM PLT ran into Sam (his son) who he had not seen in 5 years due to him being alienated from PLT by his former wife (Posner).

9. PLT told Sam that he still loved him, missed him, asked him to go out to lunch and wanted Sam to get therapy for his alienation in accordance with all the Court appointed experts recommended.

10. Unbeknown to PLT and Sam, Sam's phone "Pocket dialed" Posner.  Posner had her friend record PLT's and Sam's conversation to give to the police so she could have PLT prosecuted.

11. Posner also, despite knowing such was a lie, called the Clinton Police department and reported to them that Sam was "being beaten" by PLT, PLT was "Hitting her son" and that PLT "was waiting for the son [sam] when he came out."

12. DEF Tiger, Schleisier, Balsamo from the Clinton police responded to the call and immediately could see Posner's report was a lie. They also immediately had Sam confirm that PLT had never touched him.

13. PLT told DEFs that he was a commercial realtor and was checking out the site and ran into his son who he had not seen in 5 years due to him being alienated from PLT.

14. DEF confirmed to PLT that he knew what parental alienation was.

15. DEFs knew that PLT had a custody order with Posner for Sam and his sister and was ordered to still pay child support.

16. DEFs also falsely claimed and argued with PLT that Sam was emancipated from PLT.

17. Acting in retaliation to PLT disputing DEFs claim of emancipation, DEFs decided to push Sam to pursue domestic violence charges against PLT despite knowing there was no such basis.

18. Despite DEFs knowing the call was a false report, (and an example of the alienation that PLT had told them occurred), there were no "outstanding warrants" or "restraining orders" DEFs then asked PLT for his driver's license.  PLT complied.

19. About 5 minutes later, DEFs asked PLT where his car was.  PLT complied and pointed to his car that was about a 100 feet away from where they were standing.

20. DEFs then ordered PLT to get into his car and ordered another DEF to take his police car and block PLT in so he could not leave.  DEFs did not give PLT back his driver's license.

21. PLT offered to provide but the DEF's refused to review copies of the expert reports showing that PLT son was alienated from him, that Sam and Posner have a long history of making false allegations of abuse against PLT, that about a dozen experts determined with a medical degree of certainty that all the allegations made were in fact false and that several concluded that it was Posner that was forcing Sam to make the false allegations.

22. PLT also offered to provide but DEF's refused to review Sam's latest evaluation to confirm that Sam had learning and processing disabilities.

23. DEFs refused to do their job and investigate and accept anything that would get in the way of their retaliation against PLT who without any basis, despite witnessing first-hand how he was truthful via Posners false claim wanted to further destroy PLT chance of reconnecting with his son.

24. DEFs, while detaining PLT, ran his car plates and driver's license searching for infractions and issued him a citation for an expired registration.

25. At no time did DEF's read PLT his rights, tell him he could remain silent or leave, or that they had decided to and were investigating him.

26. While DEFs were refusing information from PLT, they were holding PLT waiting for Posner to send them information as Posner lied saying Sam had a "Restraining Order" against PLT.

27. Despite knowing there was no such restraining order, that Posner had lied about the assault and that PLT was just talking to his son, DEFs held PLT against his will for about an hour as Posner told him that she was going to have Sam file a TRO for domestic violence against PLT.

28. About 40 minutes after the initial contact, DEFs allowed Sam to leave the area.  DEFs still held PLT for an additional 20 Minutes before moving their police car and giving PLT back his license so he may leave.

29. Around 3 PM that day, DEF's called Sam to see if he was able to make it to the Court to file a restraining order.

30. DEFs were all aware that every single expert, about a dozen, concluded that DEFs had made false claims of abuse by PLT.  That Sam was forced and brainwashed by DEFs to make false allegations.

31. DEF's knew that multiple Judges had ruled that DEF's had actually lied and fabricated claims of domestic violence and harassment.

32. In a violation of PLT rights (and the statute) that FRO hearings must start to be adjudicated within 10 days, the Court adjourned the matter for 3 months when Sam was to return to school.

33. So for 3 months PLT lived in constant fear of being arrested as Posner had repeatedly done in the past by making up fictitious violations of TRO's and Court orders.

34. On March 16, 2023 after a full day trial, the Court denied the FRO.  The Court found:

    a. Posner had put Sam into this conflict, and it was not fair to him
    b. That Sam needed to have a relationship with PLT and therapy
    c. That Posner filed a false police report to Clinton
    d. Sam & Posner lied about PLT going to the house and trying to install a GPS
    e. DEFs lied about PLT assaulting Sam.

35. Most importantly the Court also ruled that even if the Court was to accept everything that Sam/Posner alleged was "True," that it still was no way near a claim of domestic violence.

36. DEFs knew that PLT did not commit any actions that could be considered domestic violence.  DEF's used the false claim to try to help Posner remove any chance that PLT and his son could ever have a relationship and further harm the chance of PLT having a relationship with his daughter, who they knew was also alienated from PLT.

37. DEF's then refused to provide PLT with copies of the police report so he can defend himself against the FRO.  To cover up this as being further abuse and retaliation against PLT, despite knowing the FRO hearing had to be done within 10 days, they made PLT file an OPRA request to get the information knowing that they could take 7 business days to produce the information.

38. By contrast, DEFs instantly provided Posner with the police report and other stuff they wanted so they could prosecute the FRO against DEF.

39. Thereafter when DEF heard the FRO hearing was delayed, they refused to provide any of the information to PLT stating that he did not have any "interest" in the matter.  DEF knowing that there is no reciprocal discovery in an FRO, did not even give PLT what they gave Posner to prosecute.

40. On April 10, 2023 PLT filed a notice of tort claim with Clinton Township/Police Department. So PLT's suit and claims against DEFs are both in their official and personal capacity.

41. DEFs, continuing with their retaliation, refused to file charges against Posner for making the knowingly false police report despite knowing that she did so and put peoples safety at risk

42. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner for the filing false police report against him despite knowing the crime occurred.

43. DEFs, continuing with their retaliation, refused to charge Posner and her friend for wiretapping despite knowing such occurred.

44. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner and her friend for wiretapping despite knowing such crime occurred.

45. DEF continuing with their retaliation did not inform PLT that he had the right to file the charges after they refused.

46. DEFs were well aware of the contracts between PLT and his former wife.

47. DEFs conduct as outline above tortuously interfered with PLT's rights in those contracts.

48. DEF were well aware how their actions and conduct would negatively affect the long term relationship that PLT had with his children and the harmful affect it would have upon PLT.

### THE COVER UP IS OFTEN AS BAD OR WORSE THAN THE CRIME AS IT SHOWS INTENT TO BREAK THE LAW

49. On April 10, 2023 PLT filed a notice of tort claim

50. told Captain Derosa he wanted to file a complaint against Tiger, Schleisier, Balsamo and other officers who might have acted illegally or improperly. Neither him nor anyone at the department ever responded.

51. PLT then reached out again to file a complaint against the officers. No one responded

52. Despite being required to respond immediately to internal affair complaints, 3-4 months later in August 2023, Ross finally reached out to PLT saying that he was going to investigate.

53. PLT never heard back from Ross. So in November/December PLT again reached out to Derosa and Glennon again telling them that no one has ever taken his complaint. They never respond.

54. In January 2024 Ross finally call PLT to take his complaint.  PLT told him that he wanted to add himself, Derosa and Glennon to the complaint for not taking the complaint, as they were required.

55. Ross then called PLT a few days later saying he did not and could not take the complaint falsely alleging it was due to a lawsuit that PLT never filed.

56. PLT then asked Ross to transfer the matter to the prosecutors officers because it was clear that DEF were still retaliating against PLT and refusing to do their job.  (PLT has since learned that Ross, Derosa and Glennon were required to transfer the matters against themselves to the prosecutors office as they were "superiors" to him and that he could not investigate himself.

57. PLT then reached out to the Hunterdon county prosecutor to take over the internal affairs complaint.

58. The prosecutor agreed and ordered DEF Kelsey Marsh and Frizzi to take PLTs complaint.

59. DEFs Clinton Township/Police Department again denied PLTs OPRA request to obtain information that was now needed to file an accurate and full complaint against its officers.

60. PLT traveled out to Hunterdon to meet with March and Frizzi

61. March was the officer who took the lead in taking PLT complaint.

62. It quickly became apparent to PLT that March was refusing to do her job, breached the duties that she owed to PLT and her true intent was to stop PLT from filing the complaint.

63. PLT told Marsh it was over a year since the incident occurred and asked her to obtain the police report, body cams, and other information so PLT could refresh his memory and see if there was anything else that occurred.  March continued to refuse to do so without explanation.

64. At the hearing DEF said "that they were not going to provide me any discovery to help me file my complaint against these officers"

65. DEF Marshs line of questioning was clearly not to obtain the facts and the basis for PLT's complaint but to cover up the officers illegal and unconstitutional conduct.

66. When PLT did not give in to DEF's Marsh's plan, Marsh became abusive towards PLT and falsely stated that he committed domestic violence against Posner and was not going to do it to her.  That she was refusing to take the complaint against the officers because PLT was trying to control her and ordered PLT to leave, would not allow PLT to have a copy of the tape so he could file a complaint

against her and Frizzi who was sitting in the room while this was occurring and allowed officer March to ignore the orders that they were given to take the complaint.

67. After the meeting, I informed Robeson of the improper conduct of her employee.  Refusing to take the report as she was ordered to do and the conduct that she showed during the interview.

> "Even if I was "louder" then she hoped or was "condensing" in my tone, both officers were still required to take my full statement and complaint which they refused to do.  They did not want to hear how they refused to take my internal affairs complaint.  How it took almost a year for Detective Ross to respond or the cleary false reasons as to why he said he did not do what the law required them to do.  Even if your officers thought I was a "total lunatic" they should have grave concerns over DeRosa, Ross and Glennon conduct in refusing to take internal affairs complaint and not acting as the law requires especially since my complaint of improper conduct are against the same officers that others have made complaints against for improper conduct.  I sure you are aware that there have been 3 such complaints against Chief Derosa."

68. Robeson did not respond so PLT was forced to send a second email.

69. Robeson finally responded and agree to transfer the entire matter to the NJ Attorney General's Office of Professional Integrity and Accountability as PLT now that I had a complaint to file against her officers as well.

70. DEF's Huntington County refused PLT OPRA request to obtain the video so he may properly prepare for the interview in filing his complaint.

71. Despite claiming they transferred the case, they refused to give me the information of whom they transferred the case too.

72. After a ½ dozen follow ups with the OPIA, as no one would respond to PLT, several months later the OPIA ignored the request to take the case and instead said that an officer in Hunterdon should investigate all the complaints, including those against people in his office.

73. Robeson did not push back and ordered her officer to take the complaint.

74. In July 2024, PLT met with DEF Crisgolo who took his complaint.

75. In Aug 2024, PLT followed up with Crisgolo and gave him more information to support his statement.

76. As of the filing of this complaint, PLT's complaints have still not been investigated or a report or findings issued, despite the rules requiring such to be done within 45 days.

WHEREFORE, PLT repeats and incorporates each and every allegation as set forth above as if fully set forth at length herein, demands against all of the DEFs, jointly and severally, as well as their successors and assigns, for the following relief:

## COUNT 1
Malicious Prosecution, Malicious use of process and Malicious abuse of process

## COUNT 2
Deprivation of Rights

## COUNT 3
Intentional Infliction of Emotional Distress (IIED)

## COUNT 4
Negligent Infliction of Emotional Distress (NIED)

## COUNT 5
False Imprisonment

## COUNT 6
Civil Conspiracy

## COUNT 7
Negligence or Gross Negligence

## COUNT 8
Invasion of Privacy

## COUNT 9
Common Law Fraud

## COUNT 10
Conspiracy to Commit Fraud

## COUNT 11
Tortious interference with contractual relationship

## COUNT 12
Aiding the commission of a tort

## COUNT 13
Breach of Duty

## COUNT 14
Deprivation and interference with protected parental rights

## PRAYER FOR RELIEF

8

As a direct and proximate result of the foregoing, PLT has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, and substantial medical and other expenses for treatment and care, past, present, and future. Damages for loss of service, society, and companionship. Said losses, injuries, and expenses are either permanent or continuing in nature and PLT will continue to suffer same in the future.

WHEREFORE, PLT demands judgment against DEFs for compensatory damages, consequential damages, punitive damages, actual damages, costs, interest, awarding reasonable attorneys fees and costs and expense of litigation. and other such relief as this Court deems just and proper.

## VERIFICATION OF ASSERTED FACTS

I PLT, do hereby certify that the foregoing factual assertions made in this Complaint are made by me and are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

## DESIGNATION OF TRIAL COUNSEL

PLT is designated as trial counsel in this matter.

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

## DEMANDS FOR A JURY TRIAL

The PLT demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey. Court Rules 1:8-2(b) and 4:35-1(a)

## CERTIFICATION PURSUANT TO R. 1:38-7

I certify that all confidential personal identifiers have been removed or redacted from this Complaint and that the same information will be removed or redacted from all documents submitted to the Court in connection with this matter in the future consistent with Rule 1:38-7(b).

DATED: Jan 3, 2024                                    Eric S. Weiss, Plaintiff

**Eric S. Weiss**
210 Walnut Street
Garwood, NJ 07027
(908) 913 0832
ericsweiss@gmail.com

| | |
|---|---|
| Eric Weiss<br><br>        Plaintiff,<br><br>        vs.<br><br>John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh,<br>John/Jane Does 1-10<br><br>        Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CIVIL DIVISION; SOMERSET COUNTY<br>DOCKET NO.<br><br><br>**COMPLAINT** |

PLT by way of complaint against the DEFs, verified to the facts asserted, pleads as follows:

### THE PARTIES

1. PLT lives in Garwood NJ

2. DEFs John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon are employed by the Township of Clinton/Police Department

3. Township of Clinton/Police Department is located at 1371 Route 31 Clinton TWSP NJ 08801  is the employer of the DEF

4. DEF Hunterdon County is the employer of Marsh, Robeson, Crisologo, and Frinzi.  Hunterdon County Prosecutor's office 71 Main Street, PO Box 2900  Flemington, New Jersey 08822

5. DEF Kelsey Marsh is also named in her individual capacity

### FACTS COMMON TO ALL COUNTS

6. This complaint has been filed because the DEF's believe they are above the law and do not have to abide by the laws, civil rights of individuals and police rules that they swore to uphold.

7. On Jan 10, 2023 PLT, a commercial realtor, was working by reviewing/accessing the Beaver Brook Concourse building site located on 1465 NJ-31, Annandale / Clinton Township NJ

8. Around 1:00 PM PLT ran into Sam (his son) who he had not seen in 5 years due to him being alienated from PLT by his former wife (Posner).

9. PLT told Sam that he still loved him, missed him, asked him to go out to lunch and wanted Sam to get therapy for his alienation in accordance with all the Court appointed experts recommended.

10. Unbeknown to PLT and Sam, Sam's phone "Pocket dialed" Posner. Posner had her friend record PLT's and Sam's conversation to give to the police so she could have PLT prosecuted.

11. Posner also, despite knowing such was a lie, called the Clinton Police department and reported to them that Sam was "being beaten" by PLT, PLT was "Hitting her son" and that PLT "was waiting for the son [sam] when he came out."

12. DEF Tiger, Schleisier, Balsamo from the Clinton police responded to the call and immediately could see Posner's report was a lie. They also immediately had Sam confirm that PLT had never touched him.

13. PLT told DEFs that he was a commercial realtor and was checking out the site and ran into his son who he had not seen 5 years due to him being alienated from PLT.

14. DEF confirmed to PLT that he knew what parental alienation was.

15. DEFs knew that PLT had a custody order with Posner for Sam and his sister and was ordered to still pay child support.

16. DEFs also falsely claimed and argued with PLT that Sam was emancipated from PLT.

17. Acting in retaliation to PLT disputing DEFs claim of emancipation, DEFs decided to push Sam to pursue domestic violence charges against PLT despite knowing there was no such basis.

18. Despite DEFs knowing the call was a false report, (and an example of the alienation that PLT had told them occurred), there were no "outstanding warrants" or "restraining orders" DEFs then asked PLT for his driver's license. PLT complied.

19. About 5 minutes later, DEFs asked PLT where his car was. PLT complied and pointed to his car that was about a 100 feet away from where they were standing.

20. DEFs then ordered PLT to get into his car and ordered another DEF to take his police car and block PLT in so he could not leave.  DEFs did not give PLT back his driver's license.

21. PLT offered to provide but the DEF's refused to review copies of the expert reports showing that PLT son was alienated from him, that Sam and Posner have a long history of making false allegations of abuse against PLT, that about a dozen experts determined with a medical degree of certainty that all the allegations made were in fact false and that several concluded that it was Posner that was forcing Sam to make the false allegations.

22. PLT also offered to provide but DEF's refused to review Sam's latest evaluation to confirm that Sam had learning and processing disabilities.

23. DEFs refused to do their job and investigate and accept anything that would get in the way of their retaliation against PLT who without any basis, despite witnessing first-hand how he was truthful via Posners false claim wanted to further destroy PLT chance of reconnecting with his son.

24. DEFs, while detaining PLT, ran his car plates and driver's license searching for infractions and issued him a citation for an expired registration.

25. At no time did DEF's read PLT his rights, tell him he could remain silent or leave, or that they had decided to and were investigating him.

26. While DEFs were refusing information from PLT, they were holding PLT waiting for Posner to send them information as Posner lied saying Sam had a "Restraining Order" against PLT.

27. Despite knowing there was no such restraining order, that Posner had lied about the assault and that PLT was just talking to his son, DEFs held PLT against his will for about an hour as Posner told him that she was going to have Sam file a TRO for domestic violence against PLT.

28. About 40 minutes after the initial contact, DEFs allowed Sam to leave the area.  DEFs still held PLT for an additional 20 Minutes before moving their police car and giving PLT back his license so he may leave.

29. Around 3 PM that day, DEF's called Sam to see if he was able to make it to the Court to file a restraining order.

3

30. DEFs were all aware that every single expert, about a dozen, concluded that DEFs had made false claims of abuse by PLT.  That Sam was forced and brainwashed by DEFs to make false allegations.

31. DEF's knew that multiple Judges had ruled that DEF's had actually lied and fabricated claims of domestic violence and harassment.

32. In a violation of PLT rights (and the statute) that FRO hearings must start to be adjudicated within 10 days, the Court adjourned the matter for 3 months when Sam was to return to school.

33. So for 3 months PLT lived in constant fear of being arrested as Posner had repeatedly done in the past by making up fictitious violations of TRO's and Court orders.

34. On March 16, 2023 after a full day trial, the Court denied the FRO.  The Court found:

   a. Posner had put Sam into this conflict, and it was not fair to him
   b. That Sam needed to have a relationship with PLT and therapy
   c. That Posner filed a false police report to Clinton
   d. Sam & Posner lied about PLT going to the house and trying to install a GPS
   e. DEFs lied about PLT assaulting Sam.

35. Most importantly the Court also ruled that even if the Court was to accept everything that Sam/Posner alleged was "True," that it still was no way near a claim of domestic violence.

36. DEFs knew that PLT did not commit any actions that could be considered domestic violence.  DEF's used the false claim to try to help Posner remove any chance that PLT and his son could ever have a relationship and further harm the chance of PLT having a relationship with his daughter, who they knew was also alienated from PLT.

37. DEF's then refused to provide PLT with copies of the police report so he can defend himself against the FRO.  To cover up this as being further abuse and retaliation against PLT, despite knowing the FRO hearing had to be done within 10 days, they made PLT file an OPRA request to get the information knowing that they could take 7 business days to produce the information.

38. By contrast, DEFs instantly provided Posner with the police report and other stuff they wanted so they could prosecute the FRO against DEF.

39. Thereafter when DEF heard the FRO hearing was delayed, they refused to provide any of the information to PLT stating that he did not have any "interest" in the matter.  DEF knowing that there is no reciprocal discovery in an FRO, did not even give PLT what they gave Posner to prosecute.

4

40. On April 10, 2023 PLT filed a notice of tort claim with Clinton Township/Police Department.  So PLT's suit and claims against DEFs are both in their official and personal capacity.

41. DEFs, continuing with their retaliation, refused to file charges against Posner for making the knowingly false police report despite knowing that she did so and put peoples safety at risk

42. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner for the filing false police report against him despite knowing the crime occurred.

43. DEFs, continuing with their retaliation, refused to charge Posner and her friend for wiretapping despite knowing such occurred.

44. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner and her friend for wiretapping despite knowing such crime occurred.

45. DEF continuing with their retaliation did not inform PLT that he had the right to file the charges after they refused.

46. DEFs were well aware of the contracts between PLT and his former wife.

47. DEFs conduct as outline above tortuously interfered with PLT's rights in those contracts.

48. DEF were well aware how their actions and conduct would negatively affect the long term relationship that PLT had with his children and the harmful affect it would have upon PLT.

### THE COVER UP IS OFTEN AS BAD OR WORSE THAN THE CRIME
### AS IT SHOWS INTENT TO BREAK THE LAW

49. On April 10, 2023 PLT filed a notice of tort claim

50. told Captain Derosa he wanted to file a complaint against Tiger, Schleisier, Balsamo and other officers who might have acted illegally or improperly.  Neither him nor anyone at the department ever responded.

51. PLT then reached out again to file a complaint against the officers.  No one responded

52. Despite being required to respond immediately to internal affair complaints, 3-4 months later in August 2023, Ross finally reached out to PLT saying that he was going to investigate.

53. PLT never heard back from Ross.  So in November/December PLT again reached out to Derosa and Glennon again telling them that no one has ever taken his complaint.  They never respond.

54. In January 2024 Ross finally call PLT to take his complaint.  PLT told him that he wanted to add himself, Derosa and Glennon to the complaint for not taking the complaint, as they were required.

55. Ross then called PLT a few days later saying he did not and could not take the complaint falsely alleging it was due to a lawsuit that PLT never filed.

56. PLT then asked Ross to transfer the matter to the prosecutors officers because it was clear that DEF were still retaliating against PLT and refusing to do their job.  (PLT has since learned that Ross, Derosa and Glennon were required to transfer the matters against themselves to the prosecutors office as they were "superiors" to him and that he could not investigate himself.

57. PLT then reached out to the Hunterdon county prosecutor to take over the internal affairs complaint.

58. The prosecutor agreed and ordered DEF Kelsey Marsh and Frizzi to take PLTs complaint.

59. DEFs Clinton Township/Police Department again denied PLTs OPRA request to obtain information that was now needed to file an accurate and full complaint against its officers.

60. PLT traveled out to Hunterdon to meet with March and Frizzi

61. March was the officer who took the lead in taking PLT complaint.

62. It quickly became apparent to PLT that March was refusing to do her job, breached the duties that she owed to PLT and her true intent was to stop PLT from filing the complaint.

63. PLT told Marsh it was over a year since the incident occurred and asked her to obtain the police report, body cams, and other information so PLT could refresh his memory and see if there was anything else that occurred.  March continued to refuse to do so without explanation.

64. At the hearing DEF said "that they were not going to provide me any discovery to help me file my complaint against these officers"

65. DEF Marshs line of questioning was clearly not to obtain the facts and the basis for PLT's complaint but to cover up the officers illegal and unconstitutional conduct.

66. When PLT did not give in to DEF's Marsh's plan, Marsh became abusive towards PLT and falsely stated that he committed domestic violence against Posner and was not going to do it to her.  That she was refusing to take the complaint against the officers because PLT was trying to control her and ordered PLT to leave, would not allow PLT to have a copy of the tape so he could file a complaint

against her and Frizzi who was sitting in the room while this was occurring and allowed officer March to ignore the orders that they were given to take the complaint.

67. After the meeting, I informed Robeson of the improper conduct of her employee.  Refusing to take the report as she was ordered to do and the conduct that she showed during the interview.

> "Even if I was "louder" then she hoped or was "condensing" in my tone, both officers were still required to take my full statement and complaint which they refused to do.  They did not want to hear how they refused to take my internal affairs complaint.  How it took almost a year for Detective Ross to respond or the cleary false reasons as to why he said he did not do what the law required them to do.  Even if your officers thought I was a "total lunatic" they should have grave concerns over DeRosa, Ross and Glennon conduct in refusing to take internal affairs complaint and not acting as the law requires especially since my complaint of improper conduct are against the same officers that others have made complaints against for improper conduct.  I sure you are aware that there have been 3 such complaints against Chief Derosa."

68. Robeson did not respond so PLT was forced to send a second email.

69. Robeson finally responded and agree to transfer the entire matter to the NJ Attorney General's Office of Professional Integrity and Accountability as PLT now that I had a complaint to file against her officers as well.

70. DEF's Huntington County refused PLT OPRA request to obtain the video so he may properly prepare for the interview in filing his complaint.

71. Despite claiming they transferred the case, they refused to give me the information of whom they transferred the case too.

72. After a ½ dozen follow ups with the OPIA, as no one would respond to PLT, several months later the OPIA ignored the request to take the case and instead said that an officer in Hunterdon should investigate all the complaints, including those against people in his office.

73. Robeson did not push back and ordered her officer to take the complaint.

74. In July 2024, PLT met with DEF Crisgolo who took his complaint.

75. In Aug 2024, PLT followed up with Crisgolo and gave him more information to support his statement.

76. As of the filing of this complaint, PLT's complaints have still not been investigated or a report or findings issued, despite the rules requiring such to be done within 45 days.

WHEREFORE, PLT repeats and incorporates each and every allegation as set forth above as if fully set forth at length herein, demands against all of the DEFs, jointly and severally, as well as their successors and assigns, for the following relief:

**COUNT 1**
Malicious Prosecution, Malicious use of process and Malicious abuse of process

**COUNT 2**
Deprivation of Rights

**COUNT 3**
Intentional Infliction of Emotional Distress (IIED)

**COUNT 4**
Negligent Infliction of Emotional Distress (NIED)

**COUNT 5**
False Imprisonment

**COUNT 6**
Civil Conspiracy

**COUNT 7**
Negligence or Gross Negligence

**COUNT 8**
Invasion of Privacy

**COUNT 9**
Common Law Fraud

**COUNT 10**
Conspiracy to Commit Fraud

**COUNT 11**
Tortious interference with contractual relationship

**COUNT 12**
Aiding the commission of a tort

**COUNT 13**
Breach of Duty

**COUNT 14**
Deprivation and interference with protected parental rights

**PRAYER FOR RELIEF**

As a direct and proximate result of the foregoing, PLT has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, and substantial medical and other expenses for treatment and care, past, present, and future. Damages for loss of service, society, and companionship. Said losses, injuries, and expenses are either permanent or continuing in nature and PLT will continue to suffer same in the future.

WHEREFORE, PLT demands judgment against DEFs for compensatory damages, consequential damages, punitive damages, actual damages, costs, interest, awarding reasonable attorneys fees and costs and expense of litigation. and other such relief as this Court deems just and proper.

### VERIFICATION OF ASSERTED FACTS

I PLT, do hereby certify that the foregoing factual assertions made in this Complaint are made by me and are true to the best of my knowledge. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

### DESIGNATION OF TRIAL COUNSEL

PLT is designated as trial counsel in this matter.

### CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

### DEMANDS FOR A JURY TRIAL

The PLT demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey. Court Rules 1:8-2(b) and 4:35-1(a)

### CERTIFICATION PURSUANT TO R. 1:38-7

I certify that all confidential personal identifiers have been removed or redacted from this Complaint and that the same information will be removed or redacted from all documents submitted to the Court in connection with this matter in the future consistent with Rule 1:38-7(b).

DATED: Jan 3, 2024                                    Eric S. Weiss, Plaintiff



New Jersey Judiciary
Civil Practice Division

# Civil Case Information Statement (CIS)

Use for initial Law Division Civil Part pleadings (not motions) under Rule 4:5-1.
Pleading will be rejected for filing, under Rule 1:5-6(c), if information above the
black bar is not completed, or attorney's signature is not affixed.

| For Use by Clerk's Office Only | | | | |
|---|---|---|---|---|
| Payment type ☐ check ☐ charge ☐ cash | Charge/Check Number | Amount $ | Overpayment $ | Batch Number |

| Attorney/Pro Se Name<br>Eric Weiss | Telephone Number<br>(908) 913-0832   ext. | County of Venue<br>Somerset |
|---|---|---|

| Firm Name (if applicable) | Docket Number (when available) |
|---|---|

| Office Address - Street<br>210 Walnut Street | City<br>Garwood | State<br>NJ | Zip<br>07027 |
|---|---|---|---|

| Document Type<br>Civil Complaint | Jury Demand<br>■ Yes   ☐ No |
|---|---|

| Name of Party (e.g., John Doe, Plaintiff)<br>Eric Weiss | Caption<br>Weiss v Tiger, Schleisier, Balsamo, DeRosa, Ross, |
|---|---|

| Case Type Number (See page 3 for listing)   005 | |
|---|---|
| Are sexual abuse claims alleged? | ☐ Yes   ■ No |
| Does this case involve claims related to COVID-19? | ☐ Yes   ■ No |
| Is this a professional malpractice case? | ☐ Yes   ■ No |
| If "Yes," see N.J.S.A. 2A:53A-27 and applicable case law regarding your obligation to file an affidavit of merit. | |

| Related Cases Pending? | ☐ Yes   ■ No |
|---|---|
| If "Yes," list docket numbers | |

| Do you anticipate adding any parties (arising out of same transaction or occurrence)? | ☐ Yes   ■ No |
|---|---|

| Name of defendant's primary insurance company (if known) | ☐ None   ■ Unknown |
|---|---|

| **The Information Provided on This Form Cannot be Introduced into Evidence.** |
|---|

Case Characteristics for Purposes of Determining if Case is Appropriate for Mediation

Do parties have a current, past or recurrent relationship?      ■ Yes      ☐ No

   If "Yes," is that relationship:

   ☐ Employer/Employee   ☐ Friend/Neighbor   ■ Familial   ☐ Business

   ☐ Other (explain) _____

Does the statute governing this case provide for payment of fees      ☐ Yes      ■ No
by the losing party?

Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition.

   Do you or your client need any disability accommodations?      ■ Yes      ☐ No
      If yes, please identify the requested accommodation:
   In-person hearings
      Will an interpreter be needed?      ☐ Yes      ☐ No
      If yes, for what language?

**I certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).**

Attorney/Self-Represented Litigant Signature: _____

**SUPERIOR COURT OF NEW JERSEY - eCOURTS**

The following was filed by ERIC WEISS on 01/03/2025:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS ET AL. |
| Case Caption: | WEISS ERIC  VS TIGER JOHN |
| Case Number: | HNT-L-000010-25 |
| Docket Text: | Complaint with Jury Demand for HNT-L-000010-25 submitted by ERIC WEISS,  on behalf of ERIC S WEISS against JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS ET AL. |
| Transaction ID: | LCV202548092 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Plaintiff | ERIC S WEISS | ERICSWEISS@GMAIL.COM |

**Notice was not electronically mailed to:**

| | |
|---|---|
| Defendant | JOHN TIGER |
| Defendant | PETER SCHLEISIER |
| Defendant | MICHAEL BALSAMO |
| Defendant | THOMAS A DEROSA |
| Defendant | SEAN ROSS |
| Defendant | JEFFERY GLENNON |
| Defendant | TOWNSHIP OF CLINTON POLICE DEP |
| Defendant | HUNTERDON COUNTY |
| Defendant | KELSEY MARSH |
| Defendant | JOHN/JANE DOES 1-10 |

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey - Civil Part.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT C

HUNTERDON COUNTY JUSTICE CENTER
CIVIL DIVISION
65 PARK AVE
FLEMINGTON        NJ 08822

                                    TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (908) 824-9750
COURT HOURS  8:30 AM - 4:30 PM

                        DATE:   JANUARY 08, 2025
                        RE:     WEISS ERIC  VS TIGER JOHN
                        DOCKET: HNT L -000010 25

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 3.

     DISCOVERY IS   450 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE PRETRIAL JUDGE ASSIGNED IS:  HON WILLIAM G. MENNEN

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      001
AT:  (908) 824-9750 EXT 13771.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                        ATTENTION:
                                ERIC S. WEISS
                                210 WALNUT STREET
                                GARWOOD          NJ 07027


JUTRAM0

**SUPERIOR COURT OF NEW JERSEY - eCOURTS**

The following was filed by Case Management on 01/09/2025 at 5:11 AM:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC VS TIGER JOHN |
| Case Number: | HNT L 000010-25 |
| Docket Text: | TRACK ASSIGNMENT Notice submitted by Case Management |
| Transaction ID: | LCV202557034 |

Plaintiff          ERIC S WEISS          ERICSWEISS@GMAIL.COM

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant Attorney For | JOHN/JANE DOES 1-10 | NJ 00000 |
| Defendant Attorney For | JOHN TIGER | NJ 00000 |
| Defendant Attorney For | PETER SCHLEISIER | NJ 00000 |
| Defendant Attorney For | MICHAEL BALSAMO | NJ 00000 |
| Defendant Attorney For | THOMAS A DEROSA | NJ 00000 |
| Defendant Attorney For | SEAN ROSS | NJ 00000 |
| Defendant Attorney For | JEFFERY GLENNON | NJ 00000 |
| Defendant Attorney For | TOWNSHIP OF CLINTON POLICE DE P | NJ 00000 |
| Defendant Attorney For | HUNTERDON COUNTY | NJ 00000 |
| Defendant Attorney For | KELSEY MARSH | NJ 00000 |

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey - Civil Part.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT D

# Hunterdon County Sheriff's Office
## PROOF OF PROCESS SERVICE



FILED

JAN 1 3 2025

SUPERIOR COURT OF N.J.
LAW DIVISION CIVIL
HUNTERDON COUNTY

Service # 1 of 9 Services

Docket # HNT-L-000010-25

Sheriff's # 25000010

SUMMONS & COMPLAINT
HUNTERDON COUNTY SUPERIOR COURT
LAW DIVISION
Hunterdon County

Plaintiff     ERIC S WEISS

Defendant   TOWNSHIP OF CLINTON POLICE DEPARTMENT

Person/Corporation to Serve
**TOWNSHIP OF CLINTON POLICE
DEPARTMENT**
1371 ROUTE 31
CLINTON TOWNSHIP, NJ 08801

Papers Served
SUMMONS, COMPLAINT, PRAYER
FOR RELIEF, VERIFICATION OF
ASSERTED FACTS, DESIGNATION
OF TRIAL COUNSEL,
CERTIFICATION PURSUANT TO
R.4:5-1, DEMANDS FOR JURY
TRIAL, CERTIFICATION PURSUANT
TO R.1:38-7, CIVIL CASE
INFORMATION STATEMENT (CIS)

I, FREDERICK W. BROWN, SHERIFF OF HUNTERDON COUNTY, DO HEREBY DEPUTIZE AND APPOINT
EDWARD KRUTSICK, A DULY SWORN OFFICER, TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO
THE LAW.

WITNESS BY HAND AND SEAL

Frederick W. Brown
Hunterdon County Sheriff

Date of Action 1/9/2025
Time of Action 11:00 AM

Personal/Corporation Served TOWNSHIP OF CLINTON POLICE DEPARTMENT
1371 ROUTE 31, CLINTON TOWNSHIP, NJ 08801

Comments/Notes:

Attempts

Delivered To: JEFFERY J. GLENNON   Relationship LIEUTENANT

Type of Service: CORPORATE SERVICE

I, EDWARD KRUTSICK, WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

S/O EDWARD KRUTSICK

ERIC S WEISS
210 WALNUT STREET
GARWOOD, NJ 07027

Sheriff Fees     $160.80

## SUMMONS

Attorney(s) eric weiss

Office Address  210 Walnut Street

Town, State, Zip Code  Garwood, NJ

Telephone Number  908 913 0832

Attorney(s) for Plaintiff

Eric Weiss

Plaintiff(s)

vs.

John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh, John/Jane Does 1-10

**Superior Court of
New Jersey**

Hunterdon        County

Civil              Division

Docket No: HNT-L-000010-25

## CIVIL ACTION
## SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ *Michele Smith*

Clerk of the Superior Court

DATED:  01/03/2025

Name of Defendant to Be Served:  Township of Clinton/Police Department

Address of Defendant to Be Served:  Police Department 1371 Route 31 Clinton TWSP NJ 08801

C SHERIFF'S OFFICE
JAN 8 '25 PM3:21

# Hunterdon County Sheriff's Office
## PROOF OF PROCESS SERVICE

Service # 2 of 9 Services

Docket # HNT-L-000010-25

Plaintiff **ERIC S WEISS**

Defendant **TOWNSHIP OF CLINTON PC**

Papers Served
SUMMONS, COMPLAINT, PRAYER FOR RELIEF, VERIFICATION OF ASSERTED FACTS, DESIGNATION OF TRIAL COUNSEL, CERTIFICATION PURSUANT TO R.4:5-1, DEMANDS FOR JURY TRIAL, CERTIFICATION PURSUANT TO R.1:38-7, CIVIL CASE INFORMATION STATEMENT (CIS)

Sheriff's # 25000010

SUMMONS & COMPLAINT
HUNTERDON COUNTY SUPERIOR COURT
LAW DIVISION
Hunterdon County

Person/Corporation to Serve
**LIEUTENANT JEFFREY GLENNON**
1371 ROUTE 31
CLINTON TOWNSHIP, NJ 08801

I, FREDERICK W. BROWN, SHERIFF OF HUNTERDON COUNTY DO HEREBY DEPUTIZE AND APPOINT EDWARD KRUTSICK, A DULY SWORN OFFICER, TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO THE LAW.

WITNESS BY HAND AND SEAL

Frederick W. Brown
Hunterdon County Sheriff

Date of Action 1/9/2025

Time of Action 11:00 AM

Comments/Notes:

Attempts

Person/Corporation Served LIEUTENANT JEFFREY GLENNON

1371 ROUTE 31, CLINTON TOWNSHIP, NJ 08801

Type of Service: PERSONAL SERVICE

I, EDWARD KRUTSICK, WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

S/O EDWARD KRUTSICK

ERIC S WEISS
210 WALNUT STREET
GARWOOD, NJ 07027

Sheriff Fees $160.80

## SUMMONS

Attorney(s) <u>eric weiss</u>

Office Address  <u>210 Walnut Street</u>

Town, State, Zip Code  <u>Garwood, NJ</u>

Telephone Number  <u>908 913 0832</u>

Attorney(s) for Plaintiff

Eric Weiss

Plaintiff(s)

vs.

John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterton County, Kelsey Marsh, John/Jane Does 1-10

**Superior Court of New Jersey**

<u>Hunterdon</u>   County
<u>Civil</u>   Division
Docket No: <u>HNT-L-000010-25</u>

## CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no address is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ Michele Smith

Clerk of the Superior Court

DATED:  <u>01/03/2025</u>

Name of Defendant to Be Served:  <u>Jeffery Glennon</u>

Address of Defendant to Be Served:  <u>Police Department 1371 Route 31 Clinton TWSP NJ 08801</u>

C SHERIFF'S OFFICE
JAN 8 '25 PM3:21

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

# Hunterdon County Sheriff's Office
## PROOF OF PROCESS SERVICE

Plaintiff   ERIC S WEISS

Defendant   TOWNSHIP OF CLINTON POLICE DEPARTMENT

Person/Corporation to Serve
**DETECTIVE SERGEANT SEAN ROSS**
1371 ROUTE 31
CLINTON TOWNSHIP, NJ 08801

Papers Served
SUMMONS, COMPLAINT, PRAYER
FOR RELIEF, VERIFICATION OF
ASSERTED FACTS, DESIGNATION
OF TRIAL COUNSEL,
CERTIFICATION PURSUANT TO
R.4:5-1, DEMANDS FOR JURY
TRIAL, CERTIFICATION PURSUANT
TO R.1:38-7, CIVIL CASE
INFORMATION STATEMENT (CIS)

Service #  3 of 9 Services

Docket # HNT-L-000010-25

Sheriff's # 25000010

SUMMONS & COMPLAINT
HUNTERDON COUNTY SUPERIOR COURT
LAW DIVISION
Hunterdon County

I, FREDERICK W. BROWN, SHERIFF OF HUNTERDON COUNTY, DO HEREBY DEPUTIZE AND APPOINT
EDWARD KRUTSICK, A DULY SWORN OFFICER, TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO
THE LAW.

WITNESS BY HAND AND SEAL

Frederick W. Brown
Hunterdon County Sheriff

Date of Action  1/9/2025
Time of Action  11:00 AM

Personal/Corporation Served DETECTIVE SERGEANT SEAN ROSS
1371 ROUTE 31, CLINTON TOWNSHIP, NJ 08801

Comments/Notes:

Attempts

Delivered To: JEFFERY J. GLENNON   Relationship LIEUTENANT

Type of Service: CORPORATE SERVICE

I, EDWARD KRUTSICK, WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

S/O EDWARD KRUTSICK

ERIC S WEISS
210 WALNUT STREET
GARWOOD, NJ 07027

Sheriff Fees      $160.80

## SUMMONS

Attorney(s) <u>eric weiss</u>

Office Address <u>210 Walnut Street</u>

Town, State, Zip Code <u>Garwood, NJ</u>

Telephone Number <u>908 913 0832</u>

Attorney(s) for Plaintiff

Eric Weiss

Plaintiff(s)

vs.

John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh, John/Jane Does 1-10

**Superior Court of New Jersey**

<u>Hunterdon</u> County

<u>Civil</u> Division

Docket No: <u>HNT-L-000010-25</u>

**CIVIL ACTION
SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

*/s/ Michele Smith*

Clerk of the Superior Court

DATED: <u>01/03/2025</u>

Name of Defendant to Be Served: <u>Sean Ross</u>

Address of Defendant to Be Served: <u>Police Department 1371 Route 31 Clinton TWSP NJ 08801</u>

HC SHERIFF'S OFFICE
JAN 8 '25 PM 3:22

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

# Hunterdon County Sheriff's Office
## PROOF OF PROCESS SERVICE

Plaintiff      ERIC S WEISS

Defendant   TOWNSHIP OF CLINTON POLICE DEPARTMENT

Person/Corporation to Serve
**POLICE CHIEF THOMAS DEROSA**
1371 ROUTE 31
TOWNSHIP OF CLINTON POLICE
DEPARTMENT
CLINTON TOWNSHIP, NJ 08801

Papers Served
SUMMONS, COMPLAINT, PRAYER
FOR RELIEF, VERIFICATION OF
ASSERTED FACTS, DESIGNATION
OF TRIAL COUNSEL,
CERTIFICATION PURSUANT TO
R.4:5-1, DEMANDS FOR JURY
TRIAL, CERTIFICATION PURSUANT
TO R.1:38-7, CIVIL CASE
INFORMATION STATEMENT (CIS)

Service #  4 of 9 Services

Docket #  HNT-L-000010-25

Sheriff's # 25000010

SUMMONS & COMPLAINT
HUNTERDON COUNTY SUPERIOR COURT
LAW DIVISION
Hunterdon County

I, FREDERICK W. BROWN, SHERIFF OF HUNTERDON COUNTY, DO HEREBY DEPUTIZE AND APPOINT
EDWARD KRUTSICK, A DULY SWORN OFFICER, TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO
THE LAW.

WITNESS BY HAND AND SEAL

Frederick W. Brown
Hunterdon County Sheriff

Date of Action 1/9/2025
Time of Action 11:00 AM

Personal/Corporation Served POLICE CHIEF THOMAS DEROSA
1371 ROUTE 31, TOWNSHIP OF CLINTON, POLICE DEPARTMENT,
CLINTON TOWNSHIP, NJ 08801

Comments/Notes:

Attempts

Delivered To: JEFFERY J. GLENNON   Relationship LIEUTENANT

Type of Service: CORPORATE SERVICE

I, EDWARD KRUTSICK, WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

S/O EDWARD KRUTSICK

ERIC S WEISS
210 WALNUT STREET
GARWOOD, NJ 07027

Sheriff Fees      $160.80

**SUMMONS**

Attorney(s) eric weiss

Office Address   210 Walnut Street

Town, State, Zip Code   Garwood, NJ

Telephone Number   908 913 0832

Attorney(s) for Plaintiff

Eric Weiss

### Superior Court of New Jersey

Hunterdon   County

Civil   Division

Docket No:   HNT-L-000010-25

Plaintiff(s)

vs.

John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh, John/Jane Does 1-10

### CIVIL ACTION
### SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ Michele Smith

Clerk of the Superior Court

DATED:   01/03/2025

Name of Defendant to Be Served:   Thomas A. DeRosa

Address of Defendant to Be Served:   Police Department 1371 Route 31 Clinton TWSP NJ 08801

4C SHERIFF'S OFFICE
JAN 8 '25 PM3:22

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

# Hunterdon County Sheriff's Office
## PROOF OF PROCESS SERVICE

Plaintiff   **ERIC S WEISS**

Defendant   TOWNSHIP OF CLINTON POLICE DEPARTMENT

Person/Corporation to Serve
**MICHAEL BALSAMO**
1371 ROUTE 31
POLICE DEPARTMENT
CLINTON TWP, NJ 08801

Papers Served
SUMMONS, COMPLAINT, PRAYER FOR RELIEF, VERIFICATION OF ASSERTED FACTS, DESIGNATION OF TRIAL COUNSEL, CERTIFICATION PURSUANT TO R.4:5-1, DEMANDS FOR JURY TRIAL, CERTIFICATION PURSUANT TO R.1:38-7, CIVIL CASE INFORMATION STATEMENT (CIS)

Service #  5 of 9 Services

Docket #  HNT-L-000010-25

Sheriff's #  25000010

SUMMONS & COMPLAINT
HUNTERDON COUNTY SUPERIOR COURT
LAW DIVISION
Hunterdon County

I, FREDERICK W. BROWN, SHERIFF OF HUNTERDON COUNTY, DO HEREBY DEPUTIZE AND APPOINT EDWARD KRUTSICK, A DULY SWORN OFFICER, TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO THE LAW.

WITNESS BY HAND AND SEAL

Frederick W. Brown
Hunterdon County Sheriff

Date of Action  1/9/2025
Time of Action  11:00 AM

Personal/Corporation Served MICHAEL BALSAMO
1371 ROUTE 31, POLICE DEPARTMENT, CLINTON TWP, NJ 08801

Comments/Notes:

Attempts

Delivered To: JEFFERY J. GLENNON   Relationship LIEUTENANT

Type of Service: CORPORATE SERVICE

I, EDWARD KRUTSICK, WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

S/O EDWARD KRUTSICK

ERIC S WEISS
210 WALNUT STREET
GARWOOD, NJ 07027

Sheriff Fees      $160.80

**SUMMONS**

Attorney(s) <u>eric weiss</u>

Office Address   <u>210 Walnut Street</u>

Town, State, Zip Code   <u>Garwood, NJ</u>

Telephone Number   <u>908 913 0832</u>

Attorney(s) for Plaintiff

Eric Weiss

Plaintiff(s)

vs.

John Tiger, Peter Schleisier, Michael Balsamo,
Thomas A. DeRosa, Sean Ross, Jeffery
Glennon, Township of Clinton/Police
Department, Hunterdon County, Kelsey
Marsh, John/Jane Does 1-10

**Superior Court of
New Jersey**

<u>Hunterdon</u>   County

<u>Civil</u>   Division

Docket No: _____

**CIVIL ACTION
SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached
to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written
answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days
from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy
clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at
http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof
of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing
fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy
clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your
answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above.
A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and
completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for
the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your
money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal
Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are
not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.
A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil
Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ Michele Smith

Clerk of the Superior Court

DATED:   <u>01/03/2025</u>

Name of Defendant to Be Served:   <u>Michael Balsamo</u>

Address of Defendant to Be Served:   <u>Police Department 1371 Route 31 Clinton TWSP NJ 08801</u>

HC SHERIFF'S OFFICE
JAN 8 '25 PM 3:22

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

# Hunterdon County Sheriff's Office
## PROOF OF PROCESS SERVICE

Service # 6 of 9 Services

Docket # HNT-L-000010-25

Plaintiff     ERIC S WEISS

Sheriff's # 25000010

Defendant   TOWNSHIP OF CLINTON POLICE DEPARTMENT

Papers Served
SUMMONS, COMPLAINT, PRAYER
FOR RELIEF, VERIFICATION OF
ASSERTED FACTS, DESIGNATION
OF TRIAL COUNSEL,
CERTIFICATION PURSUANT TO
R.4:5-1, DEMANDS FOR JURY
TRIAL, CERTIFICATION PURSUANT
TO R.1:38-7, CIVIL CASE
INFORMATION STATEMENT (CIS)

SUMMONS & COMPLAINT
HUNTERDON COUNTY SUPERIOR COURT
LAW DIVISION
Hunterdon County

Person/Corporation to Serve
**PETER SCHLEISIER**
1371 ROUTE 31
POLICE DEPARTMENT
CLINTON TOWNSHIP, NJ 08801

I, FREDERICK W. BROWN, SHERIFF OF HUNTERDON COUNTY, DO HEREBY DEPUTIZE AND APPOINT
EDWARD KRUTSICK,,A DULY SWORN OFFICER, TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO
THE LAW.

WITNESS BY HAND AND SEAL

Frederick W. Brown
Hunterdon County Sheriff

Date of Action  1/9/2025
Time of Action  11:00 AM

Personal/Corporation Served PETER SCHLEISIER
1371 ROUTE 31, POLICE DEPARTMENT, CLINTON TOWNSHIP, NJ 08801

Comments/Notes:

Attempts

Delivered To: JEFFERY J. GLENNON   Relationship LIEUTENANT

Type of Service: CORPORATE SERVICE

I, EDWARD KRUTSICK, WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

S/O EDWARD KRUTSICK

ERIC S WEISS
210 WALNUT STREET
GARWOOD, NJ 07027

Sheriff Fees      $160.80

**SUMMONS**

Attorney(s) eric weiss

Office Address  210 Walnut Street

Town, State, Zip Code  Garwood, NJ

Telephone Number  908 913 0832

Attorney(s) for Plaintiff

Eric Weiss

Plaintiff(s)

vs.

John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh, John/Jane Does 1-10

**Superior Court of New Jersey**

Hunterdon          County

Civil              Division

Docket No: HNT-L-000010-25

**CIVIL ACTION SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ *Michele Smith*

Clerk of the Superior Court

DATED:  01/03/2025

Name of Defendant to Be Served:  Peter Schleisier

Address of Defendant to Be Served:  Police Department 1371 Route 31 Clinton TWSP NJ 08801

IC SHERIFF'S OFFICE
JAN 8 '25 PM 3:22

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

# Hunterdon County Sheriff's Office
## PROOF OF PROCESS SERVICE

Plaintiff    ERIC S WEISS

Defendant   TOWNSHIP OF CLINTON POLICE DEPARTMENT

Person/Corporation to Serve
**JON TIGER**
1371 ROUTE 31
POLICE DEPARTMENT
CLINTON TWP, NJ 08801

Papers Served
SUMMONS, COMPLAINT, PRAYER
FOR RELIEF, VERIFICATION OF
ASSERTED FACTS, DESIGNATION
OF TRIAL COUNSEL,
CERTIFICATION PURSUANT TO
R.4:5-1, DEMANDS FOR JURY
TRIAL, CERTIFICATION PURSUANT
TO R.1:38-7, CIVIL CASE
INFORMATION STATEMENT (CIS)

Service #  7 of 9 Services

Docket # HNT-L-000010-25

Sheriff's # 25000010

SUMMONS & COMPLAINT
HUNTERDON COUNTY SUPERIOR COURT
LAW DIVISION
Hunterdon County

I, FREDERICK W. BROWN, SHERIFF OF HUNTERDON COUNTY, DO HEREBY DEPUTIZE AND APPOINT
EDWARD KRUTSICK, A DULY SWORN OFFICER, TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO
THE LAW.

WITNESS BY HAND AND SEAL

Frederick W. Brown
Hunterdon County Sheriff

Date of Action 1/9/2025
Time of Action 11:00 AM

Comments/Notes:

Attempts

Personal/Corporation Served JON TIGER
1371 ROUTE 31, POLICE DEPARTMENT, CLINTON TWP, NJ 08801

Delivered To: JEFFERY J. GLENNON   Relationship LIEUTENANT

Type of Service: CORPORATE SERVICE

I, EDWARD KRUTSICK, WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

S/O EDWARD KRUTSICK

ERIC S WEISS
210 WALNUT STREET
GARWOOD, NJ 07027

Sheriff Fees      $160.80

## SUMMONS

Attorney(s) <u>eric weiss</u>

Office Address <u>210 Walnut Street</u>

Town, State, Zip Code <u>Garwood, NJ</u>

Telephone Number <u>908 913 0832</u>

Attorney(s) for Plaintiff

Eric Weiss

_____
Plaintiff(s)

vs.

John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh, John/Jane Does 1-10

# Superior Court of New Jersey

<u>Hunterdon</u> County

<u>Civil</u> Division

Docket No: <u>HNT-L-000010-25</u>

# CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ *Michelle Smith*

Clerk of the Superior Court

DATED: <u>01/03/2025</u>

Name of Defendant to Be Served: <u>Jon Tiger</u>

Address of Defendant to Be Served: <u>Police Department 1371 Route 31 Clinton TWSP NJ 08801</u>

HC SHERIFF'S OFFICE
JAN 8 '25 PM 3:22

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

# Hunterdon County Sheriff's Office
## PROOF OF PROCESS SERVICE

Service #  8 of 9 Services

Docket # HNT-L-000010-25

Sheriff's # 25000010

Plaintiff    ERIC S WEISS

Defendant  TOWNSHIP OF CLINTON POLICE DEPARTMENT

SUMMONS & COMPLAINT
HUNTERDON COUNTY SUPERIOR COURT
LAW DIVISION
Hunterdon County

Person/Corporation to Serve
**KELSEY A MARSCH**
71 MAIN STREET
C/O HUNTERDON COUNTY PROSEC
FLEMINGTON, NJ 08822

Papers Served
SUMMONS, COMPLAINT, PRAYER FOR RELIEF, VERIFICATION OF ASSERTED FACTS, DESIGNATION OF TRIAL COUNSEL, CERTIFICATION PURSUANT TO R.4:5-1, DEMANDS FOR JURY TRIAL, CERTIFICATION PURSUANT TO R.1:38-7, CIVIL CASE INFORMATION STATEMENT (CIS)

I, FREDERICK W. BROWN, SHERIFF OF HUNTERDON COUNTY DO HEREBY DEPUTIZE AND APPOINT EDWARD KRUTSICK, A DULY SWORN OFFICER, TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO THE LAW.

WITNESS BY HAND AND SEAL

Frederick W. Brown
Hunterdon County Sheriff

Date of Action 1/9/2025

Time of Action 10:13 AM

Comments/Notes:

Attempts

Person/Corporation Served KELSEY A MARSCH

71 MAIN STREET, C/O HUNTERDON COUNTY PROSEC, FLEMINGTON, NJ 08822

Type of Service: PERSONAL SERVICE

I, EDWARD KRUTSICK, WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

S/O EDWARD KRUTSICK

ERIC S WEISS
210 WALNUT STREET
GARWOOD, NJ 07027

Sheriff Fees $160.80

**SUMMONS**

Attorney(s) <u>eric weiss</u>

Office Address  <u>210 Walnut Street</u>

Town, State, Zip Code <u>Garwood, NJ</u>

Telephone Number <u>908 913 0832</u>

Attorney(s) for Plaintiff

Eric Weiss

Plaintiff(s)

vs.

John Tiger, Peter Schleisier, Michael Balsamo,
Thomas A. DeRosa, Sean Ross, Jeffery
Glennon, Township of Clinton/Police
Department, Hunterdon County, Kelsey
Marsh, John/Jane Does 1-10

**Superior Court of
New Jersey**

<u>Hunterdon</u>   County

<u>Civil</u>   Division

Docket No:  <u>HNT-L-000010-25</u>

**CIVIL ACTION
SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ Michelle Smith

Clerk of the Superior Court

DATED:  <u>01/03/2025</u>

Name of Defendant to Be Served: <u>Kelsey Marsch</u>

Address of Defendant to Be Served: <u>C/O Hunterdon County Prosec  71 Main Street, Flemington, New Jersey 08822</u>

HC SHERIFF'S OFFICE
JAN 8 '25 PM 3:23

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

# Hunterdon County Sheriff's Office
## PROOF OF PROCESS SERVICE

Plaintiff  ERIC S WEISS

Defendant  TOWNSHIP OF CLINTON POLICE DEPARTMENT

Person/Corporation to Serve
**HUNTERDON COUNTY
PROSECUTOR**
71 MAIN STREET
C/O HUNTERDON COUNTY PROSEC
FLEMINGTON, NJ 08822

Papers Served
SUMMONS, COMPLAINT, PRAYER
FOR RELIEF, VERIFICATION OF
ASSERTED FACTS, DESIGNATION
OF TRIAL COUNSEL,
CERTIFICATION PURSUANT TO
R.4:5-1, DEMANDS FOR JURY
TRIAL, CERTIFICATION PURSUANT
TO R.1:38-7, CIVIL CASE
INFORMATION STATEMENT (CIS)

Service #  9 of 9 Services

Docket #  HNT-L-000010-25

Sheriff's #  25000010

SUMMONS & COMPLAINT
HUNTERDON COUNTY SUPERIOR COURT
LAW DIVISION
Hunterdon County

I, FREDERICK W. BROWN, SHERIFF OF HUNTERDON COUNTY, DO HEREBY DEPUTIZE AND APPOINT
EDWARD KRUTSICK, A DULY SWORN OFFICER, TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO
THE LAW.

WITNESS BY HAND AND SEAL

Frederick W. Brown
Hunterdon County Sheriff

Date of Action  1/9/2025
Time of Action  10:28 AM
08822
Comments/Notes:

Attempts

Personal/Corporation Served HUNTERDON COUNTY PROSECUTOR
71 MAIN STREET, C/O HUNTERDON COUNTY PROSEC, FLEMINGTON, NJ
08822

Delivered To: PAUL T APPROVATO   Relationship   CAPTAIN OF CO
INVESTIGATORS

Type of Service: CORPORATE SERVICE

I, EDWARD KRUTSICK, WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

S/O EDWARD KRUTSICK

ERIC S WEISS
210 WALNUT STREET
GARWOOD, NJ 07027

Sheriff Fees   $160.80

## SUMMONS

Attorney(s) <u>eric weiss</u>

Office Address   <u>210 Walnut Street</u>

Town, State, Zip Code <u>Garwood, NJ</u>

Telephone Number   <u>908 913 0832</u>

Attorney(s) for Plaintiff _____

Eric Weiss

_____

_____ Plaintiff(s)

vs.

John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh, John/Jane Does 1-10

**Superior Court of New Jersey**

<u>Hunterdon</u>   County

<u>Civil</u>   Division

Docket No: <u>HNT-L-000010-25</u>

# CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ *Michele Smith*

Clerk of the Superior Court

DATED: <u>01/03/2025</u>

Name of Defendant to Be Served: <u>Hunterdon County/Prosecutors office</u>

Address of Defendant to Be Served: <u>C/O Hunterdon County Prosec  71 Main Street, Flemington, New Jersey 08822</u>

C SHERIFF'S OFFICE
JAN 8 '25 PM 3:23

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following was filed by ERIC S WEISS on 01/13/2025:

| | |
|---|---|
| Plaintiff Name : | ERIC S WEISS |
| Defendant Name: : | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC  VS TIGER JOHN |
| Case Number: | HNT L 000010-25 |
| Docket Text: | Proof Of Service uploaded by Case Management Staff submitted by ERIC S WEISS |
| Transaction ID: | LCV202591642 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Plaintiff | WEISS, ERIC, S | ERICSWEISS@GMAIL.COM |


**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | JOHN/JANE DOES 1-10 | 00000 |
| Defendant | JOHN TIGER | 00000 |
| Defendant | PETER SCHLEISIER | 00000 |
| Defendant | MICHAEL BALSAMO | 00000 |
| Defendant | THOMAS A DEROSA | 00000 |
| Defendant | SEAN ROSS | 00000 |
| Defendant | JEFFERY GLENNON | 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | 00000 |
| Defendant | HUNTERDON COUNTY | 00000 |
| Defendant | KELSEY MARSH | 00000 |


Login to eCourts to view the Case Jacket. You will need a valid user ID (Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

# EXHIBIT E

**Certification: Agreement to Service**

I certify that I am the party I have selected and agree that I will be notified via email. I understand that this will be considered service and I will no longer receive a paper copy of the documents from my adversary or the court. I also agree that the email address(es) indicated below will become part of the public case record.

Case notifications will be sent to the email address(es) below:

ericsweiss@gmail.com
eric_S_weiss@yahoo.com
eric_S_weiss@yahoo.com

/s/Eric weiss

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following notice is sent from eCourts

| | | |
|---|---|---|
| Plaintiff Name: | ERIC S WEISS | |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH | |
| Case Caption: | WEISS ERIC  VS TIGER JOHN | |
| Case Number: | HNT L 000010-25 | |
| Docket Text: | NOTICE: Self represented litigant WEISS, ERIC, S has certified and agreed to receive electronic service | |
| Transaction ID: | LCV2025102026 | |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com |
| | | eric_S_weiss@yahoo.com |
| | | ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | JOHN/JANE DOES 1-10 | NJ 00000 |
| Defendant | JOHN TIGER | NJ 00000 |
| Defendant | PETER SCHLEISIER | NJ 00000 |
| Defendant | MICHAEL BALSAMO | NJ 00000 |
| Defendant | THOMAS A DEROSA | NJ 00000 |
| Defendant | SEAN ROSS | NJ 00000 |
| Defendant | JEFFERY GLENNON | NJ 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | NJ 00000 |
| Defendant | HUNTERDON COUNTY | NJ 00000 |
| Defendant | KELSEY MARSH | NJ 00000 |

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT F

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
*Attorney for Defendants, Hunterdon County Prosecutor's Office
(improperly pled as Hunterdon County) and Kelsey Marsh*

By:   Catriona Coffey (Attorney ID # 381682021)
      Deputy Attorney General
      (609) 376-2440
      catriona.coffey@law.njoag.gov

|  |  |
|---|---|
| ERIC WEISS, | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | LAW DIVISION: CIVIL PART |
| v. | HUNTERDON COUNTY |
| JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10, | DOCKET NO. HNT-L-0010-25 |
|  | <u>Civil Action</u> |
|  | **NOTICE OF APPEARANCE** |
| Defendants. |  |

TO:   <u>Via eCourts & Mail</u>
      Hon. William G. Mennen, J.S.C.
      Hunterdon County Justice Center
      65 Park Avenue, Floor 3
      Flemington, NJ 08822

<u>Via eCourts</u>
Eric Weiss
210 Walnut Street
Garwood, NJ 07027


**PLEASE TAKE NOTICE** that the undersigned counsel hereby enters her

appearance as Attorney for Defendants, Hunterdon County Prosecutor's Office

(improperly pled as Hunterdon County) and Kelsey Marsh.


Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   *s/ Catriona Coffey*
Catriona Coffey
Deputy Attorney General


Dated: April 14, 2025

**SUPERIOR COURT OF NEW JERSEY - eCOURTS**

The following was filed by COFFEY, CATRIONA on 04/14/2025 at 4:41 PM:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN  TIGER, PETER  SCHLEISIER, MICHAEL  BALSAMO, THOMAS A DEROSA ET AL. |
| Case Caption: | WEISS ERIC  VS TIGER JOHN |
| Case Number: | HNT-L-000010-25 |
| Docket Text: | NOTICE OF APPEARANCE (NOT THE FIRST PAPER) submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY  MARSH against ERIC S WEISS |
| Transaction ID: | LCV20251092510 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Plaintiff | ERIC S WEISS | ericsweiss@gmail.com |
| | | eric_S_weiss@yahoo.com |
| | | eric_S_weiss@yahoo.com |

**Notice was not electronically mailed to:**

| | |
|---|---|
| Defendant | JOHN/JANE DOES 1-10 |
| Defendant | JOHN  TIGER |
| Defendant | PETER  SCHLEISIER |
| Defendant | MICHAEL  BALSAMO |
| Defendant | THOMAS A DEROSA |
| Defendant | SEAN  ROSS |
| Defendant | JEFFERY  GLENNON |
| Defendant | TOWNSHIP OF CLINTON POLICE DEP |
| Defendant | HUNTERDON COUNTY |
| Defendant | KELSEY  MARSH |

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey - Civil Part.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT G

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
*Attorney for Defendants, Hunterdon County Prosecutor's Office
(improperly pled as Hunterdon County) and Kelsey Marsh*

By:   Catriona Coffey (Attorney ID # 381682021)
      Deputy Attorney General
      (609) 376-2440
      catriona.coffey@law.njoag.gov

| | |
|---|---|
| ERIC WEISS,<br><br>               Plaintiff,<br><br>    v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br><br>               Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br><br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><br><u>Civil Action</u><br><br>**NOTICE OF MOTION FOR SUMMARY JUDGMENT AND/OR MOTION TO DISMISS THE COMPLAINT** |

TO:   <u>Via eCourts & Mail</u>
      Hon. William G. Mennen, J.S.C.
      Hunterdon County Justice Center
      65 Park Avenue, Floor 3
      Flemington, NJ 08822

1

<u>Via eCourts</u>
Eric Weiss
210 Walnut Street
Garwood, NJ 07027

**PLEASE TAKE NOTICE** that on Friday, May 9, 2025, or as soon thereafter as counsel may be heard, the undersigned, Matthew J. Platkin, Attorney General of New Jersey, with Catriona Coffey, Deputy Attorney General, appearing as Attorney for Defendants Hunterdon County Prosecutor's Office (improperly pled as Hunterdon County) and Kelsey Marsh, shall move before the Hon. William G. Mennen, J.S.C., for an Order granting Defendants' Motion for Summary Judgment and/or Motion to Dismiss the Complaint.

**PLEASE TAKE FURTHER NOTICE** that, in support of this Motion, the undersigned will rely upon the attached Brief, Certifications, Exhibits, and Statement of Undisputed Material Facts.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to <u>R.</u> 1:6-2, it is requested that the Court consider this motion on the paper submitted unless opposition is timely filed and served, in which case oral argument is requested.

A proposed form of Order is attached hereto.


Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:    _s/ Catriona Coffey_____
       Catriona Coffey
       Deputy Attorney General


Dated: April 14, 2025

| | |
|---|---|
| ERIC WEISS,<br><br>          Plaintiff,<br><br>    v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br>HUNTERDON COUNTY<br><br><br>DOCKET NO. HNT-L-0010-25<br><br><br><u>Civil Action</u> |

---

**BRIEF IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT AND/OR DISMISSAL BY DEFENDANTS, HUNTERDON COUNTY PROSECUTOR'S OFFICE AND KELSEY MARSH**

---

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625-0112
(609) 376-2440
*Attorney for Defendants, Hunterdon County*
*Prosecutor's Office and Kelsey Marsh*


Catriona Coffey (# 381682021)
*Deputy Attorney General*
On the Brief

# <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ................................2

STANDARDS OF REVIEW ................................................................4

    A.    MOTION FOR SUMMARY JUDGMENT PURSUANT TO <u>R.</u> 4:46-2................................................................4

    B.    MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM PURSUANT TO <u>R.</u> 4:6-2(e) ................................................6

ARGUMENT ................................................................8

    POINT I

        THE HCPO DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF FAILED TO FILE THE REQUISITE NOTICE OF TORT CLAIM ................................8

    POINT II

        PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE FACTS SUFFICIENT TO STATE A CLAIM AGAINST THE HCPO DEFENDANTS ............12

    POINT III

        THE HUNTERDON COUNTY PROSECUTOR'S OFFICE CANNOT BE HELD LIABLE FOR INTENTIONAL TORTS UNDER THE NJTCA ................................13

    POINT IV

        ANY CLAIMS AGAINST THE HUNTERDON COUNTY PROSECUTOR'S OFFICE ENTITY FOR PUNITIVE

DAMAGES SHOULD BE DISMISSED AS A MATTER OF
LAW ................................................................................................. 15

CONCLUSION ....................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)................................................................5, 6

Banco Popular N. Am. v. Gandi,
184 N.J. 161 (2005) ..................................................................7

Bauer v. Nesbitt,
198 N.J. 601 (2009) ..................................................................7

Bayer v. Township of Union,
414 N.J. Super. 238 (App. Div. 2010) .....................................9

Biaggi-Pacheco v. City of Plainfield,
2017 U.S. Dist. LEXIS 170746 (D.N.J. Oct. 13, 2017) .......................14

Brill v. Guardian Life Ins. Co. of Am.,
142 N.J. 520 (1995) ..................................................................5, 6

Celotex v. Catrett,
477 U.S. 317 (1986)..................................................................5

Coyne v. DOT,
182 N.J. 481 (2005) ..................................................................8

D.D. v. University of Medicine and Dentistry of New Jersey,
213 N.J. 130 (2013) ..................................................................8, 9

DiMaria Constr., Inc. v. Interarch,
351 N.J. Super. 558 (App. Div. 2001) ......................................14

Donato v. Moldow,
374 N.J. Super. 475 (App. Div. 2005) ......................................6

Energy Rec. v. Dept. of Env. Prot.,
320 N.J. Super. 59 (App. Div. 1999), aff'd, 170 N.J. 246 (2001)......................7

Feinberg v. N.J. Dep't of Envtl. Prot.,
137 N.J. 126 (1994) ..................................................................8

Garlanger v. Berbeke,
    223 F. Supp. 2d 596 (D.N.J. 2002) ........................................................9

Glass v. Suburban Restoration Co., Inc.,
    317 N.J. Super. 574 (App. Div. 1998) ................................................12

Hoag v. Brown,
    397 N.J. Super. 34 (App. Div. 2007) ..................................................13

Hoffman v. Asseenontv.com, Inc.,
    404 N.J. Super. 415 (App. Div. 2009) ..................................................6

Joyce v. City of Sea Isle City,
    No. CIV. 04-5345RBK, 2008 WL 906266 (D.N.J. Mar. 31, 2008),
    on reconsideration in part sub nom. Joyce v. Sea Isle City, No.
    CIV. 04-5345(RBK), 2008 WL 2875456 (D.N.J. July 23, 2008) .....................13

Ledley v. William Penn Life Ins. Co.,
    138 N.J. 627 (1995) ........................................................................6

Leon v. Rite Ai Corp.,
    340 N.J. Super. 462 (App. Div. 2001) ..................................................7

Lewis v. Airco, Inc.,
    A-3509-08T3, 2011 N.J. Super. Unpub. LEXIS 1914 (App. Div.
    July 15, 2011) ..............................................................................14

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) ........................................................................5

McDade v. Siazon,
    208 N.J. 463 (2011) ......................................................................8, 9

McFeeley v. Kar,
    No. A-4543-17T1, 2019 N.J. Super. Unpub. LEXIS 147 (App.
    Div. Jan. 18, 2019) ........................................................................9

Merchants Express Money Order Co. v. Sun Nat'l Bank,
    374 N.J. Super. 556 (App. Div. 2005) ..................................................6

Nostrame v. Santiago,
    420 N.J. Super. 427 (App. Div. 2011) ................................................12

Pisano v. City of Union Cty.,
  198 N.J. Super. 588 (Law Div. 1984) ................................................... 9

Printing Mart-Morristown v. Sharp Elecs. Corp.,
  116 N.J. 739 (1989) .......................................................................... 7

Rosenau v. City of New Brunswick,
  51 N.J. 130 (1968) ............................................................................ 10

Russo Farms v. Vineland Bd. of Educ.,
  144 N.J. 84 (1996) ............................................................................ 10

Scheidt v. DRV Techs., Inc.,
  424 N.J. Super. 188 (App. Div. 2012) ................................................. 7

Sickles v. Cabot Corp.,
  379 N.J. Super. 100 (App. Div. 2005) ................................................. 7

Triffin v. American. Int'l Group, Inc.,
  372 N.J. Super. 517 (App. Div. 2004) ................................................. 6

Velez v. City of Jersey City,
  180 N.J. 284 (D.N.J. 2004) ............................................................... 9

Ward v. Barnes,
  545 F. Supp. 2d 400 (D.N.J. 2008) ..................................................... 13

Watson v. New Jersey Dept. of Treasury,
  453 N.J. Super. 42 (App. Div. 2017) ................................................... 7

**Statutes**

N.J.S.A. 5:2-10 .................................................................................... 14

N.J.S.A. 59:2-10 ............................................................................... 13, 14

N.J.S.A. 59:8-8(a) ............................................................................... 8

N.J.S.A. 59:9-2(c) ............................................................................... 15

New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3 ........................... 1, 8

## Other Authorities

Rule 4:6-2................................................................................................7

Rule 4:6-2(e) ......................................................................................2, 6

Rule 4:46-2 ...........................................................................................2

Rule 4:46-2(c) ......................................................................................4

## PRELIMINARY STATEMENT

Plaintiff Eric Weiss brings this action against John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffrey Glennon, and the Township of Clinton/Police Department (hereinafter, the "Clinton Township Defendants"), as well as (presumably) the Hunterdon County Prosecutor's Office (improperly pled as "Hunterdon County") and Kelsey Marsh (hereinafter, the "HCPO Defendants"[1]) (collectively, "Defendants"), asserting claims arising from Defendants' response to (i) a 911 call reporting an in-progress domestic violence incident between Plaintiff and his estranged son, S.W., and (ii) various internal affairs ("IA") complaints submitted to them by Plaintiff. Without specifying the parties against whom each count is brought, Plaintiff now raises fourteen tort-based claims and seeks an award of punitive damages.

Even accepting all of the allegations in the Complaint as true for purposes of this motion, Plaintiff's claims against the HCPO Defendants fail as a matter of law for several reasons.

First, the HCPO Defendants are entitled to summary judgment because Plaintiff failed to properly file a timely notice of tort claim, as required by the New

---

[1] Hunterdon County Prosecutor's Office employees Renée M. Robeson, Frank R. Crisologo, and Colin Frinzi are mentioned in Plaintiff's Complaint but have not been specifically named as defendants in the Complaint's caption or served accordingly. To the extent Plaintiff is seeking to bring the claims in his Complaint against those individuals, then such claims are similarly barred as outlined herein.

Jersey Tort Claims Act, N.J.S.A. 59:8-1 to 12-3 ("NJTCA"). Alternatively, Plaintiff's Complaint fails to state a claim upon which relief can be granted, and seeks to hold the Hunterdon County Prosecutor's Office liable for intentional torts and punitive damages, both of which are precluded under the NJTCA.

For these reasons, which are further discussed herein, the HCPO Defendants' Motion for Summary Judgment pursuant to R. 4:46-2 and/or Dismissal pursuant to R. 4:6-2(e) should be granted.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The HCPO Defendants fully incorporate and rely upon their Statement of Undisputed Material Facts submitted in support of their Motion for Summary Judgment pursuant to R. 4:46-2. Nevertheless, the facts outlined below are provided in support of alternative arguments for dismissal pursuant to R. 4:6-2(e).

On January 10, 2023, Plaintiff Eric Weiss alleges that he encountered several members of the Clinton Township Police Department when they responded to a 911 call reporting domestic violence by Plaintiff against his estranged son, S.W. During that encounter, which lasted approximately one hour, officers investigated the reports made by the 911 caller (who is Plaintiff's ex-wife and the mother of S.W.) before issuing Plaintiff a citation for an expired registration and allowing him to leave. Plaintiff alleges that, following the encounter, officers encouraged S.W. to file a restraining order against Plaintiff. Though scant on details, the Complaint

appears to allege that Clinton Township, and/or its police officers, obstructed Plaintiff's ability to defend himself against the restraining order, which an unidentified court denied on March 16, 2023.

After officers refused to file charges against Plaintiff's ex-wife, Plaintiff contacted the Clinton Township Police Department to file internal affairs ("IA") complaint(s) against the responding/investigating officers.  Plaintiff also filed a notice of tort claim with the "Clinton Township/Police Department" on April 10, 2023.  Notably, this notice of claim did not contain any allegations against, nor did it identify as a tortfeasor, the Hunterdon County Prosecutor's Office.

When his efforts to file IA complaint(s) directly with the Clinton Township Police Department failed to generate the response Plaintiff desired, he escalated the matter to the Hunterdon County Prosecutor's Office ("HCPO") at some point in early 2024.  Plaintiff traveled to the HCPO to provide information regarding his IA complaint(s) against the Clinton officers.  HCPO Detective Sergeant Kelsey Marsh and HCPO Detective Colin Frinzi conducted a complainant interview with Plaintiff during which Plaintiff became confrontational before Detective Sergeant Marsh ended the meeting.  Disgruntled with the content and results of his interview with the HCPO, Plaintiff further escalated the matter to the Office of Public Integrity and Accountability ("OPIA") within the New Jersey Attorney General's Office.  The OPIA ultimately authorized the HCPO to handle Plaintiff's IA complaint(s).

According to the Complaint, HCPO Captain Frank Crisologo interviewed Plaintiff regarding his IA complaint(s) in July 2024, and Plaintiff followed up with Captain Crisologo in August 2024.

Plaintiff filed the instant lawsuit on January 3, 2025. To date, he has not filed a notice of tort claim regarding the HCPO Defendants.

## STANDARDS OF REVIEW

The HCPO Defendants' Motion is primarily advanced as a motion for summary judgment because Plaintiff's claims are barred as he failed to properly file a timely notice of Tort Claim regarding the HCPO Defendants. Such argument applies the summary judgment standard and incorporates documents outside the pleadings. See, infra, Point I. The HCPO Defendants' alternative arguments do not incorporate documents outside the pleadings; thus, Points II–IV apply the motion to dismiss standard.

### A. MOTION FOR SUMMARY JUDGMENT PURSUANT TO R. 4:46-2.

Pursuant to Rule 4:46-2(c), summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Our Supreme Court has encouraged trial courts to use summary judgment to "eliminate from crowded court calendars cases in which a trial would serve no

useful purpose" and has advised courts "not to refrain from granting summary judgment when the proper circumstances present themselves." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 541 (1995).

In Brill, the Supreme Court of New Jersey re-examined the standard for summary judgment and adopted the approach used by the United States Supreme Court.[2] Under that standard, trial courts are to determine "whether the evidence presents a sufficient disagreement to require a submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brill, 142 N.J. at 533 (citations omitted). The court is to consider whether the competent evidence presented, when viewed in the light most favorable to the non-moving party, is sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. Id. at 540.

For a dispute to constitute a genuine issue of material fact, it must be "genuine" as well as "substantial;" that is, "true, solid [or] real," rather than "imaginary, unreal, or apparent only." Id. at 529. "[I]f the opposing party offers . . . only facts which are immaterial or of an insubstantial nature, a mere scintilla, 'fanciful, frivolous, gauzy or merely suspicious,'" summary judgment should be granted. Ibid. (quotation omitted). Accordingly, summary judgment "is designed

---

[2] See Celotex v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

to provide a prompt, businesslike and inexpensive method of disposing of cases not warranting a trial."  Id. at 530 (quoting Ledley v. William Penn Life Ins. Co., 138 N.J. 627, 641-42 (1995).

In opposition to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Triffin v. American. Int'l Group, Inc., 372 N.J. Super. 517, 523-24 (App. Div. 2004) (citations omitted).   "Competent opposition requires 'competent evidential material beyond mere 'speculation' and 'fanciful arguments.'"  Hoffman v. Asseenontv.com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009) (quoting Merchants Express Money Order Co. v. Sun Nat'l Bank, 374 N.J. Super. 556, 563 (App. Div. 2005), certif. granted, 183 N.J. 592 (2005)).  Even in cases where the evidence is "likely to be within the possession of the defendant, the plaintiff is still required to . . . present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986).

## B. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM PURSUANT TO R. 4:6-2(e).

"A motion to dismiss a complaint under R. 4:6-2(e) for failure to state a claim upon which relief can be granted must be evaluated in light of the legal sufficiency of the facts alleged in the complaint."  Donato v. Moldow, 374 N.J. Super. 475, 482 (App. Div. 2005).  It is the plaintiff's burden to "make allegations which, if proven,

would constitute a valid cause of action." <u>Leon v. Rite Ai Corp.</u>, 340 N.J. Super. 462, 472 (App. Div. 2001).  A plaintiff must present "the essential facts supporting [his] cause of action[, and *conclusory allegations are insufficient* in that regard." <u>Scheidt v. DRV Techs., Inc.</u>, 424 N.J. Super. 188, 193 (App. Div. 2012) (emphasis added).  Thus, "a court must dismiss the plaintiff's complaint if it has failed to articulate a legal basis entitling plaintiff to relief." <u>Sickles v. Cabot Corp.</u>, 379 N.J. Super. 100, 106 (App. Div. 2005); <u>see also</u> <u>Watson v. New Jersey Dept. of Treasury</u>, 453 N.J. Super. 42, 47-48 (App. Div. 2017) (noting that the purpose of the inquiry is to examine the legal sufficiency of the facts alleged).

In considering a motion to dismiss under <u>Rule</u> 4:6-2, courts must accept the facts alleged in the complaint as true, giving the pleader the benefit of all inferences that may be drawn in his favor.  <u>Printing Mart-Morristown v. Sharp Elecs. Corp.</u>, 116 N.J. 739, 746 (1989).  However, defendants must be able to ascertain, investigate, and defend claims raised against them.  <u>Bauer v. Nesbitt</u>, 198 N.J. 601, 610 (2009).  Thus, where a complaint is "thoroughly deficient" and "completely omits the underlying basis for relief[,]" such complaint "cannot be sustained as a matter of fundamental fairness."  <u>Ibid.</u>  In such instances, "dismissal is the appropriate remedy." <u>Banco Popular N. Am. v. Gandi</u>, 184 N.J. 161, 166 (2005); <u>see also</u> <u>Energy Rec. v. Dept. of Env. Prot.</u>, 320 N.J. Super. 59, 64-65 (App. Div. 1999), <u>aff'd</u>, 170 N.J. 246 (2001).

**ARGUMENT**

**POINT I**

**THE HCPO DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF FAILED TO FILE THE REQUISITE NOTICE OF TORT CLAIM.**

The New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3 ("NJTCA" or "Act"), "modifies the doctrine of sovereign immunity" and sets forth the parameters within which an aggrieved party may recover for the tortious acts of public entities and public employees. Feinberg v. N.J. Dep't of Envtl. Prot., 137 N.J. 126, 133 (1994). The Act's "guiding principle" is "that immunity from tort liability is the general rule and liability is the exception." D.D. v. University of Medicine and Dentistry of New Jersey, 213 N.J. 130, 134 (2013) (internal quotation marks omitted) (quoting Coyne v. DOT, 182 N.J. 481, 488 (2005)). Consequently, the Act "imposes strict requirements upon litigants seeking to file claims against public entities[,]" McDade v. Siazon, 208 N.J. 463, 468 (2011)

The NJTCA's notice requirement mandates that a plaintiff file a notice of claim within 90 days after the accrual of a cause of action; otherwise, the claim "shall be forever barred[.]" N.J.S.A. 59:8-8(a). Such notice "shall be filed either with (1) the Attorney General or (2) the department or agency involved in the alleged wrongful act or omission." Id. at 7. The Act further clarifies that "[a] claim . . . against a local public entity shall be filed with that entity." Ibid. A notice of tort

claim that is not filed with, or fails to name, the proper public entity or employee is inoperative for purposes of the Act. See McFeeley v. Kar, No. A-4543-17T1, 2019 N.J. Super. Unpub. LEXIS 147, at *12 (App. Div. Jan. 18, 2019) (holding that a notice of tort claim that failed to identify either the public entity or the public entity's employee was ineffective as to both); McDade, 208 N.J. 463 (plaintiff not permitted to file late notice of claim on municipal authority that was not named in the original notice of tort claim and where there were no extraordinary circumstances present).

The NJTCA's notice and time requirements are "[a]mong the most important limitations that the Act imposes on would-be claimants[.]" D.D., 213 N.J. at 134. Such requirements apply to all claims based in intentional tort or negligence, including, but not limited to, emotional distress, false imprisonment, and malicious prosecution. See, e.g., Velez v. City of Jersey City, 180 N.J. 284, 294-96 (D.N.J. 2004) (citing Garlanger v. Berbeke, 223 F. Supp. 2d 596, 602 (D.N.J. 2002) (finding that the NJTCA's notice and time requirements apply to claims of defamation, emotional distress, and malicious prosecution); Bayer v. Township of Union, 414 N.J. Super. 238, 257-58 (App. Div. 2010) (affirming dismissal of false arrest claim on NJTCA grounds); Pisano v. City of Union Cty., 198 N.J. Super. 588, 590 (Law Div. 1984) (holding that the NJTCA's notice and time requirements apply to claims of false imprisonment).

In general, a cause of action accrues on the date when "the right to institute

9

and maintain a suit" first arises. <u>Russo Farms v. Vineland Bd. of Educ.</u>, 144 N.J. 84, 98 (1996) (quoting <u>Rosenau v. City of New Brunswick</u>, 51 N.J. 130, 137 (1968)). For example, a claim for negligence accrues "when [plaintiff] suffers actual consequential damage or less from the defendant's negligence." <u>Ibid.</u> (quoting <u>Rosenau</u>, 51 N.J. at 138)).

Here, Plaintiff failed to file any notice of tort claim regarding the HCPO Defendants within the requisite 90-day period. While the Complaint states that Plaintiff filed a notice of tort claim on April 10, 2023, that notice (i) is limited to Clinton Township and the Clinton Township Police Department, and (ii) appears to have been filed before Plaintiff had any contact with the HCPO Defendants. <u>See</u>, Coffey Cert., <u>Ex. A:</u> Complaint ¶¶ 40, 49; <u>see also</u>, <u>id.</u> at ¶¶ 54–58. As such, it is inoperative as to the HCPO Defendants.

Additionally, more than 90 days have elapsed since the incidents referenced in Plaintiff's Complaint, and, as set forth in the Certifications of Renée M. Robeson and Terrance Little, neither the Hunterdon County Prosecutor's Office nor the Office of the Attorney General received a notice of tort claim regarding the HCPO Defendants. <u>See</u>, Coffey Cert., <u>Ex. B:</u> Certification of Renée M. Robeson and <u>Ex. C:</u> Certification of Terrance Little. Even giving Plaintiff the benefit of the last possible accrual date—January 3, 2025, the date Plaintiff filed his Complaint— Plaintiff would have been required to file a notice of tort claim regarding the HCPO

Defendants by April 3, 2025.  Despite Plaintiff knowing (or at least believing) he had potential causes of action against the HCPO Defendants, and further knowing of the requirement to file a notice of tort claim against public entities (as he obviously did so with respect to the Clinton Township Police Department), he nevertheless failed to do so.  See, Coffey Cert., Ex. B: Certification of Renée M. Robeson and Ex. C: Certification of Terrance Little.

Plaintiff failed to provide proper and timely notice to the HCPO Defendants as required under the NJTCA.  Thus, Plaintiff's tort claims against the HCPO Defendants—malicious prosecution, malicious use of process and malicious abuse of process; deprivation of rights; intentional infliction of emotional distress; negligent infliction of emotional distress; false imprisonment; civil conspiracy; negligence or gross negligence; invasion of privacy; common law fraud; conspiracy to commit fraud; tortious interference with contractual relationship; aiding the commission of a tort; breach of duty; and deprivation and interference with protected parental rights—are statutorily barred by the NJTCA and should be dismissed with prejudice.

## POINT II

### PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE FACTS SUFFICIENT TO STATE A CLAIM AGAINST THE HCPO DEFENDANTS.

"New Jersey is a 'fact' rather than a 'notice' pleading jurisdiction, which

11

means that a plaintiff must allege facts to support his or her claim rather than merely citing to elements of a cause of action." <u>Nostrame v. Santiago</u>, 420 N.J. Super. 427, 436 (App. Div. 2011) (citations omitted), <u>aff'd in relevant part</u>, <u>Nostrame v. Santiago</u>, 213 N.J. 109 (2013).   In other words, pleadings that merely state conclusions of law without any sufficient factual support will not be able to proceed to discovery.  <u>Glass v. Suburban Restoration Co., Inc.</u>, 317 N.J. Super. 574, 582 (App. Div. 1998).

Here, Plaintiff's Complaint cursorily asserts numerous tort-based claims against all named Defendants, including: malicious prosecution, malicious use of process and malicious abuse of process; deprivation of rights; intentional infliction of emotional distress; negligent infliction of emotional distress; false imprisonment; civil conspiracy; negligence or gross negligence; invasion of privacy; common law fraud; conspiracy to commit fraud; tortious interference with contractual relationship; aiding the commission of a tort; breach of duty; and deprivation and interference with protected parental rights.

Plaintiff's Complaint fails to sufficiently plead any facts demonstrating his various tort claims, nor does it make clear against whom each claim is asserted. Instead, Plaintiff's Complaint is rife with mere legal conclusions and bald assertions. Such improper statements in Plaintiff's Complaint should be disregarded by the Court, and his Complaint should be dismissed accordingly.

## POINT III

### THE HUNTERDON COUNTY PROSECUTOR'S OFFICE CANNOT BE HELD LIABLE FOR INTENTIONAL TORTS UNDER THE NJTCA.

The NJTCA specifically provides that "[a] public entity is not liable for the acts or omissions" which constitute "a crime, actual fraud, actual malice, or willful conduct." N.J.S.A. 59:2-10 (emphasis added). Thus, there can be no vicarious liability by a public entity for intentional torts; "that is, with respect to such intentional torts, the theory of *respondeat superior* does not apply." Hoag v. Brown, 397 N.J. Super. 34, 53-54 (App. Div. 2007); see also, Ward v. Barnes, 545 F. Supp. 2d 400, 420-21 (D.N.J. 2008) (holding that there is no legal basis under N.J.S.A. 59:2-10 for permitting *respondeat superior* liability to public entities on the theories of battery and intentional infliction of emotional distress). This is true with respect to common law torts, as well as claims for civil conspiracy or tortious interference. See, e.g., Joyce v. City of Sea Isle City, No. CIV. 04-5345RBK, 2008 WL 906266, at *24 (D.N.J. Mar. 31, 2008), on reconsideration in part sub nom. Joyce v. Sea Isle City, No. CIV. 04-5345(RBK), 2008 WL 2875456 (D.N.J. July 23, 2008) (dismissing a plaintiff's malicious prosecution claim because, under N.J.S.A. 59:2-10, a public entity "cannot be liable for intentional torts committed by its employees[.]"); Biaggi-Pacheco v. City of Plainfield, 2017 U.S. Dist. LEXIS 170746, at *11-12 (D.N.J. Oct. 13, 2017) (collecting cases standing for the

proposition that, under N.J.S.A. 5:2-10, a claims for malicious prosecution and intentional infliction of emotional distress cannot be maintained against a public entity); DiMaria Constr., Inc. v. Interarch, 351 N.J. Super. 558, 567 (App. Div. 2001) (explaining that in order to establish a claim of interference with economic advantage, a plaintiff is required to show ". . . malice – that is, defendant's *intentional* interference without justification"); Lewis v. Airco, Inc., A-3509-08T3, 2011 N.J. Super. Unpub. LEXIS 1914, at *94–*97 (App. Div. July 15, 2011) (collecting cases standing for the proposition "that the underlying tort in a civil conspiracy claim must be intentional").

Here, Plaintiff asserts intentional tort claims in Counts 1, 3, 5, 6, 8, 9, 10, 11, and 12.  As public entities are immune from all intentional torts under N.J.S.A. 59:2-10, these Counts should be dismissed with prejudice as to the Hunterdon County Prosecutor's Office.

## POINT IV

### ANY CLAIMS AGAINST THE HUNTERDON COUNTY PROSECUTOR'S OFFICE ENTITY FOR PUNITIVE DAMAGES SHOULD BE DISMISSED AS A MATTER OF LAW.

With respect to punitive damages, the NJTCA is crystal clear that such damages are not available to a plaintiff against a public entity.  See N.J.S.A. 59:9-2(c) ("No punitive or exemplary damages shall be awarded against a public entity").

14

Here, Plaintiff has asserted claims for punitive damages in the *ad damnum* clause of his Complaint.  Such damages, however, cannot be awarded against the Hunterdon County Prosecutor's Office.  Thus, the Hunterdon County Prosecutor's Office is entitled to dismissal with prejudice as to any claim for punitive damages.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Complaint as to the Hunterdon County Prosecutor's Office and Kelsey Marsh should be dismissed with prejudice.


Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:    *s/ Catriona Coffey*
       Catriona Coffey
       Deputy Attorney General


Dated: April 14, 2025

15

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
*Attorney for Defendants, Hunterdon County Prosecutor's Office*
*(improperly pled as Hunterdon County) and Kelsey Marsh*

By:   Catriona Coffey (Attorney ID # 381682021)
      Deputy Attorney General
      (609) 376-2440
      catriona.coffey@law.njoag.gov

| | |
|---|---|
| ERIC WEISS,<br><br>                    Plaintiff,<br><br>      v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br><br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><br><u>Civil Action</u><br><br>**STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO <u>R.</u> 4:46-2(a)** |

Pursuant to <u>R.</u> 4:46-2(a), Defendants Hunterdon County Prosecutor's Office and Kelsey Marsh provide the following Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

**I.      <u>PLAINTIFF'S ALLEGATIONS & CAUSES OF ACTION.</u>**

1.      On January 3, 2025, Plaintiff, Eric Weiss, filed a lawsuit against John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffrey Glennon, and the Township of Clinton/Police Department (hereinafter, the "Clinton Township Defendants"), as well as the Hunterdon County Prosecutor's Office (improperly pled as "Hunterdon County") and Kelsey Marsh (hereinafter, the "HCPO Defendants").  See, generally, Coffey Cert. Ex. A: Complaint.

2.      In Plaintiff's Complaint, he alleges that Defendants committed various common law torts against him during their response to (i) a 911 call reporting an in-progress domestic violence incident between Plaintiff and his estranged son, S.W.; and (ii) various internal affairs ("IA") complaints submitted to them by Plaintiff.  Id.

3.      In particular, Plaintiff raises fourteen tort-based claims: malicious prosecution, malicious use of process and malicious abuse of process; deprivation of rights; intentional infliction of emotional distress; negligent infliction of emotional distress; false imprisonment; civil conspiracy; negligence or gross negligence; invasion of privacy; common law fraud; conspiracy to commit fraud; tortious interference with contractual relationship; aiding the commission of a tort; breach of duty; and deprivation and interference with protected parental rights.  See, id. at Counts 1–14.

4.      Plaintiff "filed a notice of tort claim with Clinton Township/Police Department" on April 10, 2023.  See, Coffey Cert., Ex. A: Complaint ¶ 40; see also,

id. at ¶ 49.

5.      Plaintiff's Complaint contains no allegations regarding—nor does it appear Plaintiff had any interactions with—the HCPO Defendants prior to January 2024.  See, generally, id. ¶¶ 54–58.

## II.    PLAINTIFF NEVER FILED ANY NOTICE OF CLAIM WITH THE HUNTERDON COUNTY PROSECUTOR'S OFFICE.

6.      Despite asserting various state law tort-based claims against the HCPO Defendants, Plaintiff did not file a notice of tort claim regarding the HCPO Defendants prior to filing his present Complaint, as required by the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 14-4 ("NJTCA").   See, Coffey Cert., Ex. B: Certification of Katrina C. Doyle, ¶ 6 ("A diligent search of these records maintained by my office revealed that no notices of tort claim related to this case were filed by Plaintiff."); see also, Coffey Cert., Ex. C: Certification of Terrance Little, ¶ 5 ("A check of the Division of Risk Management files was conducted and revealed that a Tort Liability Notice was not filed by Eric Weiss regarding any claims raised within his Complaint.").

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:    _s/ Catriona Coffey_____
Catriona Coffey
Deputy Attorney General

Dated: April 14, 2025

3

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
*Attorney for Defendants, Hunterdon County Prosecutor's Office*
*(improperly pled as Hunterdon County) and Kelsey Marsh*

By:   Catriona Coffey (Attorney ID # 381682021)
       Deputy Attorney General
       (609) 376-2440
       catriona.coffey@law.njoag.gov

| | |
|---|---|
| ERIC WEISS,<br><br>                    Plaintiff,<br><br>       v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br><br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><br><u>Civil Action</u><br><br>**CERTIFICATION OF COUNSEL IN SUPPORT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR TO DISMISS THE COMPLAINT** |

I, Catriona Coffey, being of full age, hereby certify as follows:

1.     I am an attorney licensed to practice law in the State of New Jersey. I

am employed by the New Jersey Attorney General's Office as a Deputy Attorney

General in the Department of Law and Public Safety, Division of Law, Law

1

Enforcement and Corrections Section.

2.      I represent the Hunterdon County Prosecutor's Office (improperly pled as Hunterdon County) and Kelsey Marsh, who are named as Defendants in the above-captioned matter.

3.      Attached hereto as **Exhibit A** is a true copy of the Plaintiff's Complaint filed in this matter.

4.      Attached hereto as **Exhibit B** is a true copy of the parties Stipulation extending time to answer, move, or otherwise respond to the Complaint.

5.      Attached hereto as **Exhibit C** is a true copy of the Certification of Katrina C. Doyle.

6.      Attached hereto as **Exhibit D** is a true copy of the Certification of Terrance Little.

7.      Attached hereto as **Exhibit E** is a true copy of the unpublished opinion of the United States District Court for the District of New Jersey in Biaggi-Pacheco v. City of Plainfield, 2017 U.S. Dist. LEXIS 170746 (D.N.J. Oct. 13, 2017).

8.      Attached hereto as **Exhibit F** is a true copy of the unpublished opinion of the United States District Court for the District of New Jersey in Joyce v. City of Sea Isle City, No. CIV. 04-5345RBK, 2008 WL 906266 (D.N.J. Mar. 31, 2008), on reconsideration in part sub nom. Joyce v. Sea Isle City, No. CIV. 04-5345(RBK), 2008 WL 2875456 (D.N.J. July 23, 2008).

9.      Attached hereto as **Exhibit G** is a true copy of the unpublished opinion of the United States District Court for the District of New Jersey in <u>Joyce v. Sea Isle City</u>, No. CIV. 04-5345(RBK), 2008 WL 2875456 (D.N.J. July 23, 2008).

10.     Attached hereto as **Exhibit H** is a true copy of the unpublished opinion of the Superior Court of New Jersey, Appellate Division, in <u>Lewis v. Airco, Inc.</u>, A-3509-08T3, 2011 N.J. Super. Unpub. LEXIS 1914 (App. Div. July 15, 2011).

11.     Attached hereto as **Exhibit I** is a true copy of the unpublished opinion of the Superior Court of New Jersey, Appellate Division, in <u>McFeeley v. Kar</u>, No. A-4543-17T1, 2019 N.J. Super. Unpub. LEXIS 147 (App. Div. Jan. 18, 2019).

12.     This certification is made in support of Defendants' Motion for Summary Judgment and/or to Dismiss the Complaint.

I hereby certify that the foregoing statements made by me are true.  I understand that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

                        Respectfully submitted,

                        MATTHEW J. PLATKIN
                        ATTORNEY GENERAL OF NEW JERSEY

        By:     <u>*s/ Catriona Coffey*</u>
                        Catriona Coffey
                        Deputy Attorney General


Dated: April 14, 2025

# Exhibit A

**Eric S. Weiss**
210 Walnut Street
Garwood, NJ 07027
(908) 913 0832
ericsweiss@gmail.com

| | |
|---|---|
| Eric Weiss<br><br>          Plaintiff,<br><br>          vs.<br><br>John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon, Township of Clinton/Police Department, Hunterdon County, Kelsey Marsh,<br>John/Jane Does 1-10<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CIVIL DIVISION; HUNTERDON COUNTY<br>DOCKET NO. HNT-L-000010-25<br><br><br><br>**COMPLAINT** |

PLT by way of complaint against the DEFs, verified to the facts asserted, pleads as follows:

## THE PARTIES

1. PLT lives in Garwood NJ

2. DEFs John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffery Glennon are employed by the Township of Clinton/Police Department

3. Township of Clinton/Police Department is located at 1371 Route 31 Clinton TWSP NJ 08801 is the employer of the DEF

4. DEF Hunterdon County is the employer of Marsh, Robeson, Crisologo, and Frinzi. Hunterdon County Prosecutor's office 71 Main Street, PO Box 2900 Flemington, New Jersey 08822

5. DEF Kelsey Marsh is also named in her individual capacity

## FACTS COMMON TO ALL COUNTS

6. This complaint has been filed because the DEF's believe they are above the law and do not have to abide by the laws, civil rights of individuals and police rules that they swore to uphold.

1

7. On Jan 10, 2023 PLT, a commercial realtor, was working by reviewing/accessing the Beaver Brook Concourse building site located on 1465 NJ-31, Annandale / Clinton Township NJ

8. Around 1:00 PM PLT ran into Sam (his son) who he had not seen in 5 years due to him being alienated from PLT by his former wife (Posner).

9. PLT told Sam that he still loved him, missed him, asked him to go out to lunch and wanted Sam to get therapy for his alienation in accordance with all the Court appointed experts recommended.

10. Unbeknown to PLT and Sam, Sam's phone "Pocket dialed" Posner. Posner had her friend record PLT's and Sam's conversation to give to the police so she could have PLT prosecuted.

11. Posner also, despite knowing such was a lie, called the Clinton Police department and reported to them that Sam was "being beaten" by PLT, PLT was "Hitting her son" and that PLT "was waiting for the son [sam] when he came out."

12. DEF Tiger, Schleisier, Balsamo from the Clinton police responded to the call and immediately could see Posner's report was a lie. They also immediately had Sam confirm that PLT had never touched him.

13. PLT told DEFs that he was a commercial realtor and was checking out the site and ran into his son who he had not seen in 5 years due to him being alienated from PLT.

14. DEF confirmed to PLT that he knew what parental alienation was.

15. DEFs knew that PLT had a custody order with Posner for Sam and his sister and was ordered to still pay child support.

16. DEFs also falsely claimed and argued with PLT that Sam was emancipated from PLT.

17. Acting in retaliation to PLT disputing DEFs claim of emancipation, DEFs decided to push Sam to pursue domestic violence charges against PLT despite knowing there was no such basis.

18. Despite DEFs knowing the call was a false report, (and an example of the alienation that PLT had told them occurred), there were no "outstanding warrants" or "restraining orders" DEFs then asked PLT for his driver's license. PLT complied.

19. About 5 minutes later, DEFs asked PLT where his car was. PLT complied and pointed to his car that was about a 100 feet away from where they were standing.

20. DEFs then ordered PLT to get into his car and ordered another DEF to take his police car and block PLT in so he could not leave. DEFs did not give PLT back his driver's license.

21. PLT offered to provide but the DEF's refused to review copies of the expert reports showing that PLT son was alienated from him, that Sam and Posner have a long history of making false allegations of abuse against PLT, that about a dozen experts determined with a medical degree of certainty that all the allegations made were in fact false and that several concluded that it was Posner that was forcing Sam to make the false allegations.

22. PLT also offered to provide but DEF's refused to review Sam's latest evaluation to confirm that Sam had learning and processing disabilities.

23. DEFs refused to do their job and investigate and accept anything that would get in the way of their retaliation against PLT who without any basis, despite witnessing first-hand how he was truthful via Posners false claim wanted to further destroy PLT chance of reconnecting with his son.

24. DEFs, while detaining PLT, ran his car plates and driver's license searching for infractions and issued him a citation for an expired registration.

25. At no time did DEF's read PLT his rights, tell him he could remain silent or leave, or that they had decided to and were investigating him.

26. While DEFs were refusing information from PLT, they were holding PLT waiting for Posner to send them information as Posner lied saying Sam had a "Restraining Order" against PLT.

27. Despite knowing there was no such restraining order, that Posner had lied about the assault and that PLT was just talking to his son, DEFs held PLT against his will for about an hour as Posner told him that she was going to have Sam file a TRO for domestic violence against PLT.

28. About 40 minutes after the initial contact, DEFs allowed Sam to leave the area. DEFs still held PLT for an additional 20 Minutes before moving their police car and giving PLT back his license so he may leave.

29. Around 3 PM that day, DEF's called Sam to see if he was able to make it to the Court to file a restraining order.

3

30. DEFs were all aware that every single expert, about a dozen, concluded that DEFs had made false claims of abuse by PLT. That Sam was forced and brainwashed by DEFs to make false allegations.

31. DEF's knew that multiple Judges had ruled that DEF's had actually lied and fabricated claims of domestic violence and harassment.

32. In a violation of PLT rights (and the statute) that FRO hearings must start to be adjudicated within 10 days, the Court adjourned the matter for 3 months when Sam was to return to school.

33. So for 3 months PLT lived in constant fear of being arrested as Posner had repeatedly done in the past by making up fictitious violations of TRO's and Court orders.

34. On March 16, 2023 after a full day trial, the Court denied the FRO. The Court found:
   a. Posner had put Sam into this conflict, and it was not fair to him
   b. That Sam needed to have a relationship with PLT and therapy
   c. That Posner filed a false police report to Clinton
   d. Sam & Posner lied about PLT going to the house and trying to install a GPS
   e. DEFs lied about PLT assaulting Sam.

35. Most importantly the Court also ruled that even if the Court was to accept everything that Sam/Posner alleged was "True," that it still was no way near a claim of domestic violence.

36. DEFs knew that PLT did not commit any actions that could be considered domestic violence. DEF's used the false claim to try to help Posner remove any chance that PLT and his son could ever have a relationship and further harm the chance of PLT having a relationship with his daughter, who they knew was also alienated from PLT.

37. DEF's then refused to provide PLT with copies of the police report so he can defend himself against the FRO. To cover up this as being further abuse and retaliation against PLT, despite knowing the FRO hearing had to be done within 10 days, they made PLT file an OPRA request to get the information knowing that they could take 7 business days to produce the information.

38. By contrast, DEFs instantly provided Posner with the police report and other stuff they wanted so they could prosecute the FRO against DEF.

39. Thereafter when DEF heard the FRO hearing was delayed, they refused to provide any of the information to PLT stating that he did not have any "interest" in the matter. DEF knowing that there is no reciprocal discovery in an FRO, did not even give PLT what they gave Posner to prosecute.

4

40. On April 10, 2023 PLT filed a notice of tort claim with Clinton Township/Police Department. So PLT's suit and claims against DEFs are both in their official and personal capacity.

41. DEFs, continuing with their retaliation, refused to file charges against Posner for making the knowingly false police report despite knowing that she did so and put peoples safety at risk

42. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner for the filing false police report against him despite knowing the crime occurred.

43. DEFs, continuing with their retaliation, refused to charge Posner and her friend for wiretapping despite knowing such occurred.

44. DEFs, continuing with their retaliation, refused to take a police report and allow PLT to file charges against Posner and her friend for wiretapping despite knowing such crime occurred.

45. DEF continuing with their retaliation did not inform PLT that he had the right to file the charges after they refused.

46. DEFs were well aware of the contracts between PLT and his former wife.

47. DEFs conduct as outline above tortuously interfered with PLT's rights in those contracts.

48. DEF were well aware how their actions and conduct would negatively affect the long term relationship that PLT had with his children and the harmful affect it would have upon PLT.

### THE COVER UP IS OFTEN AS BAD OR WORSE THAN THE CRIME AS IT SHOWS INTENT TO BREAK THE LAW

49. On April 10, 2023 PLT filed a notice of tort claim

50. told Captain Derosa he wanted to file a complaint against Tiger, Schleisier, Balsamo and other officers who might have acted illegally or improperly. Neither him nor anyone at the department ever responded.

51. PLT then reached out again to file a complaint against the officers. No one responded

52. Despite being required to respond immediately to internal affair complaints, 3-4 months later in August 2023, Ross finally reached out to PLT saying that he was going to investigate.

53. PLT never heard back from Ross. So in November/December PLT again reached out to Derosa and Glennon again telling them that no one has ever taken his complaint. They never respond.

54. In January 2024 Ross finally call PLT to take his complaint. PLT told him that he wanted to add himself, Derosa and Glennon to the complaint for not taking the complaint, as they were required.

55. Ross then called PLT a few days later saying he did not and could not take the complaint falsely alleging it was due to a lawsuit that PLT never filed.

56. PLT then asked Ross to transfer the matter to the prosecutors officers because it was clear that DEF were still retaliating against PLT and refusing to do their job. (PLT has since learned that Ross, Derosa and Glennon were required to transfer the matters against themselves to the prosecutors office as they were "superiors" to him and that he could not investigate himself.

57. PLT then reached out to the Hunterdon county prosecutor to take over the internal affairs complaint.

58. The prosecutor agreed and ordered DEF Kelsey Marsh and Frizzi to take PLTs complaint.

59. DEFs Clinton Township/Police Department again denied PLTs OPRA request to obtain information that was now needed to file an accurate and full complaint against its officers.

60. PLT traveled out to Hunterdon to meet with March and Frizzi

61. March was the officer who took the lead in taking PLT complaint.

62. It quickly became apparent to PLT that March was refusing to do her job, breached the duties that she owed to PLT and her true intent was to stop PLT from filing the complaint.

63. PLT told Marsh it was over a year since the incident occurred and asked her to obtain the police report, body cams, and other information so PLT could refresh his memory and see if there was anything else that occurred. March continued to refuse to do so without explanation.

64. At the hearing DEF said "that they were not going to provide me any discovery to help me file my complaint against these officers"

65. DEF Marshs line of questioning was clearly not to obtain the facts and the basis for PLT's complaint but to cover up the officers illegal and unconstitutional conduct.

66. When PLT did not give in to DEF's Marsh's plan, Marsh became abusive towards PLT and falsely stated that he committed domestic violence against Posner and was not going to do it to her. That she was refusing to take the complaint against the officers because PLT was trying to control her and ordered PLT to leave, would not allow PLT to have a copy of the tape so he could file a complaint

6

against her and Frizzi who was sitting in the room while this was occurring and allowed officer March to ignore the orders that they were given to take the complaint.

67. After the meeting, I informed Robeson of the improper conduct of her employee. Refusing to take the report as she was ordered to do and the conduct that she showed during the interview.

> "Even if I was "louder" then she hoped or was "condensing" in my tone, both officers were still required to take my full statement and complaint which they refused to do. They did not want to hear how they refused to take my internal affairs complaint. How it took almost a year for Detective Ross to respond or the cleary false reasons as to why he said he did not do what the law required them to do. Even if your officers thought I was a "total lunatic" they should have grave concerns over DeRosa, Ross and Glennon conduct in refusing to take internal affairs complaint and not acting as the law requires especially since my complaint of improper conduct are against the same officers that others have made complaints against for improper conduct. I sure you are aware that there have been 3 such complaints against Chief Derosa."

68. Robeson did not respond so PLT was forced to send a second email.

69. Robeson finally responded and agree to transfer the entire matter to the NJ Attorney General's Office of Professional Integrity and Accountability as PLT now that I had a complaint to file against her officers as well.

70. DEF's Huntington County refused PLT OPRA request to obtain the video so he may properly prepare for the interview in filing his complaint.

71. Despite claiming they transferred the case, they refused to give me the information of whom they transferred the case too.

72. After a ½ dozen follow ups with the OPIA, as no one would respond to PLT, several months later the OPIA ignored the request to take the case and instead said that an officer in Hunterdon should investigate all the complaints, including those against people in his office.

73. Robeson did not push back and ordered her officer to take the complaint.

74. In July 2024, PLT met with DEF Crisgolo who took his complaint.

75. In Aug 2024, PLT followed up with Crisgolo and gave him more information to support his statement.

76. As of the filing of this complaint, PLT's complaints have still not been investigated or a report or findings issued, despite the rules requiring such to be done within 45 days.

WHEREFORE, PLT repeats and incorporates each and every allegation as set forth above as if fully set forth at length herein, demands against all of the DEFs, jointly and severally, as well as their successors and assigns, for the following relief:

**COUNT 1**
Malicious Prosecution, Malicious use of process and Malicious abuse of process

**COUNT 2**
Deprivation of Rights

**COUNT 3**
Intentional Infliction of Emotional Distress (IIED)

**COUNT 4**
Negligent Infliction of Emotional Distress (NIED)

**COUNT 5**
False Imprisonment

**COUNT 6**
Civil Conspiracy

**COUNT 7**
Negligence or Gross Negligence

**COUNT 8**
Invasion of Privacy

**COUNT 9**
Common Law Fraud

**COUNT 10**
Conspiracy to Commit Fraud

**COUNT 11**
Tortious interference with contractual relationship

**COUNT 12**
Aiding the commission of a tort

**COUNT 13**
Breach of Duty

**COUNT 14**
Deprivation and interference with protected parental rights

**PRAYER FOR RELIEF**

As a direct and proximate result of the foregoing, PLT has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, and substantial medical and other expenses for treatment and care, past, present, and future. Damages for loss of service, society, and companionship. Said losses, injuries, and expenses are either permanent or continuing in nature and PLT will continue to suffer same in the future.

WHEREFORE, PLT demands judgment against DEFs for compensatory damages, consequential damages, punitive damages, actual damages, costs, interest, awarding reasonable attorneys fees and costs and expense of litigation. and other such relief as this Court deems just and proper.

## VERIFICATION OF ASSERTED FACTS

I PLT, do hereby certify that the foregoing factual assertions made in this Complaint are made by me and are true to the best of my knowledge. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

## DESIGNATION OF TRIAL COUNSEL

PLT is designated as trial counsel in this matter.

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

## DEMANDS FOR A JURY TRIAL

The PLT demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey. Court Rules 1:8-2(b) and 4:35-1(a)

## CERTIFICATION PURSUANT TO R. 1:38-7

I certify that all confidential personal identifiers have been removed or redacted from this Complaint and that the same information will be removed or redacted from all documents submitted to the Court in connection with this matter in the future consistent with Rule 1:38-7(b).

DATED: Jan 3, 2024                    Eric S. Weiss, Plaintiff

# Exhibit B

```
MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market street
P.O. Box 112
Trenton, New Jersey 08625-0112
```
*Attorney for Defendants*
*Hunterdon County Prosecutor's Office*
*(improperly pled as Hunterdon County)*
*& Kelsey Marsh*

```
By:  Natalie K. Dennis (Attorney ID#244012018)
     Deputy Attorney General
     (609) 376-2440
     Natalie.Dennis@law.njoag.gov
```

| | |
|---|---|
| ERIC WEISS,<br><br>     Plaintiff,<br><br>v.<br><br>JOHN TIGER, et al.,<br><br>     Defendants. | HUNTERDON COUNTY<br>SUPERIOR COURT<br><br>CIVIL DIVISION<br><br>HNT-L-000010-25<br><br>**STIPULATION EXTENDING TIME<br>TO ANSWER, MOVE, OR<br>OTHERWISE PLEAD** |

It is hereby stipulated and agreed by and between Plaintiff Weiss and the above named Defendants that the time within which Defendants may serve and file an answer, motion, or other pleading to Plaintiff's Complaint is hereby extended to **April 14, 2025** pursuant to R. 4:6-1(c).

By: _____
    Eric Weiss
    *Pro Se*

By: s/Natalie K. Dennis
Natalie K. Dennis, DAG
*Attorney for Defendants*
*Hunterdon County Prosecutor's*
*Office & Kelsey Marsh*

Dated: 2/13/2025

Dated: February 11, 2025

# Exhibit C

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625-0112
*Attorney for Defendants, Hudson County Prosecutor's Office and Kelsey Marsh*

By:    Catriona Coffey (Attorney ID # 381682021)
       Deputy Attorney General
       (609) 376-2440
       catriona.coffey@law.njoag.gov

| | |
|---|---|
| ERIC WEISS, | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | LAW DIVISION: CIVIL PART |
| | HUNTERDON COUNTY |
| v. | DOCKET NO. HNT-L-0010-25 |
| JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10, | Civil Action |
| | **CERTIFICATION OF KATRINA C. DOYLE** |
| Defendants. | |

I, KATRINA C. DOYLE, of full age, hereby certify and state:

1.      I am employed as the Hunterdon County Counsel, and have been at all times relevant to the within action.

2.      As part of my regular duties, I am responsible for the custody of all notices of claim filed with Hunterdon County, including those files with the Hunterdon County Prosecutor's Office pursuant to N.J.S.A. 59:8-7, *et seq.*, and N.J.S.A. 59:13-5, *et seq.*

3.      Pursuant to those duties, and in the regular course of business, this office keeps

records of all notices of claim so filed.

4.      Hunterdon County's files were checked to determine whether the Plaintiff, Eric Weiss, had filed a notice of tort claim concerning the claims raised in his Complaint.

5.      I contacted Prosecutor Renee Robeson of Hunterdon County Prosecutor's Office and confirmed that her office did not receive a notice of tort claim from Plaintiff Eric Weiss concerning the claims raised in his Complaint.

6.      A diligent search of these records maintained by my office revealed that no notices of tort claim related to this case were filed by the Plaintiff.


I certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if the foregoing statements made by me are willfully false, I am subject to punishment.


Signature:          _Ku C Doyle_


Print:          Katrina C. Doyle, Hunterdon County Counsel

Date: 4/10/25

# Exhibit D

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625-0112
*Attorney for Defendants, Hudson County Prosecutor's Office and Kelsey Marsh*

By:   Catriona Coffey (Attorney ID # 381682021)
      Deputy Attorney General
      (609) 376-2440
      catriona.coffey@law.njoag.gov

|  |  |
|---|---|
| ERIC S. WEISS,<br><br>                    Plaintiff,<br><br>     v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br><br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><br><u>Civil Action</u><br><br>**CERTIFICATION**<br>**OF**<br>**TERRANCE LITTLE** |

I, Terrance Little, of full age, hereby certify and state:

1.      I am employed as a Supervising Investigator 4 in the Tort and Contract & Subrogation Unit of the State of New Jersey, Department of the Treasury, Division of Risk Management, and have been at all times relevant to the within action.

2.      As part of my regular duties, I am responsible for the custody of all notices of claim filed with the State of New Jersey, Department of the Treasury, Division of Risk Management pursuant to N.J.S.A. 59:8-7.

3.      Pursuant to those duties and in the regular course of business, this office keeps records of notices of claim so filed.

4.     At the request of Defendant's counsel, the Division of Risk Management files were checked to determine whether Eric Weiss filed any Notice of Tort Liability Claim with this office concerning Plaintiff's claims raised within his Complaint.

5.     A check of the Division of Risk Management files was conducted and revealed that a Tort Liability Notice was not filed by Eric Weiss regarding any claims raised within his Complaint.

I certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if the foregoing statements made by me are willfully false, I am subject to punishment.

*Terrance Little*
Terrance Little

*4/11/25*

DATED:        April 11, 2025

# Exhibit E

## *Biaggi-Pacheco v. City of Plainfield*

United States District Court for the District of New Jersey

October 13, 2017, Decided; October 13, 2017, Filed

Civ. No. 16-3511 (KM) (JBC)

**Reporter**

2017 U.S. Dist. LEXIS 170746 *

HECTOR W. BIAGGI-PACHECO, Plaintiff, v. THE CITY OF PLAINFIELD, PLAINFIELD CITY POLICE DEPARTMENT, UNION COUNTY, STATE OF NEW JERSEY, ET AL., Defendants.

**Prior History:** *Biaggi-Pacheco v. City of Plainfield, 2017 U.S. Dist. LEXIS 12248 (D.N.J., Jan. 30, 2017)*

**Counsel:** [*1] For HECTOR W. BIAGGI-PACHECO, Plaintiff: JOHN H. SANDERS, II, LEAD ATTORNEY, SHEBELL & SHEBELL, LLC, Shrewsbury, NJ.

For THE CITY OF PLAINFIELD, PLAINFIELD CITY POLICE DEPARTMENT, Defendants: AMANDA E. MILLER, DANIEL ANTONELLI, LEAD ATTORNEYS, RAINONE COUGHLIN MINCHELLO, LLC, WOODBRIDGE, NJ.

For UNION COUNTY PROSECUTOR, UNION COUNTY PROSECUTOR'S OFFICE, STATE OF NEW JERSEY, NEW JERSEY DEPARTMENT OF THE TREASURY, Defendants: GREGORY J. SULLIVAN, LEAD ATTORNEY, New Jersey Attorney General's Office, Division of Law, Tort Litigation and Judiciary, Trenton, NJ.

**Judges:** Kevin McNulty, United States District Judge.

**Opinion by:** Kevin McNulty

## Opinion

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff, Hector Biaggi-Pacheco, alleges that the defendants wrongfully arrested, charged, and detained him. Most relevant here is his claim that, despite the dismissal of the charges against him, he was held in Union County jail for six more days until finally he was released. In a January 30, 2017 Memorandum and Order (ECF No. 10), I dismissed certain claims directed against the State of New Jersey and granted the plaintiff leave to amend his complaint. He has done so, and the currently operative pleading is the (First) Amended Complaint (ECF No. [*2] 11, cited as 1AC and referred to herein as the "Complaint"). Now before the Court are two $UUmland$O motions under *Fed. R. Civ. P. 12(b)(6)* to dismiss the Complaint for failure to state a claim: one filed by the State of New Jersey and Union County Prosecutor's Office ("UCPO") (ECF No. 18), and one filed by Union County (ECF No. 24).

For the reasons stated herein, I will grant the motions in part and deny them in part. What emerges is essentially a two-part case, comprising (a) claims against the City of Plainfield[1] arising from events in connection with the arrest, and (b) claims against UCPO and the County, arising from the prolongation of the plaintiff's detention after his charges were dismissed.

### I. Background[2]

The allegations of the Amended Complaint are broadly similar to those of the original Complaint. (ECF No. 1) Because there are some revisions, I again review them. They are assumed to be true for purposes of this motion only.

Mr. Biaggi-Pacheco is a resident of Plainfield, New Jersey, which is in Union County. (1AC at 4, ¶ 1 ["The Parties"].)[3] While conducting a sweep and mass arrest, police arrested Mr. Biaggi-Pacheco and charged him with a drug offense, (*Id.* at 6, ¶¶ 2.) Starting on December 5, 2014, he was incarcerated in the Union

---

[1] The City of Plainfield filed an Answer (ECF No. 12) to the Amended Complaint and is not a participant in these motions.

[2] Record items cited repeatedly will be abbreviated as follows:

 Go to table1

[3] The paragraph numbering starts over at paragraph I in each section of the Amended Complaint. Citations to the Amended Complaint will therefore contain the page number where the citation occurs, in addition to the paragraph number. Where necessary, the section header is identified as well.

2017 U.S. Dist. LEXIS 170746, *2

County Jail. (*Id.* at 7, ¶ 3.) He maintained his innocence during that period. (*Id.* at 7, ¶ 4.) On January 16, 2015, the charges against him were administratively terminated. (*Id.*) However, he was not released until January 22, 2016. (*Id.* at 7, ¶ 5.)

The Complaint asserts seven causes of action:

> Count I: Wrongful Arrest and Malicious Prosecution (*42 U.S.C. 1983*)
> Count II: Wrongful Imprisonment
> Count III: Malicious Prosecution
> Count IV: Intentional Infliction of Emotional Distress
> Count V: Abuse of Process
> Count VI: Negligence
>
> Count VII: *New Jersey Civil Rights Act* **[*4]**

(*Id.* at 11-22.) The Complaint seeks compensatory damages, as well as attorneys' fees and costs of suit.

## II. Standard of Review

*Fed. R. Civ. P. 12(b)(6)* provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. When deciding such a motion, all allegations in the complaint are taken as true and viewed in the light most favorable to the plaintiff. *See Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 45 L. Ed. 2d 343(1975)*; *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998)*; *see also Phillips v. Cty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)* (noting that the "reasonable inferences" principle was not undermined by *Twombly, infra*).

While *Fed. R. Civ. P. 8(a)* does not require a complaint to contain detailed factual allegations, the obligations of a plaintiff to provide the grounds of his entitlement to relief requires more than labels and conclusions; the formulaic recitation of the elements of a cause of action won't do. *Bell AU. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id. at 570*; *see also Umland v. PLANCO Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008)*. A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citing

*Twombly, 550 U.S. at 556*). While "[t]he plausibility standard is not akin to a 'probability requirement' **[*5]** . . . it asks for more than a sheer possibility." *Iqbal, 556 U.S. at 678 (2009)*.

In *Bistrian v. Levi*, the Third Circuit outlined a three-step process for analyzing a *Rule 12(b)(6)* motion to dismiss. *696 F.3d 352, 365 (3d Cir. 2012)*. (1) The court outlines the elements a plaintiff must plead to state a claim for relief; (2) it then "peel[s] away" allegations that are no more than conclusions; (3) finally, it looks for well-pled factual allegations, assumes their veracity, and determines whether they plausibly giver rise to an entitlement to relief. *Id.* (noting further that the last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense") (citations omitted). *Accord Carpenters Health & Welfare Fund of Phila. v. Mgmt. Res. Sys., Inc., 837 F.3d 378, 382 (3d Cir. 2016)* (citing *Bistrian*).

## III. Analysis

Section III.A, *infra*, briefly discusses the differences between the original and amended Complaints. Section III.8, *infra*, analyzes all seven counts of the First Amended Complaint as asserted against the State. Section III.C, *infra*, analyzes all seven counts as asserted against the County and UCPO.

## A. Original and Amended Complaints

The original complaint in this action was confusing as to facts and format, and contained at least one obvious error as to dates. In the previous Memorandum and Order, **[*6]** I dismissed that complaint. This opinion should be read in the context of that prior Opinion, which is incorporated by reference here.

My prior Opinion clearly identified the defects of the complaint and explicitly instructed the plaintiff as to what an amended complaint should contain:

> A second fundamental flaw is that the Complaint simply contains no facts concerning what the County, acting through individual prosecutors, is alleged to have done. The complaint does not even state specifically what the charges against Mr. Biaggi-Pacheco were, who filed them, and in what form. Some minimal specificity, as required by the federal rules, is needed. The problem is exacerbated by group pleading against all

2017 U.S. Dist. LEXIS 170746, *6

defendants, jointly and severally. The plaintiff may be alleging, for example, that UCPO filed unfounded charges; he may be alleging only that UCPO negligently caused him to be held after charges were dismissed....

In particular, the amended complaint must describe, in chronological order, the events that occurred, the persons and entities involved, and the particular acts they are individually alleged to have performed.

(M&O 7-8)

The plaintiff's efforts to comply have been minimal. The Complaint, **[*7]** as amended, is a modest improvement. The Complaint does revise some of the chronology (*e.g.*, 1AC 7, ¶¶ 3-5 (amending the date of arrest and release)), and it provides additional detail as to some of the events. The group-pleading problem remains. Still missing are such basic facts as the particular offense or offenses with which the plaintiff was charged, and the manner in which the charges were brought (*e.g.*, by complaint or indictment). The reader still cannot really tell what the involvement of UCPO or the County is alleged to be. Despite these deficiencies, for the reasons stated herein I will permit the plaintiff to explore in discovery the extent to which the County or UCPO caused him to be held after charges were dismissed. Nevertheless, certain claims still fall short as a matter of law or lack the necessary factual support to meet the *Twombly* plausibility standard, and they will be dismissed.

**B. The State**

I first consider the viability of all counts of the First Amended Complaint as to the State of New Jersey. Counts I and VII arise under the federal and State constitutions. The remaining counts, Counts II, III, IV, V, and VI, are all state-law tort claims.

**1. Counts I and VII [*8]**

Counts I and VII of the original complaint were dismissed as against the State, because the State is not a "person" amenable to suit under *42 U.S.C. 1983* or NJCRA. (*See* M&O 5-6, citing, *e.g.*, *Will v. Michigan Dep't of State Police, 491 U.S. 58, 64-66, 109 S. Ct. 2304, 2308-10, 105 L. Ed. 2d 45 (1989)*; *Endl v. New Jersey, 5 F. Supp. 3d 689, 697 (D.N.J. 2014)*.) Count I (1AC 11 ("Wrongful Arrest and Malicious Prosecution"

(*42 U.S.C. § 1983*)) and Count VII (1AC 22 (NJ Civil Rights Act ("NJCRA")) are dismissed for the same reason.

**2. Counts II and VI**

I next consider Counts II and VI, which allege that the State is liable in tort for the detention of Mr. Biaggi-Pacheco for six days after the charges against him were dismissed. "A public entity [here, the State] is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." *N.J. Stat. Ann. § 59:2-2(a)*. As to these claims, however, no action by any State employee is alleged. Rather, the Complaint alleges generally that the State possessed authority over the UCPO or the County. That in itself is not sufficient to impose vicarious liability on the State. Something more specific is required—for example, a demonstration that UCPO personnel were acting as "public employees" of the State for purposes of the NJTCA. *See N.J. Stat. Ann. § 59:1-3* (defining **[*9]** public employee).

County employees, of course, are just that. UCPO employees occupy a hybrid status: they are deemed to act for the State when pursuing core law enforcement functions, but for the County when discharging their administrative duties. That principle has been recognized in the context of the State's *Eleventh Amendment* sovereign immunity. *See Coleman u. Kaye, 87 F.3d 1491, 1499 (3d Cir. 1996)* (County Prosecutor partakes of State's immunity only when acting in prosecutorial, as opposed to administrative, capacity); *Estate of Lagano v. Bergen Cty. Prosecutor's Office, 769 F.3d 850 (3d Cir. 2014)*. More important here is that the same distinction has been recognized as a matter of State law. Thus, "[w]hen county prosecutors and their subordinates act in their law enforcement/investigatory capacity, they act as 'agents' and 'officers' of the State, qualifying as State employees under [NJTCA] for the purpose of determining vicarious liability . . . ." *Wright v. State, 169 N.J. 422, 452, 778 A.2d 443 (2001)*. It follows that when employees of the County prosecutor do *not* act in that core law enforcement capacity, they act as administrators, and are considered agents of the County, not of the State.

Biaggi-Pacheco concedes that, in relation to the County and the UCPO, he is alleging an "administrative failure."

2017 U.S. Dist. LEXIS 170746, *9

(*See* Pl. Brf. 6-7.) Arranging for the release of prisoners when **[*10]** charges are dropped, he says, is not intimately bound up with the core prosecutorial functions of charging and trying criminal cases; it is a nondiscretionary, administrative function—a matter of paperwork. As to such administrative functions, the UCPO is not acting as an arm of the State, but as an arm of County government. (That would of course be true a *fortiori* in relation to any actual County employees involved in the process.)

Biaggi-Pacheco's reason for structuring the allegations in this way is not hard to find. To the extent UCPO is an arm of the State, then it, like the State, would not be a "person" amenable to suit under either 1983 or the NJCRA. (*See* Section III.B.1, *supra*; M&O 5-6.) As an arm of the County, however, UCPO is amenable to suit under 1983 and the NJCRA.

Biaggi-Pacheco must take the bitter with the sweet. By conceding that these claims involve matters of local administration, he has undermined his argument that liability flows to the State; with respect to the claims in Counts II and VI, these defendants are County, not State, actors. Counts II and VI do not contain any factual allegations that anyone involved was a State employee or agent. They are therefore **[*11]** dismissed as against the State.

### 3. Counts III, IV, and V

Counts III, IV, and V allege the intentional torts of malicious prosecution, intentional infliction of emotional distress ("IIED"), and abuse of process. The State asserts its immunity from vicarious liability for intentional torts under the NJTCA, *N.J. Stat. Ann. § 59:2-10*.

For purposes of vicarious liability, intentional torts were traditionally presumed to be outside the legitimate scope of employment. That principle is enshrined in *Section 59:2-10*, which provides that "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." *Id.* The New Jersey courts have authoritatively construed that provision to mean that "there can be no vicarious liability by a public entity for intentional torts committed by its employees; that is, with respect to such intentional torts, the theory of respondeat superior does not apply." *Hoag v. Brown, 397 N.J. Super. 34, 54, 935 A.2d 1218, 1230 (App. Div. 2007)* (citing *McDonough v. Jorda, 214 N.J. Super. 338,*

*350, 519 A.2d 874 (App. Div. 1986))*. *See Jutrowski v. Twp. of Riverdale, No. CV 13-7351, 2017 U.S. Dist. LEXIS 58827, 2017 WL 1395484, at *6 (D.N.J. Apr. 17, 2017)* (*§ 59:2-10* bars vicarious liability of State and City for assault by police); *Grieco v. Lanigan, No. CV 15-7881 (FLW), 2017 U.S. Dist. LEXIS 11219, 2017 WL 384689, at *4 (D.N.J. Jan. 27, 2017)* (*§ 59:2-10* bars vicarious municipal liability for assault); *Panarello v. City of Vineland, 160 F. Supp. 3d 734, 767 (D.N.J. 2016)* (*§ 59:2-10* bars vicarious municipal liability for assault **[*12]** and battery, false arrest).

Counts III, IV, and V allege malicious prosecution, IIED, and abuse of process—all intentional torts. *Section 59:2-10* dictates that the State cannot be held vicariously liable for them. *See Joyce v. City of Sea Isle City, No. CIV. 04-5345RBK, 2008 U.S. Dist. LEXIS 25880, 2008 WL 906266, at *24 (D.N.J. Mar. 31, 2008)*, on *reconsideration in part, 2008 U.S. Dist. LEXIS 56524, 2008 WL 2875456 (D.N.J. July 23, 2008)* (Under *§ 59:2-10*, City "cannot be liable for intentional torts committed by its employees, and this Court will dismiss Plaintiffs malicious prosecution claim"); *Ward v. Barnes, 545 F. Supp. 2d 400, 420-21 (D.N.J. 2008)* (Under *§ 59:2-10* "there is no legal basis for permitting respondeat superior liability to public entities on the theories of battery and intentional infliction of emotional distress, which are acts that require 'actual malicious or willful misconduct.'"); *Sheppard v. Gloucester Cty. Sheriff, No. 11-2398 (NLH), 2016 U.S. Dist. LEXIS 93607, 2016 WL 3912845, at *8 (D.N.J. July 19, 2016)* (Under *§ 59:2-10*, "state law claims for abuse of process . . . against the County will be dismissed with prejudice"); *Stolinski v. Pennypacker, No. CIV 07-3174(JBS), 2008 U.S. Dist. LEXIS 106368, 2008 WL 5136945, at *6 (D.N.J. Dec. 4, 2008)*, on *reconsideration in part, 2009 U.S. Dist. LEXIS 49551, 2009 WL 1651168 (D.N.J. June 11,2009)* (Under *§ 59:2-10*, the State and the State Police Office of Professional Standards are immune from "malicious prosecution and malicious abuse of process claims").

Counts III, IV, and V are therefore dismissed as against the State.

In sum, then, all claims against the State are dismissed. The remainder of this opinion concerns the two remaining defendants, the County and UCPO.

### C. The **[*13]** County and UCPO

## 1. Count I ([*§ 1983*](#)) and Count VII (NJCRA)

As to the County and UCPO, Counts I and VII fail to allege any wrongdoing in connection with the initial arrest and charges; as to these events, the relevant actors would seem to be the City of Plainfield and its police officers. (*Id.* 6, ¶ 2.)[4] Plaintiff's detention for six days after the charges were dismissed, however, plausibly suggests a federal constitutional claim of deprivation of liberty without due process. (*See id.* 12 ¶ 2(d).) Count VII is pled in conclusory terms, but it incorporates earlier factual allegations, and I interpret it as a parallel claim under the State Constitution.

Under either theory, it is plausible that any alleged misconduct surrounding the plaintiff's release date—assuming it occurred—is attributable to agents of the County or UCPO. *See* Section III.C.2, *infra*.

The motion to dismiss Counts I and VII as to the County and UCPO is therefore denied.

## 2. Counts II and VI

As against the County and USPO, the plaintiff's central grievance is the alleged prolongation of Mr. Biaggi-Pacheco's incarceration for six days after the charges against him were dismissed. That is the subject of Counts II and VI (wrongful **[*14]** imprisonment, negligence).

The County and USPO argue primarily that the allegations are too vague; the Complaint does not specify how this error occurred or who committed it. I do not imply that vagueness in a complaint should be rewarded, but these are matters which, if true, would plausibly have involved County or USPO personnel. Mr. Biaggi-Pacheco argues with some force that, through no fault of his own he is not yet in a position to be more

specific. He expects to obtain the necessary information through discovery. He alleges plausibly on information and belief that there is an administrative process in place with respect to the release of prisoners when charges are dropped. (1AC at 8-9, ¶¶ 8-10) He speculates that the delay in his release could have resulted from the negligent error of a "low level administrator," but frankly acknowledges that he does not know. (*See* Pl. Br. 10.) He has been unable to discover any official reports relating to the reasons for his continued detention. (*See* 1AC at 2 ¶¶ 4, 5.) What occurred, then, is essentially a black box from Mr. Biaggi-Pacheco's perspective.

I accept that the plaintiff, even after reasonable pre-suit inquiry, may not be able to ascertain **[*15]** the precise mechanics by which the County or the UCPO failed to accomplish his timely release. I therefore will permit these claims to go forward to discovery regarding the identities of the individuals putatively responsible, their relationships and roles within UCPO and the County, the manner in which this alleged delay in the plaintiff's release date occurred, and whether any alleged misconduct was negligent or intentional.[5]

The motion of the County and UCPO to dismiss Counts II and VI is therefore denied.

## 3. Count III (Malicious Prosecution)

Count III (1AC 16 ("Malicious Prosecution")) lacks the requisite factual allegations to survive a motion to dismiss.

Malicious prosecution under New Jersey law requires the plaintiff to prove: (1) that the criminal action was instituted by the defendant against the plaintiff; (2) that it was actuated by malice; (3) that there was an absence of probable cause for the proceeding; and (4) that it was terminated favorably to the plaintiff. [*Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 393-94, 972 A.2d 1113 (N.J. 2009)*](#) (citing [*Helmy v. City of Jersey City, 178 N.J. 183, 190, 836 A.2d 802 (2003)*](#)). Failure to establish any of the elements means that the claim must fail. *Id.*

Missing, at least as to the County and UCPO, is any factual allegation of the element of "malice," traditionally

---

[4] To be clear, this goes beyond the failure to allege *Monett* liability, *i.e.*, a government entity's vicarious responsibility for the actions of its employees, which might be shown by inadequate training or a pattern or policy of constitutional violations. *See* [*Monett v. New York City Dept of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*](#); [*Mulholland v. Gov't Cnty. of Berks, Pa., 706 F.3d 227, 237 (3d Cir. 2013)*](#). There is simply no allegation that the County, the UCPO, or their employees had *any* connection to the arrest, which was effected by the Plainfield police.

[5] Once these facts are explored, the court will be in a better position to address any qualified immunity issues on summary judgment. At present, there is not an adequate basis.

defined as "the **[*16]** intentional doing of a wrongful act without just cause or excuse." *Brunson, 199 N.J. at 395* (quoting *McFadden v. Lane, 71 N.J.L. 624, 630, 60 A. 365 (E. 85 A.1905))*. Malice is an independent element, requiring something above and beyond mere lack of probable cause, although the absence of probable cause is highly probative. *Brunson, 199 N.J. at 396*. Thus some cases have announced, as a requirement, that a case of malicious prosecution contain extrinsic evidence of malice. *Id.; see also LoBiondo v. Schwartz, 199 N.J. 62, 94, 970 A.2d 1007 (2009)* ("[I]f the only evidence of lack of a probable cause was the inference derived from favorable termination of prior suit, some extrinsic evidence of malice will be required.").

The Complaint asserts the bare legal conclusion that the County and UCPO acted maliciously. It contains no allegation, however, that *these* defendants (as opposed to, say, the Plainfield police) acted in the absence of probable cause, or knew probable cause was lacking. The Complaint alleges that "the charges brought *by police officers of the City of Plainfield* . . . . lacked sufficient evidence ...." (1AC 2 ¶ 1; *emphasis* added) The only thing the County or UCPO allegedly did in relation to these charges was dismiss them.[6] Nor does the Complaint allege that the County or UCPO had some ulterior, bad-faith motive for prosecuting Mr. Biaggi-Pacheco. **[*17]** Indeed, the Complaint does not contain any extrinsic facts that could support an inference of malice on the part of these defendants. It does contain a series of fact-free allegations of "a system of conducting arrests," "wrongful and malicious prosecutions," and "fail[ures] to properly train . . . employees." (1AC 17, ¶ 4.) These conclusory allegations fall short of the *Twombly* standard of factuality.

Count III will therefore be dismissed as against the County and UCPO.[7]

## 4. Count IV (IIED)

Count IV (1AC 18 (IIED)), must be dismissed as to the County and UCPO.

Under New Jersey law, to make out a prima facie case of IIED, a plaintiff must show that: (1) the defendant acted intentionally; (2) defendant's conduct was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community; (3) that the conduct proximately caused the plaintiff emotional distress; and (4) the emotional distress was so severe that no reasonable person could be expected to endure it. *Segal v. Lynch, 413 N.J. Super. 171, 191, 993 A.2d 1229 (App. Div. 2010)* (quoting *Buckley v. Trenton Saving Fund. Soc., 111 N.J. 355, 366, 544 A.2d 857 (1988))*. Crucially, the Complaint fails to allege any conduct or action on the part of the County or UCPO that would meet the "outrageous" **[*18]** and "extreme" standard of the second element. *See, e.g., Shabazz-Henry v. City of Newark, No. L-5471-12, 2016 N.J. Super. Unpub. LEXIS 2317, 2016 WL 6156206, at *9 (App. Div. Oct. 24, 2016)* (denying an IIED claim where defendants merely forgot to remove a warrant from the system).[8] The "severe emotional distress" contemplated by the fourth element requires more—e.g., "a dramatic impact on a plaintiff's everyday activities or ability to function [evidenced by] . . . regular psychiatric counseling." *Shabazz-Henry, 2016 N.J. Super. Unpub. LEXIS 2317, 2016 WL 6156206, at *9* (citing *Turner v. Wong, 363 N.J. Super. 186, 200, 832 A.2d 340 (App. Div. 2003)* (denying a claim for intentional infliction of emotional distress where there was no demonstration that she suffered severe emotional distress)).

The Complaint alleges that Mr. Biaggi-Pacheco was arrested on December 5, 2015; evidently he did not make bail, and remained in custody through the date his charges were dismissed, alleged to be Saturday, January 16, 2016. He was not released immediately, but

---

[6] Despite specific instructions from the Court (M&O 7-8), the First Amended Complaint does not state specifically what the charges were, or how or by whom they were actually brought. It may be that Mr. Biaggi-Pacheco was not indicted, but the reader is left to guess.

[7] These would also be alternative grounds to dismiss Count III as against the State.

---

[8] Perhaps the lowest threshold for such outrageous conduct was set by *Leang v. Jersey City of Bd. of Educ., 198 N.J. 557, 587-88, 969 A.2d 1097 (N.J. 2009)*. *Leang* found it sufficient that school officials intentionally arranged for plaintiff, a schoolteacher, to be accused of uttering a threat against her students, and taken from her classroom and arrested in a "public and notorious" manner. The authorities were allegedly aware that this plaintiff was particularly vulnerable to distress as a Cambodian Buddhist and believer in nonviolence, as well as a former victim of government oppression at the hands of the Khmer Rouge. No such special circumstances are alleged here.

was allegedly held until Friday, January 22, 2016. No facts are alleged to suggest that this lag was so incrementally distressing as to cross the line to severe psychological harm. On either element two or element four, then, the IIED claim fails.

Count IV will be dismissed as against the County and UCPO.[9]

### 5. Count V (Abuse of Process)

Count V (1AC 19 ("Abuse of Process")) **[*19]** must also be dismissed as to the County and UCPO.

The New Jersey Supreme Court has identified malicious abuse of process[10] as part of "a group of closely related torts that, although ancient in origins, are treated with great caution because of their capacity to chill resort to [the] courts by persons who believe that they have a criminal complaint or civil claim against another." *LoBiondo v. Schwartz, 199 N.J. 62, 80, 970 A.2d 1007 (2009)*. It requires that (1) the defendant made an improper, illegal, and perverted use of the process (i.e., a use neither warranted nor authorized by the process) and (2) that there was an ulterior motive in use of such a process. *Mandelbaum v. Arseneault, 2017 N.J. Super. Unpub. LEXIS 2456, 2017 WL 4287837, at *5 (N.J. App. Div. Sept. 28, 2017)* (quoting *Ash v. Cohn, 119 N.J.L. 54, 58, 194 A. 174 (E. & A. 1937))*. Importantly, "[t]he tort of malicious abuse of process lies not for commencing an improper action, but for misusing or misapplying process after it is issued." *Hoffman v. Asseenontv.com, Inc., 404 N.J. Super. 415, 431, 962 A.2d 532 (App. Div. 2009)* (emphasis added). In other words, the tort flows from "the misuse or 'misapplying [of] process justified in itself for an end other than that which it was designed to accomplish." *Baglini v. Lauletta, 338 N.J. Super. 282, 293, 768 A.2d 825 (App. Div. 2001)* (quoting *Prosser & Keeton on Torts* § 121 at 187 (5th ed. 1984)) ("The purpose for which the process is used, *once it is issued*, is the only thing of importance.").

Among the forms of process that can be abused are those attendant on criminal prosecution **[*20]** and

arrest. See *Baglini, 338 N.J. Super. at 294* (also listing attachment, execution, garnishment, sequestration proceedings, and subpoenas in aid of collection of a debt). Regardless of its nature, however, process is not abused unless "after its issuance the defendant reveals an ulterior purpose he had in securing it by committing further acts whereby he demonstrably uses the process as a means to coerce or oppress the plaintiff." *Tedards v. Auty, 232 N.J. Super. 541, 550, 557 A.2d 1030 (App. Div. 1989)*.

The Complaint alleges that the plaintiff should never have been charged criminally. It does not allege any act taken by the County or UCPO by which, *e.g.*, the arrest warrant or the Indictment were *then* diverted to an improper, collateral purpose. Nowhere in the timeline of events as described in the Complaint does Mr. Biaggi-Pacheco allege any legal steps or actions were taken against him between the date of the charge and the date it was dismissed.[11] On this basis alone the claim fails.

Count V is therefore dismissed as against the County and UCPO.[12]

### IV. Conclusion

For the reasons stated above, the motions to dismiss the Amended Complaint filed by the State, the County, and UCPO, pursuant to *Fed. R. Civ. P. 12(b)(6)*, are GRANTED IN PART AND DENIED IN PART, as follows:

(1) As to the State, the motion to dismiss **[*21]** all counts is GRANTED.

(2) As to the County and UCPO, the motions to dismiss Count I (*42 U.S.C. § 1983*), Count II (wrongful imprisonment), Count VI (negligence), and Count VII (NJCRA) are DENIED.

(3) As to the County and UCPO, the motions to dismiss Count III (malicious prosecution), Count IV

---

[9] These would also be alternative grounds to dismiss Count IV as against the State.

[10] In New Jersey, the tort is properly referred to as "malicious abuse of process." See *LoBiondo, 199 N.J. at 89*.

[11] Indeed, it seems that the case against Mr. Biaggi-Pacheco was dismissed reasonably promptly. The key factual contention, repeated in both the Complaint and the briefs, is that an administrative error occurred by which the County or UCPO delayed his release from custody after the prosecution was dropped. (*See e.g.*, 1AC 9-10, ¶¶9-11; Pl. Br. 5.)

[12] These would also be alternative grounds to dismiss Count V as against the State.

| | | | |
|---|---|---|---|
| (intentional infliction of emotional distress) and Count V (abuse of process) are GRANTED. | **United** | **States** | **District** | **Judge** |

The plaintiff has had two opportunities to formulate his claims, the second with the benefit of explicit and detailed instructions from the Court. Accordingly, these dismissals are with prejudice.

An appropriate Order is filed herewith.

Dated: October 13, 2017

/s/ Kevin McNulty

**Kevin McNulty**

**United States District Judge**


**ORDER**

**KEVIN MCNULTY, U.S.D.J.**:

The defendants having filed motions (ECF nos. 18, 24) to dismiss the complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*; and the plaintiff having filed responses (ECF nos. 23, 26); and the defendant, Union County, having filed a reply (ECF no. 27); and the court having considered the matter without oral argument; for the reasons stated in the accompanying Opinion, and good cause appearing therefor;

**IT IS** this 13th day of October, 2017

**ORDERED** that the defendants' motions (ECF nos. 18, 24) to dismiss the Complaint **[*22]** are **GRANTED IN PART AND DENIED IN PART**, as follows:

  (1) As to the State, the motion to dismiss all counts is GRANTED.

  (2) As to the County and UCPO, the motions to dismiss Count I (*42 U.S.C. § 1983*), Count II (wrongful imprisonment), Count VI (negligence), and Count VII (NJCRA) are DENIED.
  (3) As to the County and UCPO, the motions to dismiss Count III (malicious prosecution), Count IV (intentional infliction of emotional distress) and Count V (abuse of process) are GRANTED.

These dismissals are with prejudice.

/s/ Kevin McNulty

**Kevin McNulty**

2017 U.S. Dist. LEXIS 170746, *22

**Table1 (** *Return to related document text* **)**

| "M&O"= | Memorandum and Order (ECF No. 10) |
|---|---|
| "1AC"= | Amended Complaint with Exhibits (ECF No. 11) |
| "NJ Br."= | Brief in Support of the Motion to Dismiss the Amended Complaint of Plaintiff, Hector Biaggi-Pacheco, by Defendants, State of New Jersey and Union County Prosecutor's Office and Employees (ECF No. 18) |
| "Pl. Br."= | Plaintiff's Brief in Opposition to State of New Jersey and Union County Prosecutor's Office and Employees Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 23) |
| "UC Br."= | Defendant County of Union's **[\*3]** Brief in Support of the Motion to Dismiss (ECF No. 24) |
| "UC Reply"= | Reply Brief of Defendant, County of Union, in Support of the Motion to Dismiss (ECF No. 27) |

**Table1 (** *Return to related document text* **)**

---

**End of Document**

# Exhibit F

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

2008 WL 906266
Only the Westlaw citation is currently available.
Not for publication
United States District Court, D. New Jersey.

Anequa R. JOYCE, et al., Plaintiffs,
v.
CITY OF SEA ISLE CITY, et al., Defendants.

Civil No. 04-5345 (RBK).
|
March 31, 2008.

**Attorneys and Law Firms**

Pamela Elchert Thurmond, Kaufman Coren & Ress, Philadelphia, PA, for Plaintiffs.

A. Michael Barker, Joseph M. Scott, Barker, Scott & Gelfand, PC, Robert P. Merenich, Gemmel, Todd & Merenich, P.A., Linwood, NJ, Paul J. Baldini, Law Offices of Paul J. Baldini, Wildwood, NJ, Peter Herbert Spaeth, Wolff, Helies, Duggan, Spaeth & Lucas, PA, Manasquan, NJ, John J. Marquess, Haddonfield, NJ, for Defendants.

**OPINION**

KUGLER, District Judge.

**\*1** This matter comes before the Court on a motion by City of Sea Isle City ("Sea Isle City"), William J. Kennedy ("Kennedy"), City of Sea Isle City Police Department, and Jon Gansert ("Gansert") (collectively "City Defendants") for summary judgment against Anequa R. Joyce ("Anequa"), Glendon Durham ("Glendon"), and Doretha Waters-Rice ("Waters-Rice") (collectively "Plaintiffs"). Further before the Court is a motion by Sea Isle City School, Sea Isle City Board of Education, Joann Smith ("Smith"), and Gail Rodger ("Rodger") (collectively "School Defendants") for summary judgment against Plaintiffs. Additionally before the Court are individual motions for summary judgment against Plaintiffs by Dennis R. Felsing ("Felsing"), Elizabeth Tegler ("Tegler"), Angela Davenport ("Davenport"), and Kennedy. Plaintiffs accuse Defendants of race discrimination in violation of their rights under the United States and New Jersey Constitutions, of violating the New Jersey Law Against Discrimination, and of malicious prosecution. For the reasons set forth below, the Court will grant in part and deny in part the motions of School Defendants, Police Defendants, Felsing, Davenport, and Kennedy. The Court will deny Tegler's motion in its entirety.

**I. BACKGROUND**[1]

[1]     Because this case is before the Court on motions for summary judgment, the Court recites the facts in the light most favorable to Plaintiffs.

In August of 2003, Waters-Rice, who is black, moved her family to 122 43rd Street in Sea Isle City, New Jersey to live with her new husband, Walter Rice ("Rice"), who is white. Their household consisted of Rice and Waters-Rice, as well as Waters-Rice's sons Daniel Young (age 26), Luis Waters (age 19), and Glendon Durham (age 13), her granddaughter Anequa Joyce (age 8), and family friends Joe Evans, who is black, and Sarah Shaffer, who is white. At the time Sea Isle City had few, if any, other African American residents and no full-time African American police officers. (Pls.' App. 103-04, Gansert Dep. at 100-03.)

**A. Sea Isle City Police**

Soon after moving in, troubles began. Waters-Rice recalls several incidents involving a next door neighbor, Anthony Pittaluga. In early September, Pittaluga called Rice on the telephone and told him to "tell those animals they're making too much noise over there ." (City Defs.' Ex. 4 at 249-50.) Pittaluga also allegedly addressed Waters-Rice as "bitch" when he saw her, and on between ten and twenty occasions during the fall of 2003, the police were called to the residence, purportedly in response to Pittaluga's complaints of noise. (Pls.' App. 189, Rice Dep. at 278; *Id.* 263-64, Waters-Rice Dep. at 260-63.)

During one visit by the police, an officer allegedly told Waters-Rice words to the effect of "yous have to go back inside ... we've got complaints of you n* * * * * * out here or the smell and you have to go in" and "you n* * * * * * are out here and it's upsetting the neighbors and they're scared." (Pls.' App. 263-64, Waters-Rice at 260-62.) Waters-Rice recalls another particular officer saying to her "when you look a white person in the face, you put your head down and show some respect." (*Id.* at 269-70.) Later, Waters-Rice recounted, that same officer would ride by her house and raise his index finger to his eye and point at her threateningly. (*Id.* at 262.) Plaintiff Durham testified to similar encounters with police in which they addressed him and his brother as "n* *

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

* * * * " and admonished them to get in their house. (City Defs.' Ex. 7 268, 270-73.)

### B. The Christmas Play

**\*2** That year, Waters-Rice's granddaughter Anequa was enrolled in the second grade at Sea Isle City's public school, in which approximately a hundred students are enrolled. On Friday, November 21, 2003, Anequa was in Defendant Gail Rodger's music class. The class was starting their preparation for the school holiday program, which involved songs celebrating Christmas, Hanukkah, and Kwanza, as well as a Christmas play. (Pls.' App. 214, Smith Dep. 51.) Rodger admits that she instructed Anequa to color instead of joining the other students practicing for the play. (*Id.* 194-95, Rodger Dep. 32-33.) Anequa recalls Rodger explaining that Anequa would not be rehearsing because Anequa was black and "black people don't celebrate Christmas." (*Id.* 136a, Anequa Dep. II 110.)

When Anequa came home from school that day, she was crying. She told Waters-Rice that she could not be in the Christmas play "because [she] was different" and that Rodger made her sit on the floor drawing pictures while everyone else was practicing for the play. (*Id.* 269; Waters-Rice Dep. 337-38.) Waters-Rice told Anequa that she would go to school on Monday to find out why Anequa was being excluded from the play. That Monday, when Anequa was getting dressed for school, she poured white powder over her face and hands and told Waters-Rice, "Mommy, it's no problem, I'm white, it won't be no problem and they'll let me back in the play ... I'm not different anymore, I'll fit in." (*Id.* 271, Waters-Rice 347-48; *see also id.* 66, Glendon Dep. 305-07.)

### C. Meeting at Sea Isle City School

Later that morning, November 24, 2003, Waters-Rice, her husband, and their friend Sarah Shaffer went to Sea Isle City School. There, they met with Defendant Principal Smith, Assistant Principal Fiedler, and Defendant Rodger. When Waters-Rice questioned Rodger about why Anequa could not be in the play, Rodger explained that she had confused Anequa with another black student and thought Anequa was Muslim or Jehovah's Witness, and she apologized.[2] (City Defs.' Ex. 4 at 352-53.) Waters-Rice responded that Rodger should be apologizing to Anequa, not her, which Rodger then left the meeting to do. (*Id.* 353.)

[2] Defendant Smith stated in her deposition that Rodger had confused Anequa with another black girl, who was in fourth grade. (Pls.' App. 215, Smith Dep. 53-54.) Rodger testified that it was a first grade black boy whom she had been told was a Jehovah's Witness. (*Id.* 194, Rodger Dep. 29.)

Waters-Rice testified that at that point, she felt the issue with Anequa had been resolved and joked that she was happy that she "didn't have to kick nobody's butt." (Pls.' App. 273, Waters-Rice 357.) Rice and Shaffer remembered the comment the same way, and Shaffer recalled and that everyone present laughed in response. (*Id.* 210, Shaffer Dep. 54-55; *id.* 187, Rice Dep. 127-29.) Smith testified that Shaffer said to Waters-Rice, "I'm glad this misunderstanding was resolved" and that Waters-Rice responded to Shaffer, "We're really lucky we resolved this, because I came here, today, to hurt somebody. You're lucky that you won't have to cook dinner for Thanksgiving, now, because I'll be home. Because I was going to be in jail, because somebody in this school was going to end up in the hospital." (Pls.' App. 216, Smith Dep. 59.) Fiedler remembers Waters-Rice saying approximately the same thing to Shaffer. (City Defs.' Ex. 15, Fiedler Dep. 18.) Fiedler also testified that both he and Smith ignored the comment, that no one raised their voice, and that he did not feel threatened. (*Id.* 19, 37-38.)

**\*3** Waters-Rice testified that then Smith asked her where she came from. Waters-Rice answered that she was from the Seabrook area, to which Smith allegedly replied "my husband teaches in the Goultown [sic] area. He used to teach your type of people." (Pls.' App. 272-73, Waters-Rice Dep. 353-56.) Waters-Rice and Rice both testified that Shaffer then asked Smith what she meant by "your type of people," to which Smith allegedly replied, "black ... you know what I mean, darkies." (*Id.* 273, Waters-Rice Dep. 356-57; *id.* 186, Rice Dep. 125-26.) During that conversation Smith also purportedly said that she was not prejudiced because she had a "n\* \* \* \* friend." (*Id.* 208-09, Shaffer Dep. 49-50.) The meeting concluded, and Waters-Rice, Rice, and Shaffer left the school around 9:00 a.m. (City Defs.' Ex. 37.)

### D. School Officials Summon Police

At some point afterwards, Nancy Ramundo, another school employee, stated that she got a telephone call from either Justine Harkins (a neighbor of Waters-Rice's) or her husband telling her "Anequa's mom was very upset ... that she made threatening statements; and that they wanted me to be aware." (*Id.* Ex. 18 at 24.) On an unknown date, Ramundo

HNT-L-000010-25   04/14/2025 4:55:01 PM   Pg 35 of 91   Trans ID: LCV20251092587
Case 3:25-cv-09981-GC-TJB   Document 1-2   Filed 06/11/25   Page 189 of 405 PageID: 194
Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)
2008 WL 906266

also signed a statement that reads: "It was reported to me today, November 24, 2003, that Mrs. Rice in a conversation with another parent stated that 'if she had to stab somebody, kill somebody, have to go to jail, 'cause I'll hurt somebody.' " (*Id.* Ex. 42.) Ramundo, however, does not specifically recall preparing this statement. Smith testified that the school had received a call that morning from Harkins stating that Waters-Rice had come to her house and said she was going to stab somebody, she was going to kill somebody, and if she had to go to jail, because she was going to hurt somebody." (*Id.* Ex. 14 at 61.) Fiedler testified he remembers "hub-bub about, something about [Ramundo] saying something to somebody." (*Id.* Ex. 15 at 18.) Harkins denied telling Ramundo that a parent was coming over to hurt somebody. (Pls.' App. 122, Harkins Dep. 179-80.) Waters-Rice stated that she never spoke with Harkins about the situation, and Plaintiffs allege that Ramundo's note was fabricated after the fact by Defendant Smith and/or the police.

In any event, around 11:24 a.m., Smith called the police to report that Waters-Rice had made a threat. Defendant Detectives Gansert and Felsing arrived at the Sea Isle City School in response to her complaint. They interviewed Smith and Fiedler for about twenty minutes. (City Defs.' Ex. 17 at 73.) Before returning to the police department, Gansert and Felsing instructed Fiedler and Smith to make written statements. Gansert's police report from that meeting does not include any reference to the alleged telephone call from Harkins. (Pls.' App. 312-13.)

Felsing prepared an "Officer's Information Form" in which he attested that he has reason to believe that Waters-Rice was dangerous to herself, to others or to property "because subject stated to school staff that she would come back and do bodily harm to them." (*Id.* 32.) Gansert prepared a complaint in which he wrote that Waters-Rice had made verbal threats "directly to the Sea Isle City Public School Staff that she would go to jail because she was going to commit violence upon the staff, specifically by stabbing them." (*Id.* 314.) Gansert then called a municipal judge on the phone and obtained a warrant for Waters-Rice's arrest for making terroristic threats. Bail was set for $1,000 ROR with the condition that Waters-Rice not have further contact with the school. (City Defs.' Ex. 17 at 74.) At his deposition, Gansert testified that neither Smith nor Fiedler told them that Waters-Rice intended to "come back and do bodily harm to them." (Pls.' App. 111-12, Gansert Dep. 144-45.) In addition, Fiedler and Smith testified that they never told the police

about a specific threat involving stabbing. (*Id.* 94-95, Fiedler Dep. 38-41; *id.* 218, Smith Dep. 67-68.)

**\*4** There is conflicting testimony regarding why the police chose to press charges against Waters-Rice. Gansert stated that they would not have proceeded with charges, except Smith and Fiedler insisted that they do so. (*Id.* 107, Gansert at 115-16.) On the contrary, Fiedler swore that neither he nor Smith told the Police to press charges. (*Id.* 94-95, Fiedler Dep. 40-41.) Regardless of who motivated the filing of the charge, on December 17, 2003, the Cape May County Prosecutor dropped the case against Waters-Rice. (*Id.* 319.)

### E. Police Visit Plaintiffs' Home

Following the issuance of the warrant, Gansert, Felsing, Officer LaRosa, and possibly other officers, went to Waters-Rice's residence to arrest her. (*Id.* 101, Gansert Dep. 90-91.) They did not have a search warrant. When the police arrived, only Rice, Joe Evans, and Waters-Rice's son Luis Waters were home. Officer LaRosa testified that the police asked for and received permission to enter the house (*id.* 166, LaRosa at 30); however, Waters testified that he was sitting inside playing a video game when the Police walked in the door and asked for his mother. (*Id.* 248, Waters Dep. 38.) Luis testified further that the Police ordered him to sit and stay where he was, while they went through the house. (*Id.* 43.) Felsing and LaRosa entered a bedroom and observed Rice in what they described as a "trancelike state." Rice attests that he was not aware that the Police were in the house at that time because he was meditating. (City Defs.' Ex. 5 at 141-42.)

Upon returning home, Waters-Rice learned that the police had been there looking for her. Both she and Shaffer observed their clothes on the floor of their bedrooms next to open drawers and closets. (Pls.' App. 279, Waters-Rice Dep. 508, 530-36; *id.* 211, Shaffer Dep. 62.) Waters-Rice then called the police and went to the station with Rice around 6:00 p.m. for processing.

### F. Police Return to Plaintiffs' Home

The following day, at least three police officers, including Gansert and Felsing, returned to Plaintiffs' residence accompanied by John Kearney from Cape May County's Social Services, adult protective services. Police had contacted Kearney as a result of their observations of Rice the previous day and their concern that he was being subject to elder abuse. (*Id.* 148, Kearney Dep. 42-43; *id.* 82, Felsing Dep. 44-45.) This time, Waters-Rice was at home, although

the police evidently mistook her for Rice's housekeeper. (*Id.* 285, 287, Waters-Rice Dep. 567, 608.) During that visit, a police officer allegedly referred to Waters-Rice as a bitch. (*Id.* 287, Waters-Rice Dep. 608.)

While Kearney and other police were in the living room talking with Waters-Rice, Officers Felsing and Boyer were in the adjacent porch, which also served as a bedroom for two of Waters-Rice's adult sons, Young and Waters. According to Young and Waters, they had been in the process of cleaning the room when the police arrived and had placed a three-foot long sheathed sword on a bed. (Pls.' App. 303, Young Dep. 55.) Waters testified that he picked up the sword to place it back in the corner where it was normally kept, and as he did so, Officer Boyer pulled his gun, put it to Waters' head, and threatened to "blow [his] brains out." (*Id.* 303, Young Dep. 53-54.) In addition, Young and Waters testified that a tape recorder was going during these events, but that when Young removed the tape to keep as evidence, a police officer took it and broke it. (*Id.* 305, Young Dep. 74-76.)

 **\*5** Since Kearney was not able to privately interview Rice on that occasion, he ordered a hearing to determine Rice's well-being. When Rice and Waters-Rice came to court for the hearing, Kearney had a private meeting with Rice and satisfied himself that Rice was not being exploited or abused. (*Id.* 148, Kearney Dep. 45-46.) As a result, the hearing did not take place and the matter was closed.

### G. School Board Meeting

At the time of the events in question, Defendant Kennedy served both as Chief of Police and President of the Sea Isle City School Board. Soon after the events of November 24, 2003, the School Board held a meeting in which Smith reported to the Board that Waters-Rice had come to the school to complain about Anequa being excluded from the school play. Smith explained that Rodger had mistaken Anequa for another student who was a Jehovah's Witness, and that the incident concluded when Rodger apologized to Anequa in front of the class. (*Id.* 158, Kennedy Dep. I 65-68.) Smith did not inform the Board of the supposed threat from Waters-Rice, the subsequent criminal charges, or the dismissal of those charges. (*Id.,* Kennedy Dep. 66-67.) By virtue of his role as Chief of Police, Kennedy knew at that time about the criminal charges against Waters-Rice, but he did not volunteer that information to the Board. (*Id.,* Kennedy Dep. 67-68.)

### H. Glendon at School

Plaintiffs allege that following Waters-Rice's meeting with Smith, Fiedler, and Rodger, teachers and fellow students started treating Glendon differently. (*Id.* 53, Glendon Dep. 99-100.) Glendon claims to have overheard Smith use a racial slur while talking to another teacher in the hallway. In addition, Glendon began to suffer racial taunts and physical abuse at the hands of his classmates. (*Id.* 47-48, 50, Glendon Dep. 70-75, 86-88.) Plaintiffs allege that despite the presence of teachers during these occurrences, no one did anything to stop the harassment. Smith attests that she knew Glendon was being teased, but not that students were calling him racial slurs. (School Defs.' Br. 13-14.) Defendant Angela Davenport, however, recounted a specific instance where Smith asked her to sit in on a meeting with three boys who had used racial slurs against Glendon. (*Id.* 41-42, Davenport Dep. 76-78.) Similarly, Glendon stated that he reported the abuse to both Fiedler and Smith, but that their response was ineffective. (*Id.* 48, 50-51, Glendon Dep. 74, 88-92.) Glendon also testified that his eighth grade teacher, Defendant Elizabeth Tegler, "just turned her head" to the abuse, and that Ramundo, who was responsible for Glendon's special needs education, said she was unaware that Glendon was being picked on. (*Id.* 181, Ramundo Dep. 107-08.)

As a result of this torment, on one occasion, Glendon left his class, went to Anequa's classroom, and insisted they go home. (*Id* . 54-55, Glendon Dep. 101-08.) Glendon also started avoiding going to school and was absent more than fifty times between late 2003 and the spring of 2005. (*Id.* 275, Waters-Rice Dep. 399-400; *id.* 56, Glendon Dep. 109-12; *id.* 181-82, Ramundo Dep. 108-09.) Plaintiffs' expert has opined that the trauma he suffered at the hands of other students has caused Glendon substantial harm, and that he needs long-term treatment to cope with his anxiety and its physical manifestations. (*Id.* 370-72, Report of Robert L. Sadoff, M.D. at 15-17.)

### I. Alleged Retaliation

 **\*6** Plaintiffs filed this lawsuit on November 1, 2004, and they highlight several subsequent incidents, which they believe were retaliatory. Plaintiffs allege that Davenport, purporting to provide a special education session for Glendon while his regular special education teacher was absent, told him that she had read about his family's lawsuit in the paper and that she wanted to talk to him about. (*Id.* 62, Glendon Dep. 232.) When Glendon told her that he did not want to talk to her about the lawsuit, she allegedly told him that she would pull him out of class every day until his mother came to the school to discuss it. (*Id.* 60, Glendon Dep. 222-23.) On another

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)
2008 WL 906266

occasion, Davenport dropped in on Anequa's class, insisted on being Anequa's partner in a class exercise, and made Anequa feel uncomfortable by continually putting her arm around her. (*Id.* 131, 133-34, Anequa Dep. I 78-79, 110-14.) Prior to the filing of the lawsuit, Davenport once walked by Anequa's classroom and remarked that it smelled like an animal in the classroom, a comment that Anequa felt was directed at her. (*Id.* 130, 132, Anequa Dep. I 75-77, 99.)

In March of 2005, Glendon's teacher, Defendant Tegler, had her students do a voluntary assignment involving collecting money for charity. (City Defs.' Ex. 90.) Due the objections of several parents, the project was prematurely halted, but not before Glendon had been particularly successful. (*Id.* Ex. 16 at 10.) According to a written statement cited by City Defendants, on March 18, Tegler called Waters-Rice to explain why the project had been cancelled, but Waters-Rice seemed to believe that Tegler had singled out Glendon. (City Defs.' Ex. 91.) Then on March 22, 2005, Tegler testified that she received a call on her cell phone from someone identifying herself as Mrs. Rice, who called her "a racist and a bigot and a pig." (City Defs.' Ex. 16 at 25.) Smith testified that Tegler then came to her upset, told her about the call, and said that she needed to go home. (City Defs.' Ex. 14 at 86.)

Smith then called the police to report the call. (*See* Pls.' App. 337-38.) The police came to the school to meet with Tegler; however, Tegler did not return to school. The police then went to her house and discovered her there in a fetal position on the floor with vomit on her. (City Defs.' Ex. 10 at 62-63.) The police transported her to the hospital. (*Id.*)

The police obtained Tegler's cell phone later that day and determined that the last call she had received was at approximately 8:01 that morning and that it was not from Waters-Rice. (*See* City Defs.' Ex. 10 at 66.) Tegler told Felsing that she just wanted the incident to go away, and the police returned her cell phone to her. (*Id.; id.* Ex. 17 at 164.) Tegler's cell phone allegedly disappeared after that, but it was eventually located in pieces in a toilet at the school. (*Id.* 168-69.)

**J. Procedural History**

Plaintiffs filed their complaint on November 1, 2004, against the City of Sea Isle City, the Sea Isle City Police Department, Sea Isle City Board of Education, Sea Isle City School, Davenport, Gansert, James Innanone, Kennedy, Rodger, Smith, and Jane and John Does 1-5. Sea Isle City School, Sea Isle City Board of Education, Davenport, Rodger, and

Joann Smith ("School Defendants") subsequently answered and filed a counterclaim alleging that Plaintiffs' action was frivolous and in bad faith. On July 17, 2006, Plaintiffs filed their Amended Complaint, adding Felsing and Tegler as defendants, and claims for retaliation. James Innanone was dismissed from the suit by stipulation on July 20, 2007.

**\*7** Davenport moved for summary judgment on July 26, 2007. City Defendants filed their motion for summary judgment on July 31, 2007, as did Tegler. Felsing moved for summary judgment on August 1, 2007. School Defendants so moved on August 31, 2007, and lastly, Kennedy filed his motion for summary judgment on September 6, 2007.

**II. STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex,* 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e)*. To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)
2008 WL 906266

## III. DISCUSSION

Plaintiffs brought claims against Defendants under 42 U.S.C. § 1983 and § 1985, the New Jersey Constitution, the New Jersey Law Against Discrimination ("NJLAD"), and the common law tort of malicious prosecution. The Court will address the each of Plaintiffs' claims in turn, but will start with individual Defendants' qualified immunity defense to Plaintiffs' federal constitutional claims.

### A. Qualified Immunity

City Defendants, School Defendants, Felsing, and Davenport seek shelter from Plaintiffs' § 1983 claims under the doctrine of qualified immunity. Section 1983 provides a remedy for acts that violate the United States Constitution committed by a person acting under color of state law. Government officials who are accused of violating a person's constitutional rights while performing discretionary functions are entitled to qualified immunity. Qualified immunity shields officials "from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This analysis is two-fold. First, the court is to assess whether the facts as adduced by the plaintiff amount to a constitutional violation. If this test is met, the court then determines whether the right is "clearly established." Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Kopec v. Tate, 361 F.3d 772, 775-76 (3d Cir.2004). In other words, before engaging in a determination of whether a right is clearly established, the court must first determine whether a constitutional violation has occurred, because "[i]f the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the [official] is entitled to immunity." Id. at 776 (quoting Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir.2002)). As to the second prong of the qualified immunity analysis, the Supreme Court has determined that such a finding hinges on "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. The first step of the qualified immunity analysis involves an evaluation of whether Plaintiffs set forth constitutional violations; as a result, the Court simultaneously determines whether summary judgment is appropriate.

### B. Fourth Amendment Violations

*8 Plaintiffs allege violations of the Fourth Amendment stemming from Waters-Rice's arrest and the criminal charges brought against her, as well as from the warrantless search of her home. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

#### i. Felsing's Statute of Limitations Defense

Felsing argues that he is entitled to summary judgment because Plaintiffs' claims against him are barred by the statute of limitations. Plaintiffs counter that they preserved their ability to add Felsing as a defendant by employing New Jersey's fictitious party rule.

Actions brought under § 1983 are subject to statute of limitations applicable to personal injury in state in which claim accrued. Cito v. Bridgewater Twp. Police Dep't, 892 F.2d 23, 25 (3d Cir.1989). "Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within 2 years next after the cause of any such action shall have accrued." N.J. Stat. Ann. 2A:14-2. Waters-Rice's claims for false arrest and unlawful search accrued on November 24, 2003, the date of her arrest and the alleged search of her home. See Wallace v. Kato, --- U.S. ----, ----, 127 S.Ct. 1091, 1094, 166 L.Ed.2d 973 (2007). Her claim for malicious prosecution accrued the date the case against her was dismissed, December 17, 2003. See Heck v. Humphrey, 512 U.S. 477, 489, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Therefore, the statute of limitations for her claims expired on November 24, 2005 and December 17, 2005, respectively. Plaintiffs amended their complaint to name Felsing as a defendant on July 17, 2006.

Under Federal Rule of Civil Procedure 15(c), however, an amendment to a complaint will be permitted if it can "relate back" to the date of the original pleading under state law. Fed.R.Civ.P. 15(c)(1) ("An amendment to a pleading relates back to the date of the original pleading when ... the law that provides the applicable statute of limitations allows relation back."). New Jersey law provides that amendments adding a defendant will relate back to the original pleading if the plaintiff properly pleads a fictitious name prior to the expiration of the limitations period. N .J.R. 4:26-4. This fictitious party rule permits a plaintiff

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

to hold a place for a defendant whose identity he cannot yet ascertain. This rule is not always available, however. To invoke the rule, the fictitious name in the complaint must have been accompanied by an appropriate description sufficient to identify the defendant. *See Rutkowski v. Liberty Mut. Ins. Co.,* 209 N.J.Super. 140, 506 A.2d 1302, 1306 (N.J.Super.Ct.App.Div.1986).* In addition, the plaintiff must have used due diligence to try to determine the defendant's identity before and after filing the complaint. *See Matynska v. Fried,* 175 N.J. 51, 811 A.2d 456, 457 (2002).* Moreover, the application of the rule must not prejudice the defendant. *See Mears v. Sandoz,* 300 N.J.Super. 622, 693 A.2d 558, 563-64 (N.J.Super.Ct.App.Div.1997).*

*a. Appropriate Description*

**\*9** In the original complaint, Plaintiffs identified John and Jane Does 1-5 as "individuals whose names are not known (including police officers and employees of the School), and who conspired with one or more of the other Defendants and/or engaged in similar wrongdoing against the plaintiffs." This description is not an overly general placeholder. The Complaint indicates that the missing parties are Sea Isle City police officers who engaged in wrongdoing similar to that alleged against the named parties, including Gansert, whom Felsing was with during some of the key events alleged in Plaintiffs' case.

*b. Due Diligence*

Felsing alleges that Plaintiffs could have ascertained Felsing's identity within the statute of limitations based on three sources: Kearney's affidavit concerning Rice's welfare (Felsing's Ex. F), which purportedly attached a report identifying Felsing; Felsing's Supplemental Investigation Report of November 24, 2003 (*id.* Ex. V); and the Officer Information Form Felsing generated regarding the events of November 24 (*id.* Ex. T.) Plaintiffs respond that Kearney's Affidavit does not in any way evince Felsing's identity, nor has Felsing adduced any evidence showing that Plaintiffs had the police report in 2003. Plaintiffs also argue that they did not know they had a claim against Felsing until January and February of 2006 when they learned from deposing Gansert and Felsing that Felsing supplied the false statement in his Officer Information Form that Waters-Rice intended to come back to the school and do bodily harm.

There is no precise definition for what due diligence requires; the meaning must be determined based on the facts of each particular case and with respect to prior case law. *DeRienzo*

*v. Harvard Indus., Inc.,* 357 F.3d 348, 354 (3d Cir.2004).* With respect to the search of Plaintiffs' home, Felsing's identity should have been evident to Plaintiffs based on his November 24, 2003 Supplementary Investigation Report, which indicated Felsing's involvement. Through reasonable diligence, Plaintiffs could have ascertained which police officers entered her home on November 24 and therefore were the ones who allegedly emptied her drawers.

With regard to Waters-Rice's claims for false arrest and malicious prosecution, however, Plaintiffs did satisfy their due diligence obligation. Plaintiffs did not learn that the misstatement in the Officer Information Statement was Felsing's fault until they deposed Gansert and Felsing in early 2006. Plaintiffs amended their complaint to add Felsing on July 17, 2006, five months later. Before then, Plaintiffs did not know the nature of Felsing's involvement with Waters-Rice's arrest and prosecution. Accordingly, the Court finds that Plaintiffs' actions were enough to satisfy the due diligence requirements of N.J.R. 4:26-4 for her false arrest and malicious prosecution claims against Felsing but not for the unlawful search claim.

*c. Prejudice to Defendant*

**\*10** Although it is not explicitly enumerated as a factor under N.J.R. 4:26-4, the Court should consider whether a defendant has suffered prejudice or relied in some way on the expiration of the limitations period. *Mears,* 693 A.2d at 562.* Some prejudice to the defendant will not automatically determine the outcome when "[j]ustice impels strongly towards affording the plaintiffs their day in court on the merits of their claim." *Farrell v. Votator Div. of Chemtron Corp.,* 62 N.J. 111, 299 A.2d 394, 400 (N.J.1973).* Prejudice here is negligible. Felsing has already been defending himself and will continue to do so on those claims against him not subject to summary judgment. In addition, because Plaintiffs named Felsing's partner Gansert and expressed the intention to name other police officers who were involved in the alleged incidents, Felsing should have been aware at the time the original Complaint was filed that he would be brought into the case. Accordingly, summary judgment is warranted only on Plaintiffs' unlawful search claim against Felsing.

*ii. False Arrest*

City Defendants argue that Waters-Rice's arrest warrant and the complaint underlying the warrant were sufficient and reflected a substantial basis for concluding that probable cause existed. City Defendants also argue that when Gansert

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)
2008 WL 906266

obtained the warrant, he only used his own complaint, not the Officer's Information Form containing Felsing's false statement. Felsing argues that his statement that Waters-Rice intended to come back to the school to harm school personnel was not material to the issuance of the warrant, and that even absent that false statement, there was probable cause for Waters-Rice's arrest. Plaintiffs contend, and the Court agrees that there is evidence suggesting that Gansert and Felsing made up facts to support the arrest warrant, and that a jury could readily conclude that the police lacked probable cause to arrest Waters-Rice following her meeting with school officials on November 24.

An arrest made without probable cause creates a cause of action for false arrest under 42 U.S.C. § 1983. *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir.1988). Challenges to the validity of a warrant based on allegations that the accompanying affidavit contains material false statements are governed by *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *see also United States v. Carter*, 756 F.2d 310, 313 (3d Cir.1985) (applying reasoning of Franks to arrest warrants).

*a. Material False Statements*

Where a magistrate has issued a warrant, the supporting affidavit is entitled to a presumption of validity. *Franks*, 438 U.S. at 171. The party disputing the veracity of the warrant application can challenge the validity of the warrant by making a substantial preliminary showing that the affiant deliberately or recklessly included in the underlying affidavit falsehoods concerning material facts necessary to the determination of probable cause. *Id.* at 155-56. If the defendant establishes falsity by a preponderance of the evidence, the false statements will be stricken from the affidavit and the court will determine whether the information remaining in the affidavit is sufficient to support a finding of probable cause. *Id.* Courts have employed the *Franks* analysis in § 1983 claims for Fourth Amendment violations. *Jones v. Town of Seaford, Del.*, 661 F.Supp. 864, 873 (D.Del.1987) (citing *Krohn v. United States*, 742 F.2d 24, 26 (1st Cir.1984)).

**\*11** Here, Plaintiffs have make a substantial showing that Gansert and Felsing deliberately or recklessly included in the underlying affidavit falsehoods concerning material facts necessary to the determination of probable cause. It is not clear from the facts exactly what information Gansert conveyed in his telephone conversation with the judge. (*See* City Defs.' Reply 11.) Gansert testified at his deposition that neither Smith nor Fiedler told them that Waters-Rice

intended to "come back and do bodily harm to them," as he swore in the complaint from which the warrant issued. Furthermore, both Fiedler and Waters-Rice testified that Waters-Rice's purportedly threatening comment was directed to Shaffer, not "directly to the Sea Isle City Public School Staff" as stated by Gansert in his complaint. Also, Fiedler and Smith both testified that they never told the police about a specific threat involving stabbing, which could lead a jury to question the veracity of the statement in the complaint that Waters-Rice said "she was going to commit violence upon the staff, specifically by stabbing them." (*See* Pls.' App. 94, Fiedler Dep. 37-38; *id.* 216, Smith Dep. 59-60.) The number of statements that are admittedly or potentially false support Plaintiffs' contention that the inclusion of those statements was more than mere inadvertence and instead reflected deliberateness or recklessness on the part of Gansert and/or Felsing.

*b. Probable Cause*

Waters-Rice was charged with the crime of third degree terroristic threats. In New Jersey,

> [a] person is guilty of a crime of the third degree if he threatens to commit any crime of violence with the purpose to terrorize another or to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such terror or inconvenience.

N.J. Stat. Ann. 2C:12-3(a). Given the evidence of false statements in the complaint underlying the warrant, the Court concludes that Plaintiffs have submitted sufficient evidence to raise a genuine issue of material fact as to whether Sea Isle City police had probable cause to arrest Waters-Rice.

The United States Supreme Court has defined "probable cause" as "facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) ... committed ... an offense.' " *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). While "[p]robable cause to arrest requires more than mere suspicion[,] ... it

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti v. N.J. State Police,* 71 F.3d 480, 482-83 (3d Cir.1995). The Third Circuit instructs that courts should apply a "common sense approach," based on the totality of the circumstances, to determine whether there was probable cause to arrest. *Paff v. Kaltenbach,* 204 F.3d 425, 436 (3d Cir.2000). When determining whether an officer had probable cause for an arrest, a court reviewing the "totality of the circumstances" must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). Generally, the existence of probable cause is a factual issue. *Groman v. Township of Manalapan,* 47 F.3d 628, (3d Cir.1995).

*12 In this case, a jury could accept the accounts of the meeting as recited by four of the five people who were present-that the conversation concluded with everyone thinking the matter was resolved and that Waters-Rice made a comment to her friend about what would have happened if it had not been resolved. (Pls.' App. 92, 94, Fiedler Dep. 19, 37-38; *id.* 273, Waters-Rice Dep. 357; *id.* 187, Rice Dep. 128-30; *id.* 209, Shaffer Dep. 52.) Waters-Rice stated that her comment was intended as a joke, and Shaffer recalls all present laughing. Stripped of the potentially false statement that Waters-Rice directly threatened Fiedler and Smith and the admittedly false statement that Waters-Rice intended to return to the school to do bodily harm to school officials by stabbing them, a jury could reasonably find that the facts, viewed from the standpoint of an objectively reasonable police officer, did not amount to probable cause that Waters-Rice intentionally or recklessly "threaten[ed] to commit [a] crime of violence with the purpose to terrorize another." Therefore, the Court finds that Plaintiffs have raised genuine issues for trial as to whether Defendants' conduct towards Waters-Rice violated her Fourth Amendment right to be free from false arrest.

Furthermore, Gansert and Felsing are not entitled to qualified immunity on Plaintiffs' false arrest claim. The facts as adduced, are adequate to establish a Fourth Amendment violation. Based on established Fourth Amendment principles, it would have been clear to a reasonable detective that conveying falsehoods to a judge in obtaining an arrest warrant was unlawful. *See Lippay v. Christos,* 996 F.2d 1490, 1504 (3d Cir.1993) (holding police

officer not entitled to qualified immunity where he submitted affidavit in support of arrest warrant containing statements he knew to be false or would have known to be false if he had not recklessly disregarded the truth).

iii. *Malicious Prosecution*
Plaintiffs also allege that Defendants deprived Plaintiffs of their federal constitutional right to be "free from ... malicious prosecution" pursuant to 42 U.S.C. § 1983. Felsing argues that Plaintiffs have not demonstrated a sufficient deprivation of liberty to sustain a malicious prosecution claim under the Fourth Amendment. City Defendants rely on their contention that there was probable cause to arrest Waters-Rice. Smith argues she is entitled to qualified immunity on the malicious prosecution claim.

"To prove malicious prosecution under [§ ] 1983 when the claim is under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson v. Knorr,* 477 F.3d 75, 81-82 (3d Cir.2007) (citing *Estate of Smith v. Marasco,* 318 F.3d 497, 521 (3d Cir.2003)).

*13 It is undisputed that Gansert, Felsing, and Smith are responsible for initiating a criminal proceeding against Waters-Rice and that the criminal proceeding ended in her favor when the prosecutor threw out the charges. In addition, the Court has already determined that questions of fact exist regarding whether the proceeding was initiated without probable cause. Furthermore, based on the evidence of discriminatory animus on the part of Defendants-deciding to press charges when evidence suggests no crime was actually committed-a jury could certainly conclude that Defendants acted with the requisite malicious intent.

Finally, Plaintiffs have set forth facts showing that Waters-Rice suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. In response to a warrant issued for her arrest, Waters-Rice was forced to report to the police station and undergo processing, which qualifies as a seizure as a consequence of a legal proceeding. *Cf. Laufgas v. Patterson,* 206 F. App'x 196, 197 (3d Cir.2006) (holding that arrest and subsequent two hour detention amounted to a seizure within the meaning

HNT-L-000010-25   04/14/2025 4:55:01 PM   Pg 42 of 91   Trans ID: LCV20251092587
Case 3:25-cv-09981-GC-TJB   Document 1-2   Filed 06/11/25   Page 196 of 405 PageID: 201
Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

of the Fourth Amendment but that malicious prosecution claim failed because arrest was not pursuant to a warrant and occurred prior to filing criminal complaint). Therefore, Plaintiffs have offered ample evidence to make out a Fourth Amendment claim for malicious prosecution.

What is more, Gansert, Felsing, and Smith are not immune from Plaintiffs' claim of malicious prosecution. A reasonable detective would have recognized that proceeding with criminal charges based on falsified information was unlawful. *See Molina v. City of Lancaster,* 159 F.Supp.2d 813, 820 (E.D.Pa.2001) (citing *Orsatti,* 71 F.3d at 484) (stating right to be free from the fabrication of evidence, falsifying documents, and malicious prosecution is clearly established). Such law applies with equal force to Smith, who evidence suggests, may have contributed false statements to the police reports, in addition to fabricating evidence. *See id.* As a result, Defendants are not entitled to summary judgment on Plaintiffs' Fourth Amendment malicious prosecution claim.

iv. *Municipal Liability*

City Defendants argue that Plaintiffs cannot prove that Sea Isle City had an unconstitutional policy or custom that violated Plaintiffs' rights, and that even if they could, they have not linked the alleged custom to Sea Isle City, its police department, or any individual officers. Plaintiffs need only set forth specific facts showing that there is a genuine issue for trial on the issue of municipal liability, however, and this they have done.

Local government units are not liable under § 1983 solely on a theory of respondeat superior. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 824 n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Monell v. N.Y. City Dep't of Soc. Servs.,* 436 U.S. 658, 690-91, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of); *Lloyd v. Borough of Stone Harbor,* 179 N.J.Super. 496, 432 A.2d 572, 583 (N.J.Super.Ct. Ch. Div.1981) (adopting *Monell* holding for municipal liability under the New Jersey Constitution). "A defendant in a civil rights action must have personal involvement in the alleged wrongs, liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988) (citations omitted).

**\*14** To establish municipal liability under § 1983, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990), A plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the plaintiff's injury. *Monell,* 436 U.S. at 689. A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." *Kneipp v. Tedder,* 95 F.3d 1199, 1212 (3d Cir.1996) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." *Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

Hence, there are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 584 (3d Cir.2003) (footnote and citations omitted).

Here, Plaintiffs have adduced sufficient evidence from which a jury could decide that it was the custom of Sea Isle City, as expressed through its police, to violate the Fourth Amendment rights of its few black residents. Specifically, Plaintiffs have evidence that its police made statements that were either intentionally or recklessly false for the purpose of arresting and prosecuting an African American resident of the city. When coupled with facts suggesting that Sea Isle City police routinely patrolled outside Plaintiffs' home, directed

HNT-L-000010-25   04/14/2025 4:55:01 PM   Pg 43 of 91   Trans ID: LCV20251092587
Case 3:25-cv-09981-GC-TJB   Document 1-2   Filed 06/11/25   Page 197 of 405 PageID: 202

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

racial slurs at Plaintiffs, threatened Plaintiff's son with a gun based on little to no provocation, and initially assumed Waters-Rice was hired help in her own home, a jury could find that Sea Isle City had a custom of race discrimination that while not formally approved by a policymaker, was "so widespread as to have the force of law." *See Bd. of County Comm'rs of Bryan County, Oklahoma,* 520 U.S. at 404. A jury could further conclude that the custom of race discrimination was the moving force behind the violations of Plaintiffs' Fourth Amendment rights.

v. *Warrantless Search*

**\*15** Plaintiffs allege that their Fourth Amendment rights were violated when Felsing and another police officer, Officer LaRosa, looked in closets and opened drawers in two bedrooms in Plaintiffs' home. Although LaRosa is not named in the suit and Felsing is entitled to summary judgment on Plaintiffs' unlawful search claim, Plaintiffs also allege that Sea Isle City is liable for the Fourth Amendment violation. As a result, the Court will analyze whether Plaintiffs have established a genuine issue of material fact concerning whether they were victims of an unlawful search.

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (citations and internal quotation marks omitted). In the absence of exigent circumstances, the "firm line at the entrance to the house ... may not reasonably be crossed without a warrant," even if the police have probable cause that the person committed a crime. *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The scope of any search must be "strictly tied to and justified by the circumstances which rendered its initiation possible." *Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

City Defendants do no more than attack the credibility of the evidence relating to the alleged search of Plaintiffs' home, which is not enough to merit summary judgment. It is undisputed that the police did not have a search warrant when they went to Plaintiffs' home to execute the arrest warrant. Luis Waters testified that police walked in the house without knocking and asked if Waters-Rice was at home. (Pls.' App. 248, Waters Dep. 38.) He testified further that the police told him to stay where he was in the living room and proceeded to go through the house. (*Id.* 42.) When Waters-Rice and Shaffer returned home that day, they testified that they found their clothing on the floor of their bedrooms next to open drawers

and closets. (*Id.* 279, Waters-Rice Dep. 509-09, 530-36; *id.* 211, Shaffer Dep. 62.) These facts constitute circumstantial evidence from which a jury could infer that Felsing and LaRosa looked in Plaintiffs' closets and drawers in violation of their Fourth Amendment rights.

There is no evidence linking Defendants Gansert or Kennedy to the alleged unlawful search. The uncontroverted testimony establishes that Gansert remained outside the house. (*See id.* 71, Evans 65; City Defs.' Ex. 17 at 63.) Moreover, there is no evidence that Kennedy even went to Plaintiffs' residence that day or knew about the search. Accordingly, Gansert and Kennedy are entitled to summary judgment to the extent that Plaintiffs allege they are liable for violating their Fourth Amendment right to be free from unreasonable searches.

**C. Fourteenth Amendment Violations**

Plaintiffs maintain that Defendants violated Plaintiffs' Fourteenth Amendment rights to equal protection and due process. They allege generally that it is "a matter of common sense that white residents of Sea Isle City were not called racially derogative names by the white police officers and school personnel, not assumed to be maids in their own homes, not falsely arrested and not subjected to the variety of abuses that the plaintiffs were forced to endure." In addition, Plaintiffs allege two specific ways in which Defendants denied them equal protection and due process pursuant to the Fourteenth Amendment: by contributing to a hostile school environment for Glendon and Anequa and by subjecting Plaintiffs to discriminatory police surveillance.

**\*16** The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. This is not a command that all persons be treated alike, but rather a direction that all persons similarly situated be treated alike. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), or any other suspect classification. To make an equal protection claim, a plaintiff must prove that the defendants' actions (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose. *Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 264-66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

i. *Alleged Violations*

a. *Rodger*

Rodger admits that on November 21, 2003, she excluded Anequa, the only black student in the class, from joining the other students in practicing for the play. (Pls.' App. 194-95, Rodger Dep. 32-33.) Anequa testified that Rodger's explanation for this exclusion was that Anequa is black and "black people don't celebrate Christmas." (*Id.* 136a, Anequa Dep. II 110.) Therefore, Plaintiffs have produced evidence that Rodger engaged in intentional invidious discrimination based on race. The veracity of Defendants' explanation that Rodger mistook Anequa for another black student requires a credibility determination that only a jury can make. In addition, Rodger is not entitled to qualified immunity, because these facts rise to the level of a constitutional violation and also is violative of a clearly established constitutional right to equal protection. *See Mitchum v. Foster,* 407 U.S. 225, 238, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972) (stating equal protection under the law is clearly established); *Brown v. Bd. of Educ.,* 347 U.S. 483, 493-94, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (holding that segregation deprived black students of equal educational opportunities).

b. *Davenport*

Plaintiffs allege that Davenport discriminated against Anequa when she stopped in her classroom during the middle of the 2003-2004 school year and commented that it smelled like an animal. Anequa perceived this comment to be motivated by racial animus; however, that subjective perception alone is not enough to establish that Davenport violated Anequa's Fourteenth Amendment rights to equal protection. As a result, the Court will grant Davenport summary judgment on Plaintiffs' Fourteenth Amendment claim.

c. *Smith*

Plaintiffs set forth a Fourteenth Amendment claim against Smith. They offer evidence that Smith used racial slurs during a meeting with Waters-Rice, called the police to report a supposed terroristic threat made by her, conspired to file a false police report against her, and failed to stop eighteen months of abuse of Glendon by his peers. These allegations provide a basis for a reasonable jury to find that Smith's actions had a discriminatory impact on Plaintiffs and were motivated by a discriminatory purpose. Smith is not entitled to qualified immunity, because this evidence rises to the level of a constitutional violation and also is violative of a clearly

established constitutional right to equal protection and due process. *See Mitchum,* 407 U.S. at 238; *Brown,* 347 U.S. at 493-94.

d. *Kennedy*

**\*17** Plaintiffs allege that by failing to give the School Board the entire account of the incidents of November 24, after Smith only told them that there had been a case of mistaken identity involving Anequa, Kennedy acquiesced in Smith and those working under her continuing to mistreat Plaintiffs. Plaintiffs contend that had he reported the criminal charge of terroristic threats against Waters-Rice and the subsequent dismissal of those charges by the prosecutor, the School Board would have been able to monitor the situation and prevent further harm to Plaintiffs. Regardless, however, Plaintiffs cannot show that a reasonable school board member in Kennedy's position would have realized that not augmenting Smith's account of the events of November 24 would be unlawful. In fact, Kennedy testified that he made it a practice not to share information with the School Board that he only knew because he was also Chief of Police. Therefore, Kennedy is immune from Plaintiffs' Fourteenth Amendment claim against him.

e. *Felsing and Gansert*

Plaintiffs have shown questions of material fact as to whether Felsing and Gansert acted with discriminatory intent and had a discriminatory effect when they sought an arrest warrant for Waters-Rice and persisted in initiating criminal charges against her. Waters-Rice's right to be free from false arrest and malicious prosecution due to racial animus was clearly established at the time of Felsing's and Gansert's actions. *See Mitchum,* 407 U.S. at 238; *Lippay,* 996 F.2d at 1504; *Molina,* 159 F.Supp.2d at 820.

f. *Sea Isle City*

As with Plaintiffs' Fourth Amendment claims against Sea Isle City, discussed at Section III.B.iv, a reasonable jury could also find that Sea Isle City had a custom of depriving black residents of their rights to due process and equal protection under the law. Consequently, City Defendants' motion for summary judgment as to Sea Isle City's liability on Plaintiffs' Fourteenth Amendment claims will be denied.

iii. *Hostile School Environment*

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

Plaintiffs allege that the actions of School Defendants and Davenport detailed above, as well as the ongoing verbal and physical abuse Glendon suffered at the hands of his classmates gave rise to a hostile school environment to which Defendants acquiesced. Plaintiffs assert that the affirmative conduct and deliberate indifference on the part of Defendants violated Plaintiffs' rights to equal protection. Nevertheless, School Defendants and Davenport are entitled to qualified immunity on this claim.

While some circuits have recognized a cause of action for hostile educational environment under the Fourteenth Amendment, *see Gant ex rel. Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 140 (2d Cir.1999) (recognizing Fourteenth Amendment racial hostility claim against teachers, administrators, and boards of education, where plaintiff shows deliberate indifference on the part of the defendants); *Murrell v. Sch. Dist. No. 1,* 186 F.3d 1238, 1249-51 (10th Cir.1999) (holding that plaintiff states a claim for Fourteenth Amendment violation where school officials "actually knew of and acquiesced in" peer-on-peer sexual harassment), the Third Circuit has not done so. In *D.R. by L.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364 (3d Cir.1992), the Third Circuit addressed the liability of school teachers and administrators in the context of peer-on-peer sexual harassment and abuse. There, the court rejected the notion that school teachers and administrators had a special relationship with the plaintiffs during school hours such that they owed the student plaintiffs a constitutional duty to protect them from the misconduct of other students. *Id.* at 1369-73. The *D.R.* court reasoned that the Fourteenth Amendment does not automatically embrace nonfeasance by school officials in the face of sexual harassment and abuse of a student by other students. *Id.* at 1373-76. Moreover, the court in *D.R.* found that there was no § 1983 liability where private actors committed the underlying violative acts.

**\*18** As a result, the acquiescence by school employees in the abuse suffered by Glendon did not amount to a constitutional violation. Moreover, Glendon did not have a clearly established right to his school's protection. The Third Circuit has stated that for a public official to be denied qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent." *Good v. Dauphin County Soc. Servs. for*

*Children & Youth,* 891 F.2d 1087 (3d Cir.1989). In light of the preexisting law that confronted the officials at Sea Isle City School, the Fourteenth Amendment did not impose a duty on them to prevent race-based harassment of students by their classmates. Accordingly, School Defendants and Davenport are entitled to qualified immunity on Plaintiffs' § 1983 claim to the extent that Plaintiffs' rely on misconduct by private actors in creating a racially hostile school environment for Glendon and Anequa.

iii. *Discriminatory Surveillance*

To the extent that Plaintiffs seek to hold Kennedy, Gansert, or Felsing liable for Fourteenth Amendment violations stemming from discriminatory surveillance and harassment, those individual Defendants are entitled to summary judgment. Plaintiffs have offered no facts to link Kennedy, Gansert, or Felsing to the specific incidents of harassment alleged by Plaintiffs. Indeed Defendants highlight testimony by Waters-Rice that neither Kennedy nor Gansert used racial slurs. (City Defs.' Stmt. of Facts at ¶¶ 235-38, 242, 245, 255.) Since constitutional liability can only be predicated on personal involvement, and Plaintiffs have not shown any evidence of personal direction or of actual knowledge and acquiescence by Kennedy, Gansert, or Felsing in discriminatory surveillance, they merit summary judgment on Plaintiff's claims against them under the Fourteenth Amendment. *See Rode, 845 F.2d at 1207.* Nevertheless, the evidence of police misconduct may still be relevant to Plaintiffs' claim for municipal liability and § 1985(3) conspiracy.

**D. Retaliation in Violation of § 1983 and NJLAD**

Plaintiffs allege that school and police officials retaliated against them for filing their lawsuit because Tegler and Smith collaborated to falsely report that Waters-Rice had made a threatening phone call to Tegler and because the police did not elect to press charges against Tegler and Smith. In addition, Plaintiffs maintain that Davenport's conduct towards Glendon, in removing him from class to talk about the lawsuit and threatening to continue doing so until his mother came to school to discuss the matter, and towards Anequa, in partnering with her in a class activity and repeatedly putting her arm around her, was retaliatory.

**\*19** A claim for retaliation under § 1983 and the NJLAD requires a plaintiff to demonstrate: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.,* 463 F.3d 285, 296 (3d Cir.2006); *see also Hanani v. State of N.J. Dep't of Envtl. Prot.,* 205 F. App'x 71, 80 (3d Cir.2006)* (stating that elements for retaliation under NJLAD track those of § 1983).

i. *Sea Isle City, Gansert, Kennedy, and Felsing*

Plaintiffs do not make out a constitutional violation for retaliation against any of the police Defendants; therefore, they are entitled to qualified immunity. The police are not responsible for any allegedly retaliatory actions towards Plaintiffs. Felsing did respond to Smith's call concerning the supposedly threatening phone call to Tegler, and he proceeded to check on Tegler at her home; however, neither he nor any other Police Defendants filed charges against Waters-Rice as a result. In fact, they believed that Smith and Tegler had invented the story of that Waters-Rice had threatened Tegler. Police Defendants are not liable for retaliation for opting not to press charges against Smith and Tegler for filing a false police report. *See Manna v. Twp. of Fairfield,* Civ. No. 04-1430, 2007 WL 3231894, at *2-3 (D.N.J. October 30, 2007)* (deciding that defendants' failure to investigate allegedly wrongful acts reported by plaintiffs does not affect plaintiffs' exercise of free speech).

Furthermore, Plaintiffs have not offered enough evidence from which a reasonable jury could conclude that Sea Isle City had a policy or custom of retaliating for filing lawsuits against it, since Plaintiffs have not established that any of its agents engaged in retaliatory activity. Consequently, Sea Isle City, Gansert, Kennedy, and Felsing are entitled to summary judgment on Counts III and VI of Plaintiffs' Amended Complaint.

ii. *Sea Isle City School, Smith, Tegler, and Davenport*

Plaintiffs do, however, establish questions of material fact as to whether Sea Isle City School, Smith, Tegler, and Davenport retaliated against them for exercising their rights to access the courts. First, Plaintiffs engaged in constitutionally protected conduct by filing a lawsuit. In addition, a jury could find that filing a false police report accusing a person of a crime they did not commit qualifies as retaliatory conduct sufficient to deter a person of ordinary firmness from exercising her constitutional rights. A jury could draw the same conclusion about a teacher threatening to pull a child from class every day until his mother comes to school to speak with school officials. There is also a question of fact regarding whether

a school official insisting on partnering with a second-grader during a school activity and the official repeatedly putting her arm around the student would be retaliatory as to a second-grader of ordinary firmness.

**20** Finally, Plaintiffs have offered enough evidence of a causal link between Plaintiffs' lawsuit and the retaliatory action. Davenport removing Glendon from class evinces an direct causal link because her threat to continue doing so specifically related to the lawsuit. Based on that explicit causal link, a jury could reasonably infer that Davenport's conduct toward Anequa was similarly connected to the lawsuit. As for the actions of Smith and Tegler, which followed approximately four months after the suit was filed, a jury could reasonably surmise that they took advantage of the cancellation of Tegler's class project to manufacture another "threat" by Waters-Rice.

Therefore, Plaintiffs have set forth a constitutional violation, and the Court must determine whether these Defendants are entitled to qualified immunity. In the District of New Jersey, "there is a well-established right of a citizen to be free from retaliation for exercising one's right to free speech." *Brennan v. Kulick,* Civ. No. 01-3837, 2007 WL 2916519, at *2 (D.N.J. October 05, 2007)* (citing *Downey v. Coal. Against Rape & Abuse, Inc.,* 143 F.Supp.2d 423, 449 (D.N.J.2001)). Given this state of the law at the time of Defendants' conduct, Smith, Tegler, and Davenport are not entitled to qualified immunity, and their motion for summary judgment on Counts III and VI of Plaintiffs' Amended Complaint will be denied.

**E. Conspiracy in Violation of 42 U.S.C. § 1985**

Section 1985(3) permits an action to be brought by one injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To prove that Defendants conspired to violate their civil rights, in violation of 42 U.S.C. § 1985(3), Plaintiffs must prove the existence of (1) a conspiracy motivated by invidious discriminatory animus, (2) for the purpose of depriving them, either directly or indirectly, of the equal protection of the laws, (3) that there was an act in furtherance of the conspiracy, and (4) that she was, as a result, injured in her person or deprived of any right or privilege of a citizen of the United States. *See Farber v. City of Paterson,* 440 F.3d 131, 134 (3d Cir.2006).

To determine whether a conspiracy existed, the Court must look to state law. Under New Jersey law, the elements

HNT-L-000010-25   04/14/2025 4:55:01 PM   Pg 47 of 91   Trans ID: LCV20251092587
Case 3:25-cv-09981-GC-TJB   Document 1-2   Filed 06/11/25   Page 201 of 405 PageID: 206

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

of a civil conspiracy are "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose to be achieved by unlawful means; and (4) special damages." *Farris v. County of Camden,* 61 F.Supp.2d 307, 330 (D.N.J.1999). An agreement can be shown by direct or circumstantial evidence. *Adams v. Teamsters Local 115,* 214 F. App'x 167, 172 (3d Cir.2007). To sustain an action for civil conspiracy "a plaintiff must also point to (1) an overt act of one or more of the conspirators in furtherance of the conspiracy; and (2) consequential damage to the rights of another, of which the overt act is the proximate cause." *Farris,* 61 F.Supp.2d at 330. "The question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can 'infer from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached an understanding' to achieve the conspiracy's objectives." *Morgan v. Union County Bd. of Chosen Freeholders,* 268 N.J.Super. 337, 633 A.2d 985, 998 (N.J.Super.Ct.App.Div.1993).

**\*21** In this case, Plaintiffs have specifically identified the members of the alleged conspiracy; they have proffered facts from which a jury could infer a meeting of the minds occurred among Defendants; and they have presented evidence that they were discriminated against on the basis of race and denied due process and equal protection of the law in furtherance of the alleged conspiracy. *Cf. Dunkel v. Dunkel,* Civ. No. 93-1264, 1993 WL 548282 (E.D.Pa. December 30, 1993) (dismissing plaintiff's § 1985(3) claim because of lack of factual specificity as to requisite elements). Plaintiffs adduce facts to support that Defendants were part of a conspiracy insofar as they participated in and/or condoned a pattern of racially motivated misconduct, which led to Plaintiffs' constitutional injuries. As a result, Defendants are not entitled to summary judgment on Plaintiffs' § 1985 claim.

**F. New Jersey Constitution**
Unlike violations of the United States Constitution, which are actionable through § 1983, the New Jersey Constitution itself provides a remedy for violations of its provisions. *Scully v. Borough of Hawthorne,* 58 F.Supp.2d 435, 459 (D.N.J.1999). Plaintiffs allege state constitutional violations of the guarantees in the New Jersey Constitution at Article 1, Paragraphs 1 and 5 to equal protection of the laws, and in Article 1, Paragraph 6 to free speech. As the parties have cited no authority nor otherwise suggested that a court's analysis of claims brought pursuant to the New Jersey Constitution for equal protection and retaliation are any different than the

analysis of these same claims brought pursuant to the United States Constitution, this Court will rely on the same reasoning and reach the same outcomes as in sections III.B-C above in deciding Defendants' motions for summary judgment as to Plaintiffs' claims brought pursuant to the New Jersey Constitution.

**G. New Jersey Law Against Discrimination**
The NJLAD provides in relevant part: "All persons shall have the opportunity to obtain ... all the accommodations, advantages, facilities, and privileges of any place of public accommodation ... without discrimination because of race ... This opportunity is recognized as and declared to be a civil right." N.J. Stat. Ann. § 10:5-4. The statute further imposes liability on any person who "aid[s], abet[s], incite[s], compel[s], or coerce[s] the doing of any of the acts forbidden under this act, or [who] attempts to do so." § 10:5-12(e).

*i. Sea Isle City School*
School Defendants argue that Sea Isle City School and Sea Isle City Board of Education are agencies of the State of New Jersey and thus, Plaintiffs' NJLAD claims are barred by the Eleventh Amendment. The Court concludes otherwise.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." As a general proposition, a suit by private parties seeking to impose a liability that must be paid from public funds in a state treasury is barred from federal court by the Eleventh Amendment, unless Eleventh Amendment immunity is waived by the state itself or by federal statute. *See, e.g., Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Eleventh Amendment protects states and their agencies and departments from suit in federal court regardless of the type of relief sought. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Similarly, absent consent by a state, the Eleventh Amendment bars federal court suits for money damages against state officers in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Section 1983 does not override a state's Eleventh Amendment immunity. *See Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

**\*22** Counties, municipalities, and political subdivisions of a state are not protected by the Eleventh Amendment. *See Mt. Healthy,* 429 U.S. at 280. Courts usually find school boards and school districts to be such political subdivisions, not entitled to immunity. *See, e.g., id.* at 280-281; *Febres v. Camden Bd. of Educ.,* 445 F.3d 227, 229 (3d Cir.2006). Nevertheless, in some cases, such entities are determined to be "arm[s] of the State partaking of the State's Eleventh Amendment immunity." *Febres,* 445 F.3d at 229 (quoting *Mt. Healthy,* 429 U.S. at 280). In deciding into which category a school district or school board falls, a court must apply the following three-part test: (1) whether the payment of the judgment would come from the state, (2) what status the entity has under state law, and (3) what degree of autonomy the entity has. *Fitchik v. N.J. Transit Rail Operations, Inc.,* 873 F.2d 655, 659 (3d Cir.1989) (en banc).

School Defendants have not shown that they are entitled to Eleventh Amendment immunity as a matter of law. They have not provided any evidence regarding how state law treats the Sea Isle City Board of Education generally, whether the Board can sue or be sued in its own right, whether the Board is separately incorporated, or whether it is immune from state taxation, all of which are considered subfactors relevant to assessing a Board's legal status under state law. *Febres,* 445 F.3d at 230. Furthermore, New Jersey state law generally treats school boards as separate political subdivisions. *See* N.J. Stat. Ann. § 18A:10-1; *Otchy v. Elizabeth Bd. of Educ.,* 325 N.J.Super. 98, 737 A.2d 1151, 1157 (N.J.1999) (noting that under state law a school board is a distinct legal entity, which, for example, may hold property in its name). This Court is left to assume that the general rule in New Jersey applies to the Sea Isle City School Board; therefore, the School Board is not immune.

ii. *Hostile School Environment*

Plaintiffs urge the Court to recognize their claim for hostile school environment under the NJLAD. Neither School Defendants nor Davenport specifically address Plaintiffs' hostile school environment claim and apparently do not oppose the recognition of such a claim based on the New Jersey Supreme Court's recent holding on the subject.

In *L.W. ex rel. L.G. v. Toms River Regional Schools Board of Education,* 189 N.J. 381, 915 A.2d 535 (N.J.2007), the New Jersey Supreme Court recognized a cause of action for hostile school environment under the NJLAD. That case involved students harassing another student because of his perceived sexual orientation. As its basis for adopting this cause of action, the court drew on the plain language of the NJLAD, its broad remedial goal, and evidence of the prevalence of peer sexual harassment in schools. *Id.* at 547. The court also reasoned that not recognizing the cause of action "would be incongruous with the LAD's prohibition of discrimination in other settings, including the workplace," and that such claims against school districts for failing to reasonably address peer-based, affectional orientation harassment ... further [s] the Legislature's goal of eradicating the invidious discrimination faced by students in our public schools." *Id.* While a portion of the *L.W.* court's reasoning was particular to the problem of sexual harassment in schools, the court's interpretation of the plain meaning of the NJLAD and its "broad remedial goal" apply with equal force in the context of race-based harassment. Thus, the Court can discern no reason why this state's highest court would not extend its holding in *L.W.* to also include harassment due to a student's race. In addition, the United States Supreme Court has stated that "[a]n unbroken line of cases following *Brown v. Board of Education* establishes beyond doubt this Court's view that racial discrimination in education violates a most fundamental national public policy, as well as rights of individuals." *Bob Jones Univ. v. United States,* 461 U.S. 574, 593, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). Indeed, the court in *L.W.* frames its holding in one iteration in terms of a student plaintiff's "protected characteristic"; thereby contemplating such an application to future cases. *L.W.,* 915 A.2d at 547.

**\*23** Hence, to state a claim under the NJLAD for a hostile school environment, "an aggrieved student must allege discriminatory conduct that would not have occurred 'but for' the student's protected characteristic, that a reasonable student of the same age, maturity level, and protected characteristic would consider sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment, and that the school district failed to reasonably address such conduct." *Id.* Citing law pertaining to hostile work environments, the *L.W.* court states that a school is liable for a hostile school environment when it grants a supervisor authority to control the school environment and the supervisor either abuses that authority or has actual or constructive knowledge of the harassment and fails to take effective measures to end the discrimination. *Id.* at 548 (citing *Lehmann v. Toys R Us, Inc.,* 132 N.J. 587, 626 A.2d 445, 463 (N.J.1993). Furthermore, in evaluating the adequacy of the school's response to peer harassment, the factfinder "must determine the reasonableness of a school district's response to peer harassment in light of the totality of the circumstances." *Id.* at 551, 626 A.2d 445.

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

Here, Plaintiffs have adduced evidence of discriminatory conduct that would not have occurred 'but for' the student's protected characteristic. Plaintiffs suggest that Glendon's classmates did not realize before the November 24 incident with his mother that Glendon, who is light-skinned, was black, because it was only after that date that they started harassing him. Also, Glendon testified that his classmates called him racially derogative names. Moreover, a jury could easily conclude that a reasonable student of the same age, maturity level, and protected characteristic would consider racial slurs, sexually obscene taunts, and physical abuse lasting up to eighteen months sufficiently severe or pervasive to create an intimidating, hostile, or offensive school environment. Finally, Plaintiffs have produced abundant evidence that school officials, including Principal Smith, failed to take action to end Glendon's torment. (*See, e.g.,* Pls.' App. at 41-41, Davenport at 76-77.) As a result, School Defendants' and Davenport's motions for summary judgment on Plaintiffs' NJLAD claim of a hostile school environment will be denied. To the extent that Plaintiffs advance an NJLAD claim against Sea Isle City, Gansert, Kennedy, or Felsing, those Defendants will be granted summary judgment. Plaintiffs have not adduced sufficient evidence to link any of these Defendants to the hostile school environment.

### H. Tort of Malicious Prosecution

In addition to their malicious prosecution claim under the Fourth Amendment, Plaintiffs also alleged the intentional tort. Under New Jersey law, the common law elements of a malicious prosecution action arising out of a criminal prosecution are: (1) the criminal action was instituted by the defendant against the plaintiff, (2) it was actuated by malice, (3) there was an absence of probable cause for the proceeding, and (4) the criminal proceeding was terminated favorably to the plaintiff. *Lind v. Schmid,* 67 N.J. 255, 262, 337 A.2d 365 (1975). As already established in the context of Fourth Amendment malicious prosecution, it is undisputed that Defendants initiated criminal charges against Waters-Rice and that those charges were dismissed by the prosecutor and that questions of fact remain about whether probable cause existed for her arrest and about whether Defendants acted maliciously. Thus, Defendants' summary judgment motions will be denied, unless they can find refuge in the New Jersey Tort Claims Act ("TCA").

**\*24** The New Jersey Tort Claims Act provides, in part, "a public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment." N .J. Stat. Ann. § 59:3-3. To merit immunity under section 59:3-3, the action giving rise to the plaintiff's claims must have been carried out in good faith. New Jersey courts have defined "good faith," in this context to mean objectively reasonable conduct. *Hayes v. Mercer County,* 217 N.J.Super. 614, 526 A.2d 737, 741 (N.J.Super.Ct.App.Div.), *certif. denied,* 108 N.J. 643, 532 A.2d 226 (1987). Accordingly, § 59:3-3 cannot shield Defendants Gansert, Felsing, or Smith from liability, because the tort requires malicious intent.

Sea Isle City and Kennedy, however, are entitled to summary judgment on this claim. Under the TCA, public entities cannot be held liable "for acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J. Stat. § 59:2-10. As Sea Isle City is a "public entity," *see* N.J. Stat. Ann. § 59:1-3, it cannot be liable for intentional torts committed by its employees, and this Court will dismiss Plaintiffs' malicious prosecution claim against Sea Isle City. Likewise, Plaintiffs have no evidence linking Kennedy to the actions giving rise to Waters-Rice's claim of malicious prosecution; therefore, Plaintiffs cannot prove that Kennedy performed the action leading to the damages she alleges.

Defendants Gansert, Kennedy, Felsing, Smith, and Rodger also argue that they deserve summary judgment based on § 59:9-2(d) of the New Jersey Tort Claims Act. That provision provides that a plaintiff cannot recover pain and suffering damages from a public entity or public employee, except "in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00." The New Jersey Supreme has held that in certain circumstances, psychological and emotional injuries such as posttraumatic stress disorder should be treated the same as physical injuries for purposes of § 59:9-2(d). *Collins v. Union County Jail,* 150 N.J. 407, 696 A.2d 625, 632 (N.J.1997) (holding plaintiff's claim of permanent psychological injury in form of posttraumatic stress disorder resulting from being raped by corrections officer may constitute a "permanent loss of a bodily function" even absent residual physical injury); *see also Frugis v. Bracigliano,* 351 N.J.Super. 328, 798 A.2d 614, 629 (N.J.Super.Ct.App.Div.2002) (finding allegations of sexual abuse sufficient aggravating circumstances which, if accompanied by a permanent posttraumatic stress disorder, which is substantial), *rev'd on other grounds,* 177 N.J. 250, 827 A.2d 1040 (N.J.2003).

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

Here, there is sufficient evidence to surpass the threshold of § 59:9-2(d) and to permit the question to go to a jury. Plaintiffs submit the report of their medical expert, Dr. Robert Sadoff, who attests that Waters-Rice suffers from posttraumatic stress disorder and severe depression stemming from "the traumatic experiences of racial discrimination and inappropriate arrest." (*See* Pls.' App. 376-79.) Furthermore, Dr. Sadoff stated that Waters-Rice requires treatment costing approximately \$15,000 per year, well in excess of the damages threshold of § 59:9-2(d). Like the plaintiffs in *Collins* and *Frugis,* Waters-Rice suffered an intentional tort that resulted in serious and lasting psychological injury. The court in *Collins* cited the plaintiff's frequent nightmares, flashbacks, difficulty in sleeping, sudden outbursts of crying, screaming in his sleep, severe loss of self-esteem, and inability to trust others; similarly, Waters-Rice suffers from nightmares, sleeplessness, flashbacks, suicidal ideation, and also attempted suicide on one occasion. Therefore, Defendants are not entitled to summary judgment on Waters-Rice's pain and suffering damages for the tort of malicious prosecution.

**\*25** In sum, Sea Isle City and Kennedy are entitled to summary judgment on Plaintiffs' tort claim for malicious prosecution, but Smith, Rodger, Gansert, and Felsing are not and are subject to the jury's determination of whether Waters-Rice merits damages for pain and suffering on that claim.

### I. Punitive Damages

Defendants seek to limit their exposure to punitive damages on both Plaintiffs' federal constitutional claims and on their NJLAD claims. Plaintiffs do not respond with any arguments regarding punitive damages.

### i. *42 U.S.C. § 1983 and § 1985*

Defendants Sea Isle City, Gansert, Kennedy, and Felsing argue that Plaintiffs may not recover punitive damages against them on Plaintiffs' federal constitutional claims. Municipalities are immune from punitive damages on § 1983 and § 1985 claims. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *see also Bell v. City of Milwaukee,* 746 F.2d 1205, 1270 (7th Cir.1984) (interpreting *City of Newport* as precluding punitive damages in suits pursuant to § 1985 as well as § 1983), *overruled on other grounds, Russ v. Watts,* 414 F.3d 783 (7th Cir.2005). Similarly, punitive damages are not available against municipal employees when sued in their

official capacities. *Gregory v. Chehi,* 843 F.2d 111, 120 (3d Cir.1988). Therefore, Sea Isle City is not liable for punitive damages on any of Plaintiffs' alleged federal constitutional violations, nor are Gansert, Kennedy, and Felsing in their official capacities.

The Court will next address Defendants' liability for punitive damages under § 1983 in their individual capacities. Plaintiffs are entitled to punitive damages only if they can establish that "the defendants have acted with a 'reckless or callous disregard of, or indifference to, the rights and safety of others.' " *Keenan v. City of Phila.,* 983 F.2d 459, 470-71 (3d Cir.1992) (quoting *Bennis v. Gable,* 823 F.2d 723, 734 (3d Cir.1987)). The standard of "callous or reckless indifference" is an objective one, inquiring "whether a reasonable officer would have known that his conduct violated a clearly established constitutional right." *Russoli v. Salisbury Twp.,* 126 F.Supp.2d 821, 873 (M.D.Pa.2000). As to each Defendant, Plaintiffs have amassed enough evidence from which a jury could find that they acted with a reckless or callous disregard of or indifference to Plaintiffs' rights. No individual defendants warrant summary judgment on Plaintiffs' punitive damage claims.

### ii. *NJLAD*

To recover punitive damages under the NJLAD, a plaintiff must show more than the minimum conduct necessary to prove the underlying claim. *Weiss v. Parker Hannifin Corp.,* 747 F.Supp. 1118, 1135-36 (D.N.J.1990). In particular, the plaintiff must establish that (1) upper management was an actual participant in the alleged wrongdoing or was willfully indifferent to the alleged wrongdoing, and (2) that the alleged misconduct was especially egregious. *Rendine v. Pantzer,* 141 N.J. 292, 661 A.2d 1202, 1215 (N.J.1995). To constitute especially egregious conduct, the alleged misconduct must have been "wantonly reckless or malicious" and there must be "an intentional wrongdoing in the sense of an evil-minded act or an act accompanied by a wanton and willful disregard of the rights of another." *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224, 1230 (N.J.1984). As with Plaintiffs' punitive damages claim under § 1983, a jury could also conclude that Defendants' conduct merits punitive damages. In particular, much of the alleged discriminatory conduct was carried out by Smith, who qualifies as "upper management" since she is the principal of Sea Isle City School. Likewise, Davenport was a school administrator. Thus, a jury could reasonably find that the conduct alleged by Plaintiffs was especially egregious.

Joyce v. City of Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 906266

### J. Police Department

**\*26** City Defendants argue that the Police Department must be dismissed from the case because it is merely an administrative arm of Sea Isle City. "In New Jersey a municipal police department is not an entity separate from the municipality, N.J. Stat. Ann. § 40A:14-118 (municipal police department is 'an executive and enforcement function of municipal government'); therefore, the ... Police Department is not a proper defendant in this action." *Adams v. City of Camden,* 461 F.Supp.2d 263, 266 (D.N.J.2006); *see also Padilla v. Twp. of Cherry Hill,* 110 F. App'x 272, 278 (3d Cir.2004); *DeBillis v. Kulp,* 166 F.2d 255, 264 (E.D.Pa.2001). Since the Police Department is not an entity separate from the municipality, it cannot be sued in conjunction with the municipality. *See Adams,* 461 F.Supp.2d at 266. Accordingly, the Court will dismiss the Police Department from the suit.

### IV. CONCLUSION

Based on the foregoing reasoning, the Court will grant City Defendants' motion on Plaintiffs' claim that Gansert and Kennedy violated their right to be free from unreasonable searches; on Plaintiffs' Fourteenth Amendment and New Jersey constitutional claims against Kennedy; on Plaintiffs' claims of discriminatory surveillance in violation of the Fourteenth Amendment and the New Jersey Constitution against Kennedy and Gansert; on Plaintiffs' claims of retaliation in violation of § 1983, the New Jersey Constitution, and the NJLAD against Sea Isle City, Gansert, and Kennedy; on Plaintiffs' tort claims against Sea Isle City and Kennedy for malicious prosecution; and on Plaintiffs' claim for punitive damages against Sea Isle City for any federal constitutional

violations. City Defendants' motion will be denied in all other respects. The Court will grant Felsing's motion on Plaintiffs' claim that he violated their Fourth Amendment right to be free from unreasonable searches; that he violated their Fourteenth Amendment rights and the New Jersey Constitution by conducting discriminatory surveillance; and that he retaliated in violation of § 1983, the New Jersey Constitution, and the NJLAD. Felsing's motion will be denied in all other respects. The Court will grant School Defendants' motion on Plaintiffs' claim of a hostile school environment in violation of the Fourteenth Amendment and deny it in all other respects. The Court will grant Davenport's motion on Plaintiffs' Fourteenth Amendment and New Jersey constitutional claims against her, including Plaintiffs' constitutional claim of a hostile school environment. The Court will deny Davenport's motion in all other respects. The Court will deny Tegler's motion in its entirety. And as previously stated, the Court will grant Kennedy's motion on Plaintiffs' claim that he violated their right to be free from unreasonable searches; on Plaintiffs' Fourteenth Amendment and New Jersey constitutional claims; on Plaintiffs' claims of discriminatory surveillance in violation of the Fourteenth Amendment and the New Jersey Constitution; on Plaintiffs' claims of retaliation in violation of § 1983, the New Jersey Constitution, and the NJLAD; and on Plaintiffs' tort claims against him for malicious prosecution. Furthermore, the Court will dismiss Sea Isle City Police Department from the case with prejudice. An accompanying Order shall issue today.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 906266

---

**End of Document**     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit G

HNT-L-000010-25   04/14/2025 4:55:01 PM   Pg 53 of 91   Trans ID: LCV20251092587
Case 3:25-cv-09981-GC-TJB   Document 1-2   Filed 06/11/25   Page 207 of 405 PageID: 212
Joyce v. Sea Isle City, Not Reported in F.Supp.2d (2008)

2008 WL 2875456
Only the Westlaw citation is currently available.
Not for publication
United States District Court, D. New Jersey.

Anequa R. JOYCE, et al., Plaintiffs,

v.

City of SEA ISLE CITY, et al., Defendants.

Civil No. 04-5345 (RBK).

|

July 23, 2008.

**Attorneys and Law Firms**

Pamela Elchert Thurmond, Kaufman Coren & Ress, Philadelphia, PA, for Plaintiffs.

A. Michael Barker, Joseph M. Scott, Barker, Scott & Gelfand, Robert P. Merenich, Gemmel, Todd & Merenich, P.A., Linwood, NJ, Paul J. Baldini, Law Offices of Paul J. Baldini, Wildwood, NJ, Peter Herbert Spaeth, Wolff, Helies, Duggan, Spaeth & Lucas, PA, Manasquan, NJ, Eric L. Harrison, Methfessel & Werbel, PC, Edison, NJ, Gregory J. Giordano, Lenox, Socey, Wilgus, Formidoni, Brown, Giordano & Casey, LLC, Trenton, NJ, for Defendants.

**OPINION**

KUGLER, District Judge.

 **\*1** This matter comes before the Court on a motion by City of Sea Isle City ("the City"), William J. Kennedy ("Chief Kennedy"), and Jon Gansert (collectively "City Defendants") for reconsideration of this Court's March 31, 2008 Opinion and Order deciding their motion for summary judgment against Anequa R. Joyce, Glendon Durham, and Doretha Waters-Rice (collectively "Plaintiffs"). Additionally before the Court are individual motions for reconsideration of the Court's March 31, 2008 Opinion and Order by Dennis R. Felsing, Elizabeth Tegler, and Angela Davenport. Plaintiffs accuse Defendants of race discrimination in violation of their rights under the United States and New Jersey Constitutions, violations of the New Jersey Law Against Discrimination, and malicious prosecution. For the reasons set forth below, the Court will grant in part and deny in part City Defendants' motion and will deny the motions of Felsing, Davenport, and Tegler.

**I. BACKGROUND**

The Court has previously recited the unfortunate facts of this case at length in its March 31, 2008 Opinion. *See Joyce v. City of Sea Isle City*, No. Civ. A. 04-5345, 2008 WL 906266, at \*1-\*7 (D.N.J. March 31, 2008), and will not do so again here, except as necessary for the disposition of the pending motions.

**II. STANDARD**

Motions for reconsideration are not expressly recognized in the Federal Rules of Civil Procedure. *See United States v. Compaction Sys. Corp.,* 88 F.Supp.2d 339, 345 (D.N.J.1999). Generally, a motion for reconsideration is treated as a motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e), or as a motion for relief from judgment or order under Federal Rule of Civil Procedure 60(b). *See id.* In the District of New Jersey, Local Civil Rule 7.1(i) (formerly 7.1(g)) governs motions for reconsideration. *See Byrne v. Calastro,* Civ. A. No. 05-CV-68, 2006 WL 2506722, at \* 1 (D.N.J. Aug.28, 2006).

Local Civil Rule 7.1(i) permits a court to reconsider a prior decision upon a showing that the court overlooked dispositive factual matters. *See Bryan v. Shah,* 351 F.Supp.2d 295, 297 (D.N.J.2005). Rule 7.1(i) does not contemplate a recapitulation of arguments considered by the court before rendering its decision. *See Bermingham v. Sony Corp. of Am., Inc.,* 820 F.Supp. 834, 856 (D.N.J.1992), aff'd 37 F.3d 1485 (3d Cir.1994). A court may grant a motion under Rule 7.1(i) only if: (1) "an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice." *Database Am., Inc. v. Bellsouth Adver. & Publ'g Corp.,* 825 F.Supp. 1216, 1220 (D.N.J.1993).

Ordinarily, a motion for reconsideration may address only those matters of fact or issues of law which were presented to, but not considered by, the court in the course of making the decision at issue. *See SPIRG v. Monsanto Co.,* 727 F.Supp. 876, 878 (D.N.J.), aff'd, 891 F.2d 283 (3d Cir.1989). Thus, reconsideration is not to be used as a means of expanding the record to include matters not originally before the court. *See Resorts Int'l v. Greate Bay Hotel & Casino, Inc.,* 830 F.Supp. 826, 831 & n. 3 (D.N.J.1992). Absent unusual circumstances, a court should reject new evidence which was not presented when the court made the contested decision. *See id.* A party seeking to introduce new evidence on reconsideration

bears the burden of first demonstrating that evidence was unavailable or unknown at the time of the original hearing. See *Levinson v. Regal Ware, Inc.,* Civ. No. 89-1298, 1989 WL 205724, at *3 (D.N.J. Dec.1, 1989).

**\*2**  Reconsideration is "an extraordinary remedy," and a court should grant it "very sparingly." *NL Indus. Inc. v. Commercial Union Ins. Co.,* 935 F.Supp. 513, 516 (D.N.J.1996). "[M]ere disagreement with a court's decision normally should be raised through the appellate process and is inappropriate on a motion for reargument." *Yurecko v. Port Auth. Trans. Hudson Corp.,* 279 F.Supp.2d 606, 609 (D.N.J.2003).

### III. DISCUSSION

#### A. Waters-Rice's False Arrest Claim

In their motions for reconsideration, City Defendants and Officer Felsing argue this Court overlooked the distinction between false arrest and malicious prosecution under the Fourth Amendment articulated by the Supreme Court in *Heck v. Humphrey,* 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and more fully explicated in *Morales v. Busbee,* 972 F.Supp. 254 (D.N.J.1997). Neither City Defendants nor Felsing made this argument in their motions for summary judgment, however, despite Waters-Rice's plain assertion of claims for both false arrest and malicious prosecution. At no time did City Defendants or Felsing argue that Waters-Rice could not maintain a claim for false arrest because she had been arrested pursuant to a warrant. Their argument that *Heck* precludes Waters-Rice's false arrest claim may have merit; however, this Court cannot entertain it for the first time on a motion for reconsideration. See *Bowers v. Nat'l Collegiate Athletic Ass'n,* 130 F.Supp.2d 610, 613 (D.N.J.2001) (stating motions for reconsideration "are not an opportunity to argue what could have been, but was not, argued in the original set of moving and responsive papers"). As a result, City Defendants' and Felsing's motions for reconsideration concerning Waters-Rice's false arrest claim will be denied.

#### B. Section 1983 and 1985 Claims

City Defendants argue the Court overlooked the absence of facts linking any conduct by the City, Chief Kennedy, or Gansert to Anequa or Glendon. It is true that in their counterstatement of material facts, Plaintiffs did not cite any actions by Chief Kennedy or Gansert towards Anequa or Glendon that would give rise to personal liability. Nevertheless, the Court found Plaintiffs had demonstrated

triable issues of fact exist concerning whether Defendants conspired to violate Plaintiffs' civil rights in violation of 42 U.S.C. § 1985(3). Were a jury to find such a conspiracy existed, Chief Kennedy and Gansert, as members of the conspiracy, would be liable for the acts of their coconspirators whom Anequa and Glendon have alleged harmed them. See *Parkway Garage, Inc. v. City of Phila.,* No. Civ. A. 90-7752, 1994 WL 412430, at *4 (E.D.Pa. Aug.3, 1994) (noting "proof of a civil conspiracy may broaden the scope of liability under § 1983 to include individuals who were part of such conspiracy but did not act directly to deprive a plaintiff's rights" (citing *Hostrop v. Bd. of Junior Coll. Dist. No. 515,* 523 F.2d 569, 576 (7th Cir.1975), cert. denied, 425 U.S. 963 (1976))); *Morgan v. Union County Bd. of Chosen Freeholders,* 268 N.J.Super. 337, 633 A.2d 985, 999 (N.J.Super.Ct.App.Div.1993) (stating that under New Jersey law, in civil conspiracies, like criminal ones, "[t]he acts and declarations of a conspirator in furtherance of the conspiracy are binding on all parties to the conspiracy"). Therefore, the Court properly denied City Defendants' motion for summary judgment on Plaintiffs' claims under § 1983.

**\*3**  City Defendants argue further that the Court overlooked the lack of facts implicating Chief Kennedy in any unlawful act or in a conspiracy to commit an unlawful act. While City Defendants are correct that there is no direct evidence of wrongdoing by Chief Kennedy, Plaintiffs have highlighted a host of purportedly unlawful acts on the part of individuals alleged to be his coconspirators, as well as circumstantial evidence placing him at the center of the supposed conspiracy. Specifically, Plaintiffs have offered evidence that over many months, multiple unidentified Sea Isle City police officers routinely responded to or drove by Plaintiffs' home and often made discriminatory or harassing comments to Plaintiffs. Furthermore, Plaintiffs proffered evidence that they each suffered discrimination at the hands of school officials. During these events, Chief Kennedy served as both chief of Sea Isle City's police department and as a member of its school board. Based on these facts, a jury could reasonably conclude there existed "a real agreement or confederation with a common design" of which Chief Kennedy was a part. *Farris,* 61 F.Supp.2d at 330. Consequently, City Defendants' motion for reconsideration as to Plaintiffs' § 1983 claims against the City, Chief Kennedy, and Felsing, and regarding Plaintiffs' § 1985 claims against Chief Kennedy will be denied.

#### C. Punitive Damages Against Chief Kennedy and Gansert, Individually

*Joyce v. Sea Isle City, Not Reported in F.Supp.2d (2008)*

City Defendants contend the Court overlooked undisputed facts as well as mandatory authority entitling Chief Kennedy and Gansert to summary judgment on Plaintiffs' claims for punitive damages against them in their individual capacities. Plaintiffs merit punitive damages only if they can establish that "the defendants have acted with a 'reckless or callous disregard of, or indifference to, the rights and safety of others.' " *Keenan v. City of Phila.,* 983 F.2d 459, 470-71 (3d Cir.1992) (quoting *Bennis v. Gable,* 823 F.2d 723, 734 (3d Cir.1987)). The standard of "callous or reckless indifference" is an objective one, inquiring "whether a reasonable officer would have known that his conduct violated a clearly established constitutional right." *Russoli v. Salisbury Twp.,* 126 F.Supp.2d 821, 873 (M.D.Pa.2000).

City Defendants correctly indicate it is undisputed that Chief Kennedy did not have any direct contact with Plaintiffs; however, it does not follow that he could not have recklessly disregarded Plaintiffs' civil rights. As already discussed, evidence exists that supports Chief Kennedy's role in a civil rights conspiracy. Similarly, Plaintiffs have shown facts suggesting Gansert and Felsing made up facts to support the warrant for Waters-Rice's arrest. While there is no direct evidence indicative of a discriminatory motive underlying that action, a jury could conclude based on evidence of prior racial harassment of Plaintiffs by Sea Isle City police force that such a motive existed. It must be for a jury to weigh this evidence, not for the Court on summary judgment. Thus, City Defendants' motion for reconsideration of the Court's ruling on punitive damages against Chief Kennedy and Gansert will be denied.

#### D. Municipal Liability

**\*4** City Defendants argue the Court overlooked Third Circuit case law which entitles the City to summary judgment on the question of municipal liability. Specifically, City Defendants argue Plaintiffs failed to provide evidence that an identified policymaker for the City either acquiesced in, knew, or should have known about the allegedly discriminatory conduct directed at Plaintiffs. The Court agrees that its previous finding on this question was in error.

To establish municipal liability under § 1983, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990), A plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the plaintiff's

injury. *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." *Kneipp v. Tedder,* 95 F.3d 1199, 1212 (3d Cir.1996) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." *Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

Hence, there are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights.' " *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 584 (3d Cir.2003) (footnote and citations omitted).

The Court previously overlooked Plaintiffs' failure to identify a policymaker who was the moving force behind the purported custom of discrimination by Sea Isle City officials. While Plaintiffs' evidence certainly could provide evidence of a custom of race discrimination that is "so widespread as to have the force of law," they have not produced facts identifying a particular decisionmaker behind that alleged custom. As such, the Court will grant City Defendants' motion for reconsideration on this issue and grant Sea Isle City summary judgment.

#### E. Felsing's Liability With Respect to Anequa and Glendon

**\*5** Felsing asks this Court again to grant him summary judgment on any claims Anequa and Glendon assert against him. He bases his argument on the absence of evidence of any interaction between him and the children. On this point, the Court will clarify its prior opinion. The Court does not

*Joyce v. Sea Isle City, Not Reported in F.Supp.2d (2008)*

construe the facts alleged by Anequa and Glendon as asserting any individual claims against Felsing. Nevertheless, Plaintiffs do offer facts supporting the existence of a conspiracy to violate Plaintiffs' civil rights, including Glendon's and Anequa's, of which a jury could reasonably find Felsing to be a member. Following Waters-Rice's arrest, in which Felsing played a key role, Waters-Rice filed a lawsuit. Thereafter, Glendon and Anequa testified they continued to suffer harassment by police and began to suffer retaliation at school. Therefore, despite the lack of interaction between Felsing and the children, Felsing could be liable for the acts of his alleged coconspirators towards Anequa and Glendon.

### F. Statute of Limitations

Felsing argues further that the Court erred in finding Plaintiffs were sufficiently diligent in substituting Felsing for a fictitious party in their amended complaint. The Court cannot discern any law or facts that were overlooked in making its prior determination of this issue. True, Plaintiffs knew Felsing was involved in Plaintiffs' arrest based on the Officer Information Form; however, Plaintiffs had no reason to know Felsing's involvement was actionable until they deposed Gansert and him. Only during those depositions did Plaintiffs learn Felsing was the source of the false statement that Waters-Rice had expressed her intent to come back to the school. That newly acquired knowledge supplied Plaintiffs with facts to support a malicious prosecution claim. Until then, Plaintiffs could not have alleged the requisite element that Felsing acted maliciously or for a purpose other than bringing the plaintiff to justice. Moreover, there is no suggestion that Plaintiffs delayed unreasonably in conducting discovery in this case. Accordingly, Felsing's motion for reconsideration on the Court's disposition of his statute of limitations argument will be denied.

### G. Davenport

Davenport seeks reconsideration in three respects. First, she argues the Court overlooked facts entitling her to summary judgment on Plaintiffs' malicious prosecution claim. Second, she suggests the Court neglected to state any basis for denying her summary judgment on Plaintiffs' NJLAD hostile school environment claim against her. Lastly, Davenport argues she should not be liable for any of Plaintiffs' damages because the Court failed to recognize that Plaintiffs have no evidence that she personally caused any of their harm.

The Court did not interpret Plaintiffs' amended complaint as including a malicious prosecution claim against Davenport

for her own actions. This understanding is confirmed by Plaintiffs' recitation of their surviving claims following the Court's disposition of Defendants' summary judgment motions, which states their Fourth Amendment claims are "not applicable" as to Davenport. (*See* 4/9/08 letter from Steven Coren to Magistrate Judge Schneider.) Nevertheless, Davenport could be found liable for the wrongful acts of her alleged coconspirators, including malicious prosecution.

**\*6** Concerning Davenport's second argument, this Court finds no basis to alter its original disposition; however, the Court will briefly clarify it. Under the NJLAD, it is unlawful "[f]or any person ... to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [under the NJLAD]." N.J. Stat. Ann. 10:5-12(e). Liability under this provision can be grounded in the failure to stop harassment. *Hurley v. Atl. City Police Dep't,* 174 F.3d 95, 127 (3d Cir.1999). While section 10:5-12(e) has not before been extended to the context of a hostile school environment, this Court can find no reason why the New Jersey Supreme Court would not see fit to do so in light of *L.W. ex rel. L.G. v. Toms River Regional Schools Board of Education,* 189 N.J. 381, 915 A.2d 535 (N.J.2007), which recognized a cause of action for hostile school environment under the NJLAD. Davenport, a school administrator charged with overseeing Glendon's special needs, testified she knew Glendon was suffering racial harassment at school, and evidence suggests that harassment continued despite her knowledge. In addition, she took what could be construed as retaliatory actions towards Glendon after his mother filed a lawsuit against the school alleging race discrimination. Accordingly, Glendon's hostile school environment claim against Davenport under the NJLAD properly survives.

Finally, the evidence could lead the factfinder to determine that Davenport contributed to Glendon and Anequa's harm, either based on her own alleged retaliation or her participation in the purported conspiracy. *See Morganroth & Morganroth v. Norris, McLaughlin & Marcus,* P.C., 331 F.3d 406, 414 (3d Cir.2003) ("Proof of a conspiracy makes the conspirators jointly liable for the wrong and resulting damages" (quoting *Bd. of Educ., Asbury Park v. Hoek,* 38 N.J. 213, 183 A.2d 633, 646 (1962))). Hence, Davenport's motion for reconsideration on the question of her liability for damages will be denied.

### H. Tegler

Tegler asks for reconsideration of the denial of her summary judgment motion, arguing there are no facts to support her involvement in the alleged conspiracy. Tegler, however, has

raised no facts or law the Court overlooked in reaching its decision. Plaintiffs have put forth enough evidence from which a jury could reasonably find Tegler participated in a conspiracy to violate Plaintiffs' civil rights. Thus, her motion for reconsideration will be denied.

## IV. CONCLUSION

Based on the foregoing reasoning, the Court will grant City Defendants' motion on Plaintiffs' claims against Sea Isle City. City Defendants' motion will be denied in all other respects. The Court will deny Felsing's, Davenport's, and Tegler's motions for reconsideration in their entirety. An accompanying Order shall issue today.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2875456

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit H

# *Lewis v. Airco, Inc.*

Superior Court of New Jersey, Appellate Division

October 6, 2010, Argued; July 15, 2011, Decided

DOCKET NO. A-3509-08T3

**Reporter**

2011 N.J. Super. Unpub. LEXIS 1914 *; 2011 WL 2731880

JEANNETTE LEWIS, Administratrix of the ESTATE OF NICHOLAS LEWIS, SR., and JEANNETTE LEWIS, Individually, Plaintiff-Appellant/Cross-Respondent, v. AIRCO, INC., as successor in interest to AIR PRODUCTS AND CHEMICALS, INC.; ALLSTATE INSURANCE COMPANY; HONEYWELL INTERNATIONAL, INC., f/k/a ALLIED SIGNAL, INC., individually and as successor in interest to ALLIED CHEMICAL CORPORATION; THE AMERICAN CHEMISTRY COUNCIL, f/k/a/ THE CHEMICAL MANUFACTURERS ASSOCIATION and THE MANUFACTURING CHEMISTS ASSOCIATION; BRIDGESTONE/FIRESTONE, INC., individually and as successor in interest to THE FIRESTONE TIRE & RUBBER COMPANY and FIRESTONE PLASTICS COMPANY, a division of THE FIRESTONE TIRE & RUBBER CO.; CONDEA VISTA COMPANY, individually and as successor in interest to CONOCO, INC., individually and as successor in interest to the CONTINENTAL OIL COMPANY and THOMPSON-APEX COMPANY and CONOCO CHEMICALS; THE DOW CHEMICAL COMPANY, individually and as successor to UNION CARBIDE CORP.; ETHYL CORPORATION; GENCORP, individually and as successor in interest to GENERAL TIRE AND RUBBER COMPANY; POLYONE CORPORATION, f/k/a/ THE GEON COMPANY; GEORGIA GULF CORPORATION, as successor in interest to GEORGIA PACIFIC CORPORATION; GOODYEAR TIRE AND RUBBER COMPANY; GULF OIL CORPORATION, individually and as successor in interest to CHEVRON U.S.A., INC.; PHARMACIA CORPORATION f/k/a MONSANTO COMPANY;[1] NEW JERSEY MANUFACTURERS INSURANCE CO.; OCCIDENTAL CHEMICAL CORPORATION, individually and as successor in interest to OCCIDENTAL ELECTROCHEMICALS CORPORATION and HOOKER CHEMICAL CORPORATION and DIAMOND SHAMROCK CHEMICALS COMPANY and DIAMOND CHEMICALS COMPANY and DIAMOND SHAMROCK CORPORATION and DIAMOND ALKALI COMPANY; OCCIDENTAL ELECTROCHEMICALS CORPORATION; OLIN CORPORATION; PACTIV CORPORATION; PANTASOTE, INC.; RHONE-POULENC, INC., individually and as successor in interest to STAUFFER CHEMICAL COMPANY; THE SOCIETY OF THE PLASTICS INDUSTRY, INC.; TENNECO AUTOMOTIVE, INC.; TENNECO, INC.; EPEC POLYMERS, INC., as successors to TENNECO OIL COMPANY; SENTRY INSURANCE COMPANY; SHINTECH, INC., UNION CARBIDE CORPORATION; UNIROYAL, INC., individually and as successor in interest to U.S. RUBBER COMPANY; WHITTAKER CORPORATION, individually and as successor to GREAT AMERICAN CHEMICAL CORPORATION; LIBERTY MUTUAL CORP., and ZENECA, INC., f/k/a ICI AMERICAS, INC., Defendants, and GOODRICH CORPORATION, f/k/a B.F. GOODRICH COMPANY; PPG INDUSTRIES, INC.; SHELL OIL COMPANY, individually and as successor in interest to SHELL CHEMICAL, INC. and SHELL CHEMICAL COMPANY; and HEXION SPECIALTY CHEMICALS, INC., f/k/ a/ BORDEN CHEMICAL, INC., Defendants-Respondents/Cross-Appellants. OIL COMPANY, individually and as successor in interest to SHELL CHEMICAL, INC. and SHELL CHEMICAL COMPANY; and HEXION SPECIALTY CHEMICALS, INC., f/k/ a/ BORDEN CHEMICAL, INC., Defendants-Respondents/Cross-Appellants.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History: [*1]** On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-10503-02.

**Counsel:** Mark R. Cuker argued the cause for appellant/cross-respondent (Williams Cuker Berezofsky and Ron Simon (Simon & Associates) of the

---

[1] Incorrectly designated in the third-amended complaint as Monsanto Corporation.

Washington D.C. bar, admitted pro hac vice, attorneys; Mr. Cuker, of counsel and on the brief).

Thomas L. Feher (Thompson Hine, LLP) of the Ohio bar, admitted pro hac vice, argued the cause for respondents/cross-appellants Goodrich Corporation, PPG Industries, Inc., and Shell Oil Company (Lowenstein Sandler, PC, and Mr. Feher, attorneys; David W. Field and Priya R. Masilamani, of counsel; Mr. Field, on the brief).

Timothy E. Corriston argued the cause for respondent/cross-appellant Hexion Specialty Chemicals, Inc. (Connell Foley, L.L.P., attorneys; Mr. Corriston, of counsel; Mr. Corriston and Andrew B. Buckman, on the brief).

**Judges:** Before Judges Fuentes, Gilroy and Ashrafi.

# Opinion

PER CURIAM

This is an occupational-exposure, toxic-tort products liability action. Plaintiff, Jeannette Lewis, as Administratrix of the Estate of Nicholas Lewis, Sr. (Lewis), and individually, appeals from the December 15, 2008 order that barred the trial testimony of two of her liability experts; **[*2]** and from the February 5, 2009 order that denied her first motion for reconsideration and granted defendants Goodrich Corporation (Goodrich), PPG Industries, Inc. (PPG), Shell Oil Company (Shell), and Hexion Specialty Chemicals, Inc. (Hexion) (collectively, the defendants) summary judgment. Plaintiff also appeals from the March 20, 2009 order that denied her second motion for reconsideration.

Goodrich, PPG, and Shell cross-appeal from: the November 8, 2007 order that denied their motions for summary judgment on plaintiff's inadequate warning and civil conspiracy claims; the May 29, 2008 order that denied their motions for reconsideration; the December 15, 2008 order that denied their motions seeking to bar the testimony of two of plaintiff's liability experts; and the February 5, 2009 order that denied their motions for reconsideration of the order that denied summary judgment on plaintiff's inadequate warning claims based on the state-of-the-art defense. In a separate cross-appeal, Hexion appeals from the same orders as the other three defendants. We reverse on the appeal, and affirm in part and reverse in part on the cross-appeals.

I.

Prior to his death on December 31, 2000, Lewis had **[*3]** worked at the Pantasote, Inc., manufacturing facility in Passaic from 1961 to 1989. At its facility, Pantasote manufactured polyvinyl chloride (PVC)[2] resins and products. Vinyl chloride monomer[3] (VCM) (also known in the industry as vinyl chloride), an established carcinogen, is used in the production of PVC. Although occupational exposure to VCM has been causally associated with angiosarcoma (ASL), an extremely rare form of liver cancer, Lewis' cause of death was not from ASL, but rather from hepatocellular carcinoma (HCC), the most common form of liver cancer. In June 2003, believing that her husband's death was caused by exposure to VCM at the Pantasote facility, plaintiff filed a third-amended complaint against numerous parties, including those that manufactured and/or supplied VCM to Pantasote. The third amended complaint alleged causes of action sounding in negligence, products liability failure-to-warn of the risks caused by exposure to VCM, and civil conspiracy to fraudulently conceal those risks from the public.

On December 8, 2006, defendants filed motions for summary judgment on the fraud, civil conspiracy, and inadequate warning claims. On November 8, 2007, the court entered an order supported by an oral decision of October 25, 2007, granting the motions on the fraud claim, but denying the motions on the civil conspiracy and inadequate warning claims.

Also on December 8, 2006, defendants filed motions to exclude the trial testimony of plaintiff's four experts: Dr. Peter Infante, an epidemiologist; Dr. Howard Kipen, an occupational physician; Dr. David Groth, a pathologist; and James Jones, an industrial hygienist. On December 3, 2008, following an extensive *N.J.R.E. 104(a)* hearing in January and May 2008, the court granted the motion as to Infante and Kipen, determining that their conclusions that VCM exposure caused HCC were not sufficiently reliable, but denied the motion as to Groth, and as to Jones in part. The court entered a memorializing order on December 15, 2008.

_____

[2] A glossary of the acronyms frequently used throughout this opinion is set forth in the attached appendix.

[3] The term "monomer" means "a simple molecule that can form **[*4]** polymers by combining with identical or similar molecules." *Webster's New World Dictionary* 878 (3d ed. 1996).

2011 N.J. Super. Unpub. LEXIS 1914, *4

In December 2008, defendants filed a motion for summary judgment contending that plaintiff could not prove general [*5] and specific causation without Infante's and Kipen's testimony. Plaintiff filed a cross-motion for reconsideration of the order barring not only those two experts from testifying at trial, but also from barring Jones' testimony in part. On February 5, 2009, the trial court entered an order supported by an oral decision of February 3, 2009 denying plaintiff's motion for reconsideration and granting defendants' motions for summary judgment dismissing the complaint. On February 20, 2009, plaintiff filed a second motion for reconsideration. The court denied the motion on March 20, 2009.[4]

II.

A. Vinyl Chloride and the Pantasote Facility and the Manufacturing Process.

Under normal pressure, VCM is a colorless flammable gas that has a mild sweet odor detectable at concentrations between 2,000 and 3,000 parts per million (ppm). According to a 1992 United States Environmental Protection Agency (USEPA) publication, inhaled VCM has been shown to increase the risk of developing ASL. Acute short [*6] term exposure to high levels of VCM affects the central nervous system. Long-term exposure is linked to liver damage and acroosteolysis, a degenerative disease causing loss of bone tissue in the hands and sensitivity to cold.

Pantasote manufactured PVC resins and products, including vinyl film and sheeting, plasticized compounds, and thermoformed products. In 1957, Pantasote manufactured PVC resins in plant 1, and in 1960 Pantasote expanded production to include the larger plant 2. Until 1984, the facility used about 145,000 pounds of VCM a day to produce approximately 160,000 pounds of PVC, operating twenty-four hours a day, seven days per week, with three rotating shifts of workers. Goodrich, PPG, and Shell supplied VCM to the plant; Hexion did not. Pantasote ceased production in 1984 and demolished the plants.

Former Pantasote employees described the Pantasote facility and the PVC manufacturing process, in relevant part, as follows. Liquefied VCM was shipped to the facility in 10,000 to 22,000 gallon rail tank cars and unloaded to underground storage tanks. VCM was then piped in a closed system, from the storage tanks to polymerization reactors where, under pressure, it was combined [*7] with deionized water and a suspending agent to produce a PVC slurry. The polymerization process took between eight to twelve hours to complete. The reactor building was ventilated by ceiling and side-mounted fans, which forced air through ducts to bag houses and separators, prior to venting into the atmosphere.

After the polymerization process was completed, the PVC slurry was first transferred to outside storage tanks and then to a centrifuge and a dryer. The resultant powdered blend of PVC was air-conveyed through a dust collector, a sifter, and then to a bagging machine. The bags of PVC resin were stored in an adjacent warehouse for shipment, or for manufacturing products at the plant.

In the compounding process, bags of PVC resin were mixed with various additives such as plasticizers, fillers, and stabilizers, to produce PVC compounds. PVC products were manufactured in a semi-closed process in the calendaring buildings, where the compounded product was rolled into thin sheets of plastic. The buildings were ventilated by ceiling and hood exhaust fans.

B. The Workers' Exposure.

Lewis worked at the Pantasote plant as a service operator, chemical operator, or yardman. Although the record [*8] indicates that these titles were interchangeably used throughout his employment, Lewis was in charge of unloading VCM from the rail tank cars into the underground storage tanks, regenerating the water and demineralization units in the reactor buildings, transporting bags of PVC resin by forklift to various places within the plant, and measuring levels of PVC resins in the storage silos.

Lewis' co-workers testified at depositions that VCM had been released into the ambient air in the workplace at levels high enough to have had a detectable odor, either from leaks or from the normal manufacturing process. Joseph Genardi, a co-worker who performed the same job as Lewis, testified that he smelled VCM, which he described as having a "sweet smell," when he unloaded the rail tank cars in the closed pump house. It generally took Genardi three and one-half to five hours to unload

---

[4] During the course of the action, all other defendants either settled or were dismissed from the action. Plaintiff also dismissed her failure-to-warn claim against Hexion, but not the civil conspiracy claim.

the cars. The unloading process involved removing plugs from the tank car valves, attaching lines to the valves, opening the valves, and adjusting the air pressure to force VCM into the underground storage tanks. According to Genardi, there were "always leaks" in the valves, and sometimes in the fittings and gaskets, [*9] and when the transfer was completed, the lines to the tank cars were disconnected and any remaining VCM in the line was released and then vented outside the pump house.

Further, Genardi said he always smelled VCM in the reactor rooms, where he and Lewis worked. During a typical shift, Genardi entered the reactor room in plant 1 every hour, and entered the reactor room in plant 2 twice each shift. He was exposed to VCM when the reactors were opened, when slurry was dumped into the sewers, and when the seals in the reactor rooms were broken and VCM had to be vented out into the atmosphere because otherwise, the whole reactor building would become "filled with vinyl chloride."

Genardi also smelled VCM in the warehouse when he transported the bags of PVC resin by forklift. About three times a week a bag of PVC powder broke, spilling its contents into the warehouse. He said he "would actually smell, not strong, very faintly you would smell vinyl chloride and the resin . . . . It's a smell you never forget."

Michael Rapavi, Lewis' foreman, testified at depositions that prior to 1975, he often smelled VCM in the reactor rooms, in the vicinity of the slurry tanks, in the warehouse, and toward [*10] the front area of the plant if the wind was blowing in that direction and if VCM was being vented out from one of the buildings. Lewis' son, Nicholas Lewis, Jr., who began working at the facility in 1976, testified that once while he was walking outside plant 1, he asked his father what that odor was, and his father responded that he "believed" it was VCM. Lewis, Jr., also smelled VCM by the unloading area near the railcars and outside the storage area.

C. Exposure Limits, Toxicity and Monitoring of VCM.

Although VCM was known to be highly flammable and had anesthetic effects when inhaled in high concentration, it was initially considered to be very low in toxicity. In 1947, the American Conference of Government Industrial Hygienists (ACGIH) recommended a maximum allowable concentration (MAC) of exposure to VCM of 500 ppm. MACs, subsequently renamed "threshold limit values" (TLV),

are the maximum average concentrations of contaminants to which workers may be safely exposed in an eight-hour day. Also in 1947, an experiment, the Seeler study, revealed no signs of toxicity to animals fed a diet supplemented with PVC.

The "Chemical Safety Data Sheet SD-56" (SD-56), published in 1954 by the [*11] Manufacturing Chemists Association (MCA), of which Pantasote and defendants were members, reflected that assessment, and provided that "[a]side from the risk of fire and explosion, vinyl chloride presents no other very serious problem in general handling. The presently accepted upper limit of safety as a health hazard is 500 ppm."

However, in 1959, the industry learned that there were indications of VCM toxicity in ongoing laboratory animal experiments conducted by Dow Chemical scientists, T.R. Torkelson and V.K. Rowe. The Torkelson study exposed rats and other small animals to VCM levels ranging from 50 ppm to 500 ppm, levels that had been considered safe for human exposure, for seven hours a day over the course of seven months.

In a letter dated May 12, 1959, Rowe, commented on the ongoing Torkelson study, and informed the Director of Goodrich's Department of Industrial Hygiene and Toxicology that the 500 ppm threshold established by the ACGIH was based on a flawed animal study. Rowe wrote that "[w]e feel quite confident . . . that 500 ppm is going to produce rather appreciable injury when inhaled 7 hours a day, five days a week for an extended period." In another comment on the study [*12] in an interoffice correspondence dated November 24, 1959, a Union Carbide employee wrote that

> [a]n off-the-record phone call from V.K. Rowe gives me incomplete data on their current repeated inhalation study. Six months at 500, 200 and 100 [ppm] has not found a no-effect level. Even 100 [ppm] produced organ weight changes and gross pathology, with micropathology expected. [VCM] is more toxic than has been believed.

An experiment conducted and published in 1960 by E. Mastromatteo and others also found some congestion in the livers of laboratory animals exposed to high levels of VCM. And, the Torkelson study, published in 1961, concluded that VCM exposure had a "slight capacity" to cause liver damage in laboratory animals. The authors recommended that the TLV be lowered to 50 ppm, and Dow began applying this exposure value in some of its plants.

However, in a subsequent study published by D. Lester and others, the authors found only increased liver weights in rats exposed to VCM, changes they did not consider significantly pathologic. Thus, they concluded that a TLV of 500 ppm for VCM "seems to offer an adequate margin of safety for human exposure."

Faced with these differing results, in **[\*13]** 1962, the ACGIH sided with Lester, and found that, although the available data concerning the toxicity of VCM was "conflicting, the preponderance indicates a compound of relatively low toxicity with which a threshold limit of 500 ppm is consistent."

In 1963, Goodrich began testing employees at its Louisville plant for liver function. In a letter dated June 7, 1965, Rex Wilson, a physician employed by Goodrich, stated that it had been his experience that VCM is a "hepatoxin when exposure is prolonged and high in amount."

In the mid-1960's, reports surfaced linking VCM exposure to acroosteolysis in humans. In Wilson's 1967 published report of thirty-one cases of acroosteolysis, twenty-seven of the workers were autoclave workers, that is, they cleaned polymer from PVC reactors. Goodrich reported observations of acroosteolysis in some of its PVC workers at an October 6, 1966 MCA meeting. Some industry members predicted that the TLV level for VCM would be reduced to 50 ppm.

As a result, Pantasote installed a hydraulic washing system in plant 2, which obviated the need for autoclave workers to enter the reactor vessel and clean the walls. It also installed additional exhaust fans to increase **[\*14]** ventilation, and restricted access to the reactor areas and tank farms to only essential personnel in plants 1 and 2.

In August 1968, scientists employed by Dow Chemical Company presented a report at the Gordon Research Conference on Industrial Hygiene that suggested "long-term weighted exposures at or above 300 ppm could result in adverse functional changes." In 1970, the newly created Occupational Safety & Health Administration (OSHA) followed the established exposure limits and set federal standards for VCM of 500 ppm, the maximum average concentration of VCM to which a worker could be exposed in an eight-hour workday.

In that same year, P. L. Viola, an Italian researcher, presented his findings at a conference, reporting that rats developed cancerous tumors of the skin, lungs and

bones after being exposed to 30,000 ppm of VCM four hours a day, five days a week, for twelve months. The results were subsequently published in 1971, with Viola stating that "[n]o implications to human pathology can be extrapolated from the experimental model reported in this paper."

The Viola study was extensively discussed by members of the VCM industry. On November 16, 1971, a Pantasote representative **[\*15]** attended an MCA meeting during which the results of the Viola study were described. The association's members agreed to sponsor independent research regarding the carcinogenicity of VCM. The MCA also found that "[t]he seriousness of Dr. Viola's findings, if properly substantiated, can have potentially damaging results for the entire vinyl chloride industry."

In 1972, the MCA revised SD-56, warning that "[c]hronic overexposure [to vinyl chloride] may produce liver injury." It stated that "[r]ecent research studies from Italy indicate that repeated, long-term high level exposures of rats to [VCM] vapor can result in the development of malignant tumors. However, many years of industrial experience . . . have not demonstrated any carcinogenicity to humans." And, it stated that VCM "does not present a serious industrial health hazard provided workers are adequately supervised and observe the proper means of handling it." OSHA "has set a 500 ppm Ceiling Value on permitted employee exposures. Based upon animal and human observations, this level provides considerable margin of safety for industrial exposures." However, in 1970 ACGIH recommended that the TLV level for VCM exposure be reduced **[\*16]** from 500 to 200 ppm.

In November 1972, several members of MCA, including defendants, executed a "Secrecy Agreement," securing release of data, and pledging not to reveal information outside the organization about a European animal study on the effects of VCM, which was being conducted by Cesare Maltoni at the University of Bologna. The MCA learned that Maltoni had found positive carcinogenic effect in rats at doses of 250 ppm of VCM, and one case of ASL.

At a meeting in February 1973, MCA members expressed the need to defocus their concern about carcinogenicity and VCM, and to refute the European research. In July of 1973, an MCA task force met with OSHA, but withheld information about the European studies and called into question the results of the Viola

study.

On January 23, 1974, Goodrich issued a press release disclosing that three of its VCM-exposed workers at its Louisville plant had died of ASL; two died in 1973, and the third died in 1971. Four other deaths from ASL were reported at Goodrich's plant in Shawinigan, Quebec, with the earliest death occurring in 1968. As a result, in April 1974, OSHA issued a temporary emergency VCM exposure limit of 50 ppm, and effective April 1975, [*17] set a permissible exposure limit of 1 ppm as an eight-hour time-weighted average, and 5 ppm as a ceiling value averaged over a period exceeding fifteen minutes. *29 C.F.R. § 1910.1017 (2010).* Areas exceeding that standard were designated as "regulated areas."

In conformance with those standards, Pantasote installed a monitoring system in plants 1 and 2, areas that had exceeded the OSHA standard. All other areas, including calendaring, compounding, and thermoforming, did not exceed the OSHA action level.

No sampling data for the period prior to 1974, other than as set forth by Pantasote in correspondence to the USEPA, was available for the facility. For example, in a memo to the USEPA, dated June 14, 1974, Pantasote reported that atmospheric levels of VCM at the plant perimeter, on the side where tank cars were unloaded and the reactor was located, ranged from .9 to 5.5 ppm. Pantasote used devices to collect PVC emissions, including a monomer recovery system, dust collectors, and vent bags on the storage silos. The systems collected approximately 8% of the total monomer used. It estimated that without the systems, 724 pounds of PVC per hour would be released into the atmosphere, and that [*18] the systems reduced emissions to about .36 pounds per hour.

On October 17, 1974, a representative from the National Institute for Occupational Safety and Health (NIOSH) visited the Pantasote facility and reported that the company had an

> active health, safety, and sampling program and [is] interested in cooperating with the NIOSH survey program. [It is] concerned that the vinyl chloride levels may be somewhat higher in their processing plant in that it is located between the two . . . [PVC] resin production plants. Information on vinyl chloride is transmitted to their employees through union-management meetings . . . and direct meetings [with] the resin plant employees.

> Sampling is conducted in the resin . . . and processing plants . . . . The sampling program is under constant change to comply with OSHA regulations. The . . . samples are analyzed in [its] laboratories at this site.

In interoffice correspondence dated March 23, 1976, Pantasote reported that there had been high exposure levels of VCM loose at all times since the plant opened in 1958, and that the company was doubtful that they could lower the exposure levels to comply with the federal standards.

By the mid-1970's, Pantasote [*19] conducted medical tests on its plant employees, including Lewis. Not only were signs posted in the plant warning that VCM was a "Cancer Suspect Agent," but also warnings were imprinted on the bags of PVC manufactured at the plant. Pantasote also provided some of its workers with respirators, although Lewis, Jr., testified that his father did not use one.

Industry-wide, occupational exposure to VCM decreased substantially after 1975. In 1981, the Pantasote plant reduced the content of VCM in the PVC resin, thereby further lowering VCM exposure.

D. Expert Evidence (Exposure and Warning).

James Jones, a certified industrial hygienist, was first contacted by plaintiff sometime after Lewis' death, and after demolition of Pantasote plants 1 and 2. Jones received a B.S. in chemical engineering and completed some graduate work. As an undergraduate, he worked at Goodrich's Louisville plant. Later, at the NIOSH, he directed the exposure assessment portion of its VCM study, and gathered data on employee exposures to VCM by visiting six or seven PVC production facilities. In 1974, he assisted the NIOSH director in preparing to testify before OSHA concerning establishing new exposure limits for VCM.

Jones [*20] opined that from 1961 to 1974, Lewis had been exposed to a significant quantity of VCM. He explained that no quantitative exposure sampling data existed prior to 1974, and that because Pantasote's manufacturing facility no longer existed he was not able to monitor the current exposure levels. Thus, he relied significantly upon VCM odor threshold levels to estimate Lewis' exposure. He used a 2,000 ppm odor threshold, as set forth in some scientific literature, although the USEPA had established a higher threshold of 3,000 ppm, and VCM manufacturers had shown thresholds ranging upwards between 1,200 to 3,800 ppm. He

explained that whenever a worker smelled VCM, that worker would have then already been exposed to VCM levels above 2,000 ppm, which he said constituted a "substantial exposure."

Jones concluded, based on Lewis' job functions, the reports of pervasive odor of VCM at the facility, and Jones' experience in other PVC plants, that Lewis had been exposed to in excess of 40 to 50 ppm of VCM annually, or a cumulative minimum exposure, from 1961 to 1974, of 520 to 650 ppm. He opined in his report that Lewis'

> VCM exposure would have been variable, but . . . [Lewis] would have been regularly **[*21]** exposed to levels that were very high (probably in the thousands of ppm range) while unloading VCM tank cars and because of ambient VCM concentrations caused by the release of VCM from reactors and resin storage silos. He did not [wear] a respirator during this time [.] . . . Lewis' [cumulative] VCM exposure would likely be in excess of 500 ppm-years [i.e., over the years he worked at Pantasote], primarily because of exposure before 1974.

Jones further testified that the exposure warnings given to the Pantasote workers prior to 1974, about the risk of developing liver damage from exposure to VCM were inadequate. By 1970, defendants were aware of animal studies linking VCM exposure to liver cancer, reports that workers in foreign PVC plants developed liver damage, and recommendations in the scientific literature that VCM exposure levels should be lowered to 50 ppm. Jones concluded in his report:

> [I]n light of these multiple indications that VCM was harmful to workers at exposure levels as low as 50 ppm and the finding of cancer in VCM exposed animals, users of VCM should have begun monitoring and controlling exposures to VCM, and suppliers of VCM and the MCA should have lowered their **[*22]** exposure recommendations at least as early as 1961 and given adequate warning of the various health effects found in humans and animals. If this had been done, worker exposure levels at this plant would likely have been lowered much earlier than 1974, and the potential for harm, such as liver disease and cancer, to . . . Lewis, and other workers would also have been significantly reduced.

E. Lewis' Diagnosis.

In August 2000, Lewis, then seventy-five years old, physically active, with no history of hepatitis or alcohol abuse, was diagnosed with "metastatic disease to the liver and adrenals." During an examination conducted on November 2, 2000, Dr. Michael Maroules reported that Lewis had "widely disseminated cancer." A computerized tomography (CT) scan revealed that Lewis had a huge tumor in his liver, measuring in excess of 15 centimeters, multiple tumors in his lungs, and tumors in his adrenal glands. Lewis died on December 31, 2000.

It was undisputed that Lewis had not developed ASL. ASL is a sarcoma, or cancer of the connective tissue, which develops in the endothelial lining or sinusoidal cells, and is causally associated with exposure to VCM. HCC, accounting for approximately 80% **[*23]** of all primary liver cancers, is a carcinoma or cancer of the epithelial tissue, which develops in the hepatocytes or liver cells. The major risk factors for developing HCC are infection with the hepatitis-B and -C viruses, and the abuse of alcohol.

There was, however, some dispute as to whether Lewis had primary HCC, and whether the cancer had metastasized from, not to, his liver. Most malignant liver tumors metastasize to the liver from other areas of the body, but there are six types of cancers that originate in the liver, including HCC and ASL. Some records indicated that Lewis' tumor had metastasized to his liver. For example, a radiologist's report dated October 18, 2000, indicated that Lewis' CT scan findings were "consistent with metastatic disease." In Dr. Maroules' oncology report dated November 2, 2000, he stated that a "CT guided biopsy of the liver revealed malignancy, possibly endocrine." Maroules also noted in his report that the biopsy results were "consistent for endocrine source," but testified at depositions that he could not "definitely say what kind of cancer [Lewis] had." Moreover, Lewis' cause of death was listed on the death certificate as "[m]etastatic carcinoma **[*24]** to the liver, primary unknown."

However, other records supported a diagnosis of HCC. A November 7, 2000, pathology report revealed that the tests results "favor hepatocellular carcinoma." The hospital discharge summary, dated November 12, 2000, listed a final diagnosis of "[h]epatocellular carcinoma with metastasis." Another pathology report dated November 14, 2000, stated that the results of a fine needle aspiration were "suggestive of hepatocellular carcinoma."

Dr. David Groth, a board certified pathologist, opined that Lewis had primary HCC that metastasized to his lungs, possibly his adrenal glands, and caused his death. In reaching that conclusion, Groth noted that Lewis' liver tumor was about the size of a grapefruit, and was one of the largest, if not the largest, tumor he had ever seen in the thousands of cases of cancer he had studied. According to Groth, Lewis also had several small nodules in his liver, a common finding when the primary liver tumor was greater than 5 centimeters in diameter, and Lewis had elevated levels of alpha-fetoprotein, which is consistent with primary HCC.

Groth examined ten of Lewis' fifty biopsy slides before rendering his report, and another ten before **[*25]** his pre-trial deposition. He explained that the tissue of a malignant tumor will look similar to the tissue of the primary source. The slides revealed a canaliculi pattern, which are only found in the liver, thereby indicating that the primary source of the cancer was the liver. However, Groth admitted that at the time he prepared his report he had not viewed the actual slide revealing the canalicular pattern, but instead had derived that information from the pathology report. In a later certification pre-dating the *Rule 104* hearing, Groth stated he subsequently reviewed Lewis' fifty pathology slides, and found there was "nothing . . . on the remaining slides to change" his opinion that Lewis had died from HCC.

Groth explained that the blood test results ruled out several other types of cancer including adenocarcinoma, melanoma, pancreatic, prostrate, and carcinoid tumors, which generally occur in the lungs or the gastrointestinal tract. Groth also ruled out lung cancer as the primary source, because the multiple small nodules found in Lewis' lungs indicated that the cancer had metastasized to the lungs.

F. Causation.

Dr. Peter Infante, an epidemiologist, specialized in evaluating occupational **[*26]** exposures and co-authored more than 100 peer-reviewed articles, some of which concerned the effects of exposure to VCM. He had been responsible for industry-wide epidemiological studies, including studies of VCM at NIOSH, and was a director of the department at OSHA that set permissible limits for workplace toxic exposure.

Infante also had served on the World Health Organization's International Agency for Research on Cancer (IARC) committee on the "Evaluation of the Carcinogenic Risk of Chemicals to Humans" from 1977 to 1979. The IARC evaluates data, determines the carcinogenicity of various agents, examines whether agents cause human cancer, and publishes monographs[5] containing critical reviews of the data on carcinogenicity. The IARC classifies agents into four categories; group one is reserved for substances known to be carcinogenic to humans. OSHA relies on IARC evaluations in determining what information industries must include on their labels and on the material safety data sheets (MSDS).

Infante opined that not only is occupational exposure to VCM a cause of HCC in humans, but also a significant contributing factor and likely cause of Lewis' HCC. He explained that at least one laboratory animal study in the early 1970's had shown VCM exposure caused ASL in animals, and that VCM exposure was first identified as a human carcinogen in 1974 as a result of Goodrich's case reports that three of its employees had died from ASL. Although admitting that HCC and ASL are different types of liver cancer that have "different cell type origination," Infante explained that epidemiological and animal studies conducted after 1974 demonstrated to a statistically significant degree that exposure to VCM causes ASL and HCC.

In determining general causation, Infante primarily relied on two extensive and several minor epidemiological studies published in peer-reviewed scientific literature. In the first extensive study published by Otto Wong and others in 1991, the authors performed an update of a 1973 cohort study,[6] which tracked the mortality of

_____

[5] "Monograph" means "a learned detailed thoroughly documented treatise covering exhaustively a small area of a field of learning." *Kanter v. Warner-Lambert Co., 99 Cal. App. 4th 780, 122 Cal. Rptr. 2d 72, 77 n.2 (Ct. App. 2002)* **[*27]** (quoting *Webster's Third New International* Dictionary 1462 (1986)).

[6] "Cohort studies" in the context of epidemiology are "studies that 'involve the identification of two groups of individuals: 1) individuals exposed to a substance that is considered a possible cause of disease; and 2) individuals who have not been exposed. The study takes place over a specified period; researchers determine the proportion of individuals in each group who develop the disease of interest. Where a particular agent causes the disease, one should expect a higher proportion of exposed individuals to develop the disease as compared to those who had **[*29]** no exposure.'" *Knight v. Kirby Inland Marine, Inc., 482 F.3d 347, 352 n.2 (5th Cir.*

10,173 workers exposed to VCM from thirty-seven North American plants. The cohort [*28] study compared the number of exposed-workers who had died of cancer with the expected number of cases in the unexposed general population. They acknowledged that, "[w]hile there is little doubt about the relationship between occupational exposure to vinyl chloride and [ASL]," as of 1991 there was still controversy about the association between vinyl chloride and other cancers. Thus, the update was conducted to "monitor the mortality pattern of the cohort of vinyl chloride workers and attempt to resolve some of the outstanding issues," including the relationship between exposure to VCM and the development of other types of cancers.

The O. Wong study reported that from 1942 to 1982, 37 of the 10,173 workers died of liver cancer (including both ASL and HCC), compared with an expected or background rate, based on United States mortality rates of 5.77. The standardized mortality ratio (SMR), or the ratio of observed deaths from liver cancer to expected deaths according to a specific health outcome in a population, was 641.2. An SMR of 100 indicates that the death rate due to the disease is the same in the study group as in the general population. Therefore, an SMR of 641.2 means that the exposed workers' risk of dying from liver cancer was 6.4 times greater than that of the general population.

In order to determine the risk of developing liver cancer, excluding ASL which was a known risk, the authors reviewed the workers' death certificates which indicated that out of thirty-seven deaths from liver cancer, fifteen died of ASL, seven died of biliary tract cancer, and fifteen died of other types of liver cancers, including hepatomas (four), [*30] HCC (one), hepatic carcinoma (two), carcinoma of the liver (seven), and metastatic liver cancer of unknown primary (one). To verify the diagnosis, the authors compared available pathology reports to the workers' death certificates. The pathology reports revealed that there were twenty-one cases of ASL, not fifteen as stated in the death certificates. Thus, there were sixteen cases of liver/biliary tract cancer (37 (total) - 21 (ASL)), out of an expected rate of 5.7 (SMR = 281). Significantly, they found that even if the ASL cases were eliminated, the incidence of other forms of liver and biliary cancer was higher than expected. Workers with more than twenty years of exposure to VCM had the highest risk of dying from liver and biliary

---

2007) (quoting *Knight v. Kirby Inland Marine, Inc., 363 F. Supp. 2d 859, 865 n.11 (N.D. Miss. 2005)).*

cancer (SMR = 1284.9), and workers first exposed to vinyl chloride prior to age twenty-five had a significantly increased risk of developing liver cancer.

Infante admitted that the O. Wong study had not found that exposure to VCM was causally associated with HCC. As a result, Infante followed the methodology set forth in the study, but "went one step further," separating out the cases of liver cancer that were not ASL or biliary cancer (37 (total) - 21 [*31] (ASL) - 7 (biliary tract cancer) = 9 (unidentified liver cancer)). He assumed that despite the designation on the death certificates, these nine cases were HCC, because HCC was the most common form of liver cancer. The expected rate for a population of that size was three HCC cases, and thus, an exposed worker's risk of contacting HCC was three times greater than for the unexposed population. Infante concluded that the O. Wong study showed there was a statistically significant risk of developing non-ASL or biliary cancer from VCM exposure. However, he admitted that the K.A. Mundt study, a 1999 industry-sponsored update to the O. Wong study, did not support his conclusion that VCM exposure was associated with a significantly elevated risk of HCC.

In the second extensive study conducted by Elizabeth Ward and others published in 2001, the authors updated a 1991 cohort study by L. Simonato involving 12,700 workers exposed to VCM in nineteen European factories. The study was designed, in part, to evaluate whether VCM induced both HCC and ASL.

The authors identified seventy-one cases of liver cancer, comprising of thirty-seven cases of ASL, ten HCC cases, seven cases of other known histology, [*32] and seventeen cases of unspecified types of liver cancer. They found that

> [t]he results of the updated study are generally consistent with the original study with respect to liver cancer and [ASL]. A strong relation is observed between cumulative [vinyl chloride (VC)] exposure and occurrence of liver cancer. An even sharper exposure-response is observed for [ASL] . . . . . A marked exposure-response trend with both duration of employment and cumulative VC exposure was present for the ten known cases of [HCC], suggesting that VC exposure may be associated with this tumor as well. An association of [HCC] with VC exposure is biologically plausible, given that [HCC has] been induced by VC in rodents . . . . In addition, cases of [HCC] together with [ASL] have been reported among workers

highly exposed to VC.

However, Infante conceded that the authors of the Ward study had not determined a "causal" connection between exposure to VCM and HCC. He also admitted that the study showed there was no elevated risk of non-ASL cancer for workers, like Lewis, who were hired after 1964 and not employed as autoclave workers. Nonetheless, Infante testified that the demonstration of significant trends in **[*33]** the dose response, that is, an increase in dosage yields an increase in side effects for VCM exposure and HCC, evidenced a causal relationship.

As stated, Infante also relied upon several minor epidemiological studies, including a 1998 Taiwanese study by Chung-Li Du and Jung-Der Wang. This case-controlled study compared the hospital records of 2,224 VCM exposed workers to the hospital records of a group of unexposed workers employed by manufacturers of optical equipment and motorcycles. The authors examined the records of the two groups to determine whether there was an increased risk of hospital admission among workers exposed to VCM. Twelve of the exposed workers developed primary liver cancer, including HCC, ASL, and cholangiocarcinoma (originating in the bile duct). They concluded:

> Vinyl chloride monomer has been shown to be a multipotential carcinogen in animals. In humans, a causal relation has been found between occupational exposure to VCM and [ASL] of the liver. It was not until 1983 that Evans[7] reported two cases of [HCC] among VCM workers. Later on, several epidemiological studies (in the United States and Europe) also corroborated such an association in humans. According **[*34]** to recent experimental studies performed by Froment[8] different molecular mechanisms of exposure to VCM may lead to different cell types of liver tumor, including [ASL] and [HCC]. No data on viral hepatitis markers, however, are available from these studies. Thus, we are among the first to report such a high incidence of primary liver cancer

---

[7] Evans DMD, et. al., *Angiosarcoma and Hepatocellular Carcinoma in Vinyl Chloride Workers*, 7 Histopathology 377 (1983).

[8] Froment O., et. al., *Mutagenesis of Ras Proto-oncogens in Rat Liver Tumors Induced by Vinyl Chloride*, 54 Cancer Res 5340 (1994).

or [HCC] among VCM workers, and the possible synergistic influence of viral hepatitis deserves more attention.

Infante also relied on a 1981 German case-control cohort study of 7,021 workers by H. Weber and others. The study compared the SMRs of workers exposed to VCM with unexposed workers. Among the exposed workers, there were twelve cases of liver cancer, of which four cases were confirmed as ASL. Infante admitted that the study did not conclude there was a causal relationship between HCC and VCM. However, there were eight cases of non-ASL liver cancer (12 (total) - 4 (ASL)), compared with an expected **[*35]** rate of .8, yielding a relative risk of ten. Thus, Infante found there was a statistically significant risk of developing non-ASL liver cancer from exposure to VCM.

Similarly, in a Taiwanese study published in 2003 by Ruey-Hong Wong and others, the authors noted that recent studies indicated that VCM exposure is associated with HCC. The authors conducted a case-control study from a previously established cohort of 4,096 workers from six PVC manufacturing plants. It was estimated that in the 1960's the workers had been exposed to cumulative doses of about 500 ppm of VCM. They found there was a significant excess of mortality from liver cancer (twenty-five cases) among the workers, although none of the deaths appeared to have been from ASL. They obtained medical records for eighteen of the twenty-five cases, and determined that a diagnosis of HCC was histologically confirmed in only five cases, although five more cases also were regarded as positive for HCC based on high levels of alpha-fetoprotein, and the remaining eight cases were diagnosed as HCC based on clinical manifestations and imaging studies

Infante acknowledged that the authors of the R. Wong study had not concluded that exposure **[*36]** to VCM causes HCC. And he admitted that "[h]epatitis leads to cirrhosis of the liver, which then leads to [h]epatocellular carcinoma." He explained that exposure to VCM by hepatitis-infected workers, results in a "synergistic interaction," which substantially increases the worker's risk of developing HCC. Significantly, he said the authors of the study had concluded that VCM exposure was an "independent risk factor" for developing HCC.

In another 2003 study by Paolo Boffetta and others, the authors compared the results of eight cohort studies, including the previously discussed Ward, Mundt, Weber,

and R. Wong studies, and the Pirastu study discussed *infra.* The authors found a "weak but statistically significant" increased risk for developing non-ASL liver cancer from VCM exposure. Although they wrote that "[t]o date, the only cancer that has clearly been associated with vinyl chloride exposure is [ASL]," they concluded that "[a]part from the known risk of ASL, workers exposed to vinyl chloride may experience an increased risk of [HCC]." However, they cautioned that "while the meta-analysis supports a small excess of liver cancers apart from [ASL] and other studies and evidence exists **[*37]** that support[] the hypothesis, clearer evidence is still needed."

The Italian 2003 cohort study by Roberta Pirastu and others reported that mortality rates for HCC and liver cirrhosis was higher than expected for VCM exposed workers whose only job title was bagger, and showed a similar pattern for cumulative exposure as for VCM and ASL. "The study results confirm the causal relationship between VCM exposure and liver [ASL] and add supplementary evidence in favor of a causal explanation of the excess risk for [HCC] and liver cirrhosis as well as lung cancer among only baggers."

Infante also relied on another Italian case control study by Giuseppe Mastrangelo and others published in 2004. The authors initially wrote that "although a large body of evidence from experimental and epidemiologic studies [had] demonstrated the relationship between exposure to [VCM] and [ASL], . . . there [was] little evidence of a causal association between VCM and [HCC] and liver cirrhosis." However, following their study, they concluded that "VCM exposure is an independent risk factor for the development of HCC and [liver cirrhosis]." They also determined that VCM exposure "interact[s] synergistically with **[*38]** alcohol consumption and additively with viral hepatitis infection."

Infante also reviewed a 1984 article by Carlo H. Tamburro in which the author sought to address the effects of chronic low-grade exposure to VCM. The author explained that VCM "reactants have been shown to covalently bind to both hepatocytes and sinusoidal cells." The author reported that there were at least two cases of HCC in VCM-exposed workers, both of whom had engaged in chronic alcohol consumption. However, the author did not find any relationship "between [ASL] occurrence and [vinyl chloride] exposure occurring after 1966 when exposure levels generally were below 200 ppm." But Infante testified the article referred to studies conducted in the 1970's, and given the very long latency

period of VCM induced cancer, workers exposed after 1966 would not yet have developed liver cancer.

Based on his review of the epidemiological studies, Infante opined that exposure to VCM causes HCC, and that although alcohol consumption and hepatitis are also risk factors, exposure to VCM is an independent factor for developing HCC. He admitted, however, that some epidemiological studies had not shown any association between VCM and **[*39]** HCC.

In reaching his conclusion on general causation, Infante also relied on several laboratory animal studies. In the 1981 study by M.J. Radike and others on the effects of ethanol on VCM carcinogenesis, experimental rats were exposed to VCM and ethanol. The rats were divided into four groups: 1) those exposed to 600 ppm VCM; 2) those exposed to 600 ppm VCM and 5% ethanol; 3) those exposed to 5% ethanol; and 4) those not exposed to either VCM or ethanol. The study showed that the rats exposed to VCM developed ASL and HCC, and those exposed to VCM and ethanol had the highest rates of both forms of cancer.

Infante also relied on V.J. Feron's 1978 study on the oral toxicity of VCM in which rats were exposed to varying doses of VCM by incorporating PVC powder into their diet. The death rate from liver cancer was higher in all of the VCM-exposed groups, the rate increased with increasing doses, and the rats that developed hepatocellular tumors had the highest levels of alpha-fetoprotein. Importantly, the tumor response in the liver appeared to shift from a predominance of ASL at the highest dose level, to a mixture of ASL and HCC at the intermediate levels, to the exclusive development of **[*40]** HCC at the lowest level.

Lastly, Infante relied on a 1981 "short-term burst exposure" study by Robert M. Hehir. Mice were exposed to a single one-hour dose of VCM ranging from 50 ppm to 50,000 ppm (group one), and to ten one-hour exposures of 500 ppm of VCM (group two). Hehir discovered dose related effects, or increased incidences of carcinomas in the mice exposed to ten one-hour high levels of VCM (5,000 to 50,000 ppm). The mice exposed to the same cumulative VCM dose (e.g., 5,000 ppm), but at lower doses of 50 ppm over time (50 ppm x 100 hours = 5,000 ppm cumulative dose), did not have an increased incidence of tumors.

In determining specific causation, Infante accepted as factual Dr. Groth's opinion that Lewis died of primary HCC. He reviewed Lewis' history of occupational

exposure to VCM, including internal memos regarding levels of VCM at the Pantasote facility, co-worker's deposition testimony regarding the odor of VCM at the facility indicating an exposure of 3,000 ppm of VCM, and Lewis' job responsibilities. Infante also relied on his own experiences in studying the effects of VCM, and on Jones' report regarding Lewis' cumulative exposure. He found that cumulatively, Lewis had **[*41]** significant exposure to VCM, probably in excess of 500 ppm.

Infante opined that Lewis had an "extremely high risk" of developing liver cancer based on his significant occupational exposure to VCM over twenty-seven years, his age at first exposure, and the length of his exposure. He explained that Lewis fit several of the VCM exposure and latency categories presented in the O. Wong study, and therefore, had a significantly elevated risk of death from liver cancer.

Infante also found that Lewis did not have either of the two major risk factors for developing liver cancer, namely, cirrhosis of the liver or hepatitis. Infante did not address obesity as a possible cause of Lewis developing HCC because according to Infante, there are no studies demonstrating that obesity is a factor in developing the disease. Nonetheless, he admitted that his opinion was limited by the fact that HCC is the most common form of liver cancer, and the number of people developing the disease is on the rise.

Dr. Howard Kipen, a physician who specialized in occupational and environmental medicine for more than twenty years, opined that occupational exposure to VCM is a cause of HCC in humans, and was the cause of **[*42]** Lewis' HCC. In determining general causation, Kipen cited three reported cases of HCC in exposed workers, and relied on many of the same epidemiological studies as Infante, including the R. Wong study. Kipen also noted that the Ward study had found that the risk for developing HCC "increased with increasing estimated cumulative dose," that is, the study "demonstrated . . . a dose response relationship. That's pretty strong." Additionally, Kipen testified that the Mundt study gave "some credence" to the fact that there was an increased risk of developing HCC from exposure to VCM, although he admitted the study did not find that VCM exposure was causally related to HCC, and it had a "limited ability" to discriminate between HCC and ASL.

According to Kipen, the Mastrangelo study provided further support for the premise that an increase in the quantity of VCM exposure, particularly when combined with high alcohol consumption, resulted in a very significant increase in HCC cases. Importantly, the authors adjusted for alcohol consumption and hepatitis, and found that "independent of that adjustment, vinyl chloride exposure increased the risk for [HCC]." Finally, Kipen relied on a case report **[*43]** published in 1976 by J.M. Gokel and others in which a worker in a PVC facility was diagnosed with HCC. However, Kipen admitted he had not reviewed scientific textbooks in forming his opinion, which did not list VCM exposure as a factor in developing HCC. Kipen also acknowledged that none of the studies had specifically concluded that a cumulative exposure of 500 ppm of VCM resulted in an increased relative risk of contracting HCC, although the studies showed a dose response trend. He further conceded that some published epidemiological studies found no association between HCC and VCM exposure.

In determining whether the observed association between exposure to VCM and development of HCC in the epidemiological studies were causal, Kipen considered whether the following factors identified by Sir Austin Bradford Hill (the Hill factors),[9] had been satisfied: (1) temporal relationship; (2) strength of association; (3) dose response relationship; (4) replication; (5) biological plausibility; (6) consideration of alternative explanations; (7) specificity; and (8) consistency with other relevant knowledge. He concluded that they were.

Kipen found that in each of the epidemiological studies there was a temporal relationship between VCM exposure and HCC, that is, the timing of the exposure to VCM and the onset of HCC was consistent with the lengthy latency period for development of the disease. Next, the strength of association, whether the association is statistically significant, was established in the Ward and Mastrangelo studies where the authors found that the relative risk of developing HCC was "quite strong." Dose response was established in the Ward and Mastrangelo studies, which demonstrated that an increase in exposure to VCM yielded an increase in risk of developing HCC. Concerning replication, Kipen believed it was satisfied not only by the Ward and Mastrangelo studies, but also by the Taiwanese studies.

He also determined that there is a biologically plausible mechanism by which VCM could cause HCC. Kipen

---

[9] A.B. Hill, The **[*44]** *Environment and Disease: Association or Causation*, 58 *Proceedings of the Royal Society of Medicine* 295, 299 (1965).

explained that it is widely recognized that exposure to VCM causes damage to the liver, including non-malignant liver fibrosis and liver cancer. When VCM is metabolized in the liver, either **[\*45]** in the hepatocyte cells or in the sinusoidal or endothelial cells, the metabolites can directly damage the cell's deoxyribonucleic acid (DNA),[10] or create an "oxidized environment" that results in cell damage. This damage forms "the first step in the process of malignant transformation of a cell." If the sinusoidal cells become malignant, it results in ASL, and if the hepatocellular cells become malignant, it results in HCC.

In considering alternative explanations, Kipen explained that scientists generally do not "exclude alternatives," but rather, consider whether the association could be more accurately accounted for by other factors. According to Kipen, the other risk factors, liver cirrhosis and hepatitis, interacted with VCM exposure to significantly increase the risk of developing HCC.

Further, the "specificity" factor involved a consideration of whether VCM is associated with HCC, and the studies showed that there was an association **[\*46]** between VCM exposure and liver damage. Finally, as to the last factor, the consistency of the relationship, Kipen found it was established because the results of the multiple scientific studies did not otherwise contradict established "laws of biology or physics or medicine."

In determining specific causation, Kipen initially reviewed Lewis' medical records to establish the diagnosis of HCC. In making that determination, he applied the criteria developed by the British Society of Gastroenterology and used by the authors of the Mastrangelo study, which are an alpha-fetoprotein level above 400 micrograms per liter and the existence of a liver mass. Kipen found that Lewis met both criteria in that his alpha-fetoprotein level was 495 mcg, and he had a tumor in his liver measuring 15 centimeters. Moreover, although Kipen did not review the pathology slides, he reviewed the pathology report, which provided that the tests results "favor [HCC]." According to Kipen, the pathology report "trump[ed]" all of the other medical records, and thereby confirmed the diagnosis of primary

---

HCC.

Kipen noted that Lewis did not have any of the other risk factors of developing HCC, including infection with the **[\*47]** hepatitis B or hepatitis C virus, or alcohol abuse. Kipen conceded that it had been suggested, but not widely accepted, that obesity is another risk factor in developing HCC, and Lewis' weight fluctuated between obese and overweight. Kipen also admitted that non-alcoholic fatty liver disease (NAFL) can develop as a result of obesity, and that it is associated with HCC. However, he opined that Lewis did not have NAFL.

In determining Lewis' cumulative exposure to VCM, Kipen reviewed Lewis' work history, and the experts' reports. According to Kipen, the fact that Lewis had worked for twenty-seven years at the PVC plant, thirteen of which were before 1974, placed him in the high risk group for liver cancer. Lewis' work duties included unloading the rail tank cars and working in the reactor and warehouse buildings, which presented opportunities "for quite high exposure." He had not calculated Lewis' specific numerical cumulative dose exposure. Nonetheless, Kipen said he generally makes determinations as to specific causation in the absence of quantitative data. It is against this factual backdrop that we consider the issues raised on the appeal and cross-appeals.

III.

On appeal, plaintiff **[\*48]** argues that the trial court erred in precluding Drs. Infante and Kipen from testifying as to general causation because the court: 1) improperly excluded from evidence the IARC's 1987 Monograph (supplement 7),[11] the *Lancet* article,[12] the IARC's 2007 Monograph volume 97,[13] and *Harrison's*

---

[10] "DNA" is a "molecule of genetic materials shaped like a double-helix or spiral ladder." *State v. Kemp, 195 N.J. 136, 143 n.9, 948 A.2d 636 (2008)* (quoting *State v. Harvey, 151 N.J. 117, 156, 699 A.2d 596 (1997)*, cert. denied, *528 U.S. 1085, 120 S. Ct. 811, 145 L. Ed. 2d 683 (2000))*.

[11] *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans; Overall Evaluations of Carcinogenicity: An Updating of IARC Monographs Volumes 1 to 42 (supplement 7)* (1987).

[12] An article by Yann Grosse, et. al., *Carcinogenicity of 1,3-Butadiene, Ethylene Oxide, Vinyl Chloride, Vinyl Fluoride, and Vinyl Bromide*, 8 *Lancet* 679-80 (2007), reporting on the IARC's reassessment that there was "sufficient evidence" that exposure to VCM caused HCC, which was to be published in IARC Monograph 97.

[13] 97 *IARC Monographs on the Evaluation Of Carcinogenic* **[\*49]** *Risks To Humans: 1,3-Butadiene, Ethylene Oxide and Vinyl Halides (Vinyl Floride, Vinyl Chloride and Vinyl Bromide)*

*Principles of Internal Medicine* (16th ed. 2005) (*Harrison's*); and 2) improperly applied the standard for admissibility of scientific evidence by conducting its own analysis of the epidemiological studies as reported in the scientific literature. Plaintiff also contends that the court erred in precluding Kipen and Infante from testifying as to specific causation. We agree.

A. Exclusion of Evidence.

In forming his opinion on causation, Infante set forth in his report, and testified during the *N.J.R.E. 104* hearing, that he had relied on the IARC's 1987 Monograph (supplement 7), which had been published at the time of the hearing, in which VCM was classified as a group 1 carcinogen. In its supplement the IARC stated that the evidence for carcinogenicity to humans was "sufficient," a "large number of epidemiological studies and case reports [had] substantiated the causal association" between vinyl chloride and ASL of the liver, and "several studies [had] also confirm[ed] that exposure to vinyl chloride causes other forms of cancer, i.e., hepatocellular carcinoma." It referenced several of the epidemiological studies relied on by Infante, including those by Weber, Hehir, and Maltoni.

Defendants objected, arguing that supplement 7 had only reported "what some other studies [had found]." The court sustained the objection, finding supplement 7 was "conclusionary," failing to "set out the rationale, methodology, or the means by which" **[*50]** the IARC reached its conclusion.

Generally, "[p]roofs offered at a *N.J.R.E. 104(a)* hearing need not comply with the other rules of evidence, except that *N.J.R.E. 403* may be invoked and valid claims of privilege will be recognized." Biunno, Weissbard & Zegas, *Current N.J. Rules of Evidence*, comment 4 on *N.J.R.E. 104* (2011). Courts are granted broad discretion in determining the relevance of evidence and whether its probative value is substantially outweighed by its prejudicial nature. *Verdicchio v. Ricca, 179 N.J. 1, 34, 843 A.2d 1042 (2004)*.

The IARC, through its monographs, seeks, with the help of international working groups of experts, to identify causes of human cancer. In evaluating agents, the IARC reviews exposure data, epidemiological studies, cancer bioassays in experimental animals, and other data. *See Allen v. Pa. Eng'g Corp., 102 F.3d 194, 198 (5th Cir. 1996)* (stating that "[r]egulatory and advisory

bodies such as IARC . . . utilize a 'weight of the evidence' method to assess the carcinogenicity of various substances in human beings and suggest or make prophylactic rules governing human exposure"). Thus, the IARC's classifications are the end products of detailed investigations.

The purpose **[*51]** of supplement 7 was to summarize and update the data on carcinogenicity in humans and in certain animals for agents that previously had been evaluated. The IARC Monographs are used by national and international agencies, including OSHA, and are probative evidence of causation. *See Calumet Indus., Inc. v. Brock, 807 F.2d 225, 226, 257 U.S. App. D.C. 80 (D.C. Cir. 1986)* (characterizing the IARC's Monographs as a definitive source in determining whether certain chemicals are carcinogenic); *Taylor v. Airco, Inc., 494 F. Supp. 2d 21, 24 (D. Mass. 2007)* (noting the IARC found sufficient evidence of carcinogenecity in humans to classify VCM as group 1 carcinogen), *aff'd sub nom. Taylor v. Am. Chemistry Council, 576 F.3d 16 (1st Cir. 2009)*.

Supplement 7 was relevant to a determination of general causation and was the type of scientific data relied on by experts in the field of study. It should have been admitted by the trial court as an opinion contained in a learned treatise upon which Infante relied. *N.J.R.E. 803(c)(18)*; see *Jacober v. St. Peter's Med. Ctr., 128 N.J. 475, 493-97, 608 A.2d 304 (1992)*. Supplement 7 was not "conclusory" because the extensive methodology by which the IARC evaluated and categorized agents is set **[*52]** forth in its Preamble.[14] And, although the 1987 Monograph summarized prior findings, the IARC supported its conclusion by referencing epidemiological and laboratory animal studies, many of which had been testified to by Infante. Further, the IARC Monographs, including its supplements, are used by national and international agencies, including OSHA, in determining what information industries must include on their labels and on the MSDS.

Infante testified that in forming his opinion on general causation he had relied upon the IARC's 2007

_____

[14] The Preamble can be located on the IARC's website. *See* World Health Organization, International Agency for Research on Cancer, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), *available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf*.

_____

311 (2008).

reassessment of the carcinogenicity of VCM, which was to be published as volume 97 of the IARC Monographs. Defendants objected, arguing that Infante had not cited to that Monograph in his report. Infante explained that although Monograph volume 97 had not yet been published, a summary of the IARC's reassessment had been published in the *Lancet*, a leading peer-reviewed medical **[*53]** journal. The *Lancet* article, published in August 2007, set forth that in June 2007, twenty-five scientists from eight countries met at the IARC to reassess the carcinogenicity of VCM and other chemicals. The article summarized the IARC's findings, in pertinent part, stating that the results of various studies (Ward, Mundt, Piratstu, and Mastrangelo) provide "sufficient evidence" in humans that VCM causes ASL and HCC, "leading to the overall classification of vinyl chloride as 'carcinogenic to humans' (Group 1)." Nonetheless, the court sustained defendants' objection, and excluded references to the IARC's reassessment and the *Lancet* article.

In denying plaintiff's first motion for reconsideration, the trial court said it excluded the IARC's 2007 reassessment because it "had not been prepared and authenticated in an official monograph." The court excluded the *Lancet* article because, although the article referred to various studies, the published assessment did not reference methodology or scientific data, and did not "establish the proposition, other than in conclusory terms, that the risk for cancer increases substantially with cumulative exposure, a cumulative exposure which is not **[*54]** defined in the assessment to cause [HCC]."

After the *N.J.R.E. 104* hearing, in mid-February 2009, the IARC released its reassessment. In preparing that evaluation, an IARC working group reviewed case reports of HCC in VCM-exposed workers, epidemiological studies, including the Mundt, Piratstu, Mastrangelo, Weber, O. Wong, Boffetta, Ward, and Du studies, and laboratory animal studies, including the Feron and Maltoni experiments. In its study, the IARC stated that based on the working group's analysis of the Ward and Piratstu studies, "[t]ogether with the observation that vinyl chloride increases the risk for liver cirrhosis, which is a known risk factor for [HCC], these findings provide convincing evidence that vinyl chloride causes [HCC] as well as [ASL]." The IARC indicated that "[t]here was suggestive evidence that the risk for [HCC] from vinyl chloride is substantially higher among workers who are infected with hepatitis virus or report high levels of alcoholic beverage consumption." Accordingly, the IARC concluded that "[t]here is

*sufficient evidence* in humans for the carcinogenicity of vinyl chloride. Vinyl chloride causes [ASL] of the liver and [HCC]." It characterized VCM as a **[*55]** Group 1 carcinogen to humans.

In denying plaintiff's second motion for reconsideration, the trial court found: 1) it was unclear whether plaintiff could have discovered the 2007 Monograph prior to the February 2009, decision; 2) the Monograph was almost identical to the *Lancet* article, which had also been "rejected"; and 3) in any event, plaintiff failed to adduce sufficient evidence on specific causation.

Parties are obligated under *Rule 4:17-4(a)* and *(e)* to furnish expert reports requested through interrogatories on a continuing basis. *Gaido v. Weiser, 227 N.J. Super. 175, 192, 545 A.2d 1350 (App. Div. 1988)*, aff'd, *115 N.J. 310, 558 A.2d 845 (1989)*. "The purpose of [an expert's] report is to forewarn the propounding party of the expected contents of the expert's testimony in order to enable preparation to counter such opinions with other opinion material." *Maurio v. Mereck Constr. Co., 162 N.J. Super. 566, 569, 394 A.2d 110 (App. Div. 1978)*. An expert's report must include a complete statement of the expert's opinion and the facts considered in making that opinion. *R. 4:17-4(e)*.

Determining whether to preclude an expert from testifying to opinions not contained in his or her report or in other discovery materials is within **[*56]** the discretion of the trial court. *Mauro v. Owens-Corning Fiberglas Corp., 225 N.J. Super. 196, 206, 542 A.2d 16 (App. Div. 1988)*, aff'd sub nom. *Mauro v. Raymark Indus., Inc., 116 N.J. 126, 561 A.2d 257 (1989)*. Factors that would support a trial court's decision to suspend the imposition of sanctions are "the absence of a design to mislead," "the absence of the element of surprise," and the "absence of prejudice." *Wymbs v. Twp. of Wayne, 163 N.J. 523, 544, 750 A.2d 751 (2000)*. Furthermore, when the challenged testimony is "pivotal" to the party offering the testimony, "a court should seek to avoid exclusion where possible." *Ibid.* An appellate court, in reviewing a trial court's ruling concerning the admissibility of evidence, is limited to examining the decision for abuse of discretion. *Hisenaj v. Kuehner, 194 N.J. 6, 16, 942 A.2d 769 (2008)*.

Because the *Lancet* article and the IARC Monograph can be considered the substance of Infante's facts and opinions, plaintiff should have provided an updated report. *See R. 4:17-4(e)*. The report should have referred to the IARC's reassessment, which had, at the

time of the *N.J.R.E. 104* hearing, not yet been published, but had been summarized in the *Lancet* article. However, because we conclude that **[*57]** defendants were not misled, surprised or prejudiced by Infante's testimony about the IARC's reassessment, we determine that the court erred in excluding that evidence.

Defendants had been forewarned that Infante would testify about the IARC's evaluation of the carcinogenicity of VCM, because he had referenced the IARC's 1987 Monograph in his report. The reassessment was substantially similar to the 1987 Monograph, in that VCM was categorized as a group 1 carcinogenic, and the IARC cited evidence that VCM exposure was associated with ASL and HCC. The reassessment, as summarized in the *Lancet* article, referred to many of the same studies referenced by Infante. Thus, defendants were not deprived of the opportunity to test the accuracy of the opinions in supplement 7. Additionally, there was no design to mislead because Infante referred to the *Lancet* article, which was published after he testified at depositions, not as a new source of information, but in response to defendants' objection to his testimony about the yet unpublished Monograph.

The fact that the IARC's reassessment had been summarized in the *Lancet*, a scientific peer-reviewed journal, should have allayed any concerns the court **[*58]** had as to the reliability of Infante's testimony about the as-yet unpublished Monograph. *See Hisenaj, supra, 194 N.J. at 22* ("Publication itself, although not necessarily dispositive of general acceptance in the scientific community, does provide additional evidence of acceptance."). Moreover, the evidence was the type of data reasonably relied on by experts, and it supported the scientific reliability of Infante's and Kipen's opinions. Thus, the evidence should have been admitted as an opinion contained in a peer-reviewed learned treatise upon which Infante relied. *N.J.R.E. 803(c)(18)*.

Finally, to the extent that the trial court excluded the *Lancet* article on the basis that it was "conclusory," we disagree. As previously stated, in summarizing the IARC's reassessment, the *Lancet* article referred to epidemiological studies, many of which had been extensively discussed by Infante, and the IARC's methodology in arriving at its conclusions was fully explained in its Preamble.

Turning to the exclusion of *Harrison's*, Kipen testified

that *Harrison's* was "the best standard textbook of internal medicine." *Harrison's* states that "HCC **[*59]** may occur with long-term . . . exposure to . . . vinyl chloride." Defendants objected to Kipen referencing *Harrison's* because Kipen had failed to refer to the textbook in his report. Plaintiff countered that Kipen referred to *Harrison's* during depositions in another VCM case against the same defendants, involving the same attorneys.[15] Kipen had been deposed in the Burlington County case prior to his deposition in this case, and the parties agreed that Kipen's testimony in that case would constitute his testimony on general causation in this case. Nevertheless, the court sustained the objection, because *Harrison's* was not referenced "in the report."

In denying plaintiff's first motion for reconsideration, the court found it "noteworthy" that Kipen had failed to include *Harrison's* in his report, even though he referenced other textbooks. Additionally, the court stated that "*Harrison's* standing alone . . . substantively and otherwise, does not, in this court's opinion, represent a consensus" of a relationship between VCM and HCC.

We conclude that the trial court erred in excluding *Harrison's* **[*60]** from evidence during the hearing. Although Kipen should have included a reference to *Harrison's* in his report, *R. 4:17-4(e)*, defendants were not misled, surprised or prejudiced by his testimony during the *N.J.R.E. 104* hearing. Kipen testified about the text during depositions in the Burlington County case, testimony the parties agreed could be used in this case. We also determine that the court erred in barring Kipen from referencing *Harrison's* based on the court's conclusion that *Harrison's* "standing alone and by itself . . . does not represent a consensus" of a causal relationship between VCM and HCC. *Harrison's* was not offered to stand by itself but rather as one of several authorities relied upon by Kipen in formulating his opinion on causation. *See Tyndall v. Zaboski, 306 N.J. Super. 423, 427-29, 703 A.2d 980 (App. Div. 1997)* (providing that a statement from a learned treatise established as reliable by expert testimony is admissible for substantive purposes if relied upon by the expert in direct examination), *certif. denied*, 153 N.J. 404, 709 A.2d 797 (1998).

---

[15] *Holmes v. Airco*, Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-1307-04.

In sum, we conclude that the trial court erroneously prohibited plaintiff's experts from referencing the IARC's 1987 Monograph, the IARC's 2007 Monograph, **[*61]** which has now been officially published in volume 97, the *Lancet* article, and *Harrison's*.

B. Admissibility of Infante's and Kipen's Testimony.

Plaintiff argues that the court applied the wrong standard for the admissibility of scientific evidence by conducting "its own analysis of the articles, independently decided whether they have scientific value, and reached scientific conclusions diametrically opposed to those appearing in the published literature." We agree.

At the conclusion of the hearing, the trial court found that the epidemiological studies relied on by Infante did not support his opinion. The court concluded that Infante had "extrapolat[ed] from those studies to come to a conclusion that the authors do not reach," namely, that exposure to VCM causes HCC. Additionally, the court found that Infante's general causation opinion was "flawed by his so-called short burst theory," as set forth in the Hehir study, wherein laboratory animals that were exposed to short "bursts" of VCM developed tumors. The court determined that conclusions in that study were not "meaningful" to this case because the animals developed lung tumors, not HCC, and because there was no indication that Lewis **[*62]** had been exposed to similar bursts of VCM. Thus, the court ruled that Infante's opinions were not supported by epidemiological or animal studies and lacked sufficient reliability. The court concluded that Infante's opinions were "his own . . . [for] which there is no supporting authentication or justification, no methodology of reliability, [and] no reliability in terms of extrapolation from all of those studies." The court determined Infante's conclusions were "reached from dissimilar information [-] there is a misclassification in terms of his epidemiological analysis of his sources and in terms of his extrapolation [which] render[s] his general theory of causation inadmissible."

Similarly, the court found that Kipen's reliance on the Mastrangelo study rendered his opinion on general causation unreliable. In so doing, the court noted that although the study found a "synergistic effect" between cirrhosis, hepatitis, and VCM, "[i]t did not, and it could not find that there was an independent risk factor" between VCM exposure and HCC.

Where there is a claim of a defective product under a theory of strict liability, a plaintiff must prove: 1) the product was defective; 2) "the defect existed **[*63]** when the product left the defendant's control"; and 3) "the defect caused injury to a reasonably foreseeable user." *Coffman v. Keene Corp., 133 N.J. 581, 593, 628 A.2d 710 (1993)*. In a failure to warn action, the defect "is the absence of a warning to unsuspecting users that the product can potentially cause injury." *Id. at 593-94*.

General and specific causation are fundamental elements of the claim. *Id. at 594*. In a toxic-tort products liability action, a plaintiff must prove both product defect and medical causation. *James v. Bessemer Processing Co., 155 N.J. 279, 299, 714 A.2d 898 (1998)*. "[A] plaintiff in an occupational-exposure, toxic-tort case may demonstrate medical causation by establishing: (1) factual proof of the plaintiff's frequent, regular and proximate exposure to a defendant's products; and (2) medical and/or scientific proof of a nexus between the exposure and the plaintiff's condition." *Id. at 304*. The exposure must be a "substantial factor in causing or exacerbating" the complained of disease. *Id. at 299*.

*N.J.R.E. 702* provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified **[*64]** as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." To comply with *N.J.R.E. 702*, three requirements must be established:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [*State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364 (1984)*.]

The proponent of the expert's opinion bears the burden of proving that the testimony satisfies those threshold requirements. *Hisenaj, supra, 194 N.J. at 15*. The admissibility of expert testimony is a matter within the sound discretion of the trial court, and on appeal, "an appellate court is limited to examining the decision for abuse of discretion." *Id. at 12*. The second *Kelly* requirement, that is, whether Infante's and Kipen's causation testimony was sufficiently reliable is at issue here.

Generally, a proponent of scientific evidence must demonstrate that the opinions are "generally accepted, within the relevant scientific community" ("the *Frye*[16] [**65] standard"). *State v. Chun, 194 N.J. 54, 91, 943 A.2d 114*, cert. denied, 555 U.S. 825, 129 S. Ct. 158, 172 L. Ed. 2d 41 (2008); *Harvey, supra, 151 N.J. at 169-70*. Proving general acceptance "entails the strict application of the scientific method, which requires an extraordinarily high level of proof based on prolonged, controlled, consistent, and validated experience." *Rubanick v. Witco Chem. Corp., 125 N.J. 421, 436, 593 A.2d 733 (1991)*. Scientific literature can support general acceptance of a test if "the existing literature reveals a consensus of acceptance regarding a technology." *Harvey, supra, 151 N.J. at 174*.

However, our Supreme Court relaxed the standard for admissibility of novel scientific evidence relating to causation in toxic-tort litigation. *Rubanick, supra, 125 N.J. at 449*. Under the relaxed standard, applicable here, "a scientific theory of causation that has not yet reached general acceptance may be found to be sufficiently reliable if it is based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field." *Ibid*. "[I]t is not essential that [**66] there be general agreement with the opinions drawn from the methodology used. There must merely be some expert consensus that the methodology and the underlying data are generally followed by experts in the field." *Id. at 450*. Thus, "*Rubanick* changed the focus of the inquiry from the scientific community's acceptance of the substance of the opinion to its acceptance of the methodology and reasoning underlying it." *Clark v. Safety-Kleen Corp., 179 N.J. 318, 337, 845 A.2d 587 (2004)*.

In determining whether causation testimony is sufficiently reliable, the Court has cautioned that "[g]reat difficulties can arise when judges, assuming the role of scientist, attempt to assess the validity of a complex scientific methodology." *Rubanick, supra, 125 N.J. at 451*. For example, in *Rubanick*, the trial court "independently reviewed" each of the studies on which the expert relied, and decided that they "do not say what plaintiff's expert concludes." *Ibid*. The Court found that "[i]n engaging in such an analysis, the [trial] court substituted its own assessment of the studies for that of an acknowledged expert." *Ibid*. The court should not

"directly and independently determine as a matter of law that a controversial [**67] and complex scientific methodology is sound." *Ibid*. Simply stated:

[T]he inquiry is not the reliability of the expert's ultimate opinion nor is it whether the expert thought his or her own reliance on the underlying data was reasonable, nor whether the court thinks that the expert's reliance was reasonable. The proper inquiry is whether comparable "experts in the field [would] actually rely" on that information.

[*Id. at 452* (internal citations omitted).]

We conclude that the trial court failed to heed the Court's instruction in *Rubanick*.

The court improperly conducted its own independent review of the epidemiological studies, instead of determining whether the studies were generally relied on by experts in their fields and focusing on the methodology used by Infante and Kipen in reaching their conclusions. *See Landrigan v. Celotex Corp., 127 N.J. 404, 417, 605 A.2d 1079 (1992)* (indicating that a trial court should review epidemiological studies to determine if they are of a kind on which such experts ordinarily rely). Notably, the trial court found that the Mastrangelo study "cannot stand for, nor can it be extrapolated to the conclusion that . . . vinyl chloride can serve as an independent risk factor [**68] for the development of [HCC]." That finding directly contradicts the conclusion of the scientists in the study, who found that "VCM exposure appears to be an independent risk factor for HCC and [liver cirrhosis] interacting synergistically with alcohol consumption and additively with viral hepatitis infection."

Defendants' argument that admissions by Infante and Kipen that workers in the Mastrangelo study were exposed to much greater concentrations of VCM, and as a result, suffered from greater incidences of hepatitis and liver cirrhosis, go to the weight, not the admissibility of their opinions. *See Hisenaj, supra, 194 N.J. at 21* (acknowledging that identical data in scientific testing is not a prerequisite to admission of expert testimony).

Further, the methodology used by Infante, namely extrapolating from existing data contained in epidemiological studies by separating those cases of HCC from the cohort and determining the SMR, is an accepted methodology. *See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508, 519 (1997)* (noting that "[t]rained experts commonly

---

[16] *Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923)*.

extrapolate from existing data"); *Hisenaj, supra, 194 N.J. at 17, 25* (finding expert's **[*69]** testimony extrapolated from seventeen engineering studies was properly admitted). And, the data utilized by Infante, that is, the findings in the several cohort studies regarding workers exposed to VCM who suffered from liver cancer including HCC, is the type of data reasonably relied on by experts. Challenges to the fact that Infante, in extrapolating from the results of the O. Wong study, "assumed" that some non-ASL cases were HCC, similarly goes to the weight of his opinion, rather than the admissibility of it.

Defendants correctly point out that experts cannot rely on data extrapolated from articles to support conclusions not drawn by the authors. However, that is not what Infante and Kipen did. Although both Infante and Kipen admitted that the epidemiological studies do not conclusively establish a causal relationship between HCC and VCM exposure, the studies point to an association, a biological plausibility, and a dose response between VCM and HCC. Thus, the data supported their opinions.

Moreover, in evaluating the epidemiological studies, Kipen correctly applied the Bradford Hill factors to determine whether the association between VCM and HCC, as reported in the studies, was **[*70]** causal. *Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 592-93 (D.N.J. 2002)*, aff'd, *68 Fed. App'x. 356 (3d Cir. 2003)*. Because statistical associations do not necessarily imply causation, scientists widely use those factors to assess general causation from epidemiological studies. *Ibid.*; *see also In re Viagra Prods. Liab. Litig., 658 F. Supp. 2d 950, 958 (D. Minn. 2009)*. Kipen found that each of the factors had been established, and thus, the epidemiological studies supported a finding of causation.

This is a difficult case, and the trial court made great efforts to assess the complicated scientific material by conducting a lengthy *N.J.R.E. 104* hearing, considering extensive oral argument, and reviewing complex epidemiological studies. Typical of many toxic tort cases, the theory that VCM exposure causes HCC is contested. However, there are several epidemiological studies which show an association between VCM exposure and HCC, and experts generally rely on these studies in assessing causation. There are other publications, notably the IARC Monographs, which were excluded from evidence that have also assessed these

studies and determined that they support a finding **[*71]** of a causal relationship. Thus, given the exclusion of the highly relevant IARC Monographs and the court's failure to focus on the experts' methodology, as opposed to their conclusions, we reverse the trial court's ruling that Infante's and Kipen's general causation testimony is inadmissible.

IV.

In determining that Infante's opinion on specific causation lacked the requisite scientific reliability, the court found that in addition to improperly relying on the epidemiological studies, Infante had failed to review Lewis' medical records, account for the death certificate, conduct a differential diagnosis, and consider Lewis' obesity as a factor in his development of HCC.

In a toxic-tort products liability action, a plaintiff must prove both product-defect and medical causation. *James, supra, 155 N.J. at 299*. Differential diagnosis is an acceptable manner to establish causation in toxic tort cases. *Creanga v. Jardal, 185 N.J. 345, 356, 886 A.2d 633 (2005)*. "[A] differential diagnosis is a medical construct for determining 'which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their symptoms.'" *Id. at 355* (quoting *Dorland's Illustrated* **[*72]** *Medical Dictionary* 377 (23d ed. 1957)). Courts use the term "in a more general sense to describe the process by which causes of the patient's condition are identified." *Id. at 356*.

In performing a differential diagnosis, the expert first rules in all plausible causes for the patient's condition by compiling a comprehensive list of hypotheses that might explain the clinical findings under consideration, and then rules out by process of elimination all causes that did not produce the patient's condition. *Ibid.* "A reliably performed differential diagnosis includes considering plausible alternative causes." *Magistrini, supra, 180 F. Supp. 2d at 609*. However,

> [w]hile an expert is not required to rule out all alternative possible causes of a plaintiff's disease, "where a defendant points to a plausible alternative cause and the doctor offers no reasonable explanation" for why he still concludes that the chemical was a substantial factor in bringing about the plaintiff's disease, "that doctor's methodology is unreliable."
>
> [*Ibid.* (quoting *In Re Paoli R.R. Yard PCB Litig., 35*

*F.3d 717, 759 n.27 (3d Cir. 1994)*, cert. denied, 513 U.S. 1190, 115 S. Ct. 1253, 131 L. Ed. 2d 134 (1995)).]

Infante performed **[*73]** a differential diagnosis in that he accepted Groth's findings that Lewis had developed HCC, and then ruled in and then out, the two major risk factors for developing HCC--cirrhosis of the liver and hepatitis. During the hearing, Infante testified that the only possible risk factor that Lewis "may have had" was that he "may have been obese." However, Infante also testified that no studies existed to prove that obesity was a factor in developing the disease. Nevertheless, the trial court sustained defendants' objection to Infante's testimony concerning obesity because of his failure to include it in his report.

Infante did not consider obesity as an "accepted" risk factor in Lewis developing HCC. Accordingly, he did not rule the factor in or out in performing his diagnosis. We discern no prejudice to defendants by Infante explaining why he chose not to consider obesity as a risk factor.

Defendants also counter that the court properly excluded Kipen's testimony on specific causation because he failed to review the majority of Lewis' medical history and all of the pathology slides. We disagree. Kipen reviewed the pathology reports, which he stated "trump[ed]" all of the other medical records **[*74]** and confirmed the diagnosis of primary HCC. He also performed a differential diagnosis, ruling in and then out, cirrhosis of the liver and hepatitis as factors for Lewis developing HCC. Thus, Kipen should be allowed to render an opinion on specific causation. Additionally, like with Infante, Kipen should be permitted to testify whether Lewis' obesity is an accepted risk factor for HCC.

Accordingly, we reverse the trial court's decision precluding Infante and Kipen from testifying on specific causation.

V.

We now turn to defendants' cross-appeals. Goodrich, PPG, and Shell argue in Point III of their brief that the trial court erred in denying their motion to exclude Dr. David Groth from testifying. Defendants assert that Groth was not qualified to testify about the diagnosis of HCC or its pathology because he had not reviewed a single case of HCC in the last forty years, or diagnosed liver cancer, or conducted any independent research on HCC or VCM exposure. We reject these contentions.

*N.J.R.E. 702* requires that an expert be qualified "by knowledge, skill, experience, training, or education." The decision to allow an individual to testify as an expert rests within the sound discretion **[*75]** of the court. *Hisenaj, supra, 194 N.J. at 12*. On appeal, we will only reverse a trial court's decision to admit expert testimony upon a finding of abuse of that discretion. *Ibid.*

Groth is a board certified pathologist who received his medical degree from Yale University, and whose principal interest is in cancer. In addition to the general knowledge implied by his license, *see Sanzari v. Rosenfeld, 34 N.J. 128, 137, 167 A.2d 625 (1961)*, Groth also acquired knowledge from more than forty years of occupational experience. Although his major interest was in the area of asbestos-related pulmonary cancer, and he had not reviewed a single case of primary liver cancer, he had extensive experience in diagnosing and researching occupational cancer, as well as in the pathology of VCM. For example, during his internship and residency, he conducted 200 to 300 autopsies, and witnessed approximately 3,000 autopsies, of which 30% involved some form of cancer. While employed at the OSHA and the NIOSH, he conducted animal experiments, which required him to review slides of tumor cells, including HCC. As a member of a committee formed to test the toxic effect of industrial chemicals on the liver, he reviewed HCC and **[*76]** ASL tissue slides.

Additionally, while working as a consultant for the NIOSH, Groth reviewed medical records and histopathology slides on 700 cases of cancer. He also authored two peer-reviewed articles on HCC, and had significant experience with the pathology of VCM, in that he participated in toxicological studies while at the NIOSH, attended conferences, and reviewed literature.

We conclude that based on his training and experience with HCC and VCM, the trial court correctly determined Groth was qualified to testify as an expert in this case. What is more, the fact that Groth had not seen a slide of human HCC tissue since his residency and had not previously reviewed a single HCC case, goes to the weight to be accorded his opinion, not to his competency. *See Rubanick v. Witco Chem. Corp., 242 N.J. Super. 36, 48, 576 A.2d 4 (App. Div. 1990)*, modified and remanded, *125 N.J. 421, 593 A.2d 733 (1991)*.

Defendants argue next that Groth's testimony lacked sufficient reliability, contending that Groth failed to

review all the pathology slides and medical records.

An expert's opinion must be supported by facts or data either in the record or of a type usually relied on by experts in the field, which need not be admissible. **[*77]** *N.J.R.E. 703*. An expert's bare conclusion unsupported by factual evidence is inadmissible as a net opinion. *Creanga, supra, 185 N.J. at 360*. However, "[t]he failure of an expert to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion." *Rosenberg v. Tavorath, 352 N.J. Super. 385, 402, 800 A.2d 216 (App. Div. 2002)*.

We conclude that Groth's opinion was amply supported by appropriate facts and data. Groth reviewed all of the clinical data sent to him by counsel, reviewed histopathology slides of Lewis' liver tumor, conducted a differential diagnosis, and determined that even excluding the slides, the clinical data alone was sufficient to support the HCC diagnosis. Significant factors to support the diagnosis that Lewis had developed HCC included the large size of the liver tumor, the presence of smaller nodules in the liver, and elevated alpha-fetoprotein levels. Groth ruled out lung cancer as a primary site based on the presence of small bilateral nodules in Lewis' lungs, and a "clear" 1998 chest x-ray. Biochemical tests ruled out other cancers.

Moreover, **[*78]** Groth reviewed the hospital pathology report in which the carcinoembryonic antigen and feritin levels revealed canalicular staining patterns, which indicated that the tumor cells originated in the liver. Other medical records also supported Groth's opinion. One report set forth that the tumor had a trabecular pattern of growth, indicating HCC. A pathology report set forth that the results of a fine needle aspiration were "suggestive of hepatocellular carcinoma," and another report revealed that the tests results "favor hepatocellular carcinoma." Additionally, the hospital discharge summary listed the final diagnosis as "[h]epatocellular carcinoma with metastasis."

Groth did not review all of Lewis' slides, request copies of depositions, or rule out all other possible forms of cancer. For example, Groth admitted that he initially only reviewed ten out of fifty available slides, and had never reviewed the actual slide showing the canalicular staining patterns. However, he maintained that many of the slides simply showed smears of blood, and that he had all of the clinical data he needed to render a

diagnosis. Because Groth offered other sufficient reasons in support of his opinion, the **[*79]** fact that he did not review all of the material deemed significant by defendants goes to the weight, not the admissibility, of his testimony. *See Rosenberg, supra, 352 N.J. Super. at 402* (instructing that omission of a factor by an expert, who otherwise supports his opinion, that the opposing party deems relevant is more properly accounted for on cross-examination at trial). Accordingly, the trial court did not err in denying the motion to exclude Groth's testimony.

VI.

Goodrich, PPG, and Shell argue in Point IV of their brief that the trial court erroneously denied their motion seeking to exclude James Jones from testifying as to the state-of-the-art knowledge in the industry regarding the toxicity of VCM and the adequacy of the warnings. Defendants contend that Jones' opinions on the state-of-the-art knowledge in the industry and adequacy of the warnings should have been excluded because they were not based on a proper methodology. Defendants assert that Jones was not qualified to render an opinion about the "timing or type" of the warnings that should have been provided because he was not a warnings expert or toxicologist. They also argue that Jones failed to analyze what the industry **[*80]** knew prior to January 1974. We disagree.

Jones, a certified industrial hygienist, received a Bachelor of Science Degree in chemical engineering and completed some graduate work. As an undergraduate, he worked at Goodrich's Louisville plant, and later, at the NIOSH, where he directed the exposure assessment portion of their VCM study. He visited six or seven PVC production facilities to gather information on exposures to VCM for the NIOSH. In 1974, he assisted in preparing the OSHA exposure limits for VCM. He co-authored peer-reviewed articles, three of which addressed studies on VCM, and taught courses at the University of Cincinnati on industrial hygiene. As an industrial hygienist, he identified harmful workplace exposures to chemicals and other agents, determined safe exposure levels with epidemiologists and physicians, and assisted employers in reducing risks of exposures. Jones also testified to the adequacy of warnings in several other VCM cases, including rendering an opinion on the state-of-the-art knowledge in the industry.

Jones opined that the warnings given to workers prior to 1974 about the risk of developing liver damage from

exposure to VCM were inadequate. According to **[\*81]** Jones, defendants were aware of laboratory animal studies linking VCM exposure to liver cancer, of reports that workers in foreign PVC plants developed liver damage, and of recommendations in the scientific literature that VCM exposure levels should be lowered to 50 ppm. Jones concluded that "in light of these multiple indications that VCM was harmful to workers at exposure levels as low as 50 ppm and the finding of cancer in VCM exposed animals, users of VCM should have begun monitoring and controlling exposures to VCM, and suppliers of VCM and the MCA should have lowered their exposure recommendations at least as early as 1961 and given adequate warning of the various health effects found in humans and animals." Jones did not render an opinion on the design of the warning, but rather testified to what information should have been included in the warning.

We conclude that the court did not abuse its discretion in finding Jones qualified by his knowledge, skill, experience, training, and education to testify as to what information should have been provided to workers to protect them from workplace hazards. Jones was amply qualified to testify to the dangers of VCM exposure, to the toxicity **[\*82]** of VCM as contained in toxicology reports, and how employers could protect workers from such exposure. See *Beadling v. William Bowman Assocs., 355 N.J. Super. 70, 80, 809 A.2d 188 (App. Div. 2002)* (discussing certified industrial hygienist's report and opinion in products liability case in which he reviewed the defendant's warning label for compliance with federal and industry labeling requirements); *Kapsis v. Port Auth. of N.Y. & N.J., 313 N.J. Super. 395, 401-02, 712 A.2d 1250 (App. Div.)* (summarizing industrial hygienist's testimony that the plaintiff should have been warned about dangers of asbestos in the workplace), *certif. denied*, 157 N.J. 544, 724 A.2d 803 (1998). Although Jones was not qualified to testify to the specific format or wording of the warnings, he did not.

Defendants further contend that Jones' opinions on the state-of-the-art knowledge in the industry and adequacy of the warnings should have been excluded because they were not based on a proper methodology. They assert that Jones failed to analyze what the industry had known prior to January 1974.

In a toxic tort failure-to-warn case, the plaintiff must establish that the defendant had a duty to warn. *James, supra, 155 N.J. at 297-98*. "To establish such **[\*83]** a duty, the plaintiff must satisfy 'a very low threshold of proof in order to impute to a manufacturer sufficient knowledge to trigger the duty to provide a warning of the harmful effects of its product.'" *Ibid.* (quoting *Coffman, supra, 133 N.J. at 599*). In strict liability cases, "knowledge of the harmful effects of a product will be imputed to a manufacturer on a showing that 'knowledge of the defect existed within the relevant industry.'" *Id. at 298* (quoting *Coffman, supra, 133 N.J. at 599*). "The plaintiff need not prove that the defendant manufacturer was cognizant of a defect, but rather that knowledge of the defect existed within the relevant industry." *Coffman, supra, 133 N.J. at 599*. If proceeding under a theory of negligence, "the plaintiff must demonstrate that the specific defendant knew or should have known of the potential hazards of the product." *James, supra, 155 N.J. at 298*.

"Once proof of such knowledge in the industry has been established, triggering the duty to warn, the plaintiff must show that an adequate warning was not provided." *Ibid.* The manufacturer's conduct generally "should be measured by knowledge at the time the manufacturer distributed the product." *Feldman v. Lederle Labs., 97 N.J. 429, 452, 479 A.2d 374 (1984)*. **[\*84]** "The duty to warn exists not only to protect and alert product users but to encourage manufacturers and industries, which benefit from placing products into the stream of commerce, to remain apprised of the hazards posed by a product." *Coffman, supra, 133 N.J. at 599*. The manufacturer "should keep abreast of scientific advances," and is held to the standard of an expert. *Feldman, supra, 97 N.J. at 452-53*.

Contrary to defendants' assertion, Jones extensively discussed in his report and testimony the numerous studies conducted prior to 1974 that showed VCM toxicity in laboratory animals and to workers in the VCM industry. He was also aware of the Lester study that concluded that VCM was not harmful. Jones testified that the NIOSH recommended providing workers with information regarding the results of animal toxicity studies. He also cited recommendations by Torkelson and the ACGIH that the industry lower threshold ceiling exposure limits for VCM. Thus, Jones considered the state of the knowledge of the industry prior to 1974.

Lastly, defendants contend that Pantasote was a typical manufacturer in the industry, and it did not consider VCM to be toxic to humans prior to 1974. Thus, defendants **[\*85]** assert that the state of the knowledge in the industry did not require a stronger warning. In support of this argument, defendants cite testimony by

Jacob Jaglom, Pantasote's former president, who stated that Pantasote had "all" the same knowledge about the potential health hazards of VCM as the rest of the industry, and Pantasote did not interpret the then state-of-the-art knowledge to require revised warnings prior to 1974. However, Jaglom also testified that before the 1970's he did not know that VCM exposure caused liver damage in animals or workers, or that some scientists had recommended lowering the TLV for VCM to 50 ppm, or that other companies had been monitoring their workers for liver damage. Thus, there was evidence that Pantasote did not have the same knowledge as defendants regarding the toxicity of VCM, and therefore, the company did not possess representative knowledge of the industry. Accordingly, the court did not err in denying the motion to exclude Jones from testifying as to the state-of-the-art knowledge in the industry regarding the toxicity of VCM and the adequacy of the warnings.

VII.

Goodrich, PPG, and Shell argue that the trial court erred in denying their **[*86]** motion for summary judgment on the inadequate warnings claim. Defendants contend plaintiff not only failed to present any evidence that they had a duty to warn, but also failed to present evidence of a "feasible alternative warning." Defendants also assert that plaintiff failed to present expert evidence showing that defendants should have known prior to 1974 that vinyl chloride was a potential human carcinogen. Hexion joins in the argument.

A court will grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *R. 4:46-2(c)*; *Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995)*. "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." *R. 4:46-2(c)*. On appeal, we apply the same standard. *Atl. Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J. Super. 224, 230, 903 A.2d 513 (App. Div.)*, **[*87]** *certif. denied*, 189 N.J. 104, 912 A.2d 1264 (2006).

We have considered defendants' arguments in light of the record and applicable law. We affirm substantially for the reasons expressed by the trial court in its oral decision of October 25, 2007. Nevertheless, we add the following comments.

Defendants first contend that plaintiff failed to present evidence that they, as opposed to Pantasote, had a duty to warn Lewis of the dangers of exposure to VCM.

The manufacturer of a product has a duty to warn about any risk relating to the product that it knows or ought to know "on the basis of reasonably obtainable or available knowledge." *Feldman, supra, 97 N.J. at 434*. "In the employment context, a manufacturer's duty to warn of the dangers posed by its products extends to both the employer and the employees of the recipient entity." *James, supra, 155 N.J. at 298*.

Plaintiff presented evidence that Goodrich, PPG, and Shell sold VCM to Pantasote. Jones opined that the "suppliers of VCM and the MCA," which included all defendants--even Hexion, "should have lowered their exposure recommendations at least as early as 1961 and given adequate warning of the various health effects found in humans and animals." Thus, **[*88]** plaintiff presented sufficient evidence for purposes of summary judgment that defendants had a duty to warn.

Next, Goodrich, PPG, and Shell assert that plaintiff failed to present evidence of a "feasible alternative warning that would have prevented Lewis' alleged occupational exposure." We determine under the facts that plaintiff was not required to present evidence of a feasible adequate warning.

Once a plaintiff establishes a duty to warn, he or she must then establish that an adequate warning was not provided. *Ibid*. To reinforce the duty to provide necessary warnings, New Jersey applies a rebuttable "heeding presumption" to ease the plaintiff's burden in establishing that the lack of a warning was a proximate cause of the injury. *Id. at 297*. The presumption is that the plaintiff would have followed an adequate warning had one been provided. *Coffman, supra, 133 N.J. at 591*. In the employment context, the presumption is not only that the employee would have heeded the warning, but also that the employer would have heeded the warning and communicated it to the employees, thereby enabling the employees to take precautions. *Theer v. Philip Carey Co., 133 N.J. 610, 621, 628 A.2d 724 (1993)*.

From 1962 **[*89]** to 1974, Goodrich, PPG, and Shell provided no warnings to either Pantasote or Lewis, even though knowledge existed of the toxic effects of VCM in the industry. In that regard, Jones opined that defendants should have "given adequate warning of the various health effects found in humans and animals." He testified that the warning should have included information that VCM exposure causes liver damage and should have suggested that employers lower exposure standards and monitor VCM levels. Therefore, for summary judgment purposes, the record contained sufficient evidence that those defendants had failed to provide an adequate warning to withstand the motion, and the presumption is that plaintiff would have followed an adequate warning had one been provided. *Coffman, supra, 133 N.J. at 591*.

Finally, Goodrich, PPG, and Shell argue the court erred in finding that a genuine issue of fact existed as to whether they "acted like reasonable experts in the field" in investigating and warning of the potential health hazards of VCM. They claim that prior to 1974, there was no evidence that exposure to VCM was a "potential human carcinogen." Not so.

"The question in strict liability design-defect and **[*90]** warning cases is whether, assuming that the manufacturer knew of the defect in the product, [it] acted in a reasonably prudent manner in marketing the product or in providing the warnings given." *Feldman, supra, 97 N.J. at 451*. "Generally, the state of the art in design defect cases and available knowledge in defect warning situations are relevant factors in measuring reasonableness of conduct." *Ibid.*

The record contained ample evidence showing that prior to 1974 knowledge of the toxicity of VCM existed within the industry. As early as 1959, there were indications of VCM toxicity in animals (e.g., the Rowe study), and as a result, at least one member of the industry noted that VCM "is more toxic than [was previously] believed." The Mastromatteo, Torkelson and Viola animal experiments conducted in 1960, 1968, and 1970 also showed liver damage to animals. As noted by the trial court, correspondence existed among industry members discussing the animal studies and the toxicity of VCM to humans. Indeed, in 1963, Goodrich began testing its workers for liver damage, indicating it had some knowledge of the danger of VCM exposure.

Because a "duty to warn is triggered by early warning flags of **[*91]** danger from a product, so that people are not needlessly exposed to the possible dangers of a product during the time that extensive testing is being done," *Magistrini v. One Hour Martinizing Dry Cleaning, 109 F. Supp. 2d 306, 313-14 (D.N.J. 2000)*, aff'd *68 Fed. App'x. 356 (3d Cir. 2003)*, we agree with the trial court that a material question of fact existed as to whether defendants had knowledge prior to 1974 of the link between VCM exposure and cancer.

VIII.

Hexion argues that the court erred in denying defendants' motion for summary judgment on plaintiff's civil conspiracy claim because once plaintiff's fraud claim was dismissed, plaintiff failed to assert another underlying intentional tort in support of the conspiracy claim. We agree.

In denying defendants' motion, the trial court accepted the proposition that a conspiracy charge founded solely on negligence will not suffice. Although the court found no New Jersey cases addressing the issue, it was persuaded by the rationale of several out-of-state cases that held "a strict **[*92]** liability claim can serve as an underlying tort and co-conspirators can be liable in the products liability arena for the intentional acts of a defendant manufacturer." Adopting the rationale underlying the out-of-state decisions, the court found that plaintiff had produced sufficient facts "to establish a conspiracy claim with respect to the secrecy pact in 1972 through 1974." But the court made "no ruling" as to "any claim of a conspiracy among the defendants with regard to an effort to withhold information relative to the adverse effects of VCM at any point prior to 1972 and that issue is deferred."

Under New Jersey law, "a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177, 876 A.2d 253 (2005)* (internal quotation omitted); *see also Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364, 633 A.2d 985 (App. Div. 1993)*, certif. denied, *135 N.J. 468, 640 A.2d 850 (1994)*. A party is liable if he or she understands **[*93]** the general objectives of the conspiracy, accepts them, and makes an implicit or explicit agreement to further those objectives. *Banco Popular, supra, 184 N.J. at 177*. "Most importantly, the gist of the claim is not the unlawful agreement, but the underlying wrong which,

absent the conspiracy, would give a right of action." *Id. at 177-78* (internal quotation omitted).

We could not find any New Jersey State court opinions addressing the issue of whether the tort underlying a civil conspiracy claim must be intentional. Nonetheless, we note that the reported cases sustaining civil conspiracy claims are based on underlying intentional torts. *See ibid.* (holding that an allegation of a conspirator agreeing to perform a fraudulent transfer of assets in violation of the Uniform Fraudulent Transfer Act, *N.J.S.A. 25:2-20 to -34*, was sufficient to state a conspiracy claim); *Bd. of Educ. of Asbury Park v. Hoek, 38 N.J. 213, 238-39, 183 A.2d 633 (1962)* (upholding a verdict based on a civil conspiracy where there was evidence showing that the conspirators attempted to deceive the plaintiff to purposely avoid a public bidding statute); *Middlesex Concrete Prods. & Excavating Corp. v. Carteret Indus. Ass'n, 37 N.J. 507, 516-17, 181 A.2d 774 (1962)* **[*94]** (holding that a complaint alleging a civil conspiracy based on the conspirators malicious interference with plaintiff's contractual rights and business or economic relations with a municipality was sufficient to state a cause of action); *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l Inc., 387 N.J. Super. 469, 485-86, 904 A.2d 775 (App. Div. 2006)* (reversing trial court's order dismissing complaint on civil conspiracy claim where plaintiff pled common law fraud as an underlying wrong); *Morgan, supra, 268 N.J. Super. at 367* (reversing a trial court's dismissal of a civil conspiracy claim to deny a plaintiff employment because of his political affiliations because the record contained evidence of the defendants' intentional harassment to force the plaintiff into an involuntary resignation).

Although, no New Jersey State court has specifically addressed this issue, a majority of other courts that have addressed it held that the underlying tort in a civil conspiracy claim must be intentional. *See, e.g., Brown v. Philip Morris Inc., 228 F. Supp. 2d 506, 517 n.10 (D.N.J. 2002)* (noting that absent the plaintiff's fraud claim or other intentional tort, her conspiracy claim **[*95]** fails for lack of an underlying tort); *United States v. Mitlof, 165 F. Supp. 2d 558, 564 (S.D.N.Y. 2001)* (disapproving principle that one can conspire to act unintentionally as logical impossibility), *aff'd sub nom. United States v. Sheehan, 89 Fed. App'x. 307 (2d Cir. 2004)*; *Sackman v. Liggett Group, Inc., 965 F. Supp. 391, 395-96 (E.D.N.Y. 1997)* (acknowledging that civil conspiracy requires an underlying intentional tort but declining to grant summary judgment because of the

possibility that strict product liability may be a sufficient basis for civil conspiracy claim); *Sonnenreich v. Philip Morris Inc., 929 F. Supp. 416, 419-20 (S.D. Fla. 1996)* (noting conspiracy to commit negligence is illogical, and conspiracy must be based on intentional tort); *Goldstein v. Philip Morris, Inc., 2004 PA Super 260, 854 A.2d 585, 590 (Pa. Super. Ct. 2004)* (affirming dismissal of civil conspiracy claim because complaint only alleged strict liability and negligence); *Rosen v. Brown & Williamson Tobacco Corp., 11 A.D.3d 524, 782 N.Y.S.2d 795, 795 (N.Y. App. Div. 2004)* (granting summary judgment because civil conspiracy requires showing of intentional conduct).

However, as cited by the trial court, other out-of-state cases provide **[*96]** support for the proposition that a plaintiff may assert a conspiracy claim solely upon a products liability cause of action. *See Sackman, supra, 965 F. Supp. at 396*; *Wright v. Brooke Group Ltd., 652 N.W.2d 159, 174 (Iowa 2002)* (permitting claim of civil conspiracy on wrongful conduct that did not constitute an intentional tort); *see also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 175 F. Supp. 2d 593, 633 (S.D.N.Y. 2001)* (permitting a civil conspiracy claim in a strict liability design defect action based on allegations that the defendants had marketed the alleged defective product intentionally).

Here, the court found that plaintiff's strict liability claim could provide the underlying tort for her civil conspiracy claim. A strict liability claim does not, however, involve an element of intent. *Myrlak v. Port Auth. of N.Y. & N.J., 157 N.J. 84, 97, 723 A.2d 45 (1999)* (stating that fault is not a necessary element in a strict liability action); *see also O'Brien v. Muskin Corp., 94 N.J. 169, 180, 463 A.2d 298 (1983)* ("Under strict liability, a manufacturer that produces defective products is liable even if those products are carefully produced.)."

Although our Supreme Court has not specifically addressed **[*97]** whether the tort underlying a civil conspiracy claim can be anything other than an intentional tort, we determine the rationale adopted by the majority of courts that have addressed the issue is more persuasive, and that the Court would follow the majority and require the underlying tort in a civil conspiracy claim to be intentional. Accordingly, we conclude that the trial court erred in holding plaintiff could assert her conspiracy claim based upon a products liability cause of action. Therefore, we reverse that part of the November 8, 2007 order that denied defendants' motions for summary judgment seeking to

dismiss plaintiff's civil conspiracy claims. In so doing, we need not address Hexion's alternative argument that it did not conspire with remaining defendants.

IX.

In sum, we reverse those parts of the December 15, 2008 order excluding Infante and Kipen from testifying; affirm those parts of the December 15, 2008 order denying defendants' motions seeking to exclude Groth and Jones from testifying; reverse that part of the February 5, 2009 order granting defendants' motions for summary judgment dismissing the complaint; affirm that part of the November 8, 2007 order denying defendants' [*98] motions for summary judgment on the adequacy of the warning claim; and reverse that part of the November 8, 2007 order denying defendants' motions for summary judgment on the civil conspiracy claim.

Affirmed in part; and reversed in part.

*APPENDIX*

*ACRONYM - DEFINITION*

ACGIH - American Conference of Government Industrial Hygienists

ASL - Angiosarcoma

CT - Computerized Tomography

HCC - Hepatocellular Carcinoma

IARC - International Agency for Research on Cancer

MAC - Maximum Allowable Concentration

MCA - Manufacturing Chemists Association

MSDS - Material Safety Data Sheet

NAFL - Non-Alcoholic Fatty Liver Disease

NIOSH - National Institute for Occupational Safety and Health

OSHA - Occupational Safety and Health Administration

ppm - Parts Per Million

PVC - Polyvinyl Chloride

SD-56 - Chemical Safety Data Sheet SD-56

SMR - Standardized Mortality Ratio

TLV - Threshold Limit Values

USEPA - United States Environmental Protection Agency

VCM - Vinyl Chloride Monomer

---

**End of Document**

# Exhibit I

## *McFeeley v. Kar*

Superior Court of New Jersey, Appellate Division

November 27, 2018, Argued; January 18, 2019, Decided

DOCKET NOS. A-4543-17T1, A-4955-17T1

**Reporter**

2019 N.J. Super. Unpub. LEXIS 147 *; 2019 WL 254591

WILLIAM and CAROLYN MCFEELEY, husband and wife, Plaintiffs-Appellants, v. SUNNY KAR, D.O., Defendant-Respondent, and BLESSIE PAGDILAO, R.N., JAMES FOREMAN, R.N., and KENNEDY UNIVERSITY HOSPITAL, INC., Defendants.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Subsequent History:** Certification denied by *McFeeley v. Kar, 2019 N.J. LEXIS 650 (N.J., May 9, 2019)*

**Prior History:** **[*1]** On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. L-3101-17.

**Counsel:** Pamela A. Brown-Jones argued the cause for appellants (Weiss & Paarz, PC, attorneys; Robert E. Paarz, of counsel; Pamela A. Brown-Jones, on the briefs).

Michael J. Lunga argued the cause for respondent.

**Judges:** Before Judges Gilson and Natali.

## Opinion

PER CURIAM

These consolidated appeals arise out of a medical malpractice claim and present questions concerning proper notice under the *New Jersey Tort Claims Act (Act), N.J.S.A. 59:1-1 to 12-3*. Plaintiffs William and Carolyn McFeeley appeal from an April 27, 2018 order denying their motion to file a late notice of tort claim against Rowan University and Sunny Kar, D.O., who was a surgical resident at the Rowan School of Osteopathic Medicine. On leave granted, plaintiffs also appeal from a second order entered on April 27, 2018,

that dismissed their complaint against Dr. Kar and denied their motion to add the State of New Jersey as a defendant. Finally, plaintiffs appeal, on leave granted, from a May 24, 2018 order denying reconsideration of the orders entered on April 27, 2018.

Having reviewed the record and law, we affirm. The notice plaintiffs submitted was not effective under the Act. **[*2]** That notice was also not in substantial compliance with the notice requirements of the Act. Moreover, the trial court did not abuse its discretion in not permitting a late notice of tort claim. Finally, the trial court did not err in denying plaintiffs' motion to amend their complaint to name the State of New Jersey as a defendant.

I.

We take the facts from the record developed on the motions. On March 28, 2016, plaintiff William McFeeley was admitted to Kennedy University Hospital — Stratford (Kennedy Hospital) for gastric sleeve surgery. At that time, William was fifty-two years old. Following the surgery, on March 29, 2016, William suffered a heart attack.

Plaintiffs contend that the on-call surgical resident and nurses who treated William on March 29, 2016, were negligent because they failed to timely diagnose and treat the heart attack. Plaintiffs also assert that as a result of the delayed treatment, William sustained permanent damage to his heart.

On March 29, 2016, defendant Sunny Kar, D.O., was the on-call surgical resident at Kennedy Hospital. He acknowledges providing medical care to William on March 29, 2016. Dr. Kar did not work for Kennedy Hospital. Instead, in March 2016, **[*3]** Dr. Kar was a resident at the Rowan School of Osteopathic Medicine and was employed by Rowan University.

On May 19, 2016, plaintiffs' prior attorney sent a notice of tort claim to (1) the New Jersey Acting Attorney General; (2) "Kennedy Health System"; and (3) "Rutgers, the State University of New Jersey, f/k/a

UMDNJ/University of Medicine and Dentistry of New Jersey." That notice provided a general description of William's heart attack and alleged injuries and stated that the negligence took place at "Kennedy Health System-Stratford/University Medical Center."

The notice did not identify Rowan University. Instead, in response to the question that asks for the name of the public entity or entities that allegedly caused the damage, the notice stated: "Unknown at this time, including but not limited to Kennedy Health System/University Medical Center and/or Rutgers, the State University of New Jersey, f/k/a UMDNJ/University of Medicine and Dentistry of New Jersey, and/or any other state agency which selected, supervised and/or insured the above-named individuals." The notice also did not name Dr. Kar. Rather, in response to the question that asked for the identity of the public employees [*4] who were allegedly at fault, the notice stated: "Nurse Blessie (last name unknown) and others to be named after receipt of records[,] any and all other physicians, nurses, and/or other healthcare providers identified in the records but whose names are illegible."

The cover letter that accompanied the notice of tort claim asked the recipients to deliver a copy of the notice to any medical providers who are public employees or entitled to notice under the Act. The cover letter also asked the recipients to communicate with plaintiffs' attorney if "any additional information is required or if any specific claim form needs to [be] completed[.]" Plaintiffs represent that they and their prior lawyer did not receive any response to the notice of claim or cover letter.

In June 2017, plaintiffs retained new attorneys. Plaintiffs' new attorneys filed a complaint on August 8, 2017. The complaint named as defendants Dr. Kar, Nurse Blessie Pagdilao, and Kennedy Hospital. The complaint also named "John/Jane Doe[s]," who were unknown physicians, employers, and medical providers.

On November 14, 2017, Dr. Kar filed an answer. In his answer, Dr. Kar stated that he was an employee of Rowan University and, [*5] as an affirmative defense, he asserted that plaintiffs had failed to comply with the notice provisions of the Act. Three months later, on February 26, 2018, Dr. Kar filed a motion to dismiss plaintiffs' complaint against him for failure to serve a tort claim notice as required by the Act.

Plaintiffs opposed that motion and cross-moved to file a late tort claim notice and to amend their complaint to name the State of New Jersey as a defendant. The trial court heard oral arguments on those motions on April 27, 2018. That same day, the court entered orders (1) granting Dr. Kar's motion to dismiss the claims against him, (2) denying plaintiffs' motion to file a late tort claim notice against Dr. Kar and Rowan University, and (3) denying plaintiffs' motion to name the State of New Jersey as a defendant.

The court explained its rulings on the record. With regard to the motion to dismiss, the court held that the tort claim notice sent on May 19, 2016, was not in compliance with the Act because it failed to identify Rowan University. The court then reasoned that plaintiffs had not shown extraordinary circumstances and, therefore, were not entitled to file a late notice. Finally, the court ruled [*6] that plaintiffs would not be allowed to amend their complaint to name the State as a defendant because such an amendment would be an impermissible "end run" around the notice required by the Act.

Plaintiffs filed for reconsideration. The court denied that motion in an order entered on May 24, 2018, and explained the reasons for that denial on the record.

Plaintiffs appeal as of right from the order denying their motion to file a late tort claim notice. *See Rule 2:2-3(a)*. We granted leave for plaintiffs to also appeal the orders dismissing the complaint against Dr. Kar, denying their motion to add the State as a defendant, and denying their motion for reconsideration. We then consolidated the two appeals.

II.

On appeal, plaintiffs make four arguments, contending (1) the notice they sent on May 19, 2016 was in compliance with the Act and was effective against Rowan University and Dr. Kar; (2) alternatively, the notice was substantially compliant with the Act; (3) they should be permitted to file a late tort claim notice; and (4) they should be permitted to amend their complaint to name the State as a defendant. Given the requirements and limitations of the Act, we reject these arguments.

We begin our [*7] analysis with an overview of the Act. The Act governs tort claims against public entities and public employees. *Rogers v. Cape May Cty. Office of the Pub. Def., 208 N.J. 414, 420, 31 A.3d 934 (2011)*. "'Public entity' includes the State, and any county, municipality, district, public authority, public agency, and any other political subdivision or public body in the

2019 N.J. Super. Unpub. LEXIS 147, *7

State." _N.J.S.A. 59:1-3_. A "public employee" is "an employee of a public entity[.]" _Ibid._

The Act "is the statutory mechanism through which our Legislature effected a waiver of sovereign immunity." _D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 133, 61 A.3d 906 (2013)_. "The guiding principle of the [Act] is that 'immunity from tort liability is the general rule and liability is the exception[.]'" _Coyne v. DOT, 182 N.J. 481, 488, 867 A.2d 1159 (2005)_ (quoting _Garrison v. Twp. of Middletown, 154 N.J. 282, 286, 712 A.2d 1101 (1998))_.

The Act "establishes the procedures by which claims may be brought[.]" _Beauchamp v. Amedio, 164 N.J. 111, 116, 751 A.2d 1047 (2000)_. One of the procedures the Act imposes on a party seeking to bring a tort claim is a requirement to file a notice of tort claim. _D.D., 213 N.J. at 134; see also N.J.S.A. 59:8-1 to -11_. The notice has a number of required components including (1) when it has to be filed, _N.J.S.A. 59:8-8_; (2) what information it must contain, _N.J.S.A. 59:8-4_; and (3) where it has to be filed, _N.J.S.A. 59:8-7_.

With regard to timing, the notice must be filed within ninety days of the claim's accrual. _N.J.S.A. 59:8-8_. In "extraordinary circumstances," the Act allows a late filing of a notice of claim. _N.J.S.A. 59:8-9_. In that regard, the Act provides:

> A claimant **[*8]** who fails to file notice of his [or her] claim within 90 days as provided in _section 59:8-8_ of this act, may, in the discretion of a judge of the Superior Court, be permitted to file such notice at any time within one year after the accrual of his [or her] claim provided that the public entity or the public employee has not been substantially prejudiced thereby. Application to the court for permission to file a late notice of claim shall be made upon motion supported by affidavits based upon personal knowledge of the affiant showing sufficient reasons constituting extraordinary circumstances for his [or her] failure to file notice of claim within the period of time prescribed by _section 59:8-8_ of this act or to file a motion seeking leave to file a late notice of claim within a reasonable time thereafter; provided that in no event may any suit against a public entity or a public employee arising under this act be filed later than two years from the time of the accrual of the claim.
>
> [_Ibid._]

The contents of a proper notice of claim are governed by _N.J.S.A. 59:8-4_. Among other information, the notice must include "[t]he name or names of the public entity, employee or employees causing the injury, damage or loss, if known[.]" _N.J.S.A. 59:8-4(e)_. Our **[*9]** Supreme Court has construed that requirement to mean that "[t]he notice must include the name of the public entity, and the name of the employee or employees causing the injury, if known." _Velez v. City of Jersey City, 180 N.J. 284, 290, 850 A.2d 1238 (2004)_ (citing _N.J.S.A. 59:8-4(e)_). Thus, while a public employee need not always be identified in the notice, a public entity must be identified. _See In re Roy, 142 N.J. Super. 594, 599-600, 362 A.2d 589 (App. Div. 1976)_ (explaining that the notice of tort claim did not require the names of specific public employees, but required that the claimant list which public entity employed the individuals involved in the accident).

The Act also mandates where notices are to be presented. _N.J.S.A. 59:8-7_. For claims against the State, the notice "shall be filed either with (1) the Attorney General or (2) the department or agency involved in the alleged wrongful act or omission." _Ibid._ For claims against a local public entity, the notice "shall be filed with that entity." _Ibid._

Guided by this general overview of the Act, we evaluate each of plaintiffs' four arguments. We begin with the motion to dismiss and review that order de novo. _See Gomes v. Cty. of Monmouth, 444 N.J. Super. 479, 486, 134 A.3d 33 (App. Div. 2016)_. A court dismissing a civil complaint with prejudice "must 'search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned **[*10]** even from an obscure statement of claim, opportunity being given to amend if necessary.'" _Ibid._ (alteration in original) (quoting _Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989))_. "Nevertheless, a purely legal question of whether a defendant is insulated from liability because of an immunity or some other statutory provision ideally should be resolved, if possible, at an early stage of the litigation." _Ibid.; see also Rivera v. Gerner, 89 N.J. 526, 536, 446 A.2d 508 (1982)_ (noting that resolving issues involving the Act through the pretrial process "is to be encouraged").

A. The May 19, 2016 Notice

Plaintiffs contend that their May 19, 2016 notice was in compliance with the Act and effective because it was filed with the Attorney General and Rowan University is

a state agency. Rowan University, however, is not a state agency.

Rowan University was established by the Legislature as "a body corporate and politic." *N.J.S.A. 18A:64M-4*. The Legislature declared that as a university, "[Rowan University] shall be given a high degree of self-government and that the governance and conduct of the university shall be free of partisanship." *N.J.S.A. 18A:64M-5*. Accordingly, the board of trustees of Rowan University was given specific powers, including the power to "[s]ue and be sued in its own name." *N.J.S.A. 18A:64M-9(y)*.

The university also has the right **[*11]** to retain independent legal counsel, including representation by the Attorney General. *N.J.S.A. 18A:64M-9(z)*. With regard to tort claims, Rowan University, like other New Jersey public institutions of higher education, had to choose to retain its own legal counsel or elect to be represented by the Attorney General. *Ibid.*; *N.J.S.A. 18A:3B-6(h)*. Moreover, Rowan University also had to choose whether to elect representation by the Attorney General on medical malpractice claims incurred at the School of Osteopathic Medicine. *N.J.S.A. 18A:64M-33*. As to both tort and medical malpractice claims, Rowan University elected to be represented by the Attorney General. *See* Rowan Univ. Office of Risk Mgmt. & Ins., *Professional Liability Program of Self-Insurance*, Rowan University School of Osteopathic Medicine (July 2014), https://sites.rowan.edu/rmi/_docs/_prof-liability/SOMProfessionalLiabilityBooklet.pdf ; *see also General Liability*, Rowan University, https://sites.rowan.edu/rmi/general.html (last visited Jan. 2, 2018).

In short, Rowan University is a public entity and not a state agency. *See English v. Newark Hous. Auth., 138 N.J. Super. 425, 429-30, 351 A.2d 368 (App. Div. 1976)* (describing a "public entity" as an entity that possesses sovereignty parceled to it from the State, and is to that degree independent of the State, as opposed to **[*12]** an administrative part, such as a state agency, which merely shares in the State's sovereignty); *see also N.J.S.A. 59:1-3* (limiting the definition of State to preclude any "entity which is statutorily authorized to sue and be sued"). While Rowan University has elected to be represented by the Attorney General for tort and medical malpractice claims, that does not change its status as a public entity.

Accordingly, the issue here is whether the notice of tort claim filed with the Attorney General was effective against Rowan University and its employee, Dr. Kar. We hold that the failure to name Rowan University in the notice made the notice ineffective under the Act. As already noted, the Act requires the notice to include the name of the public entity. *N.J.S.A. 59:8-4(e)*. Our Supreme Court has explained that the Act's requirements are to be strictly construed, *McDade v. Siazon, 208 N.J. 463, 474, 32 A.3d 1122 (2011)*, and with regard to the contents of the notice, the public entity must be identified. *See Velez, 180 N.J. at 290*. The Court has also explained the purposes of the notice requirements, which are:

> (1) "to allow the public entity at least six months for administrative review with the opportunity to settle meritorious claims prior to the bringing of suit"; (2) "to provide the public entity **[*13]** with prompt notification of a claim in order to adequately investigate the facts and prepare a defense[]"; (3) "to afford the public entity a chance to correct the conditions or practices which gave rise to the claim"; and (4) to inform the State "in advance as to the indebtedness or liability that it may be expected to meet."

> [*Beauchamp, 164 N.J. at 121-22* (citations omitted) (first quoting Margolis & Novack, 1972 Task Force Comment to *N.J.S.A. 59:8-3*; then quoting *Fuller v. Rutgers, State Univ., 154 N.J. Super. 420, 426, 381 A.2d 811 (App. Div. 1977))*.]

Sending the Attorney General a notice that does not identify the specific public entity does not allow the Attorney General to identify what entity is allegedly at fault. Moreover, such a notice does not allow the public entity to review, adequately investigate, and potentially correct or settle the claim before a suit is brought. *See Velez, 180 N.J. at 290*; *Beauchamp, 164 N.J. at 121-22*. Consequently, we affirm the trial court's order dismissing plaintiffs' claims against Dr. Kar for failure to comply with the notice requirements of the Act.

Plaintiffs argue that requiring the identity of the public entity in the notice would be a new rule, which should not be applied to them. We disagree. Since its enactment, the Act has required a notice to identify the public entity. *N.J.S.A. 59:8-4(e)*; *see also Velez, 180 N.J. at 290*.

B. Substantial Compliance

Next, **[*14]** and in the alternative, plaintiffs argue that if

2019 N.J. Super. Unpub. LEXIS 147, *14

their May 19, 2016 notice was defective, it was nonetheless substantially compliant. We disagree.

Substantial compliance, when applied to tort claims, "has been limited carefully to those situations in which the notice, although both timely and in writing, had technical deficiencies that did not deprive the public entity of the effective notice contemplated by the statute." *D.D., 213 N.J. at 159*. The failure to identify Rowan University as the public entity was not a technical deficiency. Without identifying Rowan University, the university was deprived of the effective notice contemplated by the Act.

Plaintiffs argue that because Rowan University had elected to be represented by the Attorney General for medical malpractice and tort claims, its notice sent to the Attorney General substantially complied with the Act. Compliance with the provisions providing where notice must be filed, *N.J.S.A. 59:8-7*, cannot be bootstrapped into substantial compliance with the provisions providing what information the notice must possess, *N.J.S.A. 59:8-4(e)*. That point is illustrated here because the Attorney General represents numerous state agencies and public entities. If compliance with *N.J.S.A. 59:8-7* was sufficient **[*15]** to fulfill the requirement of *N.J.S.A. 59:8-4(e)*, than *N.J.S.A. 59:8-4(e)* would be rendered superfluous. As a condition of waiving sovereign immunity, the Act requires a claimant to identify the public entity that is allegedly at fault. *N.J.S.A. 59:8-4(e)*; *see also Velez, 180 N.J. at 290*. Consequently, the notice sent on behalf of plaintiffs did not substantially comply with that statutory requirement.

C. A Late Notice of Claim

Plaintiffs also argue that the trial court erred in denying their motion to file a late notice of claim under the Act. We review such an action for an abuse of discretion. *McDade, 208 N.J. at 476-77* (citing *Lamb v. Glob. Landfill Reclaiming, 111 N.J. 134, 146, 543 A.2d 443 (1988))*. "Although deference will ordinarily be given to the factual findings that undergird the trial court's decision, the court's conclusions will be overturned if they were reached under a misconception of the law." *D.D., 213 N.J. at 147* (citing *McDade, 208 N.J. at 473-74*).

In support of their motion to file a late notice, plaintiffs submitted a certification from William McFeeley. In that certification, William states that he had no interactions with Dr. Sunny Kar during or after his surgery on March

29, 2016, and had no recollection of ever meeting Dr. Kar. William also represents that he does not recall anyone notifying him that Dr. Kar was a medical resident from Rowan University. We discern no abuse of **[*16]** discretion in the trial court's determination that such contentions do not constitute extraordinary circumstances allowing a late notice under the Act.

Here, there was no showing that a review of William's medical records at Kennedy Hospital would not have disclosed that Dr. Kar provided care to William on March 29, 2016. In *D.D.*, our Supreme Court held that an attorney's failure to file a timely tort claim notice did not amount to an extraordinary circumstance. *213 N.J. at 158*. The plaintiff in *D.D.* claimed that she did not know that she needed to file a tort claim notice and that she was suffering from increased stress and anxiety due to the defendants' negligence. *Id. at 137-38*. Nevertheless, the Court held that such inattention cannot serve to "vault the statutory threshold." *Id. at 157*. Indeed, the Court explained that "sympathy for a particular plaintiff" cannot "obscure" the commandment in the Act "that relief be granted only in circumstances that are extraordinary." *Id. at 158*.

D. The Amendment

Finally, plaintiffs argue that they should have been allowed to amend their complaint and name the State of New Jersey as a defendant. While amendments to complaints should ordinarily be freely granted, *see Rule 4:9-1*, here the amendment must be considered **[*17]** in light of the requirements of the Act. *See Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501, 888 A.2d 464 (2006)* (noting "courts are free to refuse leave to amend when the newly asserted claim is not sustainable as a matter of law" (quoting *Interchange State Bank v. Rinaldi, 303 N.J. Super. 239, 256-57, 696 A.2d 744 (App. Div. 1997)))*.

A searching review of the record here discloses no claim against the State of New Jersey. Dr. Kar was an employee of Rowan University. While his lawyer mistakenly sometimes refers to Dr. Kar as a "state employee," Dr. Kar clearly was not a state employee. Instead, he was an employee of a public entity. Accordingly, amending the complaint to include the State of New Jersey as a defendant "would be a useless endeavor." *Notte, 185 N.J. at 501*. Just as importantly, as the trial court correctly noted, allowing plaintiffs to name the State as a defendant would be contrary to the notice and timing requirements of the Act. *See ibid.*

2019 N.J. Super. Unpub. LEXIS 147, *17

(explaining courts consider potential prejudice to non-moving parties in determining whether to grant leave to amend a complaint). Accordingly, we also affirm the order denying plaintiffs' motion to amend their complaint to name the State as a defendant.

In summary, the requirements and limitations imposed by the Act establish that plaintiffs did not file a timely notice, the notice was not in substantial compliance, **[*18]** there was no abuse of discretion in denying their request to file a late notice, and they had no basis to file a claim against the State. As a consequence, the trial court also did not err in denying reconsiderations of those orders.

Affirmed.

---

**End of Document**

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
*Attorney for Defendants, Hunterdon County Prosecutor's Office*
*(improperly pled as Hunterdon County) and Kelsey Marsh*

By:   Catriona Coffey (Attorney ID # 381682021)
      Deputy Attorney General
      (609) 376-2440
      catriona.coffey@law.njoag.gov

| | |
|---|---|
| ERIC WEISS,<br><br>                    Plaintiff,<br><br>      v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br><br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><br>Civil Action<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND/OR TO DISMISS THE COMPLAINT** |

**THIS MATTER**, having been brought before the Court by Matthew J. Platkin, Attorney General of New Jersey, with Catriona Coffey, Deputy Attorney General, appearing on behalf of Defendants Hunterdon County Prosecutor's Office

(improperly pled as Hunterdon County) and Kelsey Marsh, and the Court having considered the papers submitted herein, and for good cause shown;

IT IS on this _____ day of _____, 2025;

**ORDERED** that Defendants' Motion for Summary Judgment/Dismissal is GRANTED; and

**FURTHER ORDERED** that Plaintiff's Complaint is hereby DISMISSED WITH PREJUDICE against Defendants Hunterdon County Prosecutor's Office and Kelsey Marsh.

_____
Hon. William G. Mennen, J.S.C.

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
*Attorney for Defendants, Hunterdon County Prosecutor's Office*
*(improperly pled as Hunterdon County) and Kelsey Marsh*

By:   Catriona Coffey (Attorney ID # 381682021)
      Deputy Attorney General
      (609) 376-2440
      catriona.coffey@law.njoag.gov

| | |
|---|---|
| ERIC WEISS,<br><br>                    Plaintiff,<br><br>      v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br><br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><br><u>Civil Action</u><br><br>**CERTIFICATE OF SERVICE** |

I hereby certify that the Notice of Motion for Summary Judgment and/or Motion to Dismiss the Complaint, accompanying Brief, Certifications, Exhibits. Statement of Undisputed Material Facts, proposed form of Order, and this Certificate of Service were electronically filed via eCourts, causing those documents to be

served on Plaintiff and all counsel of record.

I further certify that a courtesy copy of the foregoing documents was sent via

U.S. Mail to the address below:

Hon. William G. Mennen, J.S.C.
Hunterdon County Justice Center
65 Park Avenue, Floor 3
Flemington, NJ 08822

I certify that the foregoing statements made by me are true.  I understand that

if any of the foregoing statements are willfully false, I am subject to punishment.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:     _s/ Catriona Coffey_____
Catriona Coffey
Deputy Attorney General

Dated: April 14, 2025

**SUPERIOR COURT OF NEW JERSEY - eCOURTS**

The following was filed by COFFEY, CATRIONA on 04/14/2025 at 4:55 PM:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN  TIGER, PETER  SCHLEISIER, MICHAEL  BALSAMO, THOMAS A DEROSA ET AL. |
| Case Caption: | WEISS ERIC  VS TIGER JOHN |
| Case Number: | HNT-L-000010-25 |
| Docket Text: | MOTION DISMISSING COMPLAINT submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY  MARSH against ERIC S WEISS |
| Transaction ID: | LCV20251092587 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Plaintiff | ERIC S WEISS | ericsweiss@gmail.com |
| | | eric_S_weiss@yahoo.com |
| | | eric_S_weiss@yahoo.com |

**Notice was not electronically mailed to:**

| | |
|---|---|
| Defendant | JOHN/JANE DOES 1-10 |
| Defendant | JOHN  TIGER |
| Defendant | PETER  SCHLEISIER |
| Defendant | MICHAEL  BALSAMO |
| Defendant | THOMAS A DEROSA |
| Defendant | SEAN  ROSS |
| Defendant | JEFFERY  GLENNON |
| Defendant | TOWNSHIP OF CLINTON POLICE DEP |
| Defendant | HUNTERDON COUNTY |
| Defendant | KELSEY  MARSH |

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey - Civil Part.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

# EXHIBIT H

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC  VS TIGER JOHN |
| Case Number: | HNT L 000010-25 |
| Docket Text: | The motion filed on 04/14/2025 will be decided on 05/23/2025. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT LCV20251092587 |
| Transaction ID: | LCV20251097097 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV<br>LPGCALENDARING@LAW.NJOAG.GOV |
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV<br>LPGCALENDARING@LAW.NJOAG.GOV |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com<br>eric_S_weiss@yahoo.com<br>ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | JOHN/JANE DOES 1-10 | NJ 00000 |
| Defendant | JOHN TIGER | NJ 00000 |
| Defendant | PETER SCHLEISIER | NJ 00000 |
| Defendant | MICHAEL BALSAMO | NJ 00000 |
| Defendant | THOMAS A DEROSA | NJ 00000 |
| Defendant | SEAN ROSS | NJ 00000 |
| Defendant | JEFFERY GLENNON | NJ 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | NJ 00000 |

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT I

**ERIC WEISS**
210 Walnut Street
Garwood NJ 07027
(ph) 908 913 0832
(email) eric_s_weiss@yahoo.com

| | |
|---|---|
| ERIC WEISS,<br>          Plaintiff,<br>     v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON / POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br>          Defendants | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br>**<u>Civil Action</u>**<br><br>PLAINTIFFS REPLY BREIF |

---

# PLAINTIFFS REPLY BRIEF TO DENY DEFENDANTS
# MOTION FOR SUMMARY JUDGMENT / MOTION TO DISMISS

---

**ERIC WEISS**
210 Walnut Street
Garwood NJ 07027
(ph) 908 913 0832
(email) eric_s_weiss@yahoo.com

Date: May 13, 2025

# TABLE OF CONTENTS

I.   **Preliminary Statement**.................................................................................... 1

II.  **Statement of Facts**...................................................................................... 2

III. **Argument**.................................................................................................... 4

    A.  **Defendants' Point I**: The Notice of Tort Claim Filed with Clinton Township
Applies to the HCPO Defendants.................................................... 4

       a. Tort Notice Timing – Continuing Violation Doctrine........................................ 4

       b. The HCPO Was Functionally "One and the Same" as Clinton Township for
Purposes of NJTCA Notice.................................................. 5

       c.   Mandated Referral of Internal Affairs Complaints to the County  Prosecutor... 6

       d.   In the Alternative, the Tort Claims Notice Requirement Was Satisfied Under
the Doctrines Substantial Compliance and Equity................................. 7

       e. The HCPO Defendants' Refusal to Investigate Plaintiff's Internal Affairs
Complaint Violates His Constitutional Rights, and No Tort Claim Notice Is
Required for Such Claims…………………………………………… 9

          i. Clarifying Counts Attributed to HCPO Defendants............................... 10

          ii. Violation of Constitutional Rights........................................... 11

          iii. No Tort Claim Notice Is Required for Constitutional Claims................. 12

       f. Conclusion........................................................................ 14

    B. **Defendants' Point II:** The Complaint Alleges Sufficient Facts to State Claims Against
the HCPO Defendants............................................................14

    C. **Defendants' Point III:** The HCPO Defendants Are Not Immune from Liability for
Intentional Torts.................................................................... 15

       a. Qualified Immunity Exception........................................ 16

       b. Failure to Investigate / Brady Violations.............................. 16

    D. **Under "Monell" Summary Judgment/MTD Must Be Denied** as to Hunterdon  County
Because the Record Shows a Pattern of Refusal to Investigate Plaintiff's Complaints,
Which Supports Municipal Liability Under § 1983………………………………… 16

       a.   Engaged in retaliatory conduct including withholding exculpatory police
reports while giving them to the accuser (¶¶ 37–39)……………………17

       b. Claims for Punitive Damages Against Kelsey Marsh Are Permissible................ 20

          i. The Assertion That Defendant Marsh Acted Within the Scope of Her
Employment Is Legally Baseless and Intellectually Disingenuous……… 20

          ii. The New Jersey Attorney General's Internal Affairs Policy &
Procedures Manual (IAPP) leaves no room for discretion or
Misinterpretation……………………………………………………… 20

       c.   The Law Allows Punitive Damages Against Marsh........................................ 22

IV.  **Conclusion**.................................................................................... 22

# Table of Cases

**New Jersey**

| Name | Citation | Reason for Citation | Page(s) |
|---|---|---|---|
| Beauchamp v. Amedio | 164 N.J. 111, 121–22 (2000) | Supports substantial compliance and actual notice under NJTCA when the public entity is aware of the claim and not prejudiced. | 1, 4, 5, 7, 9 |
| D.D. v. UMDNJ | 213 N.J. 130, 148 (2013) | Confirms that actual notice can satisfy NJTCA requirements. | 9 |
| Fuchilla v. Layman | 109 N.J. 319, 336–37 (1988) | Clarifies that tort claims notice requirements do not apply to deprivation of rights claims under § 1983. | 16 |
| Greenway Dev. Co. v. Borough of Paramus | 163 N.J. 546, 557 (2000) | Holds that constitutional claims are not barred by NJTCA notice requirements. | 12 |
| Hoag v. Brown | 397 N.J. Super. 34, 54 (App. Div. 2007) | Clarifies that NJTCA immunity does not extend to actions involving actual malice or willful misconduct. | 15 |
| In re Phillips | 117 N.J. 567, 576 (1990) | Affirms that refusal to follow lawful procedures by a public employee is disciplinable misconduct. | 20 |
| Lebron v. Sanchez | 407 N.J. Super. 204, 215 (App. Div. 2009) | Supports excusing technical noncompliance with NJTCA notice when the entity has actual knowledge and is not prejudiced. | 7 |
| McDade v. Siazon | 208 N.J. 463, 479–80 (2011) | Supports equitable considerations and substantial compliance when there is no prejudice to the public entity. | 7, 9 |
| McElwee v. Borough of Fieldsboro | 400 N.J. Super. 388, 396 (App. Div. 2008) | Holds that deviation from complaint protocols by an officer constitutes insubordination. | 20 |
| Murray v. Brown | 259 N.J. Super. 360, 365 (App. Div. 1992) | Reinforces substantial compliance with NJTCA notice based on actual knowledge and lack of prejudice. | 7 |
| Newberry v. Township of Pemberton | 319 N.J. Super. 671, 679 (App. Div. 1999) | Holds that substantial compliance with NJTCA notice is sufficient when the entity has actual knowledge and opportunity to investigate. | 6, 7 |
| Printing Mart-Morristown v. Sharp Elecs. Corp. | 116 N.J. 739, 746 (1989) | Establishes standard for motion to dismiss, requiring courts to accept allegations as true and grant reasonable inferences to plaintiff. | 14 |
| Russo Farms v. Vineland Bd. of Educ. | 144 N.J. 84, 98 (1996) | Establishes that a cause of action may accrue over time based on continuing violations, applicable to ongoing tortious conduct. | 4, 4 |
| State v. Carter | 91 N.J. 86 (1982) | Supports state-level analog to Brady violations for withholding exculpatory evidence. | 16 |
| Velez v. City of Jersey City | 180 N.J. 284, 294 (2004) | Confirms that NJTCA does not bar claims against individual public employees for intentional torts or willful misconduct. | 16, 20 |

**Federal**

| Name | Citation | Reason for Citation | Page(s) |
|---|---|---|---|
| Beers-Capitol v. Whetzel | 256 F.3d 120, 134 (3d Cir. 2001) | Supports Monell liability for deliberate indifference to constitutional violations. | 16 |
| Bielevicz v. Dubinon | 915 F.2d 845, 851 (3d Cir. 1990) | Supports Monell liability for a custom or practice of deliberate indifference to constitutional complaints. | 16 |
| Borough of Duryea v. Guarnieri | 564 U.S. 379, 387 (2011) | Affirms First Amendment right to petition the government for redress, including filing complaints against public officials. | 9, 11 |
| Brady v. Maryland | 373 U.S. 83 (1963) | Establishes that suppression of exculpatory evidence violates due process rights. | 16 |
| City of Canton v. Harris | 489 U.S. 378, 389 (1989) | Supports municipal liability under § 1983 for failure to train or supervise, leading to constitutional violations. | 15, 16 |
| Foraker v. Chaffinch | 501 F.3d 231, 236 (3d Cir. 2007) | Recognizes that retaliation for filing complaints against public officials can violate the First Amendment. | 12 |
| Hope v. Pelzer | 536 U.S. 730 (2002) | Establishes that public officials are not entitled to qualified immunity when they knowingly violate clearly established rights. | 16 |
| Mathews v. Eldridge | 424 U.S. 319, 333 (1976) | Outlines due process requirement for adequate procedural protections for government actions affecting protected interests. | 12 |
| Monell v. Dep't of Soc. Servs. | 436 U.S. 658 (1978) | Establishes municipal liability under § 1983 for constitutional violations caused by a policy, custom, or practice. | 2, 15, 16, 22 |
| Mullenix v. Luna | 577 U.S. 7 (2015) | Supports the principle that qualified immunity does not apply to knowing violations of established rights. | 16 |
| Ramirez v. County of Hudson | 2016 WL 4132299, at *8 (D.N.J. Aug. 2, 2016) | Supports punitive damages against individual public employees for egregious, malicious conduct. | 20 |
| Schneider v. City of Jersey City | 2016 WL 94839, at *4 (D.N.J. Jan. 8, 2016) | Confirms that § 1983 claims are not subject to NJTCA notice provisions. | 12 |
| Watkins v. City of Oakland | 145 F.3d 1087, 1092 (9th Cir. 1998) | Reinforces Monell liability for systemic refusal to address constitutional violations. | 16 |
| Zaloga v. Borough of Moosic | 841 F.3d 170 (3d Cir. 2016) | Provides framework for First Amendment retaliation claims based on protected activity and adverse action. | 12 |
| Zinermon v. Burch | 494 U.S. 113, 125 (1990) | Establishes due process requirement for fair procedures when addressing deprivations of liberty or property interests. | 11 |

## Table of Rules Cited

### New Jersey

| Name | Citation | Reason for Citation | Page(s) |
|---|---|---|---|
| New Jersey Administrative Code | N.J.A.C. 4A:2-2.3(a) | Defines insubordination and breach of duty, confirming that refusal to follow lawful orders constitutes disciplinable misconduct. | 20 |
| New Jersey Attorney General Directive | N.J. Att'y Gen. Directive 2022-14 | Mandates that internal affairs complaints be resolved within 45 days unless an extension is granted in writing. | 2, 16 |
| New Jersey Court Rule | R. 4:6-2(e) | Cited by Defendants to argue that the Complaint fails to state a claim, countered by Plaintiff as satisfied by detailed allegations. | 14 |
| New Jersey Court Rule | R. 4:9-1 | Basis for Plaintiff's request for leave to amend pleadings if the Court finds lack of specificity. | 14, 22 |
| New Jersey Internal Affairs Policy & Procedures Manual | IAPP, § 5.1 (Rev. July 2023) | Requires all complaints of officer misconduct to be accepted from any person at any time. | 20 |
| New Jersey Internal Affairs Policy & Procedures Manual | IAPP, § 5.1.8 | Mandates referral of complaints against law enforcement executives to the County Prosecutor. | 6 |
| New Jersey Internal Affairs Policy & Procedures Manual | IAPP, § 10.3 (Rev. July 2023) | States that failure to report misconduct or cooperate with internal affairs investigations is grounds for disciplinary action. | 20 |
| New Jersey Tort Claims Act | N.J.S.A. 59:1-1 to 12-3 | Governs tort claims against public entities, referenced as the basis for notice requirements. | 1 |
| New Jersey Tort Claims Act | N.J.S.A. 59:2-10 | Cited by Defendants to argue immunity for intentional torts, countered by Plaintiff as inapplicable for willful misconduct. | 15 |
| New Jersey Tort Claims Act | N.J.S.A. 59:8-1 et seq. | Governs notice requirements for tort claims against public entities. | 7 |
| New Jersey Tort Claims Act | N.J.S.A. 59:8-8(a) | Specifies the requirement to file a notice of tort claim with the public entity, challenged by Plaintiff as satisfied via substantial compliance. | 4, 12 |
| New Jersey Tort Claims Act | N.J.S.A. 59:9-2(c) | Bars punitive damages against public entities, but not individual employees like Marsh. | 20 |

### Federal

| Name | Citation | Reason for Citation | Page(s) |
|---|---|---|---|
| United States Code | 42 U.S.C. § 1983 | Basis for Plaintiff's constitutional claims against HCPO Defendants for violations of First and Fourteenth Amendment rights. | 12, 16, 22 |

iv

## I.   Preliminary Statement

Plaintiff Eric Weiss submits this Reply Brief in opposition to the Motion for Summary Judgment and/or Dismissal filed by Defendants Hunterdon County Prosecutor's Office (improperly pled as Hunterdon County) and Kelsey Marsh (collectively, ``HCPO Defendants''). The HCPO Defendants' motion is premised on erroneous assertions that Plaintiff failed to file a timely notice of tort claim under the New Jersey Tort Claims Act (NJTCA), N.J.S.A. 59:1-1 to 12-3, that the Complaint fails to state a claim, and that the HCPO Defendants are immune from liability for intentional torts and punitive damages. Plaintiff respectfully submits that the motion should be denied in its entirety for the following reasons:

First, the notice of tort claim filed with Clinton Township/Police Department on April 10, 2023, also applies to the HPCO defendants as it was a continuation of the torts complained of. It also sufficiently placed the HCPO Defendants on notice of Plaintiff's claims, as the HCPO was aware of the notice of tort claim, the incidents and the related internal affairs complaints escalated to their office. HCPO had constructive notice when it assumed responsibility for the investigation (Compl. ¶¶ 57-58; Beauchamp v. Amedio, 164 N.J. 111, 121-22 (2000)). Naming HCPO in the original claim would have been premature, as they had not yet acted.

Second, the Complaint alleges sufficient facts to support viable claims against the HCPO Defendants, particularly regarding their refusal to handle Plaintiff's internal affairs complaints.

1

Third, the NJTCA does not categorically bar liability for intentional torts when public employees act outside the scope of their authority or in bad faith, and punitive damages are permissible against individual defendants like Kelsey Marsh. Accordingly, the Court should deny the HCPO Defendants' motion.

## II.  Statement of Facts

Plaintiff incorporates by reference his Counter Statement of Facts submitted concurrently herewith. Additionally, Plaintiff notes that on January 10, 2023, he was detained, searched, and interrogated by Clinton Township Police officers for over an hour after they confirmed that the 911 call made by his ex-wife, Posner, alleging domestic violence, was clearly false.

Plaintiff filed a notice of tort claim with Clinton Township on April 10, 2023, detailing the tortious conduct of the officers. When Plaintiff's internal affairs complaints against these officers were not addressed, he escalated the matter to the HCPO in early 2024. During a meeting with Defendants Kelsey Marsh and Colin Frinzi, Marsh continued the tortious conduct of the Clinton Township defendants by refusing to take Plaintiff's complaint (Compl. ¶¶ 61-66), became abusive, and falsely accused him of domestic violence, obstructing his ability to seek redress. Plaintiff's exculpatory police report was suppressed by Clinton Township and the HCPO while being selectively provided to the false accuser. This suppression is central to Plaintiff's Brady and due process claims.

Marsh now falsely claims Plaintiff was confrontational (Compl. ¶¶ 63-66) to justify her insubordination and violations of Plaintiffs civil rights terminating the meeting, despite

2

Plaintiff's calm and factual effort to ensure an accurate complaint. No outburst or threat occurred, and Defendant Frinzi failed to intervene or contradict Marsh's improper conduct. (see Compl. ¶¶ 63-66)

Defendants' assertion that certain individuals—such as Renee Robeson, Colin Frinzi, and Frank Crisologo—are not named defendants is immaterial to Plaintiff's Monell claim. The conduct of these individuals is not being asserted for personal liability, but rather to demonstrate the widespread and systemic failure of the HCPO to accept and investigate legitimate internal affairs complaints (Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)). Their actions, all taken under color of law and in their official capacities, are imputed to the County for purposes of establishing municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). Plaintiff reserves the right to amend the pleadings if necessary to include any individual actor in their personal capacity, but such amendment is not required for Monell liability to attach.

Clinton Township officials explicitly were mandated by statute and operating manuals to escalate Plaintiff's internal affairs complaint to the Hunterdon County Prosecutor's Office, further demonstrating functional continuity and institutional knowledge. (PLT Decl. ¶ 12, Email Ex. H)

The HCPO's failure to investigate these complaints, despite being aware of the underlying incident and the tort claim filed with Clinton Township, forms the basis of Plaintiff's claims against the HCPO Defendants. As of this filing, 757 days have elapsed since

Plaintiff first attempted to file an internal affairs complaint; the HCPO has never issued any findings or disciplinary action, in direct violation of the 45-day IA resolution timeline (N.J. Att'y Gen. Directive 2022-14).

### III. Argument

### A. Defendants' Point I: The Notice of Tort Claim Filed with Clinton Township Applies to the HCPO Defendants

The HCPO Defendants falsely argue that Plaintiff failed to file a notice (N.J.S.A. 59:8-8(a)) of tort claim with their office, as required by N.J.S.A. 59:8-8(a).  The HCPO Defendants' argument that the notice was inoperative because it predated Plaintiff's interactions with them is pointless as it ignores the continuing nature of the tortious conduct (Russo Farms v. Vineland Bd. of Educ., 144 N.J. 84, 98 (1996)). The HCPO's failure to properly handle Plaintiff's complaints is a direct extension of the Clinton Township officers' actions, forming a single course of conduct. (See Russo Farms v. Vineland Bd. of Educ. 144 N.J. 84, 98 (1996) (holding that a cause of action accrues when the right to sue arises, which may involve continuing violations). Thus, the notice filed with Clinton Township satisfies the NJTCA's requirements as to the HCPO Defendants.

### a. Tort Notice Timing – Continuing Violation Doctrine

The fact that the HCPO Defendants were not mentioned by name in the April 10, 2023 tort claim notice does not bar Plaintiff's claims. The HCPO's involvement was part of a continuing course of related misconduct, originating from the Clinton Township incident and escalating through Plaintiff's efforts to seek redress. See Russo Farms v. Vineland Bd. of Educ., 144 N.J. 84, 98 (1996) (a

cause of action may accrue over time based on continuing violations). By the time the HCPO assumed responsibility for the internal affairs complaints, they were fully aware of the underlying facts and the pending tort claim. Thus, under the doctrine of substantial compliance and actual notice, see Beauchamp v. Amedio, 164 N.J. 111, 121-22 (2000), no separate tort claim notice was required.

Moreover, the notice filed with Clinton Township on April 10, 2023, sufficiently placed the HCPO Defendants on notice of Plaintiff's claims, as the HCPO was aware of the notice of tort claim Plaintiff had filed, the underlying incident and the related internal affairs complaints.

The NJTCA requires that a notice of claim be filed with the public entity involved in the alleged wrongful act or omission, but courts have recognized that substantial compliance with the notice requirement is sufficient when the public entity has actual notice and is not prejudiced (Beauchamp v. Amedio, 164 N.J. at 121-22). See Beauchamp v. Amedio, 164 N.J. 111, 121-22 (2000).

Here, Plaintiff filed a timely notice of tort claim with Clinton Township, detailing the tortious conduct arising from the January 10, 2023, incident. The HCPO became involved when Plaintiff escalated his internal affairs complaints to their office in early 2024, at which point they were fully aware of the underlying incident and the tort claim filed with Clinton Township.

### b. The HCPO Was Functionally "One and the Same" as Clinton Township for Purposes of NJTCA Notice

Even if the HCPO was not expressly named in the April 10, 2023 tort claim notice, it cannot evade liability where it later assumed

investigatory responsibility for the exact conduct alleged in that notice. The New Jersey Tort Claims Act (NJTCA) does not require redundant or duplicative notice when the second entity becomes directly involved through delegation, oversight, or continuation of responsibility for the subject matter already described in a valid tort notice.

### c. Mandated Referral of Internal Affairs Complaints to the County Prosecutor

The New Jersey Attorney General's Internal Affairs Policy & Procedures Manual (IAPP) explicitly requires that certain internal affairs complaints be referred to the County Prosecutor. Specifically, Section 5.1.8 of the IAPP states:

> "Complaints against a law enforcement executive, or a member of the executive's senior management team, may originate from a member of the public or from an employee of the agency. All such complaints shall be documented and referred to the County Prosecutor for review. If the subject of the Internal Affairs investigation is the Police Chief, Police Director, Sheriff or Head of Internal Affairs, either the County Prosecutor or the Attorney General's Office shall handle the investigation."

In the present case, Plaintiff's complaint implicated senior officials within the Clinton Township Police Department. Therefore, under the mandates of the IAPP, Clinton Township officials were obligated to escalate the complaint to the Hunterdon County Prosecutor's Office. This requirement underscores the functional continuity and institutional knowledge between municipal law enforcement agencies and the County Prosecutor's Office, as outlined in the IAPP.

Where two governmental entities are functionally aligned in their roles—especially where one assumes control over or supervision of the acts complained of—courts have held that notice to one is

suffice for both. In Newberry v. Township of Pemberton, 319 N.J. Super. 671, 679 (App. Div. 1999), the court held that substantial compliance was established when the proper entity had actual knowledge and an opportunity to investigate, even if not specifically named. Similarly, in Beauchamp v. Amedio, 164 N.J. 111, 122 (2000), the Court reiterated that the purpose of the notice requirement is not formality but function—ensuring the public entity has a fair opportunity to respond.

Here, the HCPO became involved in direct response to the failure of the Clinton Township Police Department to process Plaintiff's internal affairs complaints. As alleged in the Complaint, Plaintiff escalated his concerns to the HCPO, and the HCPO agreed to assume responsibility for investigating the Clinton officers (Compl. ¶¶ 57-58). The HCPO therefore placed itself in the shoes of Clinton Township for purposes of addressing Plaintiff's complaints. Once an agency voluntarily steps into the role of the entity named in a tort claim—especially to resolve or investigate the underlying events—it inherits the burden and notice associated with that conduct.

To hold otherwise would undermine the purpose of the NJTCA and elevate form over substance. See McDade v. Siazon, 208 N.J. 463, 480 (2011) (noting that equitable considerations and lack of prejudice may justify substantial compliance). Here, the HCPO had full knowledge of the April 10, 2023 tort claim, had access to all related evidence and parties, and cannot credibly claim surprise or prejudice. It was, for all practical and legal purposes, an

extension of the Clinton Township Police Department's misconduct redress mechanism.

Accordingly, because the HCPO was operating as the investigating agency on behalf of Clinton Township and responding to the same factual matter described in the original notice, it must be treated as functionally "one and the same" as Clinton for notice purposes. No additional notice was required.

### d. In the Alternative, the Tort Claims Notice Requirement Was Satisfied Under the Doctrines of Substantial Compliance and Equity

Even if the Court finds that Plaintiff's April 10, 2023 tort claim notice does not technically name the HCPO Defendants, dismissal is still unwarranted under well-established doctrines of substantial compliance and equitable principles that govern the interpretation of notice requirements under the New Jersey Tort Claims Act (NJTCA), N.J.S.A. 59:8-1 et seq.

The New Jersey Supreme Court has long recognized that technical noncompliance with the NJTCA notice requirement may be excused Lebron v. Sanchez, 407 N.J. Super. 204, 215 (App. Div. 2009) when the public entity has actual knowledge of the facts giving rise to the claim, is not prejudiced, and the claimant made a good-faith effort to comply. See Lebron v. Sanchez, 407 N.J. Super. 204, 215 (App. Div. 2009); Newberry v. Township of Pemberton, 319 N.J. Super. 671, 679 (App. Div. 1999); Murray v. Brown, 259 N.J. Super. 360, 365 (App. Div. 1992).

Here, Plaintiff's April 10, 2023 notice to Clinton Township detailed the full scope of the misconduct stemming from the January 10, 2023 incident and included allegations that necessarily

implicated county-level prosecutorial oversight. When the matter was subsequently escalated to the HCPO in early 2024, the HCPO had actual knowledge of the incident, the tort claim notice that was filed, the pending claims, and its own investigatory responsibilities. Defendants do not allege—let alone demonstrate—any prejudice arising from the lack of a second notice. As such, the purpose of the notice requirement—fair opportunity to investigate and respond—was fully satisfied. See Beauchamp v. Amedio, 164 N.J. 111, 121–22 (2000) ("The notice requirement is not intended as a trap for the unwary.").

Furthermore, equity forbids the dismissal of a valid claim (McDade v. Siazon, 208 N.J. 463, 479 (2011)) based solely on procedural technicality when the defendant had actual notice and ample opportunity to respond. See McDade v. Siazon, 208 N.J. 463, 479 (2011) (noting courts may relax procedural requirements where equity demands). Plaintiff diligently pursued relief, first through Clinton Township, then through multiple efforts to engage the HCPO and Internal Affairs. Any delay or misdirection was the result of institutional obstruction—not Plaintiff's lack of diligence. Accordingly, even if the Court concludes that strict compliance with the NJTCA notice requirement was not achieved, dismissal should be denied under the doctrines of substantial compliance and equitable notice, which have been repeatedly affirmed as valid exceptions to the rigid 90-day rule. See also D.D. v. UMDNJ, 213 N.J. 130, 148 (2013) (actual notice may satisfy NJTCA requirements)

The HCPO's receipt of Plaintiff's complaints and their agreement to investigate constitute actual notice of the claims.

9

(See D.D. v. University of Medicine and Dentistry of New Jersey}, 213 N.J. 130, 148 (2013) (noting that actual notice can satisfy NJTCA requirements). Moreover, the HCPO Defendants have not demonstrated any prejudice resulting from the lack of a separate notice, as they had ample opportunity to investigate the claims upon receiving the internal affairs complaints.

### e. The HCPO Defendants' Refusal to Investigate Plaintiff's Internal Affairs Complaint Violates His Constitutional Rights, and No Tort Claim Notice Is Required for Such Claims

The HCPO Defendants' refusal to investigate Plaintiff's internal affairs complaints against Clinton Township Police officers constitutes a violation of his constitutional rights, specifically his First Amendment right to petition (Borough of Duryea v. Guarnieri, 564 U.S. 379, 387 (2011)) the government for redress of grievances and his Fourteenth Amendment right to due process. Furthermore, claims arising from constitutional violations are not subject to the NJTCA's notice of claim requirement, rendering the HCPO Defendants' argument regarding the lack of a separate tort claim notice inapplicable to these claims.

### i. Clarifying Counts Attributed to HCPO Defendants

Clarification of Claims: Counts 2 (Deprivation of Rights) and 14 (Deprivation and Interference with Protected Parental Rights) are asserted directly against the HCPO Defendants based on their refusal to investigate Plaintiff's internal affairs complaints, their obstruction of Plaintiff's efforts to seek redress, and the retaliatory conduct that followed. These counts are grounded in violations of Plaintiff's First and Fourteenth Amendment rights and supported by factual allegations in ¶¶ 57–76 of the Complaint.

### ii. Violation of Constitutional Rights

The First Amendment protects an individual's right to petition the government for redress of grievances, which includes the ability to file complaints against public officials for misconduct. See Borough of Duryea v. Guarnieri, 564 U.S. 379, 387 (2011) (holding that the Petition Clause protects the right to seek redress through complaints to government entities). Similarly, the Fourteenth Amendment guarantees due process, which encompasses the right to a fair and impartial investigation (Zinermon v. Burch, 494 U.S. 113, 125 (1990)) of complaints against public officials, particularly when such complaints allege misconduct that infringes on protected rights. See Zinermon v. Burch, 494 U.S. 113, 125 (1990) (noting that due process requires fair procedures to address deprivations of liberty or property interests).

Here, Plaintiff alleges that Defendants Kelsey Marsh, Colin Frinzi, and Frank Crisologo, under the direction of the HCPO, refused to investigate his internal affairs complaints against Clinton Township Police officers who engaged in tortious and retaliatory conduct on January 10, 2023 (Compl. ¶¶ 57-76). Specifically, Marsh refused to obtain relevant evidence, such as police reports and body camera footage, became abusive, and falsely accused Plaintiff of domestic violence to justify terminating the complaint process (Compl. ¶¶ 61-66). Frinzi, present during the meeting, failed to intervene or fulfill his duty to take the complaint (Compl. ¶ 66). Crisologo, despite interviewing Plaintiff in July 2024, failed to produce any investigation or findings, violating the requirement to resolve internal affairs complaints

within 45 days (Compl. ¶¶ 74-76). The HCPO, by endorsing and failing to correct these actions, obstructed Plaintiff's ability to seek redress for the officers' misconduct.

To establish retaliation under the First Amendment (Zaloga v. Borough of Moosic, 841 F.3d 170 (3d Cir. 2016)), Plaintiff engaged in protected activity by attempting to file a complaint; suffered adverse action when Marsh refused to accept it and fabricated a justification; and there is a clear causal link, as Marsh's hostility only arose after Plaintiff attempted to hold officers accountable. Zaloga v Borough of Moosic 841 F.3d 170 (3d Cir. 2016).

This refusal to investigate constitutes a direct violation of Plaintiff's First Amendment right to petition, as it effectively denied him access to a government process designed to address police misconduct. See Foraker v. Chaffinch, 501 F.3d 231, 236 (3d Cir. 2007) (recognizing that retaliation for filing complaints against public officials can violate the First Amendment).

Additionally, the HCPO Defendants' actions deprived Plaintiff of due process by failing to provide a fair and impartial mechanism to address his complaints, particularly when those complaints implicated his liberty interests in being free from unlawful detention and retaliation (Compl. ¶¶ 20-28). See Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (due process requires adequate procedural protections for government actions (Mathews v. Eldridge, 424 U.S. 319, 333 (1976)) affecting protected interests).

### iii. No Tort Claim Notice Is Required for Constitutional Claims

The HCPO Defendants argue that Plaintiff's claims are barred due to the failure to file a notice of tort claim with their office

under N.J.S.A. 59:8-8(a). However, claims asserting violations of constitutional rights, such as those under the First and Fourteenth Amendments, are not subject to the NJTCA's notice requirements. The NJTCA governs tort claims against public entities and employees, but constitutional claims brought under 42 U.S.C. § 1983 or directly under the New Jersey Constitution are distinct and not subject to the same procedural constraints. See Greenway Dev. Co. v. Borough of Paramus}, 163 N.J. 546, 557 (2000) (holding that constitutional claims are not barred by NJTCA (Greenway Dev. Co. v. Borough of Paramus, 163 N.J. 546, 557 (2000)) notice requirements); see also Schneider v. City of Jersey City, 2016 WL 94839, at *4 (D.N.J. Jan. 8, 2016) (noting that § 1983 claims are not subject to NJTCA notice provisions (Schneider v. City of Jersey City, 2016 WL 94839, at *4 (D.N.J. Jan. 8, 2016))).

Plaintiff's claims for deprivation of rights (Count 2) and deprivation and interference with protected parental rights (Count 14) explicitly invoke constitutional protections (Compl. ¶¶ 78, 92). These claims arise from the HCPO Defendants' refusal to investigate, which obstructed Plaintiff's constitutional rights to petition and due process. Because these claims are grounded in constitutional violations, they are not subject to the NJTCA's notice requirement, and the HCPO Defendants' reliance on the lack of a separate tort claim notice is misplaced.

Moreover, even if the NJTCA applied, the notice filed with Clinton Township on April 10, 2023, provided sufficient notice to the HCPO Defendants, as argued in Defendants' Point I. The HCPO's awareness of the underlying incident and the internal affairs

complaints further supports the conclusion that no additional notice was required for the constitutional claims.

### f. Conclusion

In the alternative, should the Court determine that Plaintiff's pleading lacks specificity as to certain actors or theories of recovery, Plaintiff respectfully requests leave to amend under R. 4:9-1 to conform the pleadings to the proofs and arguments presented. The HCPO Defendants' refusal to investigate Plaintiff's internal affairs complaints violated his First Amendment right to petition and Fourteenth Amendment right to due process. These constitutional claims are not subject to the NJTCA's notice of claim requirement, and the Court should deny the HCPO Defendants' motion to dismiss these claims. Additionally, the notice filed with Clinton Township satisfies any applicable NJTCA requirements for related tort claims, reinforcing the viability of Plaintiff's Complaint.

### B. Defendants' Point II: The Complaint Alleges Sufficient Facts to State Claims Against the HCPO Defendants

The HCPO Defendants contend that the Complaint fails to state a claim under R. 4:6-2(e). However, the Complaint alleges specific facts demonstrating that Defendants Kelsey Marsh and the HCPO engaged in tortious conduct by refusing to investigate Plaintiff's internal affairs complaints and obstructing his right to seek redress. For example, the Complaint details how Marsh refused to obtain relevant evidence (e.g., police reports and body camera footage), became abusive, and falsely accused Plaintiff of domestic violence to justify terminating the meeting (Compl. ¶¶ 61-66). These actions support claims for intentional infliction of emotional distress, negligence, and breach of duty, among others.

14

In a motion to dismiss, the Court must accept the Complaint's allegations as true and grant all reasonable inferences in Plaintiff's favor. {Printing Mart-Morristown v. Sharp Elecs. Corp.}, 116 N.J. 739, 746 (1989). The Complaint's allegations are neither conclusory nor speculative; they provide a detailed factual basis for each claim, including the specific actions of Marsh and the HCPO's failure to act. Thus, the Complaint sufficiently states claims against the HCPO Defendants, and dismissal is unwarranted.

### C. Defendants' Point III: The HCPO Defendants Are Not Immune from Liability for Intentional Torts

The HCPO Defendants argue that the NJTCA bars liability for intentional torts under N.J.S.A. 59:2-10. However, this immunity does not apply when public employees act outside the scope of their authority or engage in willful misconduct. {See Hoag v. Brown}, 397 N.J. Super. 34, 54 (App. Div. 2007) (noting that immunity does not extend to actions involving actual malice or willful misconduct). Here, Plaintiff alleges that Kelsey Marsh acted with malice by refusing to take his complaint, making false accusations, and obstructing his rights (Compl. ¶¶ 62-66). Such conduct falls outside the scope of her authority and constitutes willful misconduct, rendering the HCPO potentially liable for her actions.

After Plaintiff filed a formal Internal Affairs complaint, no investigation was conducted, and no corrective action was taken— demonstrating the department's deliberate indifference and supporting municipal liability under Monell. See Monell v. Department of Social Services, 436 U.S. 658 (1978), City of Canton v. Harris, 489 U.S. 378 (1989) (failure to supervise and train supports § 1983 liability when it leads to rights violations)

### a. Qualified Immunity Exception:

Public officials are not entitled to qualified immunity when they knowingly violate clearly established rights. Hope v. Pelzer, 536 U.S. 730 (2002); Mullenix v. Luna, 577 U.S. 7 (2015).

### b. Failure to Investigate / Brady Violations:

A willful refusal to investigate exculpatory evidence and a pattern of retaliatory targeting violate Brady v. Maryland, 373 U.S. 83 (1963) and state analogs. See State v. Carter, 91 N.J. 86 (1982). Moreover, the NJTCA does not bar claims against individual public employees for intentional torts. {See Velez v. City of Jersey City}, 180 N.J. 284, 294 (2004). The HCPO's act of withholding all the exculpatory information from Plaintiff constitutes a violation of Brady v. Maryland, 373 U.S. 83 (1963). This suppression of evidence directly impacted Plaintiff's ability to file a meaningful complaint and is independently actionable. (Compl. ¶¶ 73-75, Ex. K)

Thus, Plaintiff's claims against Marsh in her individual capacity (e.g., intentional infliction of emotional distress, civil conspiracy) are viable and should not be dismissed.

### D. Under "Monell" Summary judgment/MTD must be denied as to Hunterdon County because the record shows a pattern of refusal to investigate plaintiff's complaints, which supports municipal liability under § 1983

Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a municipality or county may be held liable under 42 U.S.C. § 1983 where a constitutional violation was caused by a policy, custom, or practice of the government entity. A "policy or custom" may be shown by a pattern of behavior by officials with final policymaking authority, or by the entity's deliberate indifference

to known or repeated constitutional violations. City of Canton v. Harris, 489 U.S. 378, 389 (1989); Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001).

The facts here raise a genuine issue of material fact as to whether Hunterdon County, acting through the Hunterdon County Prosecutor's Office (HCPO) and its officials, maintained such a custom or policy. As pled in Plaintiff's verified Complaint and admitted in Defendants' own motion papers, Plaintiff attempted over a period of more than a year to submit a lawful Internal Affairs complaint against Clinton Township Police officers who had:

Detained Plaintiff for approximately an hour after confirming that a police report made against him was false (¶¶ 27-28, Complaint),

Refused to take Plaintiff's report of the false police call and illegal recording (¶¶ 41-44),

    **a. Engaged in retaliatory conduct including withholding exculpatory police reports while giving them to the accuser (¶¶ 37-39).**

Despite Plaintiff's repeated efforts, including direct communications with Captain DeRosa, Sergeant Ross, and Officer Glennon, no investigation was conducted. Instead, Ross, DeRosa, and Glennon refused to accept the complaint for months, and Ross ultimately declined to proceed, falsely claiming due to litigation that had not yet been filed (¶¶ 50-56),

Plaintiff then contacted the HCPO, which assigned Detective Sergeant Kelsey Marsh and Detective Frinzi to take his complaint (¶¶ 57-58). Marsh refused to obtain the police reports, bodycam footage, or materials Plaintiff requested to ensure his complaint would be complete and accurate, despite Plaintiff's explanation that

17

the events had occurred over a year prior and required records to refresh his recollection (¶¶ 60-63). Marsh stated "they were not going to provide me any discovery to help me file my complaint against these officers" (¶ 64). Rather than allowing Plaintiff to explain the misconduct, Marsh became hostile, falsely accused Plaintiff of attempting to control her, and refused to take the complaint as ordered, despite Frinzi being present he refused to intervene (¶¶ 65-67).

Plaintiff immediately reported Marsh's and Frinzi's refusal to accept the complaint to Prosecutor Robeson, explaining in detail the obstruction he encountered, and how it compounded the prior refusals by Ross, DeRosa, and Glennon (¶¶ 67-68). Robeson did not respond until a second follow-up, at which point the matter was purportedly referred to the Office of Public Integrity and Accountability (OPIA). Plaintiff repeatedly requested that Robeson identify the person or office to whom she claimed the matter was transferred at the state level. Robeson never provided a name or contact, and the Office of Public Integrity and Accountability ultimately declined to accept the matter, directing the HCPO to investigate itself, including officers named in the complaint. (Compl. ¶¶ 68, 71-73).

Several months later, HCPO Captain Crisologo took a belated statement from Plaintiff (July 2024), which Plaintiff supplemented with additional materials (August 2024). As of the date of the Complaint, no investigation had occurred and no findings issued, in direct violation of internal affairs deadlines (¶¶ 74-76).

Under the New Jersey Attorney General's Internal Affairs Policy & Procedures (rev. 2022), internal affairs complaints must be

resolved within 45 days unless an extension is granted in writing. See N.J. Attorney General Directive 2022-14. Here, the complaint was delayed for over a year, and as of this filing,(757 days since Plaintiff asked to file the internal affairs complaint) no investigation or findings were issued (Compl. ¶¶ 74-76).

These facts — many of which are unrebutted by Defendants' motion, and several of which are affirmatively admitted (see Hunterdon MTD Brief at 3-4) — demonstrate a systemic refusal to accept, process, or investigate misconduct complaints, especially where the complaint was directed at superior officers or involved prior documented constitutional violations.

The coordinated failures of Marsh, Frinzi, Robeson, Ross, and others over the course of a full year demonstrate more than negligence or delay; they establish a custom or practice of deliberate indifference to constitutional complaints, and thus give rise to municipal liability under Monell. See Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990); Watkins v. City of Oakland, 145 F.3d 1087, 1092 (9th Cir. 1998).

Additionally, liability is further supported under City of Canton v. Harris, 489 U.S. 378 (1989), where failure to train or supervise officials tasked with internal affairs responsibilities predictably resulted in the denial of constitutional protections. The HCPO's pattern of disregarding internal affairs protocols supports a claim of institutional deliberate indifference.

Defendants' argument that Plaintiff failed to file a tort claims notice is irrelevant to his deprivation of rights claims. See Fuchilla v. Layman, 109 N.J. 319, 336-37 (1988). Moreover, Monell

does not impose respondeat superior liability but holds a municipality liable when its own acts or omissions cause constitutional harm. Monell, 436 U.S. at 694.

Accordingly, Plaintiff has presented substantial evidence that Hunterdon County maintained or acquiesced in a policy or custom of refusing to investigate misconduct complaints, which proximately caused the continued violation of his constitutional rights. Summary judgment must be denied.

### b. Claims for Punitive Damages Against Kelsey Marsh Are Permissible

#### i. The Assertion That Defendant Marsh Acted Within the Scope of Her Employment Is Legally Baseless and Intellectually Disingenuous

Defendants' suggestion that Defendant Marsh acted within the scope of her employment is not just legally unsound—it is a position so untethered from governing law, policy, and professional standards that its inclusion in a formal pleading borders on audacious.

There is no conceivable interpretation of any statute, regulation, internal policy, or law enforcement standard that permits a police officer to ignore a direct order to accept an internal affairs complaint. To claim otherwise is to disregard not only the plain language of binding regulations, but also the most basic principles of professional accountability.

#### ii. The New Jersey Attorney General's Internal Affairs Policy & Procedures Manual (IAPP) leaves no room for discretion or misinterpretation:

"All complaints of officer misconduct shall be accepted from any person, including anonymous sources, at any time." — IAPP, § 5.1 (Rev. July 2023).

This mandate is further reinforced:

"It is the duty of every law enforcement officer and employee to report misconduct and to cooperate with internal affairs investigations. Failure to do so shall be grounds for disciplinary action."— IAPP, § 10.3.

No officer, let alone one assigned to receive complaints on behalf of a county prosecutor's office, may lawfully refuse to take a complaint—particularly not one concerning serious civil rights violations. Marsh's refusal to accept the complaint, her hostile conduct, and her fabrication of a justification for ejecting Plaintiff from the process are not minor procedural deviations; they are violations of core duties that strike at the heart of law enforcement legitimacy.

The New Jersey Administrative Code likewise defines insubordination and breach of duty in clear terms. N.J.A.C. 4A:2-2.3(a) confirms that refusal to follow lawful orders or procedures constitutes disciplinable misconduct. Case law echoes this standard: In In re Phillips, 117 N.J. 567, 576 (1990), the New Jersey Supreme Court affirmed that refusal to follow lawful procedures may subject a public employee to discipline; In McElwee v. Borough of Fieldsboro, 400 N.J. Super. 388, 396 (App. Div. 2008), the court held that deviation from complaint protocols by an officer constituted insubordination and grounds for removal.

The idea that such conduct could somehow be shielded under the doctrine of scope of employment is legally and logically unsupportable. Marsh was not exercising discretion—she was defying clear legal directives and fabricating a pretext to suppress a complaint she was legally required to take. Moreover, under the New Jersey Tort Claims Act, public employees who act with actual malice or willful misconduct are deemed to be acting outside the scope of

employment and forfeit the protections of public immunity. See Velez v. City of Jersey City, 180 N.J. 284, 294 (2004). Marsh's conduct—marked by retaliation, obstruction, and open defiance of mandatory policy—fits squarely within that exception.  In short, the HCPO's attempt to characterize Marsh's conduct as occurring "within the scope" of her employment is not only devoid of legal merit—it is an affront to the rule of law, institutional integrity, and the public's trust in the internal accountability mechanisms of law enforcement.

### c. The law allows Punitive Damages against Marsh

The HCPO Defendants assert that punitive damages are unavailable against the HCPO under N.J.S.A. 59:9-2(c). While this is true for public entities, punitive damages may be awarded against individual public employees for egregious conduct. {See Ramirez v. County of Hudson}, 2016 WL 4132299, at *8 (D.N.J. Aug. 2, 2016). However, Plaintiff's claim for punitive damages is directed solely at Defendant Kelsey Marsh in her individual capacity, based on conduct alleged to be intentional, retaliatory, and undertaken with malice. See Ramirez v. County of Hudson, 2016 WL 4132299, at 8 (D.N.J. Aug. 2, 2016).  The Complaint alleges that Marsh's actions were malicious and intended to harm Plaintiff, supporting a claim for punitive damages (Ramirez v. County of Hudson, 2016 WL 4132299, at *8 (D.N.J. Aug. 2, 2016)) against her in her individual capacity. Thus, the claim for punitive damages against Marsh should not be dismissed.

### IV.  Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the HCPO Defendants' Motion for Summary Judgment and/or Dismissal in its entirety. Plaintiff has pleaded viable constitutional claims under 42 U.S.C. § 1983 and the New Jersey Constitution, and has presented sufficient facts to support liability under Monell based on the HCPO's persistent refusal to accept or investigate Plaintiff's internal affairs complaints.

The April 10, 2023 tort claim notice filed with Clinton Township is legally sufficient as to the HCPO Defendants, who later assumed direct responsibility for investigating the very conduct described therein. Under the doctrines of substantial compliance, actual notice, and continuing tort, and due to the functional unity between the HCPO and the Clinton Township Police Department, no duplicative notice was required.

The assertion that Defendant Marsh acted within the scope of her employment is directly contradicted by governing law and policy. Her refusal to accept a mandated complaint, coupled with retaliatory conduct, violates binding internal affairs regulations, constitutes insubordination, and falls well outside the bounds of protected official conduct. The HCPO Defendants are not entitled to immunity for intentional and malicious acts.

Plaintiff has also stated a valid claim for punitive damages against Kelsey Marsh in her individual capacity, as her conduct involved deliberate obstruction, fabrication, and malice.

In the alternative, should the Court find that the Complaint lacks specificity as to certain actors or legal theories, Plaintiff respectfully requests leave to amend under R. 4:9-1 to conform the

pleadings to the facts, legal arguments, and record developed through briefing.

**CERTIFICATION**

I certify that the foregoing statements made by me are true and accurate to the best of my knowledge and belief. I am aware that if any of the foregoing is willfully false, I am subject to punishment.

Dated: May 13, 2025

Eric Weiss, Plaintiff

**ERIC WEISS**
210 Walnut Street
Garwood NJ 07027
(ph) 908 913 0832
(email) eric_s_weiss@yahoo.com

| | |
|---|---|
| ERIC WEISS,<br>　　　　Plaintiff,<br>　　v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON / POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br>　　　　Defendants | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br>__Civil Action__<br>PLAINTIFFS RESPONSE TO DEFENDANTS STATEMENT OF UNDISPUTED MATERIAL FACTS<br><br>PURSUANT TO R. 4:46-2(a) |

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Eric Weiss submits the following responses to the Statement of Undisputed Material Facts submitted by Defendants Hunterdon County Prosecutor's Office and Kelsey Marsh (``HCPO Defendants'') pursuant to R. 4:46-2(a):

1. Defendants' Fact 1: Plaintiff filed a lawsuit on January 3, 2025, against various defendants, including the HCPO Defendants.

   **Response:** Admitted, but Plaintiff clarifies that the lawsuit was filed in Hunterdon County, not Somerset County as initially indicated in the Complaint due to a clerical error (Compl. Pg 1).

2. Defendants' Fact 2: Plaintiff alleges that Defendants committed torts during their response to a 911 call and internal affairs complaints.

   **Response:** Admitted in Part and denied in Part. Plaintiff disputes that the allegations are limited to the 911-call response and the internal affairs complaint only. The Complaint also details tortious conduct by the HCPO Defendants in refusing to properly handle

1

Plaintiff's internal affairs complaints (Compl. ¶¶ 57-76). Additionally, Plaintiff notes that on January 10, 2023, he was detained, searched, and questioned by Clinton Township Police officers for over an hour, even after they confirmed that the 911 call made by his ex-wife, Posner, alleging domestic violence, was proven false by all reasonable doubt. (Tran Ex. A, Compl. ¶¶ 7-12)

3. Defendants' Fact 3: Plaintiff raises fourteen tort-based claims.

**Response:** Admitted in Part and denied in Part. also filed claims under the United States and New Jersey Constitutions. (Compl. ¶¶ 1-3, 78-105).

4. Defendants' Fact 4: Plaintiff filed a notice of tort claim with Clinton Township on April 10, 2023.

**Response:** Admitted. Plaintiff further asserts that this notice also applied to the HCPO Defendants, as their conduct was a continuation of the torts claimed in the notice. It sufficiently placed the HCPO Defendants on notice of the claims when the internal affairs complaints were escalated to their office in early 2024. (Compl. ¶¶ 40, 57-58)

5. Defendants' Fact 5: The Complaint contains no allegations regarding interactions with the HCPO Defendants prior to January 2024.

**Response:** Admitted. However, Plaintiff disputes the implication that this negates the applicability of the tort claim notice. The HCPO Defendants were aware of both the underlying incident and the tort claim filed with Clinton Township when they assumed responsibility for the internal affairs complaints. (Compl. ¶¶ 40,

57-58)  Their conduct is imputed to the HCPO as supervisory failures, forming the predicate for Monell liability.

Clinton Township officials explicitly were mandated by statute and operating manuals to escalate Plaintiff's internal affairs complaint to the Hunterdon County Prosecutor's Office, further demonstrating functional continuity and institutional knowledge. (PLT Decl. ¶ 12, Email Ex. H)

Plaintiff further asserts that the HCPO Defendants had actual notice of the January 2023 incident, the tort claims notice and the internal affairs escalation as early as March 2023, when Ross, DeRosa, and Glennon began obstructing Plaintiff's attempts to file an internal affairs complaint. (Compl. ¶¶ 50-56)

Plaintiff's exculpatory police report was suppressed by Clinton Township and the HCPO while being selectively provided to the false accuser. This suppression is central to Plaintiff's Brady and due process claims. (Compl. ¶¶ 73-75, Ex. K)

As of this filing, 757 days have elapsed since Plaintiff first attempted to file an internal affairs complaint; the HCPO has never issued any findings or disciplinary action, in direct violation of the 45-day IA resolution timeline. (PLT Decl. ¶ 20)

6. Defendants' Fact 6: Plaintiff did not file a notice of tort claim with the HCPO Defendants.

   **Response:** Disputed. Plaintiff was not required to file a Tort claim with HCPO because he had already filed one with Clinton. Plaintiff asserts that the notice filed with Clinton Township on April 10, 2023, applies to the HCPO Defendants as they were a continuation of the torts as they were they had a supervisory role.

HCPO had actual notice of the tort claim filed through the internal affairs complaints of the torts they continued and suffered no prejudice. See Beauchamp v. Amedio, 164 N.J. 111, 121-22 (2000).

In addition, there is no requirement to file a Tort Claim notice on violations of civil rights claim.

HPCO refusal to investigate plaintiff internal affairs complaint violated several of Plaintiffs constitutional rights. To establish retaliation under the First Amendment, Plaintiff engaged in protected activity by attempting to file a complaint; suffered adverse action when Marsh refused to accept it and fabricated a justification; and there is a clear causal link, as Marsh's hostility only arose after Plaintiff attempted to hold officers accountable. See Zaloga v. Borough of Moosic, 841 F.3d 170, 178-79 (3d Cir. 2016)

The HCPO's act of withholding all the exculpatory information from Plaintiff constitutes a violation of Brady v. Maryland, 373 U.S. 83 (1963). This suppression of evidence directly impacted Plaintiff's ability to file a meaningful complaint and is independently actionable. (Compl. ¶¶ 73-75, Ex. K)

**CERTIFICATION**

I certify that the foregoing statements made by me are true and accurate to the best of my knowledge and belief. I am aware that if any of the foregoing is willfully false, I am subject to punishment.

Dated: May 13, 2025

Eric Weiss, Plaintiff

**ERIC WEISS**
210 Walnut Street
Garwood NJ 07027
(ph) 908 913 0832
(email) eric_s_weiss@yahoo.com

| | |
|---|---|
| ERIC WEISS,<br>        Plaintiff,<br>        v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON / POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br>        Defendants | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br>**Civil Action**<br>PLAINTIFFS COUNTER STATEMENT OF UNDISPUTED MATERIAL FACTS<br><br>PURSUANT TO R. 4:46-2(a) |

### PLAINTIFF'S COUNTER STATEMENT OF UNDISPUTED MATERIAL FACTS

1. On January 10, 2023, Plaintiff was detained by Clinton Township Police officers for an hour following a false 911 call made by his ex-wife, Posner, alleging domestic violence against Plaintiff's son, S.W. (Compl. ¶¶ 7-12)

2. Additionally, Plaintiff notes that he was detained, searched, and questioned by the officers even after they confirmed the allegations were false. (Transcript, Ex. A)

3. On April 10, 2023, Plaintiff filed a notice of tort claim with the Clinton Township Police Department, detailing the tortious conduct of the officers involved in the January 10, 2023 incident. (Compl. ¶ 40)

4. HCPO had constructive notice when it assumed responsibility for the investigation. Also naming HCPO in the original claim would have been premature, as they had not yet acted. (Compl. ¶¶ 57-58)

5. When Plaintiff's internal affairs complaints against the Clinton Township officers were not addressed, he escalated the matter to the

1

Hunterdon County Prosecutor's Office (HCPO) in early 2024. (Compl. ¶ 57)

6. Clinton Township officials explicitly instructed Plaintiff to escalate his internal affairs complaint to the HCPO, further demonstrating functional continuity and institutional knowledge. (PLT Decl. ¶ 12, Email Ex. H)

7. The HCPO agreed to investigate the complaints and assigned Defendants Kelsey Marsh and Colin Frinzi to take Plaintiff's internal affairs statement. (Compl. ¶ 58)

8. During the meeting with Marsh and Frinzi, Marsh refused to obtain relevant evidence, including police reports and body-worn camera footage, which Plaintiff requested to ensure an accurate account due to the passage of time. Marsh then became abusive and falsely accused Plaintiff of domestic violence in order to terminate the meeting. (Compl. ¶¶ 61-66)

9. Defendants assert that Plaintiff's internal affairs interview was terminated because Plaintiff became confrontational. Plaintiff disputes this characterization and asserts that he remained calm and cooperative while seeking to ensure that the complaint would be accurate and complete. Marsh's accusation was false and made to avoid taking the complaint as required. Frinzi, present during the interaction, did not intervene to correct or challenge Marsh's misrepresentation. (Compl. ¶¶ 63-66)

10. Marsh falsely claimed Plaintiff was confrontational to justify terminating the meeting, despite Plaintiff's calm and factual effort to ensure an accurate complaint. No outburst or threat occurred, and

Defendant Frinzi failed to intervene or contradict Marsh's mischaracterization. (Compl. ¶¶ 63–66)

11. Plaintiff promptly informed HCPO official Renée Robeson of Marsh's improper conduct but received no meaningful response. Plaintiff was forced to escalate the matter to the Office of Public Integrity and Accountability (OPIA). (Compl. ¶¶ 67–69)

12. OPIA authorized the HCPO to handle Plaintiff's complaints. In July 2024, HCPO Captain Frank Crisologo conducted an interview with Plaintiff. Plaintiff submitted additional supporting materials in August 2024, but no investigation or findings had been issued as of January 3, 2025. (Compl. ¶¶ 72–76)

13. As of this filing, 757 days have elapsed since Plaintiff first attempted to file an internal affairs complaint; the HCPO has never issued any findings or disciplinary action, in direct violation of the 45-day IA resolution timeline. (PLT Decl. ¶ 20)

14. Plaintiff's exculpatory police report was suppressed by Clinton Township and the HCPO while being selectively provided to the false accuser. This suppression is central to Plaintiff's Brady and due process claims. (Compl. ¶¶ 73–75, Ex. K)

15. The HCPO was fully aware of the April 10, 2023 tort claim filed with Clinton Township and the underlying incident when it assumed responsibility for handling Plaintiff's internal affairs complaints, thereby constituting actual notice of the claims. (Compl. ¶¶ 57–58)

16. Plaintiff followed up with Robeson at least twice to request the identity of the OPIA official to whom the case had been referred. Robeson never disclosed that information. (Compl. ¶¶ 68, 71)

17. The OPIA ultimately declined to accept the case and instead directed the HCPO to investigate the matter internally, including complaints against individuals within its own office. (Compl. ¶ 72)

18. The HCPO's refusal to process Plaintiff's internal affairs complaints—despite having knowledge of the misconduct and being formally assigned to the matter—constitutes a violation of Plaintiff's First Amendment right to petition the government for redress of grievances. (See Borough of Duryea v. Guarnieri, 564 U.S. 379, 388 (2011); Zaloga v. Borough of Moosic, 841 F.3d 170, 178-79 (3d Cir. 2016))

19. The HCPO's conduct also deprived Plaintiff of due process under the Fourteenth Amendment by failing to provide a fair and impartial mechanism to address the underlying misconduct and continued obstruction. (See Mathews v. Eldridge, 424 U.S. 319, 333 (1976); Zinermon v. Burch, 494 U.S. 113, 125 (1990))

20. After Plaintiff formally filed an internal affairs complaint, no investigation was conducted, no findings was made and no corrective action was taken, demonstrating deliberate indifference and supporting municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978), and City of Canton v. Harris, 489 U.S. 378 (1989). (Compl. ¶¶ 72-76)

21. Additionally, liability is further supported under City of Canton v. Harris, 489 U.S. 378 (1989), where failure to train or supervise officials tasked with internal affairs responsibilities predictably resulted in the denial of constitutional protections. The HCPO's pattern of disregarding internal affairs protocols supports a claim of institutional deliberate indifference. (Canton, 489 U.S. at 390)

I certify that the foregoing statements made by me are true and accurate to the best of my knowledge and belief. I am aware that if any of the foregoing is willfully false, I am subject to punishment.

Dated:  May 13, 2025

Eric Weiss, Plaintiff

**ERIC WEISS**
210 Walnut Street
Garwood NJ 07027
(ph) 908 913 0832
(email) eric_s_weiss@yahoo.com

| | |
|---|---|
| ERIC WEISS,<br>　　　　Plaintiff,<br>　　v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON / POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br>　　　　Defendants | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><u>Civil Action</u><br>PLAINTIFFS CERTIFICATION OF SERVICE |

**PLAINTIFF'S CERTIFICATION OF SERVICE**

I, Eric Weiss, Plaintiff, hereby certify that on this 13th day of May, 2025, I caused to be served true and correct copies of the Plaintiff's Counter Statement of Undisputed Material Facts, Plaintiff's Response to Defendants' Statement of Undisputed Material Facts, and Plaintiff's Reply Brief in Opposition to Defendants' Motion for Summary Judgment and/or Dismissal via eCourts/JEDS to the following counsel of record:

　　　Matthew J. Platkin Attorney General of New Jersey
　　　Catriona Coffey Deputy Attorney General (Attorney ID # 381682021)
　　　Richard J. Hughes Justice Complex
　　　25 Market Street P.O. Box 112
　　　Trenton, NJ 08625
　　　(609) 376-2440
　　　catriona.coffey@law.njoag.gov
　　　Attorney for Defendants, Hunterdon County Prosecutor's Office and Kelsey Marsh

I further certify that the foregoing statements made by me are true and accurate to the best of my knowledge and belief. I am aware that if any of the foregoing is willfully false, I am subject to punishment.

Dated: May 13, 2025

　　　　　　　　　　　　　　　　　　　　Plaintiff, Pro Se

**Superior Court of New Jersey – Hunterdon County**

The following was filed by Eric Weiss on 05/13/2025 at 02:23:11 AM:

| | |
|---|---|
| Case Caption: | Weiss Eric Vs Tiger John |
| Case Number: | HNT-L-000010-25 |
| Docket Text: | Reply brief has been filed by Eric Weiss. JEDS EF-3362162 |
| Transaction ID: | LCV20251376446 |
| JEDS EF ID: | EF-3362162 |

**Notice has been electronically sent to:**

| | | |
|---|---|---|
| Attorney for Defendant Hunterdon County | Catriona Coffey | catriona.coffey@law.njoag.gov |
| | | lpgcalendaring@law.njoag.gov |
| Attorney for Defendant Kelsey Marsh | Catriona Coffey | catriona.coffey@law.njoag.gov |
| | | lpgcalendaring@law.njoag.gov |
| Prose User | Eric weiss | eric_s_weiss@yahoo.com |
| | | eric_s_weiss@yahoo.com |
| | | ericsweiss@gmail.com |
| Plaintiff | Eric Weiss | ericsweiss@gmail.com |

**<span style="color:red">Notice has NOT been electronically sent to:</span>**

| | | |
|---|---|---|
| Defendant | John/jane Does 1-10 | Not available |
| Defendant | John Tiger | Not available |
| Defendant | Peter Schleisier | Not available |
| Defendant | Michael Balsamo | Not available |
| Defendant | Thomas Derosa | Not available |
| Defendant | Sean Ross | Not available |
| Defendant | Jeffery Glennon | Not available |
| Defendant | Police De Township Of Clinton | Not available |

Login to eCourts to view the case jacket. You will need a valid user ID to view the submitted documents.

For questions, please contact the Civil Division in Hunterdon County.

This email is for notification purposes only and was sent from a notification-only address that cannot accept incoming email.
**Please do not reply to this message.**

# EXHIBIT J

**ERIC WEISS**
210 Walnut Street
Garwood NJ 07027
(ph) 908 913 0832
(email) eric_s_weiss@yahoo.com

| | |
|---|---|
| ERIC WEISS,<br>     Plaintiff,<br>   v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON / POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br>     Defendants | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br>**<u>Civil Action</u>**<br><br>PLAINTIFFS REPLY BREIF |

# PLAINTIFFS REPLY BRIEF TO DENY DEFENDANTS MOTION FOR SUMMARY JUDGMENT / MOTION TO DISMISS

**ERIC WEISS**
210 Walnut Street
Garwood NJ 07027
(ph) 908 913 0832
(email) eric_s_weiss@yahoo.com

Date: May 13, 2025

# TABLE OF CONTENTS

I.   **Preliminary Statement**..................................................................... 1

II.  **Statement of Facts**........................................................................ 2

III. **Argument**.................................................................................. 4

    A.  **Defendants' Point I**: The Notice of Tort Claim Filed with Clinton Township
        Applies to the HCPO Defendants.......................................... 4

        a. Tort Notice Timing – Continuing Violation Doctrine...................... 4

        b. The HCPO Was Functionally "One and the Same" as Clinton Township for
          Purposes of NJTCA Notice............................................... 5

        c.  Mandated Referral of Internal Affairs Complaints to the County  Prosecutor... 6

        d.  In the Alternative, the Tort Claims Notice Requirement Was Satisfied Under
          the Doctrines Substantial Compliance and Equity……………………….. 7

        e. The HCPO Defendants' Refusal to Investigate Plaintiff's Internal Affairs
          Complaint Violates His Constitutional Rights, and No Tort Claim Notice Is
          Required for Such Claims……………………………………… 9

            i. Clarifying Counts Attributed to HCPO Defendants............... 10

            ii. Violation of Constitutional Rights........................... 11

            iii. No Tort Claim Notice Is Required for Constitutional Claims......... 12

        f. Conclusion......................................................... 14

    B. **Defendants' Point II:** The Complaint Alleges Sufficient Facts to State Claims Against
        the HCPO Defendants.......................................................14

    C. **Defendants' Point III:** The HCPO Defendants Are Not Immune from Liability for
        Intentional Torts......................................................... 15

        a. Qualified Immunity Exception........................................ 16

        b. Failure to Investigate / Brady Violations............................ 16

    D. **Under "Monell" Summary Judgment/MTD Must Be Denied** as to Hunterdon  County
        Because the Record Shows a Pattern of Refusal to Investigate Plaintiff's Complaints,
        Which Supports Municipal Liability Under § 1983………………………… 16

        a.  Engaged in retaliatory conduct including withholding exculpatory police
          reports while giving them to the accuser (¶¶ 37–39)……………………17

        b. Claims for Punitive Damages Against Kelsey Marsh Are Permissible................ 20

            i. The Assertion That Defendant Marsh Acted Within the Scope of Her
              Employment Is Legally Baseless and Intellectually Disingenuous……… 20

            ii. The New Jersey Attorney General's Internal Affairs Policy &
              Procedures Manual (IAPP) leaves no room for discretion or
              Misinterpretation……………………………………………… 20

        c.  The Law Allows Punitive Damages Against Marsh......................... 22

IV.  **Conclusion**.............................................................. 22

# Table of Cases

**New Jersey**

| Name | Citation | Reason for Citation | Page(s) |
|------|----------|---------------------|---------|
| Beauchamp v. Amedio | 164 N.J. 111, 121–22 (2000) | Supports substantial compliance and actual notice under NJTCA when the public entity is aware of the claim and not prejudiced. | 1, 4, 5, 7, 9 |
| D.D. v. UMDNJ | 213 N.J. 130, 148 (2013) | Confirms that actual notice can satisfy NJTCA requirements. | 9 |
| Fuchilla v. Layman | 109 N.J. 319, 336–37 (1988) | Clarifies that tort claims notice requirements do not apply to deprivation of rights claims under § 1983. | 16 |
| Greenway Dev. Co. v. Borough of Paramus | 163 N.J. 546, 557 (2000) | Holds that constitutional claims are not barred by NJTCA notice requirements. | 12 |
| Hoag v. Brown | 397 N.J. Super. 34, 54 (App. Div. 2007) | Clarifies that NJTCA immunity does not extend to actions involving actual malice or willful misconduct. | 15 |
| In re Phillips | 117 N.J. 567, 576 (1990) | Affirms that refusal to follow lawful procedures by a public employee is disciplinable misconduct. | 20 |
| Lebron v. Sanchez | 407 N.J. Super. 204, 215 (App. Div. 2009) | Supports excusing technical noncompliance with NJTCA notice when the entity has actual knowledge and is not prejudiced. | 7 |
| McDade v. Siazon | 208 N.J. 463, 479–80 (2011) | Supports equitable considerations and substantial compliance when there is no prejudice to the public entity. | 7, 9 |
| McElwee v. Borough of Fieldsboro | 400 N.J. Super. 388, 396 (App. Div. 2008) | Holds that deviation from complaint protocols by an officer constitutes insubordination. | 20 |
| Murray v. Brown | 259 N.J. Super. 360, 365 (App. Div. 1992) | Reinforces substantial compliance with NJTCA notice based on actual knowledge and lack of prejudice. | 7 |
| Newberry v. Township of Pemberton | 319 N.J. Super. 671, 679 (App. Div. 1999) | Holds that substantial compliance with NJTCA notice is sufficient when the entity has actual knowledge and opportunity to investigate. | 6, 7 |
| Printing Mart-Morristown v. Sharp Elecs. Corp. | 116 N.J. 739, 746 (1989) | Establishes standard for motion to dismiss, requiring courts to accept allegations as true and grant reasonable inferences to plaintiff. | 14 |
| Russo Farms v. Vineland Bd. of Educ. | 144 N.J. 84, 98 (1996) | Establishes that a cause of action may accrue over time based on continuing violations, applicable to ongoing tortious conduct. | 4, 4 |
| State v. Carter | 91 N.J. 86 (1982) | Supports state-level analog to Brady violations for withholding exculpatory evidence. | 16 |
| Velez v. City of Jersey City | 180 N.J. 284, 294 (2004) | Confirms that NJTCA does not bar claims against individual public employees for intentional torts or willful misconduct. | 16, 20 |

## Federal

| Name | Citation | Reason for Citation | Page(s) |
|------|----------|---------------------|---------|
| Beers-Capitol v. Whetzel | 256 F.3d 120, 134 (3d Cir. 2001) | Supports Monell liability for deliberate indifference to constitutional violations. | 16 |
| Bielevicz v. Dubinon | 915 F.2d 845, 851 (3d Cir. 1990) | Supports Monell liability for a custom or practice of deliberate indifference to constitutional complaints. | 16 |
| Borough of Duryea v. Guarnieri | 564 U.S. 379, 387 (2011) | Affirms First Amendment right to petition the government for redress, including filing complaints against public officials. | 9, 11 |
| Brady v. Maryland | 373 U.S. 83 (1963) | Establishes that suppression of exculpatory evidence violates due process rights. | 16 |
| City of Canton v. Harris | 489 U.S. 378, 389 (1989) | Supports municipal liability under § 1983 for failure to train or supervise, leading to constitutional violations. | 15, 16 |
| Foraker v. Chaffinch | 501 F.3d 231, 236 (3d Cir. 2007) | Recognizes that retaliation for filing complaints against public officials can violate the First Amendment. | 12 |
| Hope v. Pelzer | 536 U.S. 730 (2002) | Establishes that public officials are not entitled to qualified immunity when they knowingly violate clearly established rights. | 16 |
| Mathews v. Eldridge | 424 U.S. 319, 333 (1976) | Outlines due process requirement for adequate procedural protections for government actions affecting protected interests. | 12 |
| Monell v. Dep't of Soc. Servs. | 436 U.S. 658 (1978) | Establishes municipal liability under § 1983 for constitutional violations caused by a policy, custom, or practice. | 2, 15, 16, 22 |
| Mullenix v. Luna | 577 U.S. 7 (2015) | Supports the principle that qualified immunity does not apply to knowing violations of established rights. | 16 |
| Ramirez v. County of Hudson | 2016 WL 4132299, at *8 (D.N.J. Aug. 2, 2016) | Supports punitive damages against individual public employees for egregious, malicious conduct. | 20 |
| Schneider v. City of Jersey City | 2016 WL 94839, at *4 (D.N.J. Jan. 8, 2016) | Confirms that § 1983 claims are not subject to NJTCA notice provisions. | 12 |
| Watkins v. City of Oakland | 145 F.3d 1087, 1092 (9th Cir. 1998) | Reinforces Monell liability for systemic refusal to address constitutional violations. | 16 |
| Zaloga v. Borough of Moosic | 841 F.3d 170 (3d Cir. 2016) | Provides framework for First Amendment retaliation claims based on protected activity and adverse action. | 12 |
| Zinermon v. Burch | 494 U.S. 113, 125 (1990) | Establishes due process requirement for fair procedures when addressing deprivations of liberty or property interests. | 11 |

# Table of Rules Cited

## New Jersey

| Name | Citation | Reason for Citation | Page(s) |
|---|---|---|---|
| New Jersey Administrative Code | N.J.A.C. 4A:2-2.3(a) | Defines insubordination and breach of duty, confirming that refusal to follow lawful orders constitutes disciplinable misconduct. | 20 |
| New Jersey Attorney General Directive | N.J. Att'y Gen. Directive 2022-14 | Mandates that internal affairs complaints be resolved within 45 days unless an extension is granted in writing. | 2, 16 |
| New Jersey Court Rule | R. 4:6-2(e) | Cited by Defendants to argue that the Complaint fails to state a claim, countered by Plaintiff as satisfied by detailed allegations. | 14 |
| New Jersey Court Rule | R. 4:9-1 | Basis for Plaintiff's request for leave to amend pleadings if the Court finds lack of specificity. | 14, 22 |
| New Jersey Internal Affairs Policy & Procedures Manual | IAPP, § 5.1 (Rev. July 2023) | Requires all complaints of officer misconduct to be accepted from any person at any time. | 20 |
| New Jersey Internal Affairs Policy & Procedures Manual | IAPP, § 5.1.8 | Mandates referral of complaints against law enforcement executives to the County Prosecutor. | 6 |
| New Jersey Internal Affairs Policy & Procedures Manual | IAPP, § 10.3 (Rev. July 2023) | States that failure to report misconduct or cooperate with internal affairs investigations is grounds for disciplinary action. | 20 |
| New Jersey Tort Claims Act | N.J.S.A. 59:1-1 to 12-3 | Governs tort claims against public entities, referenced as the basis for notice requirements. | 1 |
| New Jersey Tort Claims Act | N.J.S.A. 59:2-10 | Cited by Defendants to argue immunity for intentional torts, countered by Plaintiff as inapplicable for willful misconduct. | 15 |
| New Jersey Tort Claims Act | N.J.S.A. 59:8-1 et seq. | Governs notice requirements for tort claims against public entities. | 7 |
| New Jersey Tort Claims Act | N.J.S.A. 59:8-8(a) | Specifies the requirement to file a notice of tort claim with the public entity, challenged by Plaintiff as satisfied via substantial compliance. | 4, 12 |
| New Jersey Tort Claims Act | N.J.S.A. 59:9-2(c) | Bars punitive damages against public entities, but not individual employees like Marsh. | 20 |

## Federal

| Name | Citation | Reason for Citation | Page(s) |
|---|---|---|---|
| United States Code | 42 U.S.C. § 1983 | Basis for Plaintiff's constitutional claims against HCPO Defendants for violations of First and Fourteenth Amendment rights. | 12, 16, 22 |

## I.   Preliminary Statement

Plaintiff Eric Weiss submits this Reply Brief in opposition to the Motion for Summary Judgment and/or Dismissal filed by Defendants Hunterdon County Prosecutor's Office (improperly pled as Hunterdon County) and Kelsey Marsh (collectively, ``HCPO Defendants''). The HCPO Defendants' motion is premised on erroneous assertions that Plaintiff failed to file a timely notice of tort claim under the New Jersey Tort Claims Act (NJTCA), N.J.S.A. 59:1-1 to 12-3, that the Complaint fails to state a claim, and that the HCPO Defendants are immune from liability for intentional torts and punitive damages. Plaintiff respectfully submits that the motion should be denied in its entirety for the following reasons:

First, the notice of tort claim filed with Clinton Township/Police Department on April 10, 2023, also applies to the HPCO defendants as it was a continuation of the torts complained of. It also sufficiently placed the HCPO Defendants on notice of Plaintiff's claims, as the HCPO was aware of the notice of tort claim, the incidents and the related internal affairs complaints escalated to their office. HCPO had constructive notice when it assumed responsibility for the investigation (Compl. ¶¶ 57-58; Beauchamp v. Amedio, 164 N.J. 111, 121-22 (2000)). Naming HCPO in the original claim would have been premature, as they had not yet acted.

Second, the Complaint alleges sufficient facts to support viable claims against the HCPO Defendants, particularly regarding their refusal to handle Plaintiff's internal affairs complaints.

1

Third, the NJTCA does not categorically bar liability for intentional torts when public employees act outside the scope of their authority or in bad faith, and punitive damages are permissible against individual defendants like Kelsey Marsh. Accordingly, the Court should deny the HCPO Defendants' motion.

## II.  Statement of Facts

Plaintiff incorporates by reference his Counter Statement of Facts submitted concurrently herewith. Additionally, Plaintiff notes that on January 10, 2023, he was detained, searched, and interrogated by Clinton Township Police officers for over an hour after they confirmed that the 911 call made by his ex-wife, Posner, alleging domestic violence, was clearly false.

Plaintiff filed a notice of tort claim with Clinton Township on April 10, 2023, detailing the tortious conduct of the officers. When Plaintiff's internal affairs complaints against these officers were not addressed, he escalated the matter to the HCPO in early 2024. During a meeting with Defendants Kelsey Marsh and Colin Frinzi, Marsh continued the tortious conduct of the Clinton Township defendants by refusing to take Plaintiff's complaint (Compl. ¶¶ 61-66), became abusive, and falsely accused him of domestic violence, obstructing his ability to seek redress. Plaintiff's exculpatory police report was suppressed by Clinton Township and the HCPO while being selectively provided to the false accuser. This suppression is central to Plaintiff's Brady and due process claims.

Marsh now falsely claims Plaintiff was confrontational (Compl. ¶¶ 63-66) to justify her insubordination and violations of Plaintiffs civil rights terminating the meeting, despite

Plaintiff's calm and factual effort to ensure an accurate complaint. No outburst or threat occurred, and Defendant Frinzi failed to intervene or contradict Marsh's improper conduct. (see Compl. ¶¶ 63–66)

Defendants' assertion that certain individuals—such as Renee Robeson, Colin Frinzi, and Frank Crisologo—are not named defendants is immaterial to Plaintiff's Monell claim. The conduct of these individuals is not being asserted for personal liability, but rather to demonstrate the widespread and systemic failure of the HCPO to accept and investigate legitimate internal affairs complaints (Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)). Their actions, all taken under color of law and in their official capacities, are imputed to the County for purposes of establishing municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). Plaintiff reserves the right to amend the pleadings if necessary to include any individual actor in their personal capacity, but such amendment is not required for Monell liability to attach.

Clinton Township officials explicitly were mandated by statute and operating manuals to escalate Plaintiff's internal affairs complaint to the Hunterdon County Prosecutor's Office, further demonstrating functional continuity and institutional knowledge. (PLT Decl. ¶ 12, Email Ex. H)

The HCPO's failure to investigate these complaints, despite being aware of the underlying incident and the tort claim filed with Clinton Township, forms the basis of Plaintiff's claims against the HCPO Defendants. As of this filing, 757 days have elapsed since

Plaintiff first attempted to file an internal affairs complaint; the HCPO has never issued any findings or disciplinary action, in direct violation of the 45-day IA resolution timeline (N.J. Att'y Gen. Directive 2022-14).

### III. Argument

### A. Defendants' Point I: The Notice of Tort Claim Filed with Clinton Township Applies to the HCPO Defendants

The HCPO Defendants falsely argue that Plaintiff failed to file a notice (N.J.S.A. 59:8-8(a)) of tort claim with their office, as required by N.J.S.A. 59:8-8(a). The HCPO Defendants' argument that the notice was inoperative because it predated Plaintiff's interactions with them is pointless as it ignores the continuing nature of the tortious conduct (Russo Farms v. Vineland Bd. of Educ., 144 N.J. 84, 98 (1996)). The HCPO's failure to properly handle Plaintiff's complaints is a direct extension of the Clinton Township officers' actions, forming a single course of conduct. (See Russo Farms v. Vineland Bd. of Educ. 144 N.J. 84, 98 (1996) (holding that a cause of action accrues when the right to sue arises, which may involve continuing violations). Thus, the notice filed with Clinton Township satisfies the NJTCA's requirements as to the HCPO Defendants.

### a. Tort Notice Timing – Continuing Violation Doctrine

The fact that the HCPO Defendants were not mentioned by name in the April 10, 2023 tort claim notice does not bar Plaintiff's claims. The HCPO's involvement was part of a continuing course of related misconduct, originating from the Clinton Township incident and escalating through Plaintiff's efforts to seek redress. See Russo Farms v. Vineland Bd. of Educ., 144 N.J. 84, 98 (1996) (a

4

cause of action may accrue over time based on continuing violations). By the time the HCPO assumed responsibility for the internal affairs complaints, they were fully aware of the underlying facts and the pending tort claim. Thus, under the doctrine of substantial compliance and actual notice, see Beauchamp v. Amedio, 164 N.J. 111, 121-22 (2000), no separate tort claim notice was required.

Moreover, the notice filed with Clinton Township on April 10, 2023, sufficiently placed the HCPO Defendants on notice of Plaintiff's claims, as the HCPO was aware of the notice of tort claim Plaintiff had filed, the underlying incident and the related internal affairs complaints.

The NJTCA requires that a notice of claim be filed with the public entity involved in the alleged wrongful act or omission, but courts have recognized that substantial compliance with the notice requirement is sufficient when the public entity has actual notice and is not prejudiced (Beauchamp v. Amedio, 164 N.J. at 121-22). See Beauchamp v. Amedio, 164 N.J. 111, 121-22 (2000).

Here, Plaintiff filed a timely notice of tort claim with Clinton Township, detailing the tortious conduct arising from the January 10, 2023, incident. The HCPO became involved when Plaintiff escalated his internal affairs complaints to their office in early 2024, at which point they were fully aware of the underlying incident and the tort claim filed with Clinton Township.

   **b.** **The HCPO Was Functionally "One and the Same" as Clinton Township for Purposes of NJTCA Notice**

Even if the HCPO was not expressly named in the April 10, 2023 tort claim notice, it cannot evade liability where it later assumed

investigatory responsibility for the exact conduct alleged in that notice. The New Jersey Tort Claims Act (NJTCA) does not require redundant or duplicative notice when the second entity becomes directly involved through delegation, oversight, or continuation of responsibility for the subject matter already described in a valid tort notice.

### c. Mandated Referral of Internal Affairs Complaints to the County Prosecutor

The New Jersey Attorney General's Internal Affairs Policy & Procedures Manual (IAPP) explicitly requires that certain internal affairs complaints be referred to the County Prosecutor. Specifically, Section 5.1.8 of the IAPP states:

> "Complaints against a law enforcement executive, or a member of the executive's senior management team, may originate from a member of the public or from an employee of the agency. All such complaints shall be documented and referred to the County Prosecutor for review. If the subject of the Internal Affairs investigation is the Police Chief, Police Director, Sheriff or Head of Internal Affairs, either the County Prosecutor or the Attorney General's Office shall handle the investigation."

In the present case, Plaintiff's complaint implicated senior officials within the Clinton Township Police Department. Therefore, under the mandates of the IAPP, Clinton Township officials were obligated to escalate the complaint to the Hunterdon County Prosecutor's Office. This requirement underscores the functional continuity and institutional knowledge between municipal law enforcement agencies and the County Prosecutor's Office, as outlined in the IAPP.

Where two governmental entities are functionally aligned in their roles—especially where one assumes control over or supervision of the acts complained of—courts have held that notice to one is

6

suffice for both. In Newberry v. Township of Pemberton, 319 N.J. Super. 671, 679 (App. Div. 1999), the court held that substantial compliance was established when the proper entity had actual knowledge and an opportunity to investigate, even if not specifically named. Similarly, in Beauchamp v. Amedio, 164 N.J. 111, 122 (2000), the Court reiterated that the purpose of the notice requirement is not formality but function—ensuring the public entity has a fair opportunity to respond.

Here, the HCPO became involved in direct response to the failure of the Clinton Township Police Department to process Plaintiff's internal affairs complaints. As alleged in the Complaint, Plaintiff escalated his concerns to the HCPO, and the HCPO agreed to assume responsibility for investigating the Clinton officers (Compl. ¶¶ 57-58). The HCPO therefore placed itself in the shoes of Clinton Township for purposes of addressing Plaintiff's complaints. Once an agency voluntarily steps into the role of the entity named in a tort claim—especially to resolve or investigate the underlying events—it inherits the burden and notice associated with that conduct.

To hold otherwise would undermine the purpose of the NJTCA and elevate form over substance. See McDade v. Siazon, 208 N.J. 463, 480 (2011) (noting that equitable considerations and lack of prejudice may justify substantial compliance). Here, the HCPO had full knowledge of the April 10, 2023 tort claim, had access to all related evidence and parties, and cannot credibly claim surprise or prejudice. It was, for all practical and legal purposes, an

extension of the Clinton Township Police Department's misconduct redress mechanism.

Accordingly, because the HCPO was operating as the investigating agency on behalf of Clinton Township and responding to the same factual matter described in the original notice, it must be treated as functionally "one and the same" as Clinton for notice purposes. No additional notice was required.

### d. In the Alternative, the Tort Claims Notice Requirement Was Satisfied Under the Doctrines of Substantial Compliance and Equity

Even if the Court finds that Plaintiff's April 10, 2023 tort claim notice does not technically name the HCPO Defendants, dismissal is still unwarranted under well-established doctrines of substantial compliance and equitable principles that govern the interpretation of notice requirements under the New Jersey Tort Claims Act (NJTCA), N.J.S.A. 59:8-1 et seq.

The New Jersey Supreme Court has long recognized that technical noncompliance with the NJTCA notice requirement may be excused Lebron v. Sanchez, 407 N.J. Super. 204, 215 (App. Div. 2009) when the public entity has actual knowledge of the facts giving rise to the claim, is not prejudiced, and the claimant made a good-faith effort to comply. See Lebron v. Sanchez, 407 N.J. Super. 204, 215 (App. Div. 2009); Newberry v. Township of Pemberton, 319 N.J. Super. 671, 679 (App. Div. 1999); Murray v. Brown, 259 N.J. Super. 360, 365 (App. Div. 1992).

Here, Plaintiff's April 10, 2023 notice to Clinton Township detailed the full scope of the misconduct stemming from the January 10, 2023 incident and included allegations that necessarily

8

implicated county-level prosecutorial oversight. When the matter was subsequently escalated to the HCPO in early 2024, the HCPO had actual knowledge of the incident, the tort claim notice that was filed, the pending claims, and its own investigatory responsibilities. Defendants do not allege—let alone demonstrate—any prejudice arising from the lack of a second notice. As such, the purpose of the notice requirement—fair opportunity to investigate and respond—was fully satisfied. See Beauchamp v. Amedio, 164 N.J. 111, 121-22 (2000) ("The notice requirement is not intended as a trap for the unwary.").

Furthermore, equity forbids the dismissal of a valid claim (McDade v. Siazon, 208 N.J. 463, 479 (2011)) based solely on procedural technicality when the defendant had actual notice and ample opportunity to respond. See McDade v. Siazon, 208 N.J. 463, 479 (2011) (noting courts may relax procedural requirements where equity demands). Plaintiff diligently pursued relief, first through Clinton Township, then through multiple efforts to engage the HCPO and Internal Affairs. Any delay or misdirection was the result of institutional obstruction—not Plaintiff's lack of diligence. Accordingly, even if the Court concludes that strict compliance with the NJTCA notice requirement was not achieved, dismissal should be denied under the doctrines of substantial compliance and equitable notice, which have been repeatedly affirmed as valid exceptions to the rigid 90-day rule. See also D.D. v. UMDNJ, 213 N.J. 130, 148 (2013) (actual notice may satisfy NJTCA requirements)

The HCPO's receipt of Plaintiff's complaints and their agreement to investigate constitute actual notice of the claims.

9

(See D.D. v. University of Medicine and Dentistry of New Jersey},
213 N.J. 130, 148 (2013) (noting that actual notice can satisfy
NJTCA requirements). Moreover, the HCPO Defendants have not
demonstrated any prejudice resulting from the lack of a separate
notice, as they had ample opportunity to investigate the claims upon
receiving the internal affairs complaints.

### e. The HCPO Defendants' Refusal to Investigate Plaintiff's Internal Affairs Complaint Violates His Constitutional Rights, and No Tort Claim Notice Is Required for Such Claims

The HCPO Defendants' refusal to investigate Plaintiff's
internal affairs complaints against Clinton Township Police officers
constitutes a violation of his constitutional rights, specifically
his First Amendment right to petition (Borough of Duryea v.
Guarnieri, 564 U.S. 379, 387 (2011)) the government for redress of
grievances and his Fourteenth Amendment right to due process.
Furthermore, claims arising from constitutional violations are not
subject to the NJTCA's notice of claim requirement, rendering the
HCPO Defendants' argument regarding the lack of a separate tort
claim notice inapplicable to these claims.

### i. Clarifying Counts Attributed to HCPO Defendants

Clarification of Claims: Counts 2 (Deprivation of Rights) and
14 (Deprivation and Interference with Protected Parental Rights) are
asserted directly against the HCPO Defendants based on their refusal
to investigate Plaintiff's internal affairs complaints, their
obstruction of Plaintiff's efforts to seek redress, and the
retaliatory conduct that followed. These counts are grounded in
violations of Plaintiff's First and Fourteenth Amendment rights and
supported by factual allegations in ¶¶ 57-76 of the Complaint.

10

### ii. Violation of Constitutional Rights

The First Amendment protects an individual's right to petition the government for redress of grievances, which includes the ability to file complaints against public officials for misconduct. See Borough of Duryea v. Guarnieri, 564 U.S. 379, 387 (2011) (holding that the Petition Clause protects the right to seek redress through complaints to government entities). Similarly, the Fourteenth Amendment guarantees due process, which encompasses the right to a fair and impartial investigation (Zinermon v. Burch, 494 U.S. 113, 125 (1990)) of complaints against public officials, particularly when such complaints allege misconduct that infringes on protected rights. See Zinermon v. Burch, 494 U.S. 113, 125 (1990) (noting that due process requires fair procedures to address deprivations of liberty or property interests).

Here, Plaintiff alleges that Defendants Kelsey Marsh, Colin Frinzi, and Frank Crisologo, under the direction of the HCPO, refused to investigate his internal affairs complaints against Clinton Township Police officers who engaged in tortious and retaliatory conduct on January 10, 2023 (Compl. ¶¶ 57-76). Specifically, Marsh refused to obtain relevant evidence, such as police reports and body camera footage, became abusive, and falsely accused Plaintiff of domestic violence to justify terminating the complaint process (Compl. ¶¶ 61-66). Frinzi, present during the meeting, failed to intervene or fulfill his duty to take the complaint (Compl. ¶ 66). Crisologo, despite interviewing Plaintiff in July 2024, failed to produce any investigation or findings, violating the requirement to resolve internal affairs complaints

within 45 days (Compl. ¶¶ 74-76). The HCPO, by endorsing and failing to correct these actions, obstructed Plaintiff's ability to seek redress for the officers' misconduct.

To establish retaliation under the First Amendment (Zaloga v. Borough of Moosic, 841 F.3d 170 (3d Cir. 2016)), Plaintiff engaged in protected activity by attempting to file a complaint; suffered adverse action when Marsh refused to accept it and fabricated a justification; and there is a clear causal link, as Marsh's hostility only arose after Plaintiff attempted to hold officers accountable. Zaloga v Borough of Moosic 841 F.3d 170 (3d Cir. 2016).

This refusal to investigate constitutes a direct violation of Plaintiff's First Amendment right to petition, as it effectively denied him access to a government process designed to address police misconduct. See Foraker v. Chaffinch, 501 F.3d 231, 236 (3d Cir. 2007) (recognizing that retaliation for filing complaints against public officials can violate the First Amendment).

Additionally, the HCPO Defendants' actions deprived Plaintiff of due process by failing to provide a fair and impartial mechanism to address his complaints, particularly when those complaints implicated his liberty interests in being free from unlawful detention and retaliation (Compl. ¶¶ 20-28). See Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (due process requires adequate procedural protections for government actions (Mathews v. Eldridge, 424 U.S. 319, 333 (1976)) affecting protected interests).

### iii. No Tort Claim Notice Is Required for Constitutional Claims

The HCPO Defendants argue that Plaintiff's claims are barred due to the failure to file a notice of tort claim with their office

under N.J.S.A. 59:8-8(a). However, claims asserting violations of constitutional rights, such as those under the First and Fourteenth Amendments, are not subject to the NJTCA's notice requirements. The NJTCA governs tort claims against public entities and employees, but constitutional claims brought under 42 U.S.C. § 1983 or directly under the New Jersey Constitution are distinct and not subject to the same procedural constraints. See Greenway Dev. Co. v. Borough of Paramus}, 163 N.J. 546, 557 (2000) (holding that constitutional claims are not barred by NJTCA (Greenway Dev. Co. v. Borough of Paramus, 163 N.J. 546, 557 (2000)) notice requirements); see also Schneider v. City of Jersey City, 2016 WL 94839, at *4 (D.N.J. Jan. 8, 2016) (noting that § 1983 claims are not subject to NJTCA notice provisions (Schneider v. City of Jersey City, 2016 WL 94839, at *4 (D.N.J. Jan. 8, 2016))).

Plaintiff's claims for deprivation of rights (Count 2) and deprivation and interference with protected parental rights (Count 14) explicitly invoke constitutional protections (Compl. ¶¶ 78, 92). These claims arise from the HCPO Defendants' refusal to investigate, which obstructed Plaintiff's constitutional rights to petition and due process. Because these claims are grounded in constitutional violations, they are not subject to the NJTCA's notice requirement, and the HCPO Defendants' reliance on the lack of a separate tort claim notice is misplaced.

Moreover, even if the NJTCA applied, the notice filed with Clinton Township on April 10, 2023, provided sufficient notice to the HCPO Defendants, as argued in Defendants' Point I. The HCPO's awareness of the underlying incident and the internal affairs

complaints further supports the conclusion that no additional notice was required for the constitutional claims.

### f. Conclusion

In the alternative, should the Court determine that Plaintiff's pleading lacks specificity as to certain actors or theories of recovery, Plaintiff respectfully requests leave to amend under R. 4:9-1 to conform the pleadings to the proofs and arguments presented.  The HCPO Defendants' refusal to investigate Plaintiff's internal affairs complaints violated his First Amendment right to petition and Fourteenth Amendment right to due process. These constitutional claims are not subject to the NJTCA's notice of claim requirement, and the Court should deny the HCPO Defendants' motion to dismiss these claims. Additionally, the notice filed with Clinton Township satisfies any applicable NJTCA requirements for related tort claims, reinforcing the viability of Plaintiff's Complaint.

### B. Defendants' Point II: The Complaint Alleges Sufficient Facts to State Claims Against the HCPO Defendants

The HCPO Defendants contend that the Complaint fails to state a claim under R. 4:6-2(e). However, the Complaint alleges specific facts demonstrating that Defendants Kelsey Marsh and the HCPO engaged in tortious conduct by refusing to investigate Plaintiff's internal affairs complaints and obstructing his right to seek redress.  For example, the Complaint details how Marsh refused to obtain relevant evidence (e.g., police reports and body camera footage), became abusive, and falsely accused Plaintiff of domestic violence to justify terminating the meeting (Compl. ¶¶ 61-66). These actions support claims for intentional infliction of emotional distress, negligence, and breach of duty, among others.

14

In a motion to dismiss, the Court must accept the Complaint's allegations as true and grant all reasonable inferences in Plaintiff's favor. {Printing Mart-Morristown v. Sharp Elecs. Corp.}, 116 N.J. 739, 746 (1989). The Complaint's allegations are neither conclusory nor speculative; they provide a detailed factual basis for each claim, including the specific actions of Marsh and the HCPO's failure to act. Thus, the Complaint sufficiently states claims against the HCPO Defendants, and dismissal is unwarranted.

### C. Defendants' Point III: The HCPO Defendants Are Not Immune from Liability for Intentional Torts

The HCPO Defendants argue that the NJTCA bars liability for intentional torts under N.J.S.A. 59:2-10. However, this immunity does not apply when public employees act outside the scope of their authority or engage in willful misconduct. {See Hoag v. Brown}, 397 N.J. Super. 34, 54 (App. Div. 2007) (noting that immunity does not extend to actions involving actual malice or willful misconduct). Here, Plaintiff alleges that Kelsey Marsh acted with malice by refusing to take his complaint, making false accusations, and obstructing his rights (Compl. ¶¶ 62-66). Such conduct falls outside the scope of her authority and constitutes willful misconduct, rendering the HCPO potentially liable for her actions.

After Plaintiff filed a formal Internal Affairs complaint, no investigation was conducted, and no corrective action was taken—demonstrating the department's deliberate indifference and supporting municipal liability under Monell. See Monell v. Department of Social Services, 436 U.S. 658 (1978), City of Canton v. Harris, 489 U.S. 378 (1989) (failure to supervise and train supports § 1983 liability when it leads to rights violations)

15

### a. Qualified Immunity Exception:

Public officials are not entitled to qualified immunity when they knowingly violate clearly established rights. Hope v. Pelzer, 536 U.S. 730 (2002); Mullenix v. Luna, 577 U.S. 7 (2015).

### b. Failure to Investigate / Brady Violations:

A willful refusal to investigate exculpatory evidence and a pattern of retaliatory targeting violate Brady v. Maryland, 373 U.S. 83 (1963) and state analogs. See State v. Carter, 91 N.J. 86 (1982). Moreover, the NJTCA does not bar claims against individual public employees for intentional torts. {See Velez v. City of Jersey City}, 180 N.J. 284, 294 (2004). The HCPO's act of withholding all the exculpatory information from Plaintiff constitutes a violation of Brady v. Maryland, 373 U.S. 83 (1963). This suppression of evidence directly impacted Plaintiff's ability to file a meaningful complaint and is independently actionable. (Compl. ¶¶ 73–75, Ex. K)

Thus, Plaintiff's claims against Marsh in her individual capacity (e.g., intentional infliction of emotional distress, civil conspiracy) are viable and should not be dismissed.

### D. Under "Monell" Summary judgment/MTD must be denied as to Hunterdon County because the record shows a pattern of refusal to investigate plaintiff's complaints, which supports municipal liability under § 1983

Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a municipality or county may be held liable under 42 U.S.C. § 1983 where a constitutional violation was caused by a policy, custom, or practice of the government entity. A "policy or custom" may be shown by a pattern of behavior by officials with final policymaking authority, or by the entity's deliberate indifference

to known or repeated constitutional violations. City of Canton v. Harris, 489 U.S. 378, 389 (1989); Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001).

The facts here raise a genuine issue of material fact as to whether Hunterdon County, acting through the Hunterdon County Prosecutor's Office (HCPO) and its officials, maintained such a custom or policy. As pled in Plaintiff's verified Complaint and admitted in Defendants' own motion papers, Plaintiff attempted over a period of more than a year to submit a lawful Internal Affairs complaint against Clinton Township Police officers who had:

Detained Plaintiff for approximately an hour after confirming that a police report made against him was false (¶¶ 27-28, Complaint),

Refused to take Plaintiff's report of the false police call and illegal recording (¶¶ 41-44),

    a. **Engaged in retaliatory conduct including withholding exculpatory police reports while giving them to the accuser (¶¶ 37-39).**

Despite Plaintiff's repeated efforts, including direct communications with Captain DeRosa, Sergeant Ross, and Officer Glennon, no investigation was conducted. Instead, Ross, DeRosa, and Glennon refused to accept the complaint for months, and Ross ultimately declined to proceed, falsely claiming due to litigation that had not yet been filed (¶¶ 50-56),

Plaintiff then contacted the HCPO, which assigned Detective Sergeant Kelsey Marsh and Detective Frinzi to take his complaint (¶¶ 57-58). Marsh refused to obtain the police reports, bodycam footage, or materials Plaintiff requested to ensure his complaint would be complete and accurate, despite Plaintiff's explanation that

the events had occurred over a year prior and required records to refresh his recollection (¶¶ 60-63). Marsh stated "they were not going to provide me any discovery to help me file my complaint against these officers" (¶ 64). Rather than allowing Plaintiff to explain the misconduct, Marsh became hostile, falsely accused Plaintiff of attempting to control her, and refused to take the complaint as ordered, despite Frinzi being present he refused to intervene (¶¶ 65-67).

Plaintiff immediately reported Marsh's and Frinzi's refusal to accept the complaint to Prosecutor Robeson, explaining in detail the obstruction he encountered, and how it compounded the prior refusals by Ross, DeRosa, and Glennon (¶¶ 67-68). Robeson did not respond until a second follow-up, at which point the matter was purportedly referred to the Office of Public Integrity and Accountability (OPIA). Plaintiff repeatedly requested that Robeson identify the person or office to whom she claimed the matter was transferred at the state level. Robeson never provided a name or contact, and the Office of Public Integrity and Accountability ultimately declined to accept the matter, directing the HCPO to investigate itself, including officers named in the complaint. (Compl. ¶¶ 68, 71-73)

Several months later, HCPO Captain Crisologo took a belated statement from Plaintiff (July 2024), which Plaintiff supplemented with additional materials (August 2024). As of the date of the Complaint, no investigation had occurred and no findings issued, in direct violation of internal affairs deadlines (¶¶ 74-76).

Under the New Jersey Attorney General's Internal Affairs Policy & Procedures (rev. 2022), internal affairs complaints must be

resolved within 45 days unless an extension is granted in writing. See N.J. Attorney General Directive 2022-14. Here, the complaint was delayed for over a year, and as of this filing,(757 days since Plaintiff asked to file the internal affairs complaint) no investigation or findings were issued (Compl. ¶¶ 74-76).

These facts — many of which are unrebutted by Defendants' motion, and several of which are affirmatively admitted (see Hunterdon MTD Brief at 3-4) — demonstrate a systemic refusal to accept, process, or investigate misconduct complaints, especially where the complaint was directed at superior officers or involved prior documented constitutional violations.

The coordinated failures of Marsh, Frinzi, Robeson, Ross, and others over the course of a full year demonstrate more than negligence or delay; they establish a custom or practice of deliberate indifference to constitutional complaints, and thus give rise to municipal liability under Monell. See Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990); Watkins v. City of Oakland, 145 F.3d 1087, 1092 (9th Cir. 1998).

Additionally, liability is further supported under City of Canton v. Harris, 489 U.S. 378 (1989), where failure to train or supervise officials tasked with internal affairs responsibilities predictably resulted in the denial of constitutional protections. The HCPO's pattern of disregarding internal affairs protocols supports a claim of institutional deliberate indifference.

Defendants' argument that Plaintiff failed to file a tort claims notice is irrelevant to his deprivation of rights claims. See Fuchilla v. Layman, 109 N.J. 319, 336-37 (1988). Moreover, Monell

does not impose respondeat superior liability but holds a municipality liable when its own acts or omissions cause constitutional harm. Monell, 436 U.S. at 694.

Accordingly, Plaintiff has presented substantial evidence that Hunterdon County maintained or acquiesced in a policy or custom of refusing to investigate misconduct complaints, which proximately caused the continued violation of his constitutional rights. Summary judgment must be denied.

### b. Claims for Punitive Damages Against Kelsey Marsh Are Permissible

#### i. The Assertion That Defendant Marsh Acted Within the Scope of Her Employment Is Legally Baseless and Intellectually Disingenuous

Defendants' suggestion that Defendant Marsh acted within the scope of her employment is not just legally unsound—it is a position so untethered from governing law, policy, and professional standards that its inclusion in a formal pleading borders on audacious.

There is no conceivable interpretation of any statute, regulation, internal policy, or law enforcement standard that permits a police officer to ignore a direct order to accept an internal affairs complaint. To claim otherwise is to disregard not only the plain language of binding regulations, but also the most basic principles of professional accountability.

#### ii. The New Jersey Attorney General's Internal Affairs Policy & Procedures Manual (IAPP) leaves no room for discretion or misinterpretation:

"All complaints of officer misconduct shall be accepted from any person, including anonymous sources, at any time." — IAPP, § 5.1 (Rev. July 2023).

This mandate is further reinforced:

"It is the duty of every law enforcement officer and employee to report misconduct and to cooperate with internal affairs investigations. Failure to do so shall be grounds for disciplinary action."— IAPP, § 10.3.

No officer, let alone one assigned to receive complaints on behalf of a county prosecutor's office, may lawfully refuse to take a complaint—particularly not one concerning serious civil rights violations. Marsh's refusal to accept the complaint, her hostile conduct, and her fabrication of a justification for ejecting Plaintiff from the process are not minor procedural deviations; they are violations of core duties that strike at the heart of law enforcement legitimacy.

The New Jersey Administrative Code likewise defines insubordination and breach of duty in clear terms. N.J.A.C. 4A:2-2.3(a) confirms that refusal to follow lawful orders or procedures constitutes disciplinable misconduct. Case law echoes this standard: In In re Phillips, 117 N.J. 567, 576 (1990), the New Jersey Supreme Court affirmed that refusal to follow lawful procedures may subject a public employee to discipline; In McElwee v. Borough of Fieldsboro, 400 N.J. Super. 388, 396 (App. Div. 2008), the court held that deviation from complaint protocols by an officer constituted insubordination and grounds for removal.

The idea that such conduct could somehow be shielded under the doctrine of scope of employment is legally and logically unsupportable. Marsh was not exercising discretion—she was defying clear legal directives and fabricating a pretext to suppress a complaint she was legally required to take. Moreover, under the New Jersey Tort Claims Act, public employees who act with actual malice or willful misconduct are deemed to be acting outside the scope of

employment and forfeit the protections of public immunity. See Velez v. City of Jersey City, 180 N.J. 284, 294 (2004). Marsh's conduct—marked by retaliation, obstruction, and open defiance of mandatory policy—fits squarely within that exception. In short, the HCPO's attempt to characterize Marsh's conduct as occurring "within the scope" of her employment is not only devoid of legal merit—it is an affront to the rule of law, institutional integrity, and the public's trust in the internal accountability mechanisms of law enforcement.

### c. The law allows Punitive Damages against Marsh

The HCPO Defendants assert that punitive damages are unavailable against the HCPO under N.J.S.A. 59:9-2(c). While this is true for public entities, punitive damages may be awarded against individual public employees for egregious conduct. {See Ramirez v. County of Hudson}, 2016 WL 4132299, at *8 (D.N.J. Aug. 2, 2016). However, Plaintiff's claim for punitive damages is directed solely at Defendant Kelsey Marsh in her individual capacity, based on conduct alleged to be intentional, retaliatory, and undertaken with malice. See Ramirez v. County of Hudson, 2016 WL 4132299, at 8 (D.N.J. Aug. 2, 2016). The Complaint alleges that Marsh's actions were malicious and intended to harm Plaintiff, supporting a claim for punitive damages (Ramirez v. County of Hudson, 2016 WL 4132299, at *8 (D.N.J. Aug. 2, 2016)) against her in her individual capacity. Thus, the claim for punitive damages against Marsh should not be dismissed.

### IV. Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the HCPO Defendants' Motion for Summary Judgment and/or Dismissal in its entirety. Plaintiff has pleaded viable constitutional claims under 42 U.S.C. § 1983 and the New Jersey Constitution, and has presented sufficient facts to support liability under Monell based on the HCPO's persistent refusal to accept or investigate Plaintiff's internal affairs complaints.

The April 10, 2023 tort claim notice filed with Clinton Township is legally sufficient as to the HCPO Defendants, who later assumed direct responsibility for investigating the very conduct described therein. Under the doctrines of substantial compliance, actual notice, and continuing tort, and due to the functional unity between the HCPO and the Clinton Township Police Department, no duplicative notice was required.

The assertion that Defendant Marsh acted within the scope of her employment is directly contradicted by governing law and policy. Her refusal to accept a mandated complaint, coupled with retaliatory conduct, violates binding internal affairs regulations, constitutes insubordination, and falls well outside the bounds of protected official conduct. The HCPO Defendants are not entitled to immunity for intentional and malicious acts.

Plaintiff has also stated a valid claim for punitive damages against Kelsey Marsh in her individual capacity, as her conduct involved deliberate obstruction, fabrication, and malice.

In the alternative, should the Court find that the Complaint lacks specificity as to certain actors or legal theories, Plaintiff respectfully requests leave to amend under R. 4:9-1 to conform the

pleadings to the facts, legal arguments, and record developed through briefing.

**CERTIFICATION**

I certify that the foregoing statements made by me are true and accurate to the best of my knowledge and belief. I am aware that if any of the foregoing is willfully false, I am subject to punishment.

Dated: May 13, 2025

Eric Weiss, Plaintiff

**ERIC WEISS**
210 Walnut Street
Garwood NJ 07027
(ph) 908 913 0832
(email) eric_s_weiss@yahoo.com

| | |
|---|---|
| ERIC WEISS,<br>          Plaintiff,<br>   v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON / POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br>          Defendants | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><u>**Civil Action**</u><br>PLAINTIFFS RESPONSE TO DEFENDANTS STATEMENT OF UNDISPUTED MATERIAL FACTS<br><br>PURSUANT TO R. 4:46-2(a) |

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiff Eric Weiss submits the following responses to the Statement of Undisputed Material Facts submitted by Defendants Hunterdon County Prosecutor's Office and Kelsey Marsh (``HCPO Defendants'') pursuant to R. 4:46-2(a):

1. Defendants' Fact 1: Plaintiff filed a lawsuit on January 3, 2025, against various defendants, including the HCPO Defendants.

   **Response:** Admitted, but Plaintiff clarifies that the lawsuit was filed in Hunterdon County, not Somerset County as initially indicated in the Complaint due to a clerical error (Compl. Pg 1).

2. Defendants' Fact 2: Plaintiff alleges that Defendants committed torts during their response to a 911 call and internal affairs complaints.

   **Response:** Admitted in Part and denied in Part. Plaintiff disputes that the allegations are limited to the 911-call response and the internal affairs complaint only. The Complaint also details tortious conduct by the HCPO Defendants in refusing to properly handle

1

Plaintiff's internal affairs complaints (Compl. ¶¶ 57-76). Additionally, Plaintiff notes that on January 10, 2023, he was detained, searched, and questioned by Clinton Township Police officers for over an hour, even after they confirmed that the 911 call made by his ex-wife, Posner, alleging domestic violence, was proven false by all reasonable doubt. (Tran Ex. A, Compl. ¶¶ 7-12)

3. Defendants' Fact 3: Plaintiff raises fourteen tort-based claims.

   **Response:** Admitted in Part and denied in Part. also filed claims under the United States and New Jersey Constitutions. (Compl. ¶¶ 1-3, 78-105).

4. Defendants' Fact 4: Plaintiff filed a notice of tort claim with Clinton Township on April 10, 2023.

   **Response:** Admitted. Plaintiff further asserts that this notice also applied to the HCPO Defendants, as their conduct was a continuation of the torts claimed in the notice. It sufficiently placed the HCPO Defendants on notice of the claims when the internal affairs complaints were escalated to their office in early 2024. (Compl. ¶¶ 40, 57-58)

5. Defendants' Fact 5: The Complaint contains no allegations regarding interactions with the HCPO Defendants prior to January 2024.

   **Response:** Admitted. However, Plaintiff disputes the implication that this negates the applicability of the tort claim notice. The HCPO Defendants were aware of both the underlying incident and the tort claim filed with Clinton Township when they assumed responsibility for the internal affairs complaints. (Compl. ¶¶ 40,

57–58)  Their conduct is imputed to the HCPO as supervisory failures, forming the predicate for Monell liability.

Clinton Township officials explicitly were mandated by statute and operating manuals to escalate Plaintiff's internal affairs complaint to the Hunterdon County Prosecutor's Office, further demonstrating functional continuity and institutional knowledge. (PLT Decl. ¶ 12, Email Ex. H)

Plaintiff further asserts that the HCPO Defendants had actual notice of the January 2023 incident, the tort claims notice and the internal affairs escalation as early as March 2023, when Ross, DeRosa, and Glennon began obstructing Plaintiff's attempts to file an internal affairs complaint. (Compl. ¶¶ 50–56)

Plaintiff's exculpatory police report was suppressed by Clinton Township and the HCPO while being selectively provided to the false accuser. This suppression is central to Plaintiff's Brady and due process claims. (Compl. ¶¶ 73–75, Ex. K)

As of this filing, 757 days have elapsed since Plaintiff first attempted to file an internal affairs complaint; the HCPO has never issued any findings or disciplinary action, in direct violation of the 45-day IA resolution timeline. (PLT Decl. ¶ 20)

6. Defendants' Fact 6: Plaintiff did not file a notice of tort claim with the HCPO Defendants.

**Response:** Disputed. Plaintiff was not required to file a Tort claim with HCPO because he had already filed one with Clinton. Plaintiff asserts that the notice filed with Clinton Township on April 10, 2023, applies to the HCPO Defendants as they were a continuation of the torts as they were they had a supervisory role.

HCPO had actual notice of the tort claim filed through the internal affairs complaints of the torts they continued and suffered no prejudice. See Beauchamp v. Amedio, 164 N.J. 111, 121-22 (2000).

In addition, there is no requirement to file a Tort Claim notice on violations of civil rights claim.

HPCO refusal to investigate plaintiff internal affairs complaint violated several of Plaintiffs constitutional rights. To establish retaliation under the First Amendment, Plaintiff engaged in protected activity by attempting to file a complaint; suffered adverse action when Marsh refused to accept it and fabricated a justification; and there is a clear causal link, as Marsh's hostility only arose after Plaintiff attempted to hold officers accountable. See Zaloga v. Borough of Moosic, 841 F.3d 170, 178-79 (3d Cir. 2016)

The HCPO's act of withholding all the exculpatory information from Plaintiff constitutes a violation of Brady v. Maryland, 373 U.S. 83 (1963). This suppression of evidence directly impacted Plaintiff's ability to file a meaningful complaint and is independently actionable. (Compl. ¶¶ 73-75, Ex. K)


**CERTIFICATION**

I certify that the foregoing statements made by me are true and accurate to the best of my knowledge and belief. I am aware that if any of the foregoing is willfully false, I am subject to punishment.


Dated: May 13, 2025

Eric Weiss, Plaintiff

**ERIC WEISS**
210 Walnut Street
Garwood NJ 07027
(ph) 908 913 0832
(email) eric_s_weiss@yahoo.com

| | |
|---|---|
| ERIC WEISS,<br>          Plaintiff,<br>          v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON / POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br>          Defendants | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><u>Civil Action</u><br>PLAINTIFFS COUNTER STATEMENT OF UNDISPUTED MATERIAL FACTS<br><br>PURSUANT TO R. 4:46-2(a) |

**PLAINTIFF'S COUNTER STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. On January 10, 2023, Plaintiff was detained by Clinton Township Police officers for an hour following a false 911 call made by his ex-wife, Posner, alleging domestic violence against Plaintiff's son, S.W. (Compl. ¶¶ 7-12)

2. Additionally, Plaintiff notes that he was detained, searched, and questioned by the officers even after they confirmed the allegations were false. (Transcript, Ex. A)

3. On April 10, 2023, Plaintiff filed a notice of tort claim with the Clinton Township Police Department, detailing the tortious conduct of the officers involved in the January 10, 2023 incident. (Compl. ¶ 40)

4. HCPO had constructive notice when it assumed responsibility for the investigation. Also naming HCPO in the original claim would have been premature, as they had not yet acted. (Compl. ¶¶ 57-58)

5. When Plaintiff's internal affairs complaints against the Clinton Township officers were not addressed, he escalated the matter to the

Hunterdon County Prosecutor's Office (HCPO) in early 2024. (Compl. ¶ 57)

6. Clinton Township officials explicitly instructed Plaintiff to escalate his internal affairs complaint to the HCPO, further demonstrating functional continuity and institutional knowledge. (PLT Decl. ¶ 12, Email Ex. H)

7. The HCPO agreed to investigate the complaints and assigned Defendants Kelsey Marsh and Colin Frinzi to take Plaintiff's internal affairs statement. (Compl. ¶ 58)

8. During the meeting with Marsh and Frinzi, Marsh refused to obtain relevant evidence, including police reports and body-worn camera footage, which Plaintiff requested to ensure an accurate account due to the passage of time. Marsh then became abusive and falsely accused Plaintiff of domestic violence in order to terminate the meeting. (Compl. ¶¶ 61-66)

9. Defendants assert that Plaintiff's internal affairs interview was terminated because Plaintiff became confrontational. Plaintiff disputes this characterization and asserts that he remained calm and cooperative while seeking to ensure that the complaint would be accurate and complete. Marsh's accusation was false and made to avoid taking the complaint as required. Frinzi, present during the interaction, did not intervene to correct or challenge Marsh's misrepresentation. (Compl. ¶¶ 63-66)

10. Marsh falsely claimed Plaintiff was confrontational to justify terminating the meeting, despite Plaintiff's calm and factual effort to ensure an accurate complaint. No outburst or threat occurred, and

Defendant Frinzi failed to intervene or contradict Marsh's mischaracterization. (Compl. ¶¶ 63–66)

11. Plaintiff promptly informed HCPO official Renée Robeson of Marsh's improper conduct but received no meaningful response. Plaintiff was forced to escalate the matter to the Office of Public Integrity and Accountability (OPIA). (Compl. ¶¶ 67–69)

12. OPIA authorized the HCPO to handle Plaintiff's complaints. In July 2024, HCPO Captain Frank Crisologo conducted an interview with Plaintiff. Plaintiff submitted additional supporting materials in August 2024, but no investigation or findings had been issued as of January 3, 2025. (Compl. ¶¶ 72–76)

13. As of this filing, 757 days have elapsed since Plaintiff first attempted to file an internal affairs complaint; the HCPO has never issued any findings or disciplinary action, in direct violation of the 45-day IA resolution timeline. (PLT Decl. ¶ 20)

14. Plaintiff's exculpatory police report was suppressed by Clinton Township and the HCPO while being selectively provided to the false accuser. This suppression is central to Plaintiff's Brady and due process claims. (Compl. ¶¶ 73–75, Ex. K)

15. The HCPO was fully aware of the April 10, 2023 tort claim filed with Clinton Township and the underlying incident when it assumed responsibility for handling Plaintiff's internal affairs complaints, thereby constituting actual notice of the claims. (Compl. ¶¶ 57–58)

16. Plaintiff followed up with Robeson at least twice to request the identity of the OPIA official to whom the case had been referred. Robeson never disclosed that information. (Compl. ¶¶ 68, 71)

3

17. The OPIA ultimately declined to accept the case and instead directed the HCPO to investigate the matter internally, including complaints against individuals within its own office. (Compl. ¶ 72)

18. The HCPO's refusal to process Plaintiff's internal affairs complaints—despite having knowledge of the misconduct and being formally assigned to the matter—constitutes a violation of Plaintiff's First Amendment right to petition the government for redress of grievances. (See Borough of Duryea v. Guarnieri, 564 U.S. 379, 388 (2011); Zaloga v. Borough of Moosic, 841 F.3d 170, 178-79 (3d Cir. 2016))

19. The HCPO's conduct also deprived Plaintiff of due process under the Fourteenth Amendment by failing to provide a fair and impartial mechanism to address the underlying misconduct and continued obstruction. (See Mathews v. Eldridge, 424 U.S. 319, 333 (1976); Zinermon v. Burch, 494 U.S. 113, 125 (1990))

20. After Plaintiff formally filed an internal affairs complaint, no investigation was conducted, no findings was made and no corrective action was taken, demonstrating deliberate indifference and supporting municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978), and City of Canton v. Harris, 489 U.S. 378 (1989). (Compl. ¶¶ 72-76)

21. Additionally, liability is further supported under City of Canton v. Harris, 489 U.S. 378 (1989), where failure to train or supervise officials tasked with internal affairs responsibilities predictably resulted in the denial of constitutional protections. The HCPO's pattern of disregarding internal affairs protocols supports a claim of institutional deliberate indifference. (Canton, 489 U.S. at 390)

I certify that the foregoing statements made by me are true and accurate to the best of my knowledge and belief. I am aware that if any of the foregoing is willfully false, I am subject to punishment.

Dated:  May 13, 2025

Eric Weiss, Plaintiff

**ERIC WEISS**
210 Walnut Street
Garwood NJ 07027
(ph) 908 913 0832
(email) eric_s_weiss@yahoo.com

| | |
|---|---|
| ERIC WEISS,<br>        Plaintiff,<br>    v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON / POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br>        Defendants | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><u>Civil Action</u><br>PLAINTIFFS CERTIFICATION OF SERVICE |

**PLAINTIFF'S CERTIFICATION OF SERVICE**

I, Eric Weiss, Plaintiff, hereby certify that on this 13th day of May, 2025, I caused to be served true and correct copies of the Plaintiff's Counter Statement of Undisputed Material Facts, Plaintiff's Response to Defendants' Statement of Undisputed Material Facts, and Plaintiff's Reply Brief in Opposition to Defendants' Motion for Summary Judgment and/or Dismissal via eCourts/JEDS to the following counsel of record:

> Matthew J. Platkin Attorney General of New Jersey
> Catriona Coffey Deputy Attorney General (Attorney ID # 381682021)
> Richard J. Hughes Justice Complex
> 25 Market Street P.O. Box 112
> Trenton, NJ 08625
> (609) 376-2440
> catriona.coffey@law.njoag.gov
> Attorney for Defendants, Hunterdon County Prosecutor's Office and Kelsey Marsh

I further certify that the foregoing statements made by me are true and accurate to the best of my knowledge and belief. I am aware that if any of the foregoing is willfully false, I am subject to punishment.

Dated: May 13, 2025

Plaintiff, Pro Se

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following was filed by ERIC S WEISS on 05/13/2025:

| | |
|---|---|
| Plaintiff Name : | ERIC S WEISS |
| Defendant Name: : | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC  VS TIGER JOHN |
| Case Number: | HNT L 000010-25 |
| Docket Text: | Opposition To Motion uploaded by Case Management Staff submitted by ERIC S WEISS |
| Transaction ID: | LCV20251378274 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| | | |
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| | | |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com |
| | | eric_S_weiss@yahoo.com |
| | | ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | JOHN/JANE DOES 1-10 | 00000 |
| Defendant | JOHN TIGER | 00000 |
| Defendant | PETER SCHLEISIER | 00000 |
| Defendant | MICHAEL BALSAMO | 00000 |
| Defendant | THOMAS A DEROSA | 00000 |
| Defendant | SEAN ROSS | 00000 |
| Defendant | JEFFERY GLENNON | 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | 00000 |

Login to eCourts to view the Case Jacket. You will need a valid user ID (Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT K

**Certification: Agreement to Service**

I certify that I am the party I have selected and agree that I will be notified via email. I understand that this will be considered service and I will no longer receive a paper copy of the documents from my adversary or the court. I also agree that the email address(es) indicated below will become part of the public case record.

Case notifications will be sent to the email address(es) below:

ericsweiss@gmail.com
eric_S_weiss@yahoo.com
eric_S_weiss@yahoo.com

/s/Eric weiss

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following notice is sent from eCourts

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC  VS TIGER JOHN |
| Case Number: | HNT L 000010-25 |
| Docket Text: | NOTICE: Self represented litigant WEISS, ERIC, S has certified and agreed to receive electronic service |
| Transaction ID: | LCV20251311761 |

**Notice has been electronically mailed to:**

| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV<br>LPGCALENDARING@LAW.NJOAG.GOV |
|---|---|---|
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV<br>LPGCALENDARING@LAW.NJOAG.GOV |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com<br>eric_S_weiss@yahoo.com<br>ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

| Defendant | JOHN/JANE DOES 1-10 | NJ 00000 |
|---|---|---|
| Defendant | JOHN TIGER | NJ 00000 |
| Defendant | PETER SCHLEISIER | NJ 00000 |
| Defendant | MICHAEL BALSAMO | NJ 00000 |
| Defendant | THOMAS A DEROSA | NJ 00000 |
| Defendant | SEAN ROSS | NJ 00000 |
| Defendant | JEFFERY GLENNON | NJ 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | NJ 00000 |

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT L

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC  VS TIGER JOHN |
| Case Number: | HNT L 000010-25 |
| Docket Text: | The motion filed on 04/14/2025 was rescheduled to 05/23/2025. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT LCV20251092587 |
| Transaction ID: | LCV20251411194 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| | | |
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| | | |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com |
| | | eric_S_weiss@yahoo.com |
| | | ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | JOHN/JANE DOES 1-10 | NJ 00000 |
| Defendant | JOHN TIGER | NJ 00000 |
| Defendant | PETER SCHLEISIER | NJ 00000 |
| Defendant | MICHAEL BALSAMO | NJ 00000 |
| Defendant | THOMAS A DEROSA | NJ 00000 |
| Defendant | SEAN ROSS | NJ 00000 |
| Defendant | JEFFERY GLENNON | NJ 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | NJ 00000 |

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT M

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following clerk notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC  VS TIGER JOHN  *RAB CONFLICT |
| Case Number: | HNT L 000010-25 |
| Docket Text: | **CLERK NOTICE**: re: MOTION DISMISSING COMPLAINT LCV20251092587 -This motion has been reassigned to the Hon. John E. Bruder, J.S.C. Per R. 4:6-2(e), matters outside the pleading have been presented. Thus, the motion is adjourned 1 cycle and will be treated as one for summary judgment. |
| Transaction ID: | LCV20251430121 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com |
| | | eric_S_weiss@yahoo.com |
| | | ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | JOHN/JANE DOES 1-10 | NJ 00000 |
| Defendant | JOHN TIGER | NJ 00000 |
| Defendant | PETER SCHLEISIER | NJ 00000 |
| Defendant | MICHAEL BALSAMO | NJ 00000 |
| Defendant | THOMAS A DEROSA | NJ 00000 |
| Defendant | SEAN ROSS | NJ 00000 |
| Defendant | JEFFERY GLENNON | NJ 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | NJ 00000 |

Login to eCourts to view the Case Jacket. You will need a valid user ID (Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT N

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC  VS TIGER JOHN  *RAB CONFLICT |
| Case Number: | HNT L 000010-25 |
| Docket Text: | The motion filed on 04/14/2025 was rescheduled to 06/06/2025. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT LCV20251092587 |
| Transaction ID: | LCV20251430135 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV<br>LPGCALENDARING@LAW.NJOAG.GOV |
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV<br>LPGCALENDARING@LAW.NJOAG.GOV |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com<br>eric_S_weiss@yahoo.com<br>ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | JOHN/JANE DOES 1-10 | NJ 00000 |
| Defendant | JOHN TIGER | NJ 00000 |
| Defendant | PETER SCHLEISIER | NJ 00000 |
| Defendant | MICHAEL BALSAMO | NJ 00000 |
| Defendant | THOMAS A DEROSA | NJ 00000 |
| Defendant | SEAN ROSS | NJ 00000 |
| Defendant | JEFFERY GLENNON | NJ 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | NJ 00000 |

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT O



*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
25 MARKET STREET
PO BOX 112
TRENTON, NJ 08625-0112

PHILIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

MATTHEW J. PLATKIN
*Attorney General*

MICHAEL C. WALTERS
*Acting Director*

May 19, 2025

<u>Via eCourts</u>
The Honorable John Bruder, J.S.C.
20 North Bridge Street, Floor 4
Somerville, New Jersey 08876

Re:     ***Weiss v. Tiger, et al.,*** Docket No. HNT-L-0010-25
        HCPO Defendants' Motion for Summary Judgement and/or Dismissal
        <u>Return Date: June 6, 2025</u>

Dear Judge Bruder:

My office represents Defendants, Hunterdon County Prosecutor's Office (improperly pled as Hunterdon County) and Kelsey Marsh (hereinafter, the "HCPO Defendants") in the above-captioned matter.

As the HCPO Defendants' motion to dismiss pursuant to <u>R.</u> 4:6-2(e) and for summary judgment pursuant to <u>R.</u> 4:46-1 now has a return date of June 6, 2025, please allow this letter to confirm that, in accordance with <u>R.</u> 4:46-1, the HCPO Defendants will file their reply brief on or before June 2, 2025, and such filing will complete the briefing on this motion.

Thank you for your consideration of this matter.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:     <u>*/s/ Catriona Coffey*</u>
        Catriona Coffey
        Deputy Attorney General

cc: Eric Weiss, *Pro Se Plaintiff* (via eCourts)



HUGHES JUSTICE COMPLEX · TELEPHONE: (609) 376-2440 · FAX: (609) 777-3607
*New Jersey is an Equal Opportunity Employer · Printed on Recycled Paper and Recyclable*

**SUPERIOR COURT OF NEW JERSEY - eCOURTS**

The following was filed by COFFEY, CATRIONA on 05/19/2025 at 3:58 PM:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN  TIGER, PETER  SCHLEISIER, MICHAEL  BALSAMO, THOMAS A DEROSA ET AL. |
| Case Caption: | WEISS ERIC  VS TIGER JOHN  *RAB CONFLICT |
| Case Number: | HNT-L-000010-25 |
| Docket Text: | GENERAL CORRESPONDENCE submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY  MARSH against ERIC S WEISS |
| Transaction ID: | LCV20251435376 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Plaintiff | ERIC S WEISS | ericsweiss@gmail.com |
| | | eric_S_weiss@yahoo.com |
| | | eric_S_weiss@yahoo.com |
| Defendant Attorney | CATRIONA COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| Defendant Attorney | CATRIONA COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |

**Notice was not electronically mailed to:**

| | |
|---|---|
| Defendant | JOHN/JANE DOES 1-10 |
| Defendant | JOHN  TIGER |
| Defendant | PETER  SCHLEISIER |
| Defendant | MICHAEL  BALSAMO |
| Defendant | THOMAS A DEROSA |
| Defendant | SEAN  ROSS |
| Defendant | JEFFERY  GLENNON |
| Defendant | TOWNSHIP OF CLINTON POLICE DEP |

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey - Civil Part.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT P

**Via eCourts and Email**                                              **May 28, 2025**
Hon. John E. Bruder, J.S.C.
Superior Court of New Jersey, Somerset County
20 North Bridge Street, 4th Floor
Somerville, NJ 08876
                **Re: Weiss v. Tiger, et al.**; Docket No. HNT-L-0010-25

Dear Judge Bruder:

I respectfully request clarification of the reassignment of this matter and an adjournment of the June 6, 2025, hearing due to scheduling conflicts, procedural irregularities, and my rights under the Americans with Disabilities Act (ADA). These issues raise serious concerns about due process and judicial fairness, and I seek the Court's immediate attention to ensure a just resolution.

**Clarification of Reassignment -** The Clerk's Notice dated May 19, 2025 (Exhibit A, Trans ID: LCV20251430121), states that the motion to dismiss/summary judgment filed by the defendants was reassigned to Your Honor. However, the eCourts docket still lists Judge Mennen as the assigned judge (Exhibit B). This discrepancy creates confusion regarding jurisdiction (as it is a Hunterdon County Case), scheduling, judicial oversight, and deadlines, undermining confidence in the process. The lack of a formal reassignment order, combined with Judge Mennen's role in this case from the begging, heightens these concerns. I respectfully request:

1. Confirmation that Your Honor is assigned to this motion or to this case;
2. The basis for the reassignment; and
3. Whether this is a temporary or permanent judicial substitution.

**Adjournment of June 6, 2025, Hearing -** On May 13, 2025, I formally refused Defendants' adjournment request and informed defense counsel that I was unavailable on June 6 due to a conflicting oral argument and the demands of preparing for an upcoming trial (Exhibit C). The following day, on May 14, in SOM-L-000013-25, Your Honor granted defense counsel's last-minute adjournment request, rescheduling that hearing to June 3 (Exhibit D), further compressing my ability to prepare for the already scheduled hearings and trial. As a litigant with cognitive disabilities requiring ADA accommodations, I cannot adequately prepare for a third hearing on June 6 without suffering significant prejudice.

Despite my prior objection, the court clerk—apparently acting sua sponte—granted the adjournment that Defendants had been denied, rescheduling the motion to June 6: a date and timeframe I had explicitly identified as a conflict. To justify this change, the clerk asserted that the motion was now being treated as one for summary judgment—despite the fact that Defendants had always moved for summary judgment, not dismissal. This procedural sleight, combined with the unexplained judicial reassignment, raises serious concerns about fairness, the integrity of the docket, and the appearance of forum shopping—particularly troubling where the movant is a governmental entity. As the New Jersey Supreme Court held in *DeNike v. Cupo*, 196 N.J. 502, 514 (2008), "Even the appearance of judicial impropriety is to be avoided." I respectfully request that the hearing be adjourned to a date that accommodates both my known scheduling conflict and my ADA-qualifying needs.

**Defendants' Intent to reply on June 2 will violate Plaintiffs right to proper due process -** Lastly, I object to Defendants' stated intent to file their reply brief on June 2, 2025 (Exhibit E). Defendants knew they were required to file their reply by May 18, 2025 (Exhibit E). The rule is mandatory, not discretionary. Courts have repeatedly emphasized the importance of strict compliance with procedural deadlines, especially in dispositive motions. In Pressler & Verniero, Current N.J. Court Rules, comment 3.4.2 on R. 1:6-3, it is made clear that

"[f]ailure to file in compliance with the time frames may result in the court disregarding the noncompliant reply brief."

In Zimmerman v. Sussex County Educational Services Comm'n, 201 N.J. Super. 554, 561 (App. Div. 1985), the Appellate Division held that procedural violations that result in prejudice may constitute reversible error, especially when deadlines are ignored in dispositive motions. The failure to timely serve the reply deprives the opposing party—especially a pro se litigant—of adequate time to review, analyze, and prepare argument in response to new points raised. This is especially consequential here given my ADA-qualifying disabilities.

Permitting a late reply, especially one containing new material or legal arguments, offend principles of due process and fair notice. Unless the Court is prepared to strike the reply or adjourn the motion to allow proper time for rebuttal, I respectfully request that the Court reject the June 2 filing as untimely.  Permitting a late reply would violate due process and fairness, especially for a litigant with my disabilities.

**Relief Requested** - In light of the above, I respectfully request:

1. Formal confirmation of Your Honor's assignment to this motion or case;
2. Disclosure of the basis and scope of the reassignment;
3. Adjournment of the June 6, 2025, hearing to a date consistent with my conflicts and ADA rights; and
4. Enforcement of R. 4:46-2(a) against Defendants for failing to submit a statement of undisputed material facts, including denial of their motion or exclusion of untimely filings.

These requests are critical to preserving my due process rights and ensuring a fair proceeding. Thank you for your consideration.

Respectfully submitted,

Eric S. Weiss, Pro Se Plaintiff
cc: Catriona Coffey, Deputy Attorney General (via eCourts and email)

# Exhibit A

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following clerk notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC  VS TIGER JOHN  *RAB CONFLICT |
| Case Number: | HNT L 000010-25 |
| Docket Text: | **CLERK NOTICE**: re: MOTION DISMISSING COMPLAINT LCV20251092587 -This motion has been reassigned to the Hon. John E. Bruder, J.S.C. Per R. 4:6-2(e), matters outside the pleading have been presented. Thus, the motion is adjourned 1 cycle and will be treated as one for summary judgment. |
| Transaction ID: | LCV20251430121 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| | | |
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| | | |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com |
| | | eric_S_weiss@yahoo.com |
| | | ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | JOHN/JANE DOES 1-10 | NJ 00000 |
| Defendant | JOHN TIGER | NJ 00000 |
| Defendant | PETER SCHLEISIER | NJ 00000 |
| Defendant | MICHAEL BALSAMO | NJ 00000 |
| Defendant | THOMAS A DEROSA | NJ 00000 |
| Defendant | SEAN ROSS | NJ 00000 |
| Defendant | JEFFERY GLENNON | NJ 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | NJ 00000 |

Login to eCourts to view the Case Jacket. You will need a valid user ID (Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
*Attorney for Defendants, Hunterdon County Prosecutor's Office*
*(improperly pled as Hunterdon County) and Kelsey Marsh*

By:   Catriona Coffey (Attorney ID # 381682021)
      Deputy Attorney General
      (609) 376-2440
      catriona.coffey@law.njoag.gov

| | |
|---|---|
| ERIC WEISS,<br><br>                    Plaintiff,<br><br>      v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br><br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><br><u>Civil Action</u><br><br>**STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO <u>R.</u> 4:46-2(a)** |

Pursuant to <u>R.</u> 4:46-2(a), Defendants Hunterdon County Prosecutor's Office and Kelsey Marsh provide the following Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

## I.     <u>PLAINTIFF'S ALLEGATIONS & CAUSES OF ACTION.</u>

1

1.      On January 3, 2025, Plaintiff, Eric Weiss, filed a lawsuit against John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffrey Glennon, and the Township of Clinton/Police Department (hereinafter, the "Clinton Township Defendants"), as well as the Hunterdon County Prosecutor's Office (improperly pled as "Hunterdon County") and Kelsey Marsh (hereinafter, the "HCPO Defendants").  See, generally, Coffey Cert. Ex. A: Complaint.

2.      In Plaintiff's Complaint, he alleges that Defendants committed various common law torts against him during their response to (i) a 911 call reporting an in-progress domestic violence incident between Plaintiff and his estranged son, S.W.; and (ii) various internal affairs ("IA") complaints submitted to them by Plaintiff.  Id.

3.      In particular, Plaintiff raises fourteen tort-based claims: malicious prosecution, malicious use of process and malicious abuse of process; deprivation of rights; intentional infliction of emotional distress; negligent infliction of emotional distress; false imprisonment; civil conspiracy; negligence or gross negligence; invasion of privacy; common law fraud; conspiracy to commit fraud; tortious interference with contractual relationship; aiding the commission of a tort; breach of duty; and deprivation and interference with protected parental rights.  See, id. at Counts 1–14.

4.      Plaintiff "filed a notice of tort claim with Clinton Township/Police Department" on April 10, 2023.  See, Coffey Cert., Ex. A: Complaint ¶ 40; see also,

id. at ¶ 49.

    5.    Plaintiff's Complaint contains no allegations regarding—nor does it appear Plaintiff had any interactions with—the HCPO Defendants prior to January 2024.  See, generally, id. ¶¶ 54–58.

## II.  PLAINTIFF NEVER FILED ANY NOTICE OF CLAIM WITH THE HUNTERDON COUNTY PROSECUTOR'S OFFICE.

    6.    Despite asserting various state law tort-based claims against the HCPO Defendants, Plaintiff did not file a notice of tort claim regarding the HCPO Defendants prior to filing his present Complaint, as required by the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 14-4 ("NJTCA").   See, Coffey Cert., Ex. B: Certification of Katrina C. Doyle, ¶ 6 ("A diligent search of these records maintained by my office revealed that no notices of tort claim related to this case were filed by Plaintiff."); see also, Coffey Cert., Ex. C: Certification of Terrance Little, ¶ 5 ("A check of the Division of Risk Management files was conducted and revealed that a Tort Liability Notice was not filed by Eric Weiss regarding any claims raised within his Complaint.").

                               Respectfully submitted,

                               MATTHEW J. PLATKIN
                               ATTORNEY GENERAL OF NEW JERSEY

               By:    *s/ Catriona Coffey*
                          Catriona Coffey
                          Deputy Attorney General

Dated: April 14, 2025

# Exhibit B

**Judiciary eCourts System - Civil Part**

Home    Help    Logout

---

**CASE JACKET**

User:Eric weiss

## Docket Number:  HNT L 000010 - 25

Back                                                                                    Create Summary Report

**Case Caption:** Weiss Eric Vs Tiger John *Rab Conflict

| | | |
|---|---|---|
| **Court:** Civil Part | **Venue:** Hunterdon | **Case Initiation Date:** 01/03/2025 |
| **Case Type:** Civil Rights | **Case Status:** Active | **Jury Demand:** 6 Jurors |
| **Case Track:** 3 | **Judge:** William G Mennen | **Team:** 1 |
| **# of Discovery Days:** 450 | **Age of Case:** 00 YR 04 MO | **Consolidated Case:** N |
| **Original Discovery End Date:** 07/03/2026 | **Current Discovery End Date:** 07/03/2026 | **# of DED Extensions:** 0 |
| **Original Arbitration Date:** | **Current Arbitration Date:** | **# of Arb Adjournments:** 0 |
| **Original Trial Date:** | **Current Trial Date:** | **# of Trial Date Adjournments:** 0 |
| **Disposition Date:** | **Case Disposition:** Open | **Statewide Lien:** |

---

| Plaintiffs (1) | Defendants (10) | Case Proceedings (3) | ACMS Documents (23) | Fees (14) |

Eric S Weiss      (Party No. 1)

---

### Case Actions

| Filed Date | Filings | Docket Text | Transaction ID | Entry Date |
|---|---|---|---|---|
| 05/19/2025 | ✉ | **CLERK NOTICE:** re: MOTION DISMISSING COMPLAINT [LCV20251092587] -This motion has been reassigned to the Hon. John E. Bruder, J.S.C. Per R. 4:6-2(e), matters outside the pleading have been presented. Thus, the motion is adjourned 1 cycle and will be treated as one for summary judgment. | LCV20251430121 | 05/19/2025 |
| 05/19/2025 | ✉ | The motion filed on 04/14/2025 was rescheduled to 06/06/2025. Do not come to the courthouse no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT [LCV20251092587] | LCV20251430135 | 05/19/2025 |
| 05/19/2025 | 📎 ✉ | GENERAL CORRESPONDENCE submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY MARSH against ERIC S WEISS | LCV20251435376 | 05/19/2025 |
| 05/15/2025 | ✉ | The motion filed on 04/14/2025 was rescheduled to 05/23/2025. Do not come to the courthouse no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT [LCV20251092587] | LCV20251411194 | 05/15/2025 |
| 05/13/2025 | 📎 ✉ | Reply brief submitted by Eric Weiss. JEDS EF-3362162 | LCV20251376446 | 05/13/2025 |
| 05/13/2025 | 📎 ✉ | Opposition To Motion uploaded by Case Management Staff submitted by ERIC S WEISS *LINKED FILING* | LCV20251378274 | 05/13/2025 |
| 05/05/2025 | 📎 ✉ | NOTICE: Self represented litigant WEISS, ERIC, S has certified and agreed to receive electronic service | LCV20251311761 | 05/13/2025 |
| 04/15/2025 | ✉ | The motion filed on 04/14/2025 will be decided on 05/23/2025. Do not come to the courthouse no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT [LCV20251092587] | LCV20251097097 | 04/15/2025 |
| 04/14/2025 | 📎 ✉ | NOTICE OF APPEARANCE (NOT THE FIRST PAPER) submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY MARSH against ERIC S WEISS | LCV20251092510 | 04/14/2025 |
| 04/14/2025 | 📎 ✉ | MOTION DISMISSING COMPLAINT submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY MARSH against ERIC S WEISS *LINKED FILING* | LCV20251092587 | 04/14/2025 |
| 01/14/2025 | 📎 ✉ | NOTICE: Self represented litigant WEISS, ERIC, S has certified and agreed to receive electronic service | LCV2025102026 | 01/22/2025 |
| 01/13/2025 | 📎 ✉ | Proof Of Service uploaded by Case Management Staff submitted by ERIC S WEISS | LCV202591642 | 01/13/2025 |
| 01/09/2025 | 📎 | TRACK ASSIGNMENT Notice submitted by Case Management | LCV202557034 | 01/09/2025 |
| 01/03/2025 | 📎 ✉ | Complaint with Jury Demand for HNT-L-000010-25 submitted by ERIC WEISS, on behalf of ERIC S WEISS against JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS ET AL. | LCV202548092 | 01/08/2025 |

Showing 1 to 14 of 14 entries

# Exhibit C

Re: Weiss v. Tiger, at al., HNT-L-000010-25

From:  Eric Weiss (eric_s_weiss@yahoo.com)

To:    catriona.coffey@law.njoag.gov

Date:  Tuesday, May 13, 2025 at 01:19 PM EDT

Dear Ms. Coffey,

Unfortunately, I am unavailable during that timeframe. I am scheduled to be in court on another matter that day and have a trial beginning the following week, for which an adjournment has already been granted and no further adjournments will be allowed.

Accordingly, I will be fully engaged in motion and trial preparation during those weeks and cannot accommodate your request.

I already consented to a 60-day adjournment in this matter. You have had the file for five months, and my opposition was both timely and expected.

I have honored my obligations and extended professional courtesy. I cannot continue to do so at the expense of my other cases and deadlines.

Please be guided accordingly,

--

Eric S. Weiss

(C) 908 913 0832


LEGAL NOTICE

Unless expressly stated otherwise, this message is confidential and may be privileged. It is intended for the addressee(s) only. Access to this E-mail by anyone else is unauthorized. If you are not an addressee, any disclosure or copying of the contents of this E-mail or any action taken (or not taken) in reliance on it is unauthorized and may be unlawful. If you are not an addressee, please inform the sender immediately.

 Please only print if necessary


On Tuesday, May 13, 2025 at 12:56:01 PM EDT, Catriona Coffey <catriona.coffey@law.njoag.gov> wrote:


Good afternoon, Mr. Weiss:

I am in receipt of your opposition to the motion to dismiss that I filed in <u>Weiss v. Tiger, et al.</u>, HNT-L-000010-25.  As I have numerous filing deadlines next week, I am reaching out to ask if you would kindly consent to a one cycle adjournment of the motion so that I can respond to your filing.  A one cycle adjournment would bring the new motion return date to June 6, 2025.  Please let me know whether you consent to this request.

Thank you,



**Catriona Coffey**, Deputy Attorney General

Law Enforcement & Corrections Section

New Jersey Office of the Attorney General, Division of Law

25 Market Street, P.O. Box 112, Trenton, NJ 08625

**Office** (609) 300-2852 • **Cell** (609) 960-2257

**Email** catriona.coffey@law.njoag.gov

CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

# Exhibit D

# LHRG&C

LAROCCA HORNIK ROSEN GREENBERG & CRUPI LLC

252 South Street
Freehold, NJ 07728
732-409-1144
732-409-0350 fax
mail@divorcelawnj.com
www.divorcelawnj.com

**Rotem Peretz, Esq.**
Partner
rperetz@divorcelawnj.com

Andrew G. Hegt (1977-2012)

May 14, 2025

**VIA E-COURTS**

The Honorable John Bruder, J.S.C.
Somerset County Superior Court – Law Division
20 North Bridge Street
Somerville, New Jersey 08876

> **Re:** **Eric Weiss v. Deborah Posner, Frank
> LaRocca, Ronald Carlin, and Sam Weiss**
> **Docket No.: SOM-L-000013-25**

Dear Judge Bruder:

This office represents the Defendants, attorneys Frank LaRocca and Ronald Carlin, with regard to the above-referenced matter. The Plaintiff, Eric Weiss, is self-represented.

As the court is aware, Oral Argument is presently scheduled to be heard in this matter, this afternoon, at 1:30 p.m., in person. A genuinely and highly emergent issue has arisen in another matter that requires my immediate attention in a complex case that involves the safety and welfare of minor children. I realize that this request is made on short notice; however, this issue arose late last night and culminated in the involvement of DCPP until 2:00 a.m.

Therefore, I respectfully request an adjournment of this matter and would make myself available on any other day at any other time if the court is able to accommodate this request. I do not make this last-minute request lightly and would not do so if it were not truly necessary under the circumstances.

Any courtesies the court is able to extend would be greatly appreciated.

Respectfully submitted,

ROTEM PERETZ

RP:jz
cc: Eric Weiss (via email)

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | POSNER DEBORAH, SAM WEISS, FRANK LAROCCA, RON CARLIN |
| Case Caption: | WEISS ERIC  VS DEBORAH POSNER @ |
| Case Number: | SOM L 000013-25 |
| Docket Text: | Oral argument has been granted. Hearing is rescheduled on 06/03/2025 with Judge BRUDER, JOHN, E, Court Room 3. re: MOTION TO DISMISS COMPLAINT, FAILURE TO STATE CLAIM LCV2025361632 |
| Transaction ID: | LCV20251396127 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Defendant Attorney | JEFFREY W PLAZA | JPLAZA@EPGPRLAW.COM |
| Defendant Attorney | JEFFREY W PLAZA | JPLAZA@EPGPRLAW.COM |
| Defendant Attorney | ROTEM  PERETZ | RPERETZ@DIVORCELAWNJ.COM<br>NPEZZANO@DIVORCELAWNJ.COM |
| Defendant Attorney | ROTEM  PERETZ | RPERETZ@DIVORCELAWNJ.COM<br>NPEZZANO@DIVORCELAWNJ.COM |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com<br>eric_S_weiss@yahoo.com<br>ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

# Exhibit E



*State of New Jersey*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
25 MARKET STREET
PO BOX 112
TRENTON, NJ 08625-0112

PHILIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

MATTHEW J. PLATKIN
*Attorney General*

MICHAEL C. WALTERS
*Acting Director*

May 19, 2025

<u>Via eCourts</u>
The Honorable John Bruder, J.S.C.
20 North Bridge Street, Floor 4
Somerville, New Jersey 08876

Re:   ***Weiss v. Tiger, et al.***, Docket No. HNT-L-0010-25
       HCPO Defendants' Motion for Summary Judgement and/or Dismissal
       <u>Return Date: June 6, 2025</u>

Dear Judge Bruder:

My office represents Defendants, Hunterdon County Prosecutor's Office (improperly pled as Hunterdon County) and Kelsey Marsh (hereinafter, the "HCPO Defendants") in the above-captioned matter.

As the HCPO Defendants' motion to dismiss pursuant to <u>R.</u> 4:6-2(e) and for summary judgment pursuant to <u>R.</u> 4:46-1 now has a return date of June 6, 2025, please allow this letter to confirm that, in accordance with <u>R.</u> 4:46-1, the HCPO Defendants will file their reply brief on or before June 2, 2025, and such filing will complete the briefing on this motion.

Thank you for your consideration of this matter.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   <u>*/s/ Catriona Coffey*</u>
       Catriona Coffey
       Deputy Attorney General

cc: Eric Weiss, *Pro Se Plaintiff* (via eCourts)



**Superior Court of New Jersey – Hunterdon County**

The following was filed by Eric Weiss on 05/28/2025 at 09:54:52 PM:

| | |
|---|---|
| Case Caption: | Weiss Eric Vs Tiger John *Rab Conflict |
| Case Number: | HNT-L-000010-25 |
| Docket Text: | Adjournment request has been filed by Eric Weiss. JEDS EF-3395738 |
| Transaction ID: | LCV20251610697 |
| JEDS EF ID: | EF-3395738 |

**Notice has been electronically sent to:**

| | | |
|---|---|---|
| Attorney for Defendant Hunterdon County | Catriona Coffey | catriona.coffey@law.njoag.gov<br>lpgcalendaring@law.njoag.gov |
| Attorney for Defendant Kelsey Marsh | Catriona Coffey | catriona.coffey@law.njoag.gov<br>lpgcalendaring@law.njoag.gov |
| Prose User | Eric weiss | eric_s_weiss@yahoo.com<br>eric_s_weiss@yahoo.com<br>ericsweiss@gmail.com |
| Plaintiff | Eric Weiss | ericsweiss@gmail.com |

**<span style="color:red">Notice has NOT been electronically sent to:</span>**

| | | |
|---|---|---|
| Defendant | John/jane Does 1-10 | Not available |
| Defendant | John Tiger | Not available |
| Defendant | Peter Schleisier | Not available |
| Defendant | Michael Balsamo | Not available |
| Defendant | Thomas Derosa | Not available |
| Defendant | Sean Ross | Not available |
| Defendant | Jeffery Glennon | Not available |
| Defendant | Police De Township Of Clinton | Not available |

Login to eCourts to view the case jacket. You will need a valid user ID to view the submitted documents.

For questions, please contact the Civil Division in Hunterdon County.

This email is for notification purposes only and was sent from a notification-only address that cannot accept incoming email.
**Please do not reply to this message.**

EXHIBIT Q

**Via eCourts and Email**                                                         **May 28, 2025**
Hon. John E. Bruder, J.S.C.
Superior Court of New Jersey, Somerset County
20 North Bridge Street, 4th Floor
Somerville, NJ 08876
          **Re: Weiss v. Tiger, et al.**; Docket No. HNT-L-0010-25

Dear Judge Bruder:

I respectfully request clarification of the reassignment of this matter and an adjournment of the June 6, 2025, hearing due to scheduling conflicts, procedural irregularities, and my rights under the Americans with Disabilities Act (ADA). These issues raise serious concerns about due process and judicial fairness, and I seek the Court's immediate attention to ensure a just resolution.

**Clarification of Reassignment -** The Clerk's Notice dated May 19, 2025 (Exhibit A, Trans ID: LCV20251430121), states that the motion to dismiss/summary judgment filed by the defendants was reassigned to Your Honor. However, the eCourts docket still lists Judge Mennen as the assigned judge (Exhibit B). This discrepancy creates confusion regarding jurisdiction (as it is a Hunterdon County Case), scheduling, judicial oversight, and deadlines, undermining confidence in the process. The lack of a formal reassignment order, combined with Judge Mennen's role in this case from the begging, heightens these concerns. I respectfully request:

1.  Confirmation that Your Honor is assigned to this motion or to this case;
2.  The basis for the reassignment; and
3.  Whether this is a temporary or permanent judicial substitution.

**Adjournment of June 6, 2025, Hearing -** On May 13, 2025, I formally refused Defendants' adjournment request and informed defense counsel that I was unavailable on June 6 due to a conflicting oral argument and the demands of preparing for an upcoming trial (Exhibit C). The following day, on May 14, in SOM-L-000013-25, Your Honor granted defense counsel's last-minute adjournment request, rescheduling that hearing to June 3 (Exhibit D), further compressing my ability to prepare for the already scheduled hearings and trial. As a litigant with cognitive disabilities requiring ADA accommodations, I cannot adequately prepare for a third hearing on June 6 without suffering significant prejudice.

Despite my prior objection, the court clerk—apparently acting sua sponte—granted the adjournment that Defendants had been denied, rescheduling the motion to June 6: a date and timeframe I had explicitly identified as a conflict. To justify this change, the clerk asserted that the motion was now being treated as one for summary judgment—despite the fact that Defendants had always moved for summary judgment, not dismissal. This procedural sleight, combined with the unexplained judicial reassignment, raises serious concerns about fairness, the integrity of the docket, and the appearance of forum shopping—particularly troubling where the movant is a governmental entity. As the New Jersey Supreme Court held in *DeNike v. Cupo*, 196 N.J. 502, 514 (2008), "Even the appearance of judicial impropriety is to be avoided." I respectfully request that the hearing be adjourned to a date that accommodates both my known scheduling conflict and my ADA-qualifying needs.

**Defendants' Intent to reply on June 2 will violate Plaintiffs right to proper due process -** Lastly, I object to Defendants' stated intent to file their reply brief on June 2, 2025 (Exhibit E). Defendants knew they were required to file their reply by May 18, 2025 (Exhibit C). The rule is mandatory, not discretionary. Courts have repeatedly emphasized the importance of strict compliance with procedural deadlines, especially in dispositive motions. In Pressler & Verniero, Current N.J. Court Rules, comment 3.4.2 on R. 1:6-3, it is made clear that

1

"[f]ailure to file in compliance with the time frames may result in the court disregarding the noncompliant reply brief."

In Zimmerman v. Sussex County Educational Services Comm'n, 201 N.J. Super. 554, 561 (App. Div. 1985), the Appellate Division held that procedural violations that result in prejudice may constitute reversible error, especially when deadlines are ignored in dispositive motions. The failure to timely serve the reply deprives the opposing party—especially a pro se litigant—of adequate time to review, analyze, and prepare argument in response to new points raised. This is especially consequential here given my ADA-qualifying disabilities.

Permitting a late reply, especially one containing new material or legal arguments, offend principles of due process and fair notice. Unless the Court is prepared to strike the reply or adjourn the motion to allow proper time for rebuttal, I respectfully request that the Court reject the June 2 filing as untimely.  Permitting a late reply would violate due process and fairness, especially for a litigant with my disabilities.

**Relief Requested** - In light of the above, I respectfully request:

1. Formal confirmation of Your Honor's assignment to this motion or case;
2. Disclosure of the basis and scope of the reassignment;
3. Adjournment of the June 6, 2025, hearing to a date consistent with my conflicts and ADA rights; and
4. Enforcement of R. 4:46-2(a) against Defendants for failing to submit a statement of undisputed material facts, including denial of their motion or exclusion of untimely filings.

These requests are critical to preserving my due process rights and ensuring a fair proceeding. Thank you for your consideration.

Respectfully submitted,

Eric S. Weiss, Pro Se Plaintiff
cc: Catriona Coffey, Deputy Attorney General (via eCourts and email)

# Exhibit A

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following clerk notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC  VS TIGER JOHN  *RAB CONFLICT |
| Case Number: | HNT L 000010-25 |
| Docket Text: | **CLERK NOTICE**: re: MOTION DISMISSING COMPLAINT LCV20251092587 -This motion has been reassigned to the Hon. John E. Bruder, J.S.C. Per R. 4:6-2(e), matters outside the pleading have been presented. Thus, the motion is adjourned 1 cycle and will be treated as one for summary judgment. |
| Transaction ID: | LCV20251430121 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| | | |
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| | | |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com |
| | | eric_S_weiss@yahoo.com |
| | | ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | JOHN/JANE DOES 1-10 | NJ 00000 |
| Defendant | JOHN TIGER | NJ 00000 |
| Defendant | PETER SCHLEISIER | NJ 00000 |
| Defendant | MICHAEL BALSAMO | NJ 00000 |
| Defendant | THOMAS A DEROSA | NJ 00000 |
| Defendant | SEAN ROSS | NJ 00000 |
| Defendant | JEFFERY GLENNON | NJ 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | NJ 00000 |

Login to eCourts to view the Case Jacket. You will need a valid user ID (Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
*Attorney for Defendants, Hunterdon County Prosecutor's Office*
*(improperly pled as Hunterdon County) and Kelsey Marsh*

By:   Catriona Coffey (Attorney ID # 381682021)
      Deputy Attorney General
      (609) 376-2440
      catriona.coffey@law.njoag.gov

|  |  |
|---|---|
| ERIC WEISS,<br><br>                         Plaintiff,<br><br>      v.<br><br>JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A. DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON/POLICE DEPARTMENT, HUNTERDON COUNTY, KELSEY MARSH, and JOHN/JANE DOES 1-10,<br><br>                         Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CIVIL PART<br><br>HUNTERDON COUNTY<br><br>DOCKET NO. HNT-L-0010-25<br><br><u>Civil Action</u><br><br>**STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO <u>R.</u> 4:46-2(a)** |

Pursuant to <u>R.</u> 4:46-2(a), Defendants Hunterdon County Prosecutor's Office and Kelsey Marsh provide the following Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

## I.      <u>PLAINTIFF'S ALLEGATIONS & CAUSES OF ACTION.</u>

1.      On January 3, 2025, Plaintiff, Eric Weiss, filed a lawsuit against John Tiger, Peter Schleisier, Michael Balsamo, Thomas A. DeRosa, Sean Ross, Jeffrey Glennon, and the Township of Clinton/Police Department (hereinafter, the "Clinton Township Defendants"), as well as the Hunterdon County Prosecutor's Office (improperly pled as "Hunterdon County") and Kelsey Marsh (hereinafter, the "HCPO Defendants").  See, generally, Coffey Cert. Ex. A: Complaint.

2.      In Plaintiff's Complaint, he alleges that Defendants committed various common law torts against him during their response to (i) a 911 call reporting an in-progress domestic violence incident between Plaintiff and his estranged son, S.W.; and (ii) various internal affairs ("IA") complaints submitted to them by Plaintiff.  Id.

3.      In particular, Plaintiff raises fourteen tort-based claims: malicious prosecution, malicious use of process and malicious abuse of process; deprivation of rights; intentional infliction of emotional distress; negligent infliction of emotional distress; false imprisonment; civil conspiracy; negligence or gross negligence; invasion of privacy; common law fraud; conspiracy to commit fraud; tortious interference with contractual relationship; aiding the commission of a tort; breach of duty; and deprivation and interference with protected parental rights.  See, id. at Counts 1–14.

4.      Plaintiff "filed a notice of tort claim with Clinton Township/Police Department" on April 10, 2023.  See, Coffey Cert., Ex. A: Complaint ¶ 40; see also,

id. at ¶ 49.

5.      Plaintiff's Complaint contains no allegations regarding—nor does it appear Plaintiff had any interactions with—the HCPO Defendants prior to January 2024.  See, generally, id. ¶¶ 54–58.

## II.   PLAINTIFF NEVER FILED ANY NOTICE OF CLAIM WITH THE HUNTERDON COUNTY PROSECUTOR'S OFFICE.

6.      Despite asserting various state law tort-based claims against the HCPO Defendants, Plaintiff did not file a notice of tort claim regarding the HCPO Defendants prior to filing his present Complaint, as required by the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 14-4 ("NJTCA").   See, Coffey Cert., Ex. B: Certification of Katrina C. Doyle, ¶ 6 ("A diligent search of these records maintained by my office revealed that no notices of tort claim related to this case were filed by Plaintiff."); see also, Coffey Cert., Ex. C: Certification of Terrance Little, ¶ 5 ("A check of the Division of Risk Management files was conducted and revealed that a Tort Liability Notice was not filed by Eric Weiss regarding any claims raised within his Complaint.").

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:    *s/ Catriona Coffey*
       Catriona Coffey
       Deputy Attorney General

</div>

Dated: April 14, 2025

# Exhibit B

**Judiciary eCourts System - Civil Part**

Home    Help    Logout

CASE JACKET

User:Eric weiss

## Docket Number:  HNT L 000010 - 25

Back                                                                                    Create Summary Report

**Case Caption:** Weiss Eric Vs Tiger John *Rab Conflict

| | | |
|---|---|---|
| **Court:** Civil Part | **Venue:** Hunterdon | **Case Initiation Date:** 01/03/2025 |
| **Case Type:** Civil Rights | **Case Status:** Active | **Jury Demand:** 6 Jurors |
| **Case Track:** 3 | **Judge:** William G Mennen | **Team:** 1 |
| **# of Discovery Days:** 450 | **Age of Case:** 00 YR 04 MO | **Consolidated Case:** N |
| **Original Discovery End Date:** 07/03/2026 | **Current Discovery End Date:** 07/03/2026 | **# of DED Extensions:** 0 |
| **Original Arbitration Date:** | **Current Arbitration Date:** | **# of Arb Adjournments:** 0 |
| **Original Trial Date:** | **Current Trial Date:** | **# of Trial Date Adjournments:** 0 |
| **Disposition Date:** | **Case Disposition:** Open | **Statewide Lien:** |

| Plaintiffs (1) | Defendants (10) | Case Proceedings (3) | ACMS Documents (23) | Fees (14) |

Eric S Weiss    (Party No. 1)

### Case Actions

| Filed Date | Filings | Docket Text | Transaction ID | Entry Date |
|---|---|---|---|---|
| 05/19/2025 | ✉ | **CLERK NOTICE:** re: MOTION DISMISSING COMPLAINT [LCV20251092587] -This motion has been reassigned to the Hon. John E. Bruder, J.S.C. Per R. 4:6-2(e), matters outside the pleading have been presented. Thus, the motion is adjourned 1 cycle and will be treated as one for summary judgment. | LCV20251430121 | 05/19/2025 |
| 05/19/2025 | ✉ | The motion filed on 04/14/2025 was rescheduled to 06/06/2025. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT [LCV20251092587] | LCV20251430135 | 05/19/2025 |
| 05/19/2025 | 📎 ✉ | GENERAL CORRESPONDENCE submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY MARSH against ERIC S WEISS | LCV20251435376 | 05/19/2025 |
| 05/15/2025 | ✉ | The motion filed on 04/14/2025 was rescheduled to 05/23/2025. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT [LCV20251092587] | LCV20251411194 | 05/15/2025 |
| 05/13/2025 | 📎 ✉ | Reply brief submitted by Eric Weiss. JEDS EF-3362162 | LCV20251376446 | 05/13/2025 |
| 05/13/2025 | 📎 ✉ | Opposition To Motion uploaded by Case Management Staff submitted by ERIC S WEISS *LINKED FILING* | LCV20251378274 | 05/13/2025 |
| 05/05/2025 | 📎 ✉ | NOTICE: Self represented litigant WEISS, ERIC, S has certified and agreed to receive electronic service | LCV20251311761 | 05/13/2025 |
| 04/15/2025 | ✉ | The motion filed on 04/14/2025 will be decided on 05/23/2025. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION DISMISSING COMPLAINT [LCV20251092587] | LCV20251097097 | 04/15/2025 |
| 04/14/2025 | 📎 ✉ | NOTICE OF APPEARANCE (NOT THE FIRST PAPER) submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY MARSH against ERIC S WEISS | LCV20251092510 | 04/14/2025 |
| 04/14/2025 | 📎 ✉ | MOTION DISMISSING COMPLAINT submitted by COFFEY, CATRIONA of ATTORNEY GENERAL LAW on behalf of HUNTERDON COUNTY, KELSEY MARSH against ERIC S WEISS *LINKED FILING* | LCV20251092587 | 04/14/2025 |
| 01/14/2025 | 📎 ✉ | NOTICE: Self represented litigant WEISS, ERIC, S has certified and agreed to receive electronic service | LCV2025102026 | 01/22/2025 |
| 01/13/2025 | 📎 ✉ | Proof Of Service uploaded by Case Management Staff submitted by ERIC S WEISS | LCV202591642 | 01/13/2025 |
| 01/09/2025 | 📎 ✉ | TRACK ASSIGNMENT Notice submitted by Case Management | LCV202557034 | 01/09/2025 |
| 01/03/2025 | 📎 ✉ | Complaint with Jury Demand for HNT-L-000010-25 submitted by ERIC WEISS, on behalf of ERIC S WEISS against JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS ET AL. | LCV202548092 | 01/08/2025 |

Showing 1 to 14 of 14 entries

# Exhibit C

Re: Weiss v. Tiger, at al., HNT-L-000010-25

From:   Eric Weiss (eric_s_weiss@yahoo.com)
To:     catriona.coffey@law.njoag.gov
Date:   Tuesday, May 13, 2025 at 01:19 PM EDT

Dear Ms. Coffey,

Unfortunately, I am unavailable during that timeframe. I am scheduled to be in court on another matter that day and have a trial beginning the following week, for which an adjournment has already been granted and no further adjournments will be allowed.

Accordingly, I will be fully engaged in motion and trial preparation during those weeks and cannot accommodate your request.

I already consented to a 60-day adjournment in this matter. You have had the file for five months, and my opposition was both timely and expected.

I have honored my obligations and extended professional courtesy. I cannot continue to do so at the expense of my other cases and deadlines.

Please be guided accordingly,
--
Eric S. Weiss
(C) 908 913 0832

LEGAL NOTICE
Unless expressly stated otherwise, this message is confidential and may be privileged. It is intended for the addressee(s) only. Access to this E-mail by anyone else is unauthorized. If you are not an addressee, any disclosure or copying of the contents of this E-mail or any action taken (or not taken) in reliance on it is unauthorized and may be unlawful. If you are not an addressee, please inform the sender immediately.
 Please only print if necessary

On Tuesday, May 13, 2025 at 12:56:01 PM EDT, Catriona Coffey <catriona.coffey@law.njoag.gov> wrote:

Good afternoon, Mr. Weiss:

I am in receipt of your opposition to the motion to dismiss that I filed in <u>Weiss v. Tiger, et al.</u>, HNT-L-000010-25.  As I have numerous filing deadlines next week, I am reaching out to ask if you would kindly consent to a one cycle adjournment of the motion so that I can respond to your filing.  A one cycle adjournment would bring the new motion return date to June 6, 2025.  Please let me know whether you consent to this request.


Thank you,




**Catriona Coffey**, Deputy Attorney General

Law Enforcement & Corrections Section

New Jersey Office of the Attorney General, Division of Law

25 Market Street, P.O. Box 112, Trenton, NJ 08625

**Office** (609) 300-2852 • **Cell** (609) 960-2257

**Email** catriona.coffey@law.njoag.gov


CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

# Exhibit D

# LHRG&C

**LAROCCA HORNIK ROSEN GREENBERG & CRUPI LLC**

252 South Street
Freehold, NJ 07728
732-409-1144
732-409-0350 fax
mail@divorcelawnj.com
www.divorcelawnj.com

**Rotem Peretz, Esq.**
Partner
rperetz@divorcelawnj.com

Andrew G. Hegt (1977-2012)

May 14, 2025

**<u>VIA E-COURTS</u>**
The Honorable John Bruder, J.S.C.
Somerset County Superior Court – Law Division
20 North Bridge Street
Somerville, New Jersey 08876

> **Re:** **<u>Eric Weiss v. Deborah Posner, Frank
> LaRocca, Ronald Carlin, and Sam Weiss</u>**
> **Docket No.: SOM-L-000013-25**

Dear Judge Bruder:

This office represents the Defendants, attorneys Frank LaRocca and Ronald Carlin, with regard to the above-referenced matter. The Plaintiff, Eric Weiss, is self-represented.

As the court is aware, Oral Argument is presently scheduled to be heard in this matter, this afternoon, at 1:30 p.m., in person. A genuinely and highly emergent issue has arisen in another matter that requires my immediate attention in a complex case that involves the safety and welfare of minor children. I realize that this request is made on short notice; however, this issue arose late last night and culminated in the involvement of DCPP until 2:00 a.m.

Therefore, I respectfully request an adjournment of this matter and would make myself available on any other day at any other time if the court is able to accommodate this request. I do not make this last-minute request lightly and would not do so if it were not truly necessary under the circumstances.

Any courtesies the court is able to extend would be greatly appreciated.

Respectfully submitted,

ROTEM PERETZ

RP:jz
cc: Eric Weiss (via email)

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | POSNER DEBORAH, SAM WEISS, FRANK LAROCCA, RON CARLIN |
| Case Caption: | WEISS ERIC  VS DEBORAH POSNER @ |
| Case Number: | SOM L 000013-25 |
| Docket Text: | Oral argument has been granted. Hearing is rescheduled on 06/03/2025 with Judge BRUDER, JOHN, E, Court Room 3. re: MOTION TO DISMISS COMPLAINT, FAILURE TO STATE CLAIM LCV2025361632 |
| Transaction ID: | LCV20251396127 |

**Notice has been electronically mailed to:**

| Defendant Attorney | JEFFREY W PLAZA | JPLAZA@EPGPRLAW.COM |
|---|---|---|
| Defendant Attorney | JEFFREY W PLAZA | JPLAZA@EPGPRLAW.COM |
| Defendant Attorney | ROTEM  PERETZ | RPERETZ@DIVORCELAWNJ.COM NPEZZANO@DIVORCELAWNJ.COM |
| Defendant Attorney | ROTEM  PERETZ | RPERETZ@DIVORCELAWNJ.COM NPEZZANO@DIVORCELAWNJ.COM |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com eric_S_weiss@yahoo.com ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

Login to eCourts to view the case jacket. You will need a valid user ID(Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

# Exhibit E



*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
25 MARKET STREET
PO BOX 112
TRENTON, NJ 08625-0112

PHILIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

MATTHEW J. PLATKIN
*Attorney General*

MICHAEL C. WALTERS
*Acting Director*

May 19, 2025

<u>Via eCourts</u>
The Honorable John Bruder, J.S.C.
20 North Bridge Street, Floor 4
Somerville, New Jersey 08876

Re:     *Weiss v. Tiger, et al.*, Docket No. HNT-L-0010-25
        HCPO Defendants' Motion for Summary Judgement and/or Dismissal
        <u>Return Date: June 6, 2025</u>

Dear Judge Bruder:

My office represents Defendants, Hunterdon County Prosecutor's Office (improperly pled as Hunterdon County) and Kelsey Marsh (hereinafter, the "HCPO Defendants") in the above-captioned matter.

As the HCPO Defendants' motion to dismiss pursuant to <u>R.</u> 4:6-2(e) and for summary judgment pursuant to <u>R.</u> 4:46-1 now has a return date of June 6, 2025, please allow this letter to confirm that, in accordance with <u>R.</u> 4:46-1, the HCPO Defendants will file their reply brief on or before June 2, 2025, and such filing will complete the briefing on this motion.

Thank you for your consideration of this matter.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:     <u>/s/ Catriona Coffey</u>
        Catriona Coffey
        Deputy Attorney General

cc: Eric Weiss, *Pro Se Plaintiff* (via eCourts)



**Superior Court of New Jersey – Hunterdon County**

The following was filed by Eric Weiss on 05/28/2025 at 09:56:06 PM:

| | |
|---|---|
| Case Caption: | Weiss Eric Vs Tiger John *Rab Conflict |
| Case Number: | HNT-L-000010-25 |
| Docket Text: | Letter/Correspondence has been filed by Eric Weiss. JEDS EF-3395742 |
| Transaction ID: | LCV20251610699 |
| JEDS EF ID: | EF-3395742 |

**Notice has been electronically sent to:**

| | | |
|---|---|---|
| Attorney for Defendant Hunterdon County | Catriona Coffey | catriona.coffey@law.njoag.gov<br>lpgcalendaring@law.njoag.gov |
| Attorney for Defendant Kelsey Marsh | Catriona Coffey | catriona.coffey@law.njoag.gov<br>lpgcalendaring@law.njoag.gov |
| Prose User | Eric weiss | eric_s_weiss@yahoo.com<br>eric_s_weiss@yahoo.com<br>ericsweiss@gmail.com |
| Plaintiff | Eric Weiss | ericsweiss@gmail.com |

**Notice has NOT been electronically sent to:**

| | | |
|---|---|---|
| Defendant | John/jane Does 1-10 | Not available |
| Defendant | John Tiger | Not available |
| Defendant | Peter Schleisier | Not available |
| Defendant | Michael Balsamo | Not available |
| Defendant | Thomas Derosa | Not available |
| Defendant | Sean Ross | Not available |
| Defendant | Jeffery Glennon | Not available |
| Defendant | Police De Township Of Clinton | Not available |

Login to eCourts to view the case jacket. You will need a valid user ID to view the submitted documents.

For questions, please contact the Civil Division in Hunterdon County.

This email is for notification purposes only and was sent from a notification-only address that cannot accept incoming email. **Please do not reply to this message.**

EXHIBIT R

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following clerk notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | ERIC S WEISS |
| Defendant Name: | JOHN/JANE DOES 1-10, JOHN TIGER, PETER SCHLEISIER, MICHAEL BALSAMO, THOMAS A DEROSA, SEAN ROSS, JEFFERY GLENNON, TOWNSHIP OF CLINTON POLICE DE P, HUNTERDON COUNTY, KELSEY MARSH |
| Case Caption: | WEISS ERIC  VS TIGER JOHN  *RAB CONFLICT |
| Case Number: | HNT L 000010-25 |
| Docket Text: | **CLERK NOTICE**: re: MOTION DISMISSING COMPLAINT LCV20251092587 -Plaintiff's adjournment request is denied. The matter will be scheduled for an in-person oral argument on 06/06/25. A separate notice will go out later this week containing more specific information for oral argument. |
| Transaction ID: | LCV20251640236 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| | | |
| Defendant Attorney | CATRIONA  COFFEY | CATRIONA.COFFEY@LAW.NJOAG.GOV |
| | | LPGCALENDARING@LAW.NJOAG.GOV |
| | | |
| Plaintiff | WEISS, ERIC, S | eric_S_weiss@yahoo.com |
| | | eric_S_weiss@yahoo.com |
| | | ericsweiss@gmail.com |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | JOHN/JANE DOES 1-10 | NJ 00000 |
| Defendant | JOHN TIGER | NJ 00000 |
| Defendant | PETER SCHLEISIER | NJ 00000 |
| Defendant | MICHAEL BALSAMO | NJ 00000 |
| Defendant | THOMAS A DEROSA | NJ 00000 |
| Defendant | SEAN ROSS | NJ 00000 |
| Defendant | JEFFERY GLENNON | NJ 00000 |
| Defendant | TOWNSHIP OF CLINTON POLICE DE P | NJ 00000 |

Login to eCourts to view the Case Jacket. You will need a valid user ID (Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

EXHIBIT S



### *State of New Jersey*

**PHILIP D. MURPHY**
*Governor*

**TAHESHA L. WAY**
*Lt. Governor*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
25 MARKET STREET
PO BOX 112
TRENTON, NJ 08625-0112

**MATTHEW J. PLATKIN**
*Attorney General*

**MICHAEL C. WALTERS**
*Acting Director*

June 2, 2025

Via eCourts
The Honorable John E. Bruder, J.S.C.
Somerset County Courthouse
20 North Bridge Street, Floor 4
Somerville, New Jersey 08876

Re:   *Weiss v. Tiger, et al.,* Docket No. HNT-L-0010-25
      Ready Hold Request for Oral Argument Scheduled on June 6, 2025

Dear Judge Bruder:

As the Court is aware, my office represents Defendants, Hunterdon County Prosecutor's Office (improperly pled as Hunterdon County) and Kelsey Marsh (hereinafter, the "HCPO Defendants") in the above-captioned matter. For the reasons outlined below, I am respectfully requesting a ready hold before 12:30pm for the oral argument scheduled to be heard on June 6, 2025.

As a Deputy Attorney General (DAG), part of my duties includes providing mandatory "Election Duty" service, during which I am tasked with representing County Boards of Elections for purposes of both primary and general elections. I am presently assigned to mandatory Election Duty during the early voting period of this year's primary election. My assignment begins on Friday, June 6, 2025, at 2:00pm. I am the only DAG reporting during that period for the three counties to which I am assigned.

Thus, I am respectfully requesting a ready hold anytime before 12:30pm that day for oral argument scheduled before Your Honor on the HCPO Defendants' pending motion.

Thank you for your consideration of this matter.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   */s/ Catriona Coffey*
      Catriona Coffey
      Deputy Attorney General

cc: Eric Weiss, *Pro Se Plaintiff* (via eCourts)

